UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

EXHIBIT 4

BEVERLY WOOTEN, as surviving spouse of Barry Wyatt Wooten, and BARRY WAYNE WOOTEN, as administrators of the Estate of Barry Wyatt Wooten, deceased,
    *Plaintiffs*,

v.

FORD MOTOR COMPANY,
    *Defendant*.

Civil Action 5:23-cv-00346-MTT

## DECLARATION OF NICHOLAS WOOTEN IN SUPPORT OF OPPOSITION TO FORD MOTOR COMPANY'S MOTION TO SEAL AND FOR APPROPRIATE SANCTIONS

I, Nicholas Wooten, declare under the penalties of perjury, as provided for by 18 U.S.C. § 1746, that the following statements are true:

1. I am over the age of 21, under no legal disability, and I have personal knowledge of the facts set forth in this Declaration. If called as a witness, I could and would testify to the following.

2. I am a 1993 graduate of Troy University in Dothan, Alabama and a 1997 graduate of The Thomas Goode Jones School of Law. I was admitted to the Bar of the State of Alabama in May of 1998. I completed an LLM program in International Finance and Taxation from the Thomas Jefferson School of Law in San Diego, California in December of 2013 including authoring my thesis *"The Trust as the Special Purpose Vehicle in Mortgage Backed Securitizations: Special considerations, issues and implications related to the funding of the Trust"* graduating *Summa Cum Laude* while self-employed as a solo practitioner.

3. I have been admitted to practice in the State of Alabama since May 1, 1998 (ASB-1870-O77N), the State of Colorado since October of 2021 (56448), and the State of Texas since April of 2022 (24128672). I am in the process of applying for admission to the Georgia Bar.

4. I have been admitted to practice in the following Federal Courts:

   - The United States Supreme Court, March 2020.
   - The Seventh Circuit Court of Appeals, March 2019
   - The Eleventh Circuit Court of Appeals, May 2010.

   - The USDC for the Northern District of Alabama. March 2010.
   - The USDC for the Middle District of Alabama. May 1998.
   - The USDC for the Southern District of Alabama. February 2009.
   - The USDC for the Northern District of Florida. August 2011.
   - The USDC for the Southern District of Indiana. October 2019.
   - The USDC for the Northern District of Illinois, December 2014.
   - The USDC for the Central District of Illinois, December 2014.
   - The USDC for the Southern District of Illinois. November 2020.
   - The USDC for the Northern District of California.
   - The USDC for the District of Connecticut.
   - The USDC for the Middle District of Florida.
   - The USDC for the Western District of Texas.

   - All United States Bankruptcy Courts for Alabama.
   - United States Bankruptcy Court for the Northern District of Florida.
   - United States Bankruptcy Court for the Southern District of New York.
   - United States Bankruptcy Court for the Northern District of Illinois.
   - United States Bankruptcy Court for the Southern District of Indiana.
   - United States Bankruptcy Court for the Western District of Texas.

5. I have been granted Pro Hac Vice admission in the following Bankruptcy Courts:

   - The District of Delaware (2014)
   - The Eastern District of New York (2011)
   - The Southern District of New York (2008)
   - The Northern District of Mississippi (2010)
   - The Middle District of Louisiana (2008)
   - The Eastern District of Arkansas (2014)

6. I have been granted Pro Hac Vice Admission in the following District Courts:

   - The Middle District of Georgia (2023)
   - The District of Kansas (2013)
   - The Western and Eastern Districts of Arkansas (2014)

7. I have also been admitted Pro Hac Vice in the following State Courts:

- Ohio (2008)
- New York (2009)
- Kentucky (2009)
- Florida (2010)
- Georgia (2014)
- Arkansas (2018)
- Illinois (2018)
- Louisiana (2025)

8. I am a member of the National Trial Lawyers, the Alabama Association for Justice, and the American Association for Justice.

9. My career has been focused on litigation representing individuals against sophisticated corporate litigants such as Ford Motor Company.

10. In the present case, Plaintiffs' third request for production served on Ford in March of 2024 specifically sought Ford's communications with NHTSA regarding any of its ADAS features including BlueCruise.

11. This request was made in Plaintiffs' discovery because Plaintiffs' counsel team was aware that NHTSA was investigating two different fatal crashes involving Mach-E vehicles.

12. Despite Plaintiffs' request on this topic, Ford failed to produce a single document between Ford and NHTSA until April 25, 2025.

13. At that time, Ford produced a handful of documents between Ford and NHTSA including the LCA FMEA (Dkt. 131-1) and Ford's response to NHTSA question 5 (Dkt. 180-5).

14. As exhaustively covered in prior filings with the Court, particularly Dkt. 131-1, the Ford April 25, 2025, document production contained highly relevant information.

15. Relevant to this motion, Ford's response to NHTSA question 5 (Dkt. 180-5) contradicted Ford's position taken throughout this case that ACC with LCA is a completely different feature than BlueCruise. Ford told NHTSA in response to question 5:

> Lane Centering Assist is a hands-on driving assistance feature. LCA can be described as a compilation of longitudinal control governed by ACC, which utilizes radar

and forward-facing camera, and lateral control governed by a steerable path, which utilizes a forward-facing camera. Driver attentiveness is monitored via steering wheel torque.

***All vehicles equipped with BlueCruise have LCA capability in addition to a mode that will let the driver enter a qualified hands-free state when additional conditions are met.*** BlueCruise can be described as a compilation of:

- o Longitudinal control governed by ACC, which utilizes radar and a forward-facing camera

- o Lateral control from LCA's steerable path, which utilizes a forward-facing camera

- o Vehicle location as determined by vehicle GPS

Driver attentiveness is monitored by a driver-facing camera and steering wheel torque.

***The hands-on mode of BlueCruise may be referred to as limited, hands-on or LCA mode in documentation.*** The hands-free mode may be referred to as extended, hands-free, Bluezone (BZ) or Connected Bluezone (CBZ) mode throughout documentation. **[Emphasis Supplied]**

16. The Parties were then engaged in motion practice around Ford's late document production through May and into June 2025.

17. This was followed by expert depositions. The effort to complete expert depositions consumed the vast majority of our Firm's time and resources in June and July.

18. On July 29, 2025, our Director of Complex Litigation Support, Kamden Ahlberg, notified me that NHTSA had sent a letter to Ford regarding NHTSA's engineering analysis (EA25001) and provided me with the Office of Defect Investigation's Resume for EA25001.

19. I directed Mr. Ahlberg to gather a complete set of documents that were publicly available that would explain how NHTSA's Preliminary Evaluation which was numbered PE24012 had transitioned to an engineering analysis (EA25001).

20. I sought this information to determine the timeline of the transition and with the intent of seeking information about why NHTSA had increased its scrutiny of Ford as part of our due diligence in this case.

21. In a follow-up message, Mr. Ahlberg provided me with another NHTSA document from PE24012, which included a list of hyperlinks to relevant documents. This is a screenshot of the bottom of page 2 of this NHTSA document:

**Affected Products (4)**

**Vehicle**

| MAKE | MODEL | YEAR |
|------|-------|------|
| FORD | MUSTANG MACH E | 2021-2024 |

**Associated Documents (403)**

OPENING RESUME APPROVED
INOA-PE24012-12041.pdf 0.219KB
https://static.nhtsa.gov/odi/inv/2024/INOA-PE24012-12041.pdf

22. Based upon the fact that this document was 30 pages long, 28 of the pages were hyperlinks to the 403 associated documents, and many had titles indicating they were non-confidential, I instructed Mr. Ahlberg to download all of those links for examination.

23. My intent was to review the non-confidential materials and determine if there was enough information available to discern whether the documents were relevant and responsive to our third request for production to Ford.

24. After the download process was completed, I instructed Mr. Ahlberg to begin a preliminary examination of the documents.

25. Assuming our review confirmed my suspicion these materials were relevant and responsive, my original plan was to compile a list of redacted documents from the NHTSA website, produce that list to Ford, and demand the production of these documents through supplementation under Rule 26(e). I fully understood this method was going to ultimately require the Court's involvement and take substantial time.

26. Mr. Ahlberg notified me very shortly after downloading the documents that the NHTSA documents had not been properly redacted. I had Mr. Ahlberg demonstrate to me the ease with which the failed redactions could be removed by selecting the black text box and clicking delete.

27. I immediately recognized that whomever Ford had assigned to redact these materials had failed to properly redact these documents.

28. I then instructed Mr. Ahlberg to randomly select ten of the improperly redacted documents, confirm the failed redactions could be removed, and provide the sampled documents to me for review to determine their relevance and responsiveness.

29. My review indicated that the sample contained highly relevant information that was responsive to our third request for production and likely responsive to other requests for production Plaintiffs had propounded on Ford.

30. Based on my own previous experience with corporate defendants failing to properly redact documents, I knew:

    a. That the law imposed the obligation to properly redact documents on the party producing the documents.
    b. Proper redactions fall under the duty of competence of the counsel producing the documents.
    c. Prior experiences had all resulted in unpublished opinions where the defendant was admonished for the failure to properly redact or simply agreed that the failure to properly redact was a waiver of confidentiality as to the documents improperly redacted.
    d. In each instance, the failure to properly redact had been treated as a waiver of confidentiality either by agreement of defendant or the Court.
    e. I also knew that this particular failure did not appear to involve the inadvertent disclosure of privileged information or work product.
    f. The redactions of the NHTSA documents were not litigation related. Rather, Ford was seeking to keep these materials from being disclosed to the general public through the FOIA exemption process.

31. I then identified the person who signed Exhibit 2 to Plaintiffs' response who certified to NHTSA that Ford had produced a file of redacted documents to NHTSA as Emily Frascaroli, the Director of Ford's Automotive Safety Office.

32. Ms. Frascaroli's title certainly implied she was a high-ranking executive with Ford. My research of Ms. Frascaroli indicated she was a very high-ranking in-house Ford lawyer who appeared to lead Ford's internal teams in charge of both responding to discovery and products liability litigation.

33. Based on the sum of my own experience and the fact that a high-ranking Ford attorney was responsible for the production of these documents to NHTSA, I

had no hesitation ordering my team to remove the improper redactions from all of the NHTSA documents we had downloaded.

34. I based this decision on the following facts: (1) Ford owed Plaintiffs unredacted copies of the NHTSA documents under our third request for production and the terms of the parties' protective order in this case; (2) removing the redactions involved minimal effort; (3) my sampling of the documents indicated they were relevant and responsive; (4) Plaintiffs could then supplement their discovery to Ford's litigation counsel in this case with the NHTSA documents; (5) the Court would not be faced with refereeing another lengthy discovery dispute that would further delay the case.

35. Our Firm also found that many of the documents submitted to NHTSA were responsive to other requests for production we had propounded. However, I stopped this analysis before it was completed due to the need to produce the materials to Ford before the August 7 hearing.

36. It is also worth informing the Court that Plaintiffs have confirmed that Ford continues to provide NHTSA with documents that are not properly redacted even after being alerted to this issue by Plaintiffs.

37. After Ford filed this motion, I directed Mr. Ahlberg to prepare a short video showing how simple it was to remove the improper redactions. If the Court requests, Plaintiffs can submit the video to all parties or play the video for the Court at any hearing on Ford's motion.

38. I have also included a table of responses to Ford's allegations as part of this declaration in an effort to ensure a full response to each and every Ford allegation our Firm could identify:

| Ford's Allegations | The Wootens' Response |
|---|---|
| "Plaintiffs downloaded thousands of Ford documents from NHTSA's website." Dkt. 184 at 1. | **Confirmed.** See Motion Response Section I. |
| "Plaintiffs downloaded **redacted** documents from the NHTSA website …." *Id.* at 1. | **Confirmed.** See Motion Response Section I. |
| "Plaintiffs … removed those redactions …." *Id.* at 1. | **Confirmed.** See this declaration and Motion Response Section I. |
| "Plaintiffs represented to the Court that '[t]he documents…can easily be viewed on Adobe.'" *Id.* at 2. | **Confirmed.** All "redactions" could be removed in Adobe with two mouse clicks. |

| | |
|---|---|
| "Plaintiffs ... published those **unredacted** documents in open Court ...." *Id.* at 1. | **Confirmed.** The Plaintiffs used certain of the NHTSA documents in open court as reflected in Docket Entry 180. |
| "Plaintiffs ... then filed those unredacted documents—marked 'Entire Page Business Confidential'—on the Court's public docket." *Id.* at 1. | **Denied.** Plaintiffs did not file the documents on the Court's public docket. Plaintiffs provided the exhibits to the Court's staff along with the exhibit list. It is Plaintiff's understanding the Clerk of Court or Court Staff then made Docket Entry 180. |
| "Plaintiffs presented these confidential materials ... as 'publicly available' documents ...." *Id.* at 1. | **Confirmed.** The documents were publicly available on NHTSA's website. Any computer-literate member of the public could retrieve them and remove Ford's failed redactions. See Plaintiffs' Response Sections I-II. |
| "And Plaintiffs' counsel has violated ethical obligations by...misrepresenting to the Court that these documents were 'public available.'" *Id.* at 7. | **Denied.** See this declaration and Plaintiffs' Motion Response Sections I-II. |
| "Plaintiffs failed to inform the Court and Ford that the materials were heavily redacted as downloaded from NHTSA..." *Id.* at 2. | **Denied.** See Plaintiffs' Motion Response Sections I-IV. |
| "...Plaintiffs failed to be forthright with the Court and Ford about (1) the confidential nature of the information they represented as 'public.'" *Id.* at 4. | **Denied.** See Plaintiffs' Motion Response Sections I-IV. |
| "And Plaintiffs' counsel has violated ethical obligations by filing unredacted versions of Ford's documents on the public docket, before consulting the Court..."*Id.* at 7. | **Denied.** See Plaintiffs' Motion Response Sections I-IV. |
| "...Plaintiffs failed to be forthright with the Court about...(2) how and why Plaintiffs came to have fully unredacted documents." *Id.* | **Denied.** See Plaintiffs' Motion Response Sections I-II. |
| "Again, Plaintiffs failed to inform the Court that the original documents were redacted, that Plaintiff was using unredacted versions for their own purposes, and how they came to have | **Denied.** See Plaintiffs' Motion Response Sections I-II. |

| unredacted confidential documents." *Id.* at 5. | |
|---|---|

39. To be perfectly clear with the Court, undersigned is the attorney who was responsible for the decision to remove Ford's ineffective redactions.

40. Undersigned is the attorney who was responsible for ordering the removal of Ford's ineffective redactions.

41. Undersigned is the attorney who was responsible for designating the NHTSA documents as non-confidential.

42. Undersigned is the attorney who was responsible for the decision to use and publish these documents at the August 7 hearing.

43. If anyone on the Plaintiffs' side of this case should be sanctioned for these decisions, it is the undersigned counsel and no other member of Plaintiffs' counsel team.

44. Undersigned stands on his analysis of this situation and his good faith belief that Ford was required to produce unredacted copies of these materials to Plaintiffs and the decision to remove the improper redactions simply expedited access to discovery materials that Ford had withheld for more than a year.

45. If the Court disagrees and believes there are grounds for sanctions, undersigned will accept any consequences of his decisions the Court believes are appropriate.

46. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 22nd day of August 2025.

Nicholas Heath Wooten,
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned certifies that on August 22, 2025, a true and correct copy of the foregoing **DECLARATION IN OPPOSITION TO FORD MOTOR COMPANY'S MOTION TO SEAL AND FOR APPROPRIATE SANCTIONS** was served upon counsel of record via use of the CM/ECF system for the Middle District of Georgia.

*Counsel for Plaintiffs*