UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| BEVERLY WOOTEN, as surviving spouse of Barry Wyatt Wooten, and BARRY WAYNE WOOTEN, as administrators of the Estate of Barry Wyatt Wooten, deceased,<br>*Plaintiffs*,<br>v.<br>FORD MOTOR COMPANY,<br>*Defendant*. | Civil Action No. 5:23-cv-00346-MTT |

**PLAINTIFFS' MOTION FOR AN EVIDENTIARY HEARING**

**Introduction and Background**

Plaintiffs move the Court to hold an evidentiary hearing before issuing further sanctions. Neither Ford's motion (Doc. 184) nor the Court's order (Doc. 195) states the "precise rule, standard, or law" Plaintiffs allegedly violated or "how [they] allegedly violated it."[1] Neither mentions "*subjective* bad faith," the Eleventh Circuit standard for inherent-power sanctions.[2] If the Court is relying on Ford's motion to justify sanctions, the order seemingly adopts the wrong state's common law as the basis for sanctions.

Also, Ford improperly interjected new and additional arguments for sanctions in its reply briefing. This includes arguing Plaintiffs' actions

[1] *Baker v. 3M Co.*, No. 21-12393, 2023 U.S. App. LEXIS 13339, at *9, 2023 WL 3734013 (11th Cir. May 31, 2023) (quotation omitted).

[2] *Id.* at *10 (emphasis added).

were improper under the Court's informal discovery procedures. (Dkt. 193, pg. 1). Ford also used its reply to misrepresent facts by telling the Court the NHTSA documents only concern BlueCruise. Ford has tried repeatedly to tell this Court that BlueCruise is not LCA with ACC despite Ford's statements to NHTSA cited below. For instance, NHTSA's June 4, 2024 Information Request to Ford states plainly the scope of information NHTSA sought:

> Unless otherwise stated in the text, the following definitions apply to these information requests:
>
> • **Peer Vehicles**: All other Ford and Lincoln vehicles equipped with any partial driving automation feature that offers lane and speed maintenance manufactured for sale or lease in the United States, including, but not limited to, current U.S. territories and possessions.

*See* Dkt. 187-1, pg. 1. At the same time, NHTSA's Information Request clearly includes LCA with ACC.[3]

In its reply brief, Ford there admits reinterpreting and limiting (in violation of this Court's local rules) Plaintiffs' discovery request seeking materials from NHTSA to unilaterally decide Ford would only produce documents related to "**Ford's Lane Keeping System, Lane Departure Warning, Lane Keeping Assist, or Traffic Sign Recognition available in 2021-2023 Ford F-150 pickup trucks[.]**" Dkt. 193, page 2. But what is missing from Ford's rewritten and improperly limited discovery response? Any mention of LCA with ACC. Ford restricted its

---

[3] Plaintiffs are compelled to make clear that Dkt. 187-1 is a publicly available NHTSA document that has never been restricted from full public access at any time and has never been the subject of a claim of confidentiality.

definition of responsive materials to exclude production of information on the one system Ford allegedly agreed is relevant to this case. And what did Ford tell NHTSA about LCA? In response to NHTSA's June 4, 2024 Information Request (Dkt. 187-1), Ford stated:

> [T]here are 2,539,962 Ford and Lincoln vehicles (including subject and **peer vehicles**) **equipped with a partial driving automation system within the scope of the request**. ***The majority of these vehicles are equipped with a system that Ford calls Lane Centering Assist (LCA)***, which is a hands-on partial driving automation system that combines longitudinal control authority governed by Adaptive Cruise Control (ACC) and lateral control authority governed by a steerable path. LCA is offered on a wide range of Ford and Lincoln models beginning in model year 2019. **Vehicles that are equipped with BlueCruise**, the focus of this investigation, **have LCA capability** *and additionally offer hands-free partial driving automation when certain conditions are met*. Hands-free BlueCruise operation is only offered on certain roadways and system availability is geofenced using vehicle GPS. BlueCruise-equipped vehicles employ a camera-based driver monitoring system to determine driver attentiveness to the roadway. BlueCruise was introduced in model year 2021 and is currently available in a select range of Ford and Lincoln vehicles.[4]

*See* Dkt. 187-5, pg. 2 (emphasis supplied).

Ford told NHTSA unequivocally that BlueCruise vehicles have LCA capability. Ford told NHTSA *the majority* of the vehicles NHTSA is inquiring about are equipped with LCA. Ford has responded to NHTSA with documents that are wholly relevant to LCA as well as providing

---

[4] Like Dkt. 187-1, Dkt. 187-5 is a publicly available NHTSA document that has never been restricted from full public access at any time and has never been the subject of a claim of confidentiality. Both documents are NHTSA documents.

numerous documents that are exclusively limited to the P702 platform. Ford also described BlueCruise to NHTSA as follows:

> BlueCruise can be described as a compilation of:
>
> - Longitudinal control governed by ACC, which utilizes radar and a forward-facing camera
> - Lateral control from LCA's steerable path, which utilizes a forward-facing camera
> - Vehicle location as determined by vehicle GPS
>
> […] The hands-on mode of BlueCruise may be referred to as limited, hands-on or LCA mode in documentation.

*See* Dkt. 180-5, pgs. 2-3.[5]

Ford's arguments to this Court in support of sanctions cannot be reconciled with Ford's cited statements to NHTSA. Ford has represented to the Court that the NHTSA documents are only about BlueCruise and thus irrelevant to this case. While at the same time Ford told NHTSA the majority of the 2.5 million Ford vehicles NHTSA is investigating are equipped with only LCA and not BlueCruise. NHTSA's investigation plainly entails LCA. Ford told NHTSA that LCA is a "hands-on partial driving automation system." *See* 187-5, *supra.*

[5] Like Dkt. 187-1, 187-5, Dkt. 180-5 was publicly available on NHTSA's website without any restriction from full public access. Ford produced this document to Plaintiffs as Ford-Wooten 012294-012295 as part of Ford's late April 25, 2025, discovery production. Plaintiffs used this document without objection during Ford's expert depositions. When Plaintiffs downloaded the NHTSA documents in July 2025, this was one of numerous NHTSA documents completely unredacted. Plaintiffs have retained the original downloaded file to prove this to the Court. Ford never made this information available to the Court during its assault on Plaintiffs' counsel. Like all the other exhibits used at the August 7, 2025, hearing, there was no objection to the use of this document by Ford.

Ford has also told this Court that Ford and NHTSA intended these documents to remain confidential. That representation misstates the standard, the law, and the applicable burden of producing redacted information under NHTSA's instructions and the FOIA. In fact, Ford's own certification the materials are "confidential business information" under FOIA makes clear that Ford either has been or may be required to produce such information subject to a protective order or a legal request. *See*, Exhibit 1 attached, Certificate in Support of Request for Confidentiality, certifying in part "[d]uring the course of defending itself in litigation, Ford may have been, or may be required to produce such information subject to a protective order or pursuant to a legal request." Ford's certification to NHTSA requesting treatment of certain materials as "confidential business information" under FOIA's exemption 4 admits and expects these very same materials can and will be disclosed during litigation.

Ford's certification acknowledges that the request for treatment as "confidential business information" under FOIA has nothing to do with disclosures in litigation. Furthermore, Ford well knows that government records are presumptively public under FOIA. NHTSA affirmatively placed the burden of proper redaction of the "public" materials on Ford.

Ford also invoked an allegation of criminal wrongdoing against Plaintiffs' counsel at page 5 of its reply. This is an allegation that Ford did not see fit to lodge in its initial salvo, and it's without factual support. However, that bell cannot be unrung. This singular allegation alone would

suffice as grounds for an evidentiary hearing to demonstrate Plaintiffs' counsel did nothing to modify any record on NHTSA's website, defeat or circumvent any security feature, or misuse NHTSA's system.

On August 7, 2025, Plaintiffs were fully prepared to walk the Court and Ford through how Plaintiffs' counsel obtained the NHTSA documents. Plaintiffs prepared an entire presentation for the Court and for Ford. Ford fails to acknowledge that Plaintiffs contacted the Court, copying Ford's counsel, seeking guidance about how to proceed with the NHTSA documents on July 31, 2025. Plaintiffs had also prepared a partial review of a portion of the NHTSA documents indicating their responsiveness to Plaintiffs' requests for production beyond request 3. No objection was made.

In the week between Plaintiffs' letter and the August 7 hearing, Ford's counsel sent no communication—a departure from Ford counsel's past behavior. Plaintiffs' counsel attributed this silence to either renewed concern about sanctions for failure to respond properly to discovery or Ford's counsel doing their own due diligence regarding the NHTSA documents.

On August 5, 2025, Plaintiffs' records show that Ford's counsel accessed and downloaded Plaintiffs' production of the 10,710 pages of NHTSA documents within minutes of Plaintiffs' delivery of the hyperlink for electronic access to the documents. If Ford's counsel believed that Ford intended to produce the NHTSA documents in a redacted form, then certainly receiving 10,710 pages that were 99.5% unredacted was notice

of failed redaction. Again, Ford's counsel did not contact Plaintiffs' counsel.

At bottom, there is an evidentiary dispute about Ford counsel's understanding the import of the NHTSA documents, failing to question why the materials were being produced, apparently failing to communicate with their own client, failing to contact Plaintiffs' counsel to discuss any misapprehensions about the NHTSA documents, failing to request an explanation regarding the NHTSA documents at the hearing, and failing to object to the use of the NHTSA documents at the hearing.

Plaintiffs' counsel's review of the NHTSA documents reveals there are a small number of pages Ford submitted to NHTSA that are properly redacted. These successful redactions clearly demonstrate that Ford knew how to properly redact when Ford deemed it necessary. Ford's failure to properly redact most documents implicates intentional choices rather than gross incompetence. This creates an evidentiary dispute about whether Ford intended to properly redact the NHTSA documents or it made a conscious choice to strategically use proper redaction only on select documents.

Ford's motion is premised on the NHTSA documents being privileged. Despite Plaintiffs counsel's declaration that there are no privileged or work-product materials in the NHTSA documents, Ford has represented to the Court that Plaintiffs' misuse of "privileged" materials justifies sanctions. This sets up a direct evidentiary conflict between the testimony of Plaintiffs' counsel and the argument of Ford's counsel.

Despite Ford's counsel offering no evidence that the NHTSA documents are privileged, and in fact, offering no evidence that Ford has even allowed its counsel to spend the time necessary to review the NHTSA documents for privilege, Ford's counsel has leveled this accusation in its demand for sanctions.

Ford counsel's representation to the Court is the subject of a forthcoming safe harbor letter and draft Rule 11 motion. However, the Court's initial agreement that sanctions are appropriate indicates that the Court has resolved Plaintiffs' sworn statement that there are no privileged materials in the NHTSA documents against them without an evidentiary hearing, and without a review of the NHTSA documents.

An evidentiary hearing is needed to resolve factual disputes about Ford's privilege claims, to make credibility determinations, to allow Plaintiffs to explain their actions and offer evidence regarding the propriety of their actions, and at a minimum, to clarify the basis for sanctions. Due process requires no less.

## Argument

### Plaintiffs are entitled to prove there are no privileged materials in the NHTSA documents.

In its motion, Ford says that "the redacted portions of the NHTSA materials were *privileged*." Doc. 184 at 7 (emphasis added). By "privileged," Ford means covered by the attorney-client privilege. After all, *Bahdjedjian*, the only case Ford could find to argue for sanctions, is about "a lawyer's ethical obligations upon receiving another party's

attorney-client privileged materials"—a completely different scenario.[6] But *Bahdjedjian* is a California case applying California common law. Georgia law applies here. *See* Fed. R. Evid. 501; LR 83.2.1. And under Georgia law, "the privilege attaches only to communications made in the course of an attorney-client relationship" and "for the purpose of getting or giving legal advice." *St. Simons Waterfront, LLC v. Hunter, Maclean, Exley & Dunn, P.C.*, 293 Ga. 419, 426 (2013) (internal quotation marks and citation omitted). Documents that Ford sent to NHTSA by definition cannot be attorney-client communications since the NHTSA documents are sent to Ford's prudential regulator. The fact that no attorney-client relationship exists between NHTSA and Ford is conclusive proof the NHTSA documents are not "privileged" under Georgia law.

Plaintiffs' counsel has previously provided a declaration that the NHTSA documents do not contain any attorney-client communications or any work-product materials. Additionally, NHTSA specifically instructed Ford to withhold any privileged materials and instead provide a privilege log. NHTSA's instructions make clear that even if privileged materials were sent to NHTSA, Ford would have waived any privilege it claims here:

> If on the basis of attorney-client, attorney work product, or other privilege, Ford does not submit one or more requested documents or items of information in response to this request, Ford must provide a privilege log identifying each document or item withheld, and stating the date, subject or title, the name and position of the person(s) from, and the

[6] *Bahdjedjian v. W. Diocese of the Armenian Church of N. Am.*, No. CV19-4717DSF(GJSx), 2020 U.S. Dist. LEXIS 166942, at *5, 2020 WL 5353982 (C.D. Cal. Apr. 29, 2020).

> person(s) to whom it was sent, and the name and position of any other recipient (to include all carbon copies or blind carbon copies), the nature of that information or material, and the basis of the claim of privilege and why that privilege applies.

Doc. 187-1 at 10–11. Ford's belated privilege claim underlying its sanctions motion—unaccompanied by a privilege log and absent evidence of a single page of privileged material—creates factual disputes about whether the NHTSA materials are privileged.

Among other things, Ford's privilege claim creates a fact dispute about whether Ford knew the materials were not "privileged" under Georgia law when it filed the motion. It also creates fact disputes about whether the NHTSA documents are attorney-client "communications," whether they were made "in the course of an attorney-client relationship," and whether they were made "for the purpose of getting … legal advice." *See St. Simons Waterfront, LLC*, 293 Ga. at 426.

Despite these factual disputes, the Court entered a text order agreeing with Ford that sanctions are appropriate. Plaintiffs are entitled to an evidentiary hearing to prove that the NHTSA documents are not privileged. Due process demands no less.

**Plaintiffs are entitled to an evidentiary hearing to demonstrate there is no subjective bad faith.**

Despite the Court's finding that sanctions are appropriate, Ford has offered no evidence of subjective bad faith, and the Court has not made any finding of subjective bad faith. Such a finding is mandatory to sanction under the Court's inherent authority. Ford prompted the Court's

order by telling the Court that the "key inquiry is 'a finding of bad faith.'" Doc. 184 at 5 (no citation). In the Eleventh Circuit, however, "a sanction under a district court's inherent powers requires a finding of *subjective* bad faith." *Atl. Cas. Ins. Co. v. Ross*, No. 24-13970, 2025 U.S. App. LEXIS 6401, at *2 (11th Cir. Mar. 19, 2025) (emphasis added) (citing *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 n.4 (11th Cir. 2017)). An evidentiary hearing is the best forum for making credibility determinations, resolving factual disputes, and considering the actual evidence relevant to this determination. That is especially so here because sanctions are improper without "a finding of subjective bad faith." *Id.* The Eleventh Circuit has explained that "[i]n assessing whether a party should be sanctioned, a court examines the wrongdoing in the context of the case, including the culpability of other parties." *Id.,* 1225.

**The Court should hold an evidentiary hearing to satisfy due process and Eleventh Circuit precedent.**

Ford invoked the Court's inherent power in its bid for sanctions. "[T]he inherent-powers standard is a subjective bad-faith standard." *Baker*, 2023 U.S. App. LEXIS 13339 at *9 (internal quotation marks omitted) (quoting *Purchasing Power*, 851 F.3d at 1223). But Ford says nothing about subjective bad faith in its motion, and the Court makes no finding of subjective bad faith in its order. In any event, the Court "must 'exercise caution in invoking its inherent power, and it must comply with the mandates of due process.'" *Baker*, 2023 U.S. App. LEXIS 13339, at *8 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991)).

Due process demands two things—notice and an opportunity to be heard. First, it requires "fair notice" that the "conduct may warrant sanctions and the reasons why." *Id.* (internal quotation marks omitted) (quoting *Kornhauser v. Comm'r of Soc. Sec.*, 685 F.3d 1254, 1257 (11th Cir. 2012)). That means, among other things, "the attorney is entitled to know the precise rule, standard, or law that he or she is alleged to have violated and how he or she allegedly violated it." *Id.* at *9 (quoting *United States v. Shaygan*, 652 F.3d 1297, 1318–19 (11th Cir. 2011).

**Precedent requires an evidentiary hearing.**

"The Eleventh Circuit will find an abuse of discretion if no hearing is held" here for two independent reasons. *See Dashtpeyma v. Liberty Ins. Corp.*, No. 1:11-cv-3809-JEC-AJB, 2012 U.S. Dist. LEXIS 198515, at *9–10 (N.D. Ga. July 9, 2012) (citations omitted). First, Ford's privilege claim requires the Court to "resolve factual disputes or make credibility determinations." *Id.* (citing *Didie v. Howes*, 988 F.2d 1097, 1105 (11th Cir. 1993); *Mercer v. Mitchell*, 908 F.2d 763, 769 n.11 (11th Cir. 1990)). Second, "the record does not clearly indicate why sanctions should be imposed." *Id.* at *10 (citing *In re Mroz*, 65 F.3d 1567, 1576 (11th Cir. 1995)). As the record stands, it is not clear which rules the Court is using as a basis for sanctions, and it appears that the Court has accepted Ford counsel's argument the NHTSA documents are "privileged" without requiring Ford to make any evidentiary showing that the materials are subject to the privilege or reviewing the documents *in camera.* "An abuse of discretion occurs when the district court applies an incorrect legal standard, applies

the law in an unreasonable or incorrect manner . . . or ignores or misunderstands the relevant evidence." *Purchasing Power*, 851 F.3d at 1222-23 (quoting *Sciarretta v. Lincoln Nat'l Life Ins*., 778 F.3d 1205, 1212 (11th Cir. 2015)) (internal quotation marks omitted).

Without providing Plaintiffs' counsel with an evidentiary hearing, the Court will have decided sanctions without providing Plaintiffs with the opportunity to present evidence of their actions, the ethical propriety of their actions, expert testimony supporting the propriety of their actions, and a full and complete exposition on the underlying facts that are disputed. This does not comport with due process.

Due process requires "an opportunity to respond, orally or in writing, to the invocation of such sanctions" and an opportunity "to justify [their] actions." *Baker, supra* at *8 (internal quotation marks and brackets omitted) (quoting *Kornhauser*, 685 F.3d at 1257). "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* (internal citations omitted).

An evidentiary hearing will confirm that Plaintiffs lacked notice that viewing and accessing documents posted on a public government website that were not properly or effectively redacted might be sanctionable. None of the Georgia Rules of Professional Conduct

addresses the issue.[7] In fact, imposing sanctions here is at odds with the "duties of loyalty and zealous advocacy" that Georgia lawyers owe their clients. *Edwards v. Lewis*, 283 Ga. 345, 350 (2008). It would discourage the "thoroughness" required for competent representation, particularly in situations like this involving steep informational asymmetry. G. R. & Regs. St. Bar. 1.1. No Georgia case law and no Eleventh Circuit decision addresses ineffectively redacted documents posted on a public government website.[8] At the same time, the legal profession and the media celebrate failed attempts to hide information from the public.[9]

---

[7] *See* Ga. R. & Regs. St. Bar 1.1 ("A lawyer shall provide competent representation to a client. … Competence requires … thoroughness"); Ga. R. & Regs. St. Bar 3.3(a)(1) ("A lawyer shall not knowingly … make a false statement of material fact or law to a tribunal"); Ga. R. & Regs. St. Bar 3.4(a) ("A lawyer shall not … unlawfully alter, destroy or conceal a document or other material having potential evidentiary value."); Ga. R. & Regs. St. Bar 4.4 ("In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.").

[8] *Cf. Klein v. Oved*, No. 22-cv-80160-KAM, 2023 U.S. Dist. LEXIS 196806, at *16 n.11 (S.D. Fla. July 19, 2023) (denying motion for sanctions and noting, "[n]othing in this Order is intended to adjudicate whether [defendant] is entitled to … a remedy [for removing redactions] or whether any request for a remedy would be timely.").

[9] *See, e.g.*, Geoffrey A. Vance, *When Redactions Don't Redact*, PerkinsCoie.com (Jan. 16, 2019) ("The press has widely reported on Paul Manafort's attorneys' failed attempt to redact sensitive information in a recent legal filing, allowing the press to uncover and publish the very information the attorneys intended to redact. The problem stemmed from the attorneys' use and understanding of Adobe Acrobat's black highlighting function."), https://perkinscoie.com/insights/update/when-redactions-dont-redact; Mathew Ingram, *Thank you to everyone who can't redact documents properly*, Columbia Journalism Review (Jan. 10, 2019) ("In the past, redacting a document involved actual black ink, but the digital kind is a lot more tricky—and that's bad for anyone who is trying to keep certain facts classified, but good for journalists who are trying to shed light on the behavior of bad actors both inside the government

Also, at least one district court has done what Ford claims is sanctionable. In *Allstate Insurance Co. v. Linea Latina De Accidentes, Inc.*, the plaintiff attempted to make redactions "by using Adobe Acrobat's rectangle tool to place black-filled rectangles over certain information." No. 09-3681 (JNE/JJK), 2010 U.S. Dist. LEXIS 124773, at *6, 2010 WL 5014386 (D. Minn. Nov. 24, 2010). "This is not an effective method of redaction because the rectangles can be deleted, thereby exposing the underlying information." *Id.* at *6–7. And with "a few keystrokes, the Court deleted the rectangles" itself. *Id.* at *7 n.4. The court ultimately sanctioned the plaintiff who had failed to properly redact the documents, not the party who received the documents with failed redactions. Since the *Allstate* decision, Ford has been on notice for over a decade that its use of black-filled rectangles is "not an effective" redaction method. *See id.* at *6.

**Time Needed to Conduct an Evidentiary Hearing and Request for Discovery**

**Time Needed to Conduct an Evidentiary Hearing and Request for Discovery** Plaintiffs seek discovery from Ford on the following issues:

(1) Ford's actions that led to the production of the NHTSA documents in this case.

(2) Ford's process for redacting the NHTSA documents before submitting them to NHTSA.

(3) Ford's knowledge that the NHTSA documents would be made publicly available before Ford submitted the documents to NHTSA.

---

and elsewhere."), https://www.cjr.org/analysis/manafort-mueller-redacted-document-ukraine.php.

(4) Ford's compliance with NHTSA's instructions for submitting documents where Ford asserted a right to confidential treatment under FOIA.
(5) The basis of Ford's assertion of the right to confidential treatment.
(6) Ford's knowledge of NHTSA's instructions to withhold privileged materials from the NHTSA documents.
(7) Ford's compliance with NHTSA's instructions for withholding privileged materials.
(8) Ford's knowledge that its request for confidential treatment was based on one or more FOIA exemptions.
(9) Ford's knowledge that its requests for confidential treatment under FOIA had no impact on Ford's discovery obligations in litigation.
(10) Ford's knowledge that NHTSA's decision regarding Ford's request for confidential treatment of the NHTSA documents under FOIA has no bearing on Ford's discovery obligations in litigation.

To obtain the information in items 1-10, Plaintiffs request the Court's permission to depose two Ford Employees. The first is Emily Frascaroli, the Ford employee who signed the letter to NHTSA certifying Ford's compliance with NHTSA's instructions previously submitted to the Court. The second is Tom Single, another Ford employee in the Automotive Safety Office who certified to NHTSA that the NHTSA documents had been held confidentially except where the materials were previously or may in the future be produced in litigation subject to a protective order. If the Court allows these fact-driven depositions made necessary by Ford's motion, Plaintiffs agree in advance that they will not assert any waiver of any privilege results from any testimony provided by either of Ford's employees. Alternatively, Plaintiffs request the Court order Ford to have these employees appear at the Court's evidentiary hearing and give their testimony in open court.

Plaintiffs' counsel anticipates that they will need two full days to present the evidence necessary to create an appropriate record in the face of the Court's finding that sanctions are appropriate. Plaintiffs will need to present evidence on the following matters:

1) Testimony from Plaintiffs' counsel involved in the underlying conduct.
2) Evidence of how Plaintiffs obtained the NHTSA documents.
3) Evidence of the process of removing the ineffective attempt to redact certain of the NHTSA documents.
4) Evidence of the NHTSA documents that Ford properly redacted.
5) Evidence identifying which of the NHTSA documents were never subject to any claim of confidentiality or any attempt to redact.
6) Evidence the NHTSA documents are responsive to discovery requests other than Plaintiffs' request number 3.
7) Evidence that no NHTSA documents are subject to any claim of privilege.
8) Evidence regarding Ford's intent and knowledge when submitting documents to NHTSA.
9) Expert testimony regarding Plaintiffs' counsel's duties and obligations under existing law and Rules of Professional Conduct including their duties with respect to relevant materials in the public domain, their duties of diligence and zealous advocacy, and any other duties and obligations relevant to the fact pattern.
10) Expert testimony regarding who bears professional responsibility for properly redacting materials where confidentiality is claimed.
11) Evidence as to the purpose of Ford's redactions in responding to NHTSA.
12) Evidence as to Ford's knowledge that the "public" file provided to NHTSA would be publicly posted for the entire world to access.
13) Evidence as to whether Ford submitted any privileged materials to NHTSA.

14) Evidence of the basis for Ford requesting confidential treatment of the NHTSA documents.
15) Evidence of Ford counsel's actions or inactions in response to Plaintiffs' counsel's communications regarding the NHTSA documents.
16) Any other evidence the Court requires.

## Conclusion & Request for Relief

Plaintiffs respectfully request the Court provide the following relief:

A. Allow the depositions of Ford employees Emily Frascaroli and Tom Single, or, alternatively, order Ford to produce them to provide testimony at an evidentiary hearing.

B. Set an evidentiary hearing and allow two days for the presentation of evidence before imposing sanctions.

C. Any other relief proper under the circumstances.

Dated: September 9, 2025

Respectfully submitted,

*<u>/s/ Nick Wooten</u>*
Robert D. Cheeley
Georgia Bar No. 122727
Nicholas H. Wooten
Admitted *Pro Hac Vice*
Andre T. Tennille III
Georgia Bar No. 940510
Gabrielle D. Gravel
Georgia Bar No. 449376
CHEELEY LAW GROUP, LLC
2500 Old Milton Parkway, Suite 200
Alpharetta, Georgia 30009
(770) 814-7001
bob@cheeleylawgroup.com
nick@cheeleylawgroup.com
dre@cheeleylawgroup.com
gabby@cheeleylawgroup.com

Virgil Adams
ADAMS, JORDAN & HERRINGTON, P.C.
915 Hill Park, Suite 101
Macon, Georgia 31202
478.743.2159
478.743.4938 (fax)
vadams@adamsjordan.com

Donald H. Slavik
SLAVIK LAW FIRM, LLC
2834 Blackhawk Court
Steamboat Springs, CO 80487
(970) 457-1011
dslavik@slavik.us

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that today I have served a copy of the foregoing on all parties of record, including the Defendants counsel listed below:

Michael R. Boorman, mboorman@watsonspence.com
Paul E. Petersen III, ppetersen@watsonspence.com
Scott A. Richman, srichman@mtrclegal.com
Tiffany Gutierrez, tgutierrez@mtcrlegal.com
Michael Carey, mcarey@dykema.com

/s/ *Nick Wooten*
*Counsel for Plaintiff*