IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

_____

BEVERLY WOOTEN as surviving        )
spouse and co-administrator of     )
the Estate of Barry Wyatt          )
Wooten; BARRY WAYNE WOOTEN as      )
co-administrator of Estate of      )
Barry Wyatt Wooten,                )
                                   )
        Plaintiffs,                )
                                   ) Case No. 5:23-CV-346
vs.                                )
                                   ) Macon, Georgia
FORD MOTOR COMPANY,                )
                                   )
        Defendant.                 )
_____)


EVIDENTIARY HEARING


October 2, 2025


BEFORE THE HONORABLE MARC T. TREADWELL
UNITED STATES DISTRICT JUDGE


Proceedings reported stenographically
_____

DARLENE D. FULLER, USCR
Registered Professional Reporter
Registered Merit Reporter
Certified Realtime Reporter
Georgia Certified Reporter No. 5641-3440-5157-6832

APPEARANCES:

FOR THE PLAINTIFF:          Robert D. Cheeley
                           CHEELEY LAW GROUP LLC
                           2500 Old Milton Parkway, Suite 200
                           Alpharetta, Georgia 30009
                           (770) 814-7001
                           bob@cheeleylawgroup.com

                           Nick Wooten
                           DC LAW, PLLC
                           1012 West Anderson Lane
                           Austin, Texas 78757
                           (512) 910-3285
                           nick@teamjustice.com

                           Caroline W. Herrington
                           ADAMS, JORDAN & HERRINGTON
                           Post Office Box 928
                           915 Hill Park, Suite 101
                           Macon, Georgia 31202-0928
                           (478) 743-2159
                           cherrington@adamsjordan.com


FOR DEFENDANT FORD:         Paul E. Petersen III
                           Michael R. Boorman
                           WATSON SPENCE LLP
                           999 Peachtree Street NE, Suite 1130
                           Atlanta, Georgia 30309
                           (229) 436-1545
                           ppetersen@watsonspence.com
                           mboorman@watsonspence.com

                           Tiffany M. Gutierrez
                           MCDONALD TOOLE RICHMAN & CORRENTI
                           111 North Magnolia Avenue, Ste 1200
                           Orlando, Florida 32801
                           (407) 246-1800
                           tgutierrez@mtrclegal.com

**PLAINTIFF EXHIBITS ADMITTED DURING TESTIMONY**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| PX 3 | NHTSA Doc Reveal 1- RESTRICTED ...........57 | |
| PX 4 | NHTSA Doc Reveal 1- RESTRICTED ...........57 | |
| PX 5 | NHTSA Doc Reveal 1- RESTRICTED ...........57 | |
| PX 6 | NHTSA Doc Reveal 1- RESTRICTED ...........57 | |
| PX 7 | Plf analysis of docs produced from .......28 Ford on 4-25-25 - RESTRICTED | |
| PX 8 | Plf spreadsheet of documents on NHTSA ....29 website - RESTRICTED | |
| PX 9 | Summary categorization of PX #8 ..........29 RESTRICTED | |
| PX 11 | Excerpts from 1-6-22 deposition of .......35 30(b)(6) deponent by Mr. Wooten - RESTRICTED | |

**DEFENSE EXHIBITS ADMITTED DURING TESTIMONY**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| DX 1 | 5-20-25 Nitendra Nath declaration ........91 | |
| DX 6 | Seatbelt defeat device 1 .................63 | |
| DX 7 | Seatbelt defeat device 2 .................64 | |
| DX 8 | Seatbelt defeat device 3 .................64 | |

**COURT EXHIBITS ADMITTED DURING TESTIMONY**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| CX 1 | Excerpt from 8-7-25 hearing transcript ...19 | |
| CX 2 | Excerpt from the 2-13-25 hearing ........20 transcript | |
| CX 3 | 7-31-25 Cheeley letter to the Court ......24 | |

Macon, Georgia

Thursday, October 2, 2023

9:27 a.m.

P R O C E E D I N G S

COURT OFFICER:  All rise.  United States District Court for the Middle District of Georgia, Macon Division, is now in session.  Please be seated.

THE COURT:  Good morning.

COUNSEL COLLECTIVELY:  Good morning.

THE COURT:  All right.  We have Mr. Wooten, Mr. Cheeley.  Ms. Herrington is joining us.  Mr. Boorman, Ms. Gutierrez, and Mr. Petersen.

Let's begin with a couple of issues that I think we can cover fairly quickly.  Turning first to Ford, does Ford have or has it had an ADAS upload from the Wooten vehicle?

MR. PETERSEN:  Your Honor, that's a little more complicated of a question to answer, but no to the extent that the parties would like would be my answer.  The plaintiffs currently have the primary module that would be downloadable.

We had a -- we were changing a protocol and investigating what would happen with that download.  It was determined that it likely would not show any actual evidence after the brakes were input in the vehicle, so it wouldn't show relevant information about whether the systems were active at the time of the crash.  This kind of put a kibosh on the

protocol going back and forth, which was already a challenge anyway, so the parties have not downloaded that module.

THE COURT: All right. Was there an automatic upload such as the plaintiffs have described or referred to in their recent filings?

MR. PETERSEN: If you're speaking of the filing last night at 11:00 p.m., I haven't had a chance to review that at all, but I can answer that question, just not in response to their filing. We have produced all over-the-air data that is in Ford's possession relevant to this VIN number for this vehicle. There is nothing remaining.

THE COURT: Was there an automatic upload?

MR. PETERSEN: Not showing any relevant information to the facts of our crash.

THE COURT: Was there an automatic upload?

MR. PETERSEN: It is not a crash upload. It's just there is some data from the vehicle that was sent over the air. Now both parties have it. For a while now both parties have had that information.

THE COURT: And has that been disclosed or produced?

MR. PETERSEN: Yes, sir. Most of it a year or so ago, and the rest in -- months ago. Several months ago.

THE COURT: Okay. Mr. Wooten, does that address that issue?

MR. WOOTEN: No, sir, Your Honor. Mr. Thompson, who

only recently became available as a potential expert on August 1st and who we only met on August 26th, built and designed these systems. We have attached a number of exhibits to our filing last night, and I apologize for the late hour, but we were scrambling to get enough information to provide the declaration. But Ford has and does collect data regarding ADAS system status. It is part of what they sell to insurance companies for a profit.

THE COURT: I read the affidavit.

MR. WOOTEN: And they -- Your Honor, to me -- I am not the expert. Mr. Thompson said it is more likely than not they have this data, and they have had it. But common sense would also say you can't sell something you don't collect. And the way Ford's FordPass system works is once you create the account, you have identified yourself as being associated with a particular vehicle, and then Ford sells VIN-specific usage data, collected, according to their internal documents, in real time to numerous insurance companies throughout the United States. And that includes ADAS system status, yes, sir.

THE COURT: Well, if I understand what Mr. Petersen just said, yes, there was an automatic upload, and that's been produced to you.

MR. PETERSEN: Sir, I would like to clarify, all that data was from the weeks and months prior to the crash anyway, so it's not a crash upload.

THE COURT:  So -- but, what you're saying is that all automatic uploads available to Ford have been produced.

MR. PETERSEN:  Yes, Your Honor.  And we have run that to ground extensively.

THE COURT:  You have what?  When you say run to the ground, you mean your Ford --

MR. PETERSEN:  In-house.

THE COURT:  -- people?  In-house.

MR. PETERSEN:  Yes.

MR. WOOTEN:  And, Your Honor, the data that was produced in spreadsheet form, not the actual data, is peculiar because it shows key on/key off information and things like whether the doors were unlocked and whether the windows were rolled up.  That information comes from CAN bus signals.  That is collected over the air.

We have Ford's internal architecture that says they collect 4,500 separate signals over the air, and we have Ford's internal documents that say that they collect about 25 gigabytes per hour of data.

The interesting thing about the crash data -- or the data provided is -- as we noted, it is more than five minutes from where my uncle worked, Barry Wooten, to the scene of the crash.  This data cuts off about three minutes before what we know to be the crash.  But the line that stamps that time, all the data is absent.  There is a comm stamp saying that there

was communication with the modem, but there is no data, and there is also no data that would have been collected after an event.

And we do know from pictures, because this was a hybrid vehicle, that even with the severity of this crash, the hybrid batteries remained operable and on.  We have photos showing that the lines were cut to the batteries about an hour after the crash as part of the clean-up.  So, we see power lights on in the truck even after the crash through the Monroe County EMS records -- or the fire records.  So, we know the truck had power.

The telematics unit is behind -- under the passenger's rear seat.  We see pictures that the telematics unit has a power pack on it.  That is what is communicating with Ford.  Mr. Thompson would be able to expound extensively about the type of data that would be collected in an event, which is a crash.

And, again, we also have available and can show the Court, not NHTSA documents, but Ford documents we have obtained through our own efforts that showed that Ford was capturing 4,500 different CAN bus signals.  They produced about 66.  And even the categories that they told us they were producing they didn't produce all of them.  So, we have issues with that.  But it is clear that Ford gathers much more data than they have acknowledged.

The second piece of that is it seems, in my review of the spreadsheet, based on our additional knowledge, that what they gave us is signals that would be associated with the FordPass account, not Ford's proprietary stream of data that they collect in real time. And that was what we asked the Court to order, was the last seven days of that actual native data so that we could examine it with an expert.

THE COURT: Mr. Wooten, one thing that's been a problem in this case is that the plaintiffs repeatedly wait until the last minute to bring issues up. Obviously, you're very familiar with this, you've been suspicious about it for quite some time, and here it comes up at this stage.

It's of interest to me, because clearly if there is such data, it should have been disclosed. But, you know, once again, when we're talking about that fact, that the plaintiffs repeatedly just are a day late and a dollar short in raising issues.

Now, what Ford's going to do -- I will give you two weeks. If you need more time, let me know. But you will get an affidavit or affidavits from Ford personnel with knowledge, who will swear under penalty of perjury that all uploads from prior to the crash have been disclosed and there are no other uploads from that period -- there were no other uploads from that period, past tense.

MR. BOORMAN: Your Honor, may I ask a clarification

so that we don't have to bother the Court again?

THE COURT:  Sure.

MR. BOORMAN:  When I heard the Court to say, "all uploads," are you referring to all uploads from the day of the crash?  Or from the history of the entire ownership of the vehicle?

THE COURT:  Well, that's the issue raised in the correspondence, so yes.  That's what I'm referring to.

MR. BOORMAN:  The day of crash?  Yes, Your Honor. Thank you.

THE COURT:  Another topic raised in the improper communication with the Court by Mr. Cheeley was authentication of documents.  All I'll say about this -- about that is this. In my view, authentication issues go in the CS category. Reasonable lawyers can always work out authentication issues, and I fully expect that you will.

Next preliminary issue.  I did at the August 7th, 2025, hearing order Ford to produce certain SPP data.  And, again, in Mr. Cheeley's letter, he raises three documents that he contends were not produced.  What's Ford's position on that?

MR. PETERSEN:  Yes, sir.  And I would just re-clarify at least the letter for a second.  Ford fully complied and produced all the documents that Your Honor ordered.  They have now found documents that are -- at least as I read that letter -- referenced in those documents produced that they now

think because there are names of other documents in those documents produced, those additional documents should be produced.

For instance, Your Honor ordered Ford to produce the SPP specification. The plaintiffs point out there are six prior versions of it. What could the first version of that from 2000-and -- you know, years before the crash have to do with the case at large? So, our position is, one, we haven't -- we don't believe this issue is properly before the Court. We haven't had a chance to respond.

But high level, our position is we've fully complied with the Court's order. We produced the documents you ordered. This is continuing a trend of just asking for things just because they are in the universe that exists. They are not relevant, and we would oppose any further document production at this late stage.

THE COURT: Well, there's certainly been that trend, and that relates to what I was just discussing with Mr. Cheeley, but let me ask you this. And this may simplify things, similar to a point we established several months ago. The same concept, anyway. What is Ford's position on the plaintiffs' theory that the SPP steered the vehicle straight?

MR. PETERSEN: Your Honor, I think we have been consistent in that the vehicle and the system as designed were not intended to hold this curve. It couldn't and it didn't and

that's how it's designed.

The vehicle steered straight because the LCA system disengaged as it was designed to do, and that is the forward path of the vehicle as it was moving in its inertia.  A reasonable driver would have taken over earlier and negotiated this turn.

That's not an SPP error as it has been framed in this case.  SPP errors happen, but they are not safety concerns, because the driver is always fully in control of the Level II system.

THE COURT:  Under your theory, what disengaged the LCA?

MR. PETERSEN:  Again, I am not the tech guy on the case.  I apologize, Your Honor, if this is a dumbed-down version or not exactly how it would be explained.  But the torque that was required to hold this turn at 77 miles an hour, the limit was exceeded, the lateral drift crossed the lane, it was too high, and the system says only the driver can impart this amount of torque.  I'm handing the driving -- the driver needs to be driving at this point, I can't do it, so I'm not going to -- I can't even continue to try.

THE COURT:  So, torque applied by the steering wheel disengaged the LCA?

MR. PETERSEN:  The torque was disengaged, which the LCA is applying a limited amount of torque in its function.  So

I think it's similar but not exactly the same.

THE COURT:  All right.  So, maybe I didn't understand.  Well, first, we're assuming that the LCA was on.

MR. PETERSEN:  Yes, sir.  That's an assumption.

THE COURT:  I know that's a big assumption in Ford's mind, and I understand that.  But tell me again under that theory what caused the LCA to disengage.

MR. PETERSEN:  When the torque limit is reached, the LCA disengages.

THE COURT:  And how is the torque limit reached?

MR. PETERSEN:  So, the truck is traveling 77 miles an hour, basically straight.  The engineers would disagree that there is some amount of curve, but basically straight.  It comes up on a curve where it would take more than I believe three pounds of torque force, which is the limit, thereabouts, to turn the steering wheel to go into this turn.

Once the truck realizes I've gotten to my limit to try to make the turn, I can't impart any more torque, the driver is always responsible for driving, but at that point, the driver needs to impart the additional torque to make the turn.  And that's when the LCA disengages.

THE COURT:  So, the radius of the turn is what, under this theory, caused the LCA to disengage?

MR. PETERSEN:  Well, it is a common -- the torque requirement is a combination of radius and speed, yes, sir.

THE COURT:  Right.  So, it could not follow the road any further and, consequently, the LCA disengaged because it exceeded the torque limitations.

MR. PETERSEN:  We've been consistent that LCA was never designed to be able to take a curve like this, especially at a speed like that.  Or on exit ramps or several other factors, but we're speaking about a limited scope here in this discussion.

MR. WOOTEN:  May I respond to that, Your Honor?

THE COURT:  Briefly.

MR. WOOTEN:  Very quickly.  It would have taken 3.9 meters per second to completely traverse that -- that curve if the vehicle had ever turned right at the gantry.  The vehicle will go all the way to 3-and-a-half meters per second of lateral acceleration on its own if it ever went right.

The problem with Ford's current position is that the evidence from the actual testing that includes the signal shows that the path is being plotted up the left lane line and the exit line.  The reason for that is because Ford turned off the signals that would have recognized an exit or a lane split or merge.

So, under its default rules, the only lane line available to plot the path on was the left lane line, and that is where the vehicle plotted its path.  There was never any torque introduced.

And the man who built the system, Mr. Nath, explained that the camera's unreliable for determining curvature and should never be relied on for determining curvature. Even though that is what Ford chose to use. Mr. Nath's testimony was the issue at that intersection if it went straight was path, was LCA path. He did not say it had to do anything with torque. He said the torque should have gone right. It should have at least given what torque it had.

So, I appreciate that Ford's trying to migrate back to the original position that the curve is simply too sharp, but we know that is not the case from the actual testing and signals now.

We also have a video from our testing and Ford's testing where the vehicle comes around the curve just before the exit that's very nearly the same degree of curve, and it navigates it just fine, in full on automation with no hands on the wheel from both Mr. Harrington and Mr. Pascarella, Ford's expert. But when it gets to the exit, it just goes dead straight because, out of all of its possible paths, the only one the computer still has available to it is the left lane line based on the signals Ford disconnected.

MR. PETERSEN: And, Your Honor, we would dispute almost all of that. Just to touch on the very last part, it's the easiest part to understand, so might as well. The curve coming in the highway, around the highway is nothing like the

exit curve.  So, there's a lot of nuance and difference in the positions that we both hold apparently.

THE COURT:  Let me see if I can get at it this way.  Putting aside the theory that the LCA disengaged and that meant the vehicle continued to go straight, what is Ford's position on whether -- and I may not be using the best terminology or putting it the best way, but what is Ford's position on the theory that under these conditions, with the lane markings changing as they do at that point, that under these conditions the SPP will plot a path straight?

MR. PETERSEN:  Two things, Your Honor.  We know that the LCA disengaged from all the testing.  It just does at a certain point.  But putting that aside, I believe that is going to be the subject of Ford's supplemental expert reports based on Mr. Harrington's supplemental report and latest deposition.  So, I would like to let them get into it without me butchering it.

THE COURT:  So -- and Ford will take a contrary position, that the SPP does not plot the straight path under those conditions for this vehicle?

MR. PETERSEN:  I would need to speak to our experts to give a definitive statement.  What I can tell you definitively is even if that does happen, SPP errors, as they have been framed in this case, the driver is supposed to be in control of the vehicle.  If it happens, all you do is steer a

bit to the right and that fixes every problem.

THE COURT:  Well, obviously all of you are way, way ahead of me on these technical issues.  But from what I have seen, it frankly doesn't surprise me that for this vehicle the SPP would plot that path.  And I understand Ford's position is that--using my words--that's not a big deal.  That's what happens when you lose your lanes with the technology that this vehicle was operating under, and anybody who's used this technology has probably experienced something similar when they've lost a lane.

But, I just wanted to see as best I could understand what the positions are, because I think that might inform how we resolve some of the other issues we have before us.

MR. CHEELEY:  Your Honor, may I make a point, please, on that?

THE COURT:  Um-hum.

COURTROOM DEPUTY:  Mr. Cheeley, can you please move the mic.

MR. CHEELEY:  Yes.  There is a Ford document that was produced.  It's Bates Number 001143, and it's a summary of all the outcomes of testing.  And for the section dealing with lane marking type; performance, the results was "test failed" on August the 6th, 2020.  For lane marking detection performance adjacent lanes, the results are "test failed, signal not used in DAT201" on August the 6th, 2020.  For merge and split point

detection, the results on July the 6th, 2020, says, "The test case results are approved despite the failed test steps."  For motorway exit and entrance ramp, "failed, signal not used in DAT201," on August the 3rd, 2020.  For motorway exit and entrance ramp performance on August -- or July the 17th, 2020, "motorway exit signal not used during DAT2.0 project."  For motorway exit and entrance ramp test, on July the 17th --

THE COURT:  I got'cha, Mr. Cheeley.

MR. CHEELEY:  -- "failed."

THE COURT:  I got'cha.

MR. PETERSEN:  And if I may just briefly, that is a document Mr. Cheeley, on his direct of their expert, Shawn Harrington, whenever -- yesterday afternoon, with their expert.  Again, it is going to be the subject of our expert supplemental reports.  I didn't come prepared to discuss that.

But I will say, you heard "motorway entrance and exit."  Again, you've heard us say several times this feature was never designed to be used on an exit ramp.

THE COURT:  All right.  Okay.  Well, I wanted to get a feel for your respective positions at this point because it may be that one resolution of what to do with these NHTSA documents depends on what Ford's positions are.

Now, let's move on.  Let me mention something that I think gets to what I was just talking with Mr. Wooten about and how it is that -- because the other issues we have to discuss

really are a consequence largely of the plaintiffs' simply, for lack of a better way to put it, dropping the ball.

And on this BlueCruise issue that we've been talking about since the summer, earlier in June or July --

Kim, bring up Exhibit 1 that we marked, please.

COURTROOM DEPUTY:  Just the highlighted part?

THE COURT:  Yeah.

(Court Exhibit 1 admitted into evidence at 9:55 a.m.)

THE COURT:  This is from the August 7th, 2025, hearing where -- this was the issue.  That the plaintiffs had moved for sanctions because Ford had not produced BlueCruise information.  And of course I ruled.  Well, they objected, and certainly at the time those objections were lodged that was a perfectly reasonable deposition -- objection.

And instead of -- though, instead of dealing with the objection, Plaintiffs moved straight to a motion for sanctions, which clearly had no merit.  But the point is, here's Mr. Cheeley trying to explain to me why BlueCruise is all of a sudden relevant, and he's making the point that the only distinction between BlueCruise and the equipment in --

Oh, it's Mr. Wooten speaking, I'm sorry.  Thank you Kim.

-- that the hardware is all the same.  That the only thing that changed was the software upgrade that activated the BlueCruise.  Mr. Wooten pushed hard the point that the hardware

was all the same, so Ford's position that there's a difference was just totally unfounded.

Now, let's look at Exhibit 2.

(Court Exhibit 2 admitted into evidence at 9:57 a.m.)

THE COURT:  That's from the February 13th, 2025, which was before the -- the late production in March before the Nath deposition, and this is Mr. Harrington testifying at that hearing on direct examination.  And he tells us just what Mr. Wooten said:

*"A.  The only difference was that the software in the truck that I tested had been upgraded to full BlueCruise, which unlocked the hands-free BlueCruise feature which was not unlocked at the time for Mr. Wooten."*

And he goes on to make the point,

*"A.  There was no additional hardware added to his truck. There was simply an over-the-air software update that unlocked instead of lane centering hands-on, it's lane centering hands-free, and that's the difference.*

*"Q.  So as far --*

The question:

*"Q.  So as far as the lateral motion controller, traffic jam assist, LCA, all those components of ADAS, they are all..."*

...still the same.  So, the point Plaintiffs have been pushing so hard and castigating Ford for so thoroughly, they have known

about all along.

Why they weren't exploring what now seems to me to be obvious, that the existing hardware on the truck is a factor in this case.  I think it was Mr. Harrington who said he had never heard of SPP before.  But, I just don't understand this sudden revelation that BlueCruise -- the argument that BlueCruise is the same when Plaintiffs have known that all along.  So.

MR. PETERSEN:  Your Honor, may I touch on two of those points quickly?

THE COURT:  Sure.

MR. PETERSEN:  First, you are correct that Mr. Wooten's truck had the hardware in it to run BlueCruise. It did not have the software.  The software upgraded the algorithm, but it also unlocked some of the hardware, so -- one of the pieces of hardware.

So, just because that camera was on the truck doesn't mean that the truck had the functional hardware for BlueCruise. That camera was not active, it couldn't be used, it didn't have the software.

Second point is yesterday, in Mr. Harrington's deposition, he took a look at Mr. Nath's -- do you mind if we share an exhibit?

THE COURT:  Certainly.

MR. PETERSEN:  Mr. Harrington was asked to look at Mr. Nath's affidavit; specifically this Paragraph 20 that

explains how BlueCruise and ACA -- ACC with LCA are not the same feature.  Mr. Harrington's confirmed in no unequivocal terms--which is rare for him--that he did not have any criticisms or disagreements with this entire paragraph.

So, Ford maintains that LCA and BlueCruise are different functions, they have different functionality and different systems.  Mr. Harrington yesterday confirmed that.

THE COURT:  Yeah, I understand that.  And I am not quarreling with the position Ford has taken.  My point is that the plaintiffs have known that the hardware was there.  I can't understand why there was a sudden revelation in the Nath -- I mean, they came across an issue about a malfunction or what -- for lack of a better word, I will say "malfunction" of the hardware, but they knew it was there.  They knew the vehicle had gone straight.  It's just inexplicable to me, as I have come to understand the case, that the plaintiffs didn't raise this issue a long time before and raise it in a proper way.

MR. PETERSEN:  Yes, sir.  And we actually do want you to have that Harrington transcript.  We're glad that Ms. Tavalero emailed about it yesterday.  It is just not ready yet.

One of the other things that Mr. Harrington testified about yesterday--again, in no unequivocal terms--that before Nath's deposition he had heard the term "SPP" and knew about it and other manufacturers' versions.  He called them "steerable

paths."

So, at the August 7th hearing, there was some discussion about how in the plaintiffs' motion -- this is on Page 6 of the transcript -- how in the plaintiffs' motion to allow Mr. Harrington to do that extra testing, that this was a new issue injected into the case by Mr. Nath, and Plaintiffs and their experts had never heard of this before.

Yesterday, Mr. Harrington said, "Yes, I had heard of SPP before this case and other OEMs have similar things that they don't call 'SPP' but they call 'steerable path.'"

So, I just wanted to bring that up, and we will show you that transcript when we get a chance.

THE COURT:  I will be interested in seeing that. That may buttress the point.

MR. WOOTEN:  So, Your Honor, may I reply to this issue?

THE COURT:  You may.

MR. WOOTEN:  I want to make very clear the dispute, this whole case, has been that we have pushed for more discovery from Ford on the issues, and what Ford has steadfastly taken the position is that there is space between LCA and BlueCruise.  And they are -- as it says here, they say that they are separate features, they have nothing in common.

On August 25th of 2025 we got the answer to one question from NHTSA.  It was Question 5, where Ford says

BlueCruise is LCA --

THE COURT:  No, I have seen all that, Mr. Wooten.

MR. WOOTEN:  Correct.

THE COURT:  I have seen all -- Mr. Wooten, no.  It's clear to me.  I am not saying there's not an issue to be raised.  I am not saying that you shouldn't -- that there's not a basis for contesting Ford's position as you understand it to be with regard to BlueCruise versus Mr. Wooten's truck.  I am just saying it's come up in a very unusual way by the plaintiffs.  And it sounds like Mr. Harrington's known generally about the issue.

But you knew what was in the truck.  Your experts knew what was in the truck.  And why it took till August to get to this point, I don't know.  And that's not the only problem I've got.  And we've got another one to discuss, and that's Mr. Christian.

So, let's move on to our next issue.  And that is the NHTSA documents.  It's a narrow issue.

Kim, bring up Exhibit 3.

(Court Exhibit 3 admitted into evidence at 10:06 a.m.)

THE COURT:  We all know the background of this.  And it's the letter that Mr. Cheeley wrote to the Court, although I understand Mr. Wooten is taking responsibility for all that happened here, but the statement that the "documents are

publicly available on the NHTSA website and can be easily viewed on Adobe."

And the question, of course, is is that an appropriate representation to the Court, giving the underlying facts? And if not, what are the consequences of that?

Now, Mr. Cheeley, you requested an evidentiary hearing on this issue. What do you propose to do -- I'm sorry, Mr. Wooten.

MR. WOOTEN: Yes, Your Honor. I am happy to either be questioned by Your Honor or to just explain from my perspective what happened on August 7th and lead up to it. However you prefer to do it. It's entirely -- you tell me what you'd like me to do.

THE COURT: Well, for purposes of what we're doing today, I will accept everything -- your view of everything that happened up until the time of the sending of this letter.

MR. WOOTEN: Yes, sir. So, um, we -- so, let me explain what happened internally, in our office. We completed Ford's expert depositions of Dr. Wood on July 24th, I think --

Paul -- were you there? Paul --

Mr. Petersen and I were at that deposition in San Antonio. That was a Thursday. I really couldn't do anything else the rest of the weekend because we'd been in six expert depositions in two weeks, and I'd been all over the country.

So, when we got into the office on Monday,

Mr. Ahlberg, who is sitting here beside me, as we set out in our declaration, we were searching for something.  He went back to the NHTSA website and he alerted me that on the NHTSA website there was -- and I included it in my declaration, it's a screenshot that there was information that showed there was 420 documents on the website.  My preliminary expectation was those documents were going to be redacted, but all the documents are named.

And we've prepared, Your Honor -- I'll happily share this with you.  I have a copy for Your Honor.  Copy for my colleagues.

(Mr. Wooten disseminated documents to Court and counsel at 10:09 a.m.)

MR. WOOTEN:  If I could call Your Honor's attention to the names that are on the documents in the second column from the left where it says, "File Name Given by Ford to NHTSA at Time of Download."  All the documents -- beginning about halfway down the page, you begin to see "non-confidential" -- "Non-Conf" -- in the file name.

And then the other name that you see repeatedly throughout is "Public."  If you go to the second page, the blue line says "Public."

So, given that Ford had requested confidential treatment of the material, what I had thought we were going to end up doing was downloading these documents, presenting them

to Ford, requesting supplementation, and demonstrating that, you know, those documents would be responsive to our discovery requests for their communications with NHTSA.

As we began that process, Mr. Ahlberg alerted me that some of these documents did not appear to be redacted correctly. We have a couple short videos I am happy to show Your Honor of what we were seeing or what Mr. Ahlberg was seeing when he would download a document.

THE COURT: No, you don't have to show me. I accept that.

MR. WOOTEN: Okay. So, we'll --

THE COURT: I don't think Ford disputes that.

MR. WOOTEN: Okay. So -- and I --

THE COURT: And as I said, it's amateurish. But it is redacted. But go ahead.

MR. WOOTEN: Your Honor, I don't mean to pick nits. First of all, I apologize we're even here, because I consider it a personal failure that if I left you any doubt about the integrity of what I was doing, then I failed you. I'm very upset about that. I didn't sleep for two or three days after your docket entry came in. It deeply troubled me personally.

But, the issue was is that we got the documents from NHTSA, not from Ford. We had been given a few documents back on April 25th of 2025.

I have another document that -- I am just going to

write "7" on this just so it's marked.

(Mr. Wooten disseminating documents to Court and counsel at 10:12 a.m.)

(Plaintiffs' Exhibit 7 admitted into evidence at 10:12 a.m.

MR. WOOTEN:  This is an analysis of documents we got on April 25th, 2025.  From Ford.  The column that says, "Unified Title," these were the documents produced along with the answer to Question 5 on April 25th of 2025.  Ford gave us -- there was -- not a page of any of this was redacted.  It was all stamped "confidential."  It wasn't even stamped "non-sharing."

We matched these documents, except for three, to documents that were part of the download from NHTSA that we did beginning on the 29th of July.  Of course, the documents that are given to NHTSA were covered by their request for confidential business treatment under the FOIA, which is understood very well to be a request for access -- to not be accessed by the general public.

But the FOIA request has nothing to do with discovery.  It's Ford's request that the general public not have access to it, it's not -- has no bearing on our rights to discovery.  And I knew that they had given us other documents that they had not claimed were redacted.

I knew we had requested all the NHTSA documents, and

so, as Your Honor is aware, we had several thousand pages produced very late. Here's almost 11,000 pages -- 11,000 pages more. And so, when we looked at -- and to be clear, I need to go back to the previous one that I -- the large one I had marked as Number 8. And this is probably simpler because it's a summary.

(Mr. Wooten disseminated documents to Court and counsel at 10:14 a.m.)

(Plaintiffs' Exhibits 8 and 9 admitted into evidence at 10:14 a.m.)

MR. WOOTEN: What the summary shows, Your Honor, there are 191 documents where there were these full-page squares over the page that, as we would scroll, you would see the black boxes would jump out of the way and you could see the text behind them. And then you just click on the black box and click "delete" and it -- the text is visible.

There were 186 that had no kinds of mark-ups, no effort at marking them up. They were completely open. You could see the entire contents.

There are 47 where there were no black box limited -- there are no black boxes on the page, but there were limited proper redactions. Those seemed to be primarily redactions of personal -- PII, personal identifying information, that Ford is supposed to redact before it provides it to NHTSA. And that was done correctly.

So, you can't see the VIN number of vehicles, you can't see the names of the people involved in the crashes, you can't see the dates of birth or driver's license number or any of that type of information.

There were 11 where they provided documents that say "Designated Confidential Business Information." And there's no other document. It just says that in lieu of providing the document to NHTSA.

And then there were 5 that were properly redacted, including one where Ford laid out a presentation to the NTSB and NHTSA about the San Antonio Mach E crash, where they left the title page of the presentation unredacted and the final page of the presentation that asked for questions. So all their internal commentary about their analysis they had properly redacted. And out of those documents, 228 of those were responsive to more than one of our discovery requests.

The blue documents in Exhibit 8 specifically mention the P702. There are 82 of those documents.

And then there were 36 documents that are in green that are not part of the PE2412 download. They are part of the engineering analysis for EA25-001, which was the upgraded NHTSA investigation from the initial -- the preliminary inquiry to the actual engineering analysis.

So, um, we gave these -- first of all, Mr. Cheeley did send the letter on the 31st. That is correct. Before we

did that, and as I went through my declaration, when Mr. Ahlberg alerted me to this issue, Your Honor, you know, we -- even though I didn't consider this to be a Rule 502 issue because we were obtaining documents from NHTSA, I still treated it just like I would in a Rule 502 situation. I looked at it and I said, what is this document actually about? Does it involve things that are privileged, things that are attorney-client work product? No. Is it redacted -- is it information we're entitled to under a request? Yes.

I went through that analysis first by sampling a small set. I asked Mr. Ahlberg to pull me ten documents, randomly, give them to me to look at. I looked at them. They were all documents that were responsive.

Um, then, after I did that, I -- I looked at the situation, and I said, okay, they are responsive at least to our requests for NHTSA documents. They are responsive, and they are not privileged or confidential, and they are not work product. So, what I viewed myself as doing in that instant was saving all of us six months of a continued discovery fight over whether or not Ford was going to produce these documents in discovery.

We completed removal of the redactions for the portion that had the black boxes, and we produced them to Ford with the Bates labels and said they are responsive to Request for Production Number 3, and we gave it to them on August the

5th through a DropBox link, and our records showed that they accessed those documents almost immediately.

Now, again, I did not write the letter on July 31st. Mr. Cheeley wrote the letter. I don't know where I was at that day, but the letter went out. I didn't see it till it was out. And that's fine. That's -- I made the decisions to remove the documents, the boxes.

But when we came here on the 7th, in my mind what was going to happen is we were going to talk about those documents before we ever got into the substance of them. And you can go back to the transcript -- you know, we talked about -- I mentioned we had recently acquired NHTSA documents. I mentioned that there were some we wanted to show you. And when it got to the point in time where it was time to do that, I said, "May I proceed into the documents?" and Your Honor said, "Yes."

Now, I need you to be clear about where my head was at in that moment. I thought that I was going to prompt something from someone. Either Your Honor was going to say, "Mr. Wooten sent us a letter, what is this about? Can you explain what the letter meant?" Or, Ford was going to make at least a prophylactic objection of some sort to discussing those documents.

When they didn't, I thought that that was a strategic choice. Because Your Honor had already talked about the fact

that they had promised to produce some discovery, and they had told the Court they were unable to comply, it was too difficult. And I thought that they were making the choice not to say anything in the hopes of not upsetting Your Honor about this issue of holding back 11,000 documents.

So, I understood that to be the Court's permission to proceed into the substance. Now, the --

THE COURT: Hold on. How could you interpret silence, which is what you're describing, by permission from me to begin using documents that had been redacted? And that you had unredacted?

MR. WOOTEN: Well, Your Honor --

THE COURT: Because -- *because* -- nobody told me they had been redacted. And Ford will probably tell us this, but I remember very well they -- they acknowledged they had gotten this document dump, but they were not familiar with the documents at that point. And they will probably talk about that in a moment. But so, how was my -- how did I give you permission?

MR. WOOTEN: Your Honor, I am not blaming Your Honor. I -- I told you when I signed the declaration, if there's a consequence, then I will have to bear it. I did not believe -- when I went into those documents, I believed that we had alerted the Court that there was an issue to discuss about the documents.

And then we mentioned it a couple times in the lead-up to the point where I actually began to show some of the exhibits that we used.  Not all of them were NHTSA documents from that -- some of them were from expert exhibits.  They weren't all from that NHTSA production.  I think we even used the answer to Question 5 that Your Honor -- that we were just discussing, so it wasn't all new NHTSA documents.

But, what I believed was because we had sent the letter to Ford, we had sent the letter to Your Honor, that if we were going to have -- we would have a conversation before we went into the subject matter.  And when Ford said nothing, I believed that that was a strategic decision on their part.  That was my good faith belief.  I honestly thought because in --

And I will tell you this.  In my previous experience -- and it's been a while, it's been 15 years probably since I had a defendant provide documents that weren't properly redacted.  So, that's in the context of coming from a defendant directly to me; not something that we got from a government website.  Probably 15 years since that happened.  But it happened three or four times right around the time that this became an issue in 2010, 2015 time frame.

And each time, one of two things always happened. The defense lawyer would call up or I would call him up and say, "Hey, you know, these aren't redacted correctly."  And

they go, "Oh, well, I guess if you'll just keep them covered, you know, under our protective order and don't share them outside the case, then just use them."

And the one or two times we went before the judge, the judge said to them, "You have the obligation to redact.  It is not Mr. Wooten's obligation to redact."  Again, because none of those things implicated privilege or work product.

And to show Your Honor that I know the difference, I also have a document marked as Exhibit 11.  It's from a 30(b)(6) deposition I was taking a couple years ago in Houston.  Go to Page 159.

(Plaintiffs' Exhibit 11 admitted into evidence at 10:24 a.m.)

MR. WOOTEN:  So, back up just a little bit.  Go to 157.

So, I am taking a 30(b)(6) deposition of a bank, a mortgage servicer.  In their production, they had given us about 30 pages of communications between their general counsel and their outside counsel, explaining why they had not provided loan modification that the CFPB required.

I thought they had intentionally produced that to us to explain and defend their actions.  We had the documents for about six months, because they were directly on point to that issue, which is what we were litigating, so I thought that they had waived.

We got to the deposition, and -- slide down one more page -- we're in the deposition, and at Line 14 of Page 158, Mr. Ron Sawyer, one of two colleagues on that case, said, "I'm going to interject.  This was clearly inadvertently sent over."  And I can let Your Honor read the next couple pages, but essentially what transpired at that moment was -- I told him what I just told you -- "We thought that you had meant to give this to us to explain your defense."  They said, "No, we did not.  We want to claw this back."

I said, "100 percent no problem, let's identify the documents subject to clawback," and we set them to the side.  It's two pages of a deposition transcript.  As soon as they said there was an issue, no problem.  I didn't try to persist.  I said, "If you say there's a clawback issue, that's fine.  That's what Rule 502 is for."

So, I know what a Rule 502 issue is.  You know, I was not ignoring that.  In this instance.  If a lawyer tells me they made a mistake, I am fine with that, I will go and do what I can to accommodate them through the rules and my obligations to represent my client.  And this was handled.  It takes two pages to resolve it, and we go on to the rest of the deposition, and there's no issue.

I am not unaware.  I litigate all over the country.  And I -- and as I told you before, Your Honor, I try to be the most technically proficient and the most prepared lawyer in

every courtroom I walk into.  It's a point of professional pride.  This is very much a point of professional disappointment.  Because -- somehow we got cross-ways.  I made an assumption apparently that we were all on the same page.  I guess I probably should have stopped and waved my hands, even though I got these documents from NHTSA.

I mean, obviously Your Honor wouldn't be upset with me if he didn't believe I'd done something wrong.  It was never my intention to do anything -- to misrepresent anything to this Court.  I don't do that.  It's just not who I am.

And, you know, this issue -- I know the difference between 502 and somebody making a failed redaction in a discovery document.  And that goes to the other point, Your Honor.  Even though we marked these documents as non-confidential and gave them to Ford, we did not share them outside this case.  We only gave them to our experts.  And we only intended to use them within the scope of the protective order.  Even though we didn't get them from Ford, we still gave them the same courtesy we've given them with every document they've ever given us.

And, you know, one of the things I was most disappointed about in this case was when this happened I didn't get a call from anybody to ask me what in the world happened.  Because if they had come to me and said "we think you did wrong," I would have loved to explain exactly what we did and

exactly how it happened and try to resolve this before we got here today.

And, I'm glad Your Honor has provided me an opportunity to explain what happened.  I hope Your Honor understands that I would never intentionally do something I thought that the Court could interpret as misrepresenting something, suppressing something, card cheating.  I just don't operate that way.

And this -- this whole process, this whole allegation is -- like I said, it's been very troubling because -- I mean, I've done this almost 28 years.  I've never even -- I've never had anyone say that I did something that was sanctionable.  Not trying to say people didn't try to sanction me in the past because they were frustrated.  No judge has ever said they thought I really did something wrong.  So, that's a failure on my part that you would even believe that I had done something to create a problem in this case or to be somehow anything other than forthcoming.

But, I just -- Your Honor, I -- I take a lot of professional pride in doing things the right way, and the fact that we're here means I didn't do something right.

THE COURT:  Everything that you have told me, up to a point, is understandable and defensible.  And Professor Hall's affidavit underscores the point.  Your affidavit underscores the point.  You clearly knew the significance of what you had

and the ethical and professional issues raised by it, and you went to great lengths to establish, to your satisfaction, that it was appropriate to remove the redactions.

Ford might quibble with that point, but I will assume that -- including up to the point of removing these amateur redactions, I will assume that it's defensible. Up to that point.

But that, given the rest of the facts, hurts more than it helps. Because it demonstrates that you were fully aware of the significance of what was happening. And in my view, you had to be aware that it was not appropriate to tell me that these "documents are publicly available on the NHTSA website and can be easily viewed on Adobe."

Nor do I think that it's appropriate for you to begin using the documents, apparently based upon an assumption that Ford knew what you had done with the documents you had just given to them and, knowing that, Ford was going to sit on their hands. That's where the problem is. If you had -- in this letter, if Plaintiffs had told me the full circumstances, we could have resolved the issue, and it might have been resolved in your favor.

Again, I don't fault -- I'll say this as a general proposition. Ford may have some more to say. That under these circumstances, I am not prepared to fault anybody for removing these redactions, given the nature of them. The technical

nature of them.  But to do that and in my view misrepresent to the Court what you had, that's the problem.  It makes --

MR. WOOTEN:  Your Honor --

THE COURT:  -- no sense.  That's the other thing.  It makes no sense.  Of course, every transgression I see, it seems like, I ask myself, what were they thinking?  What on earth were they thinking, that this wasn't going to blow up in their face, as it has.

MR. WOOTEN:  Your Honor, if I may respond.  Again, when I got in front of you and we had previewed that we had these documents, we obtained these documents, and we were talking -- through the early parts of the transcript, we talked about it a couple times.  I kept saying things along the lines of, "We would like to show Your Honor some of these documents," and that sort of thing.  Again, in my mind, I was waiting for someone to say, "I have an objection," "We have a prophylactic objection," "We have questions," "We have..." anything.

THE COURT:  What I recall Ford said at the hearing --

MR. WOOTEN:  I mean, I --

THE COURT:  -- and I'm going to turn it over to Ford in a minute -- is something to the effect, "Judge, we just got these, we don't know anything about these documents yet."  That I think was the gist of what they said at the hearing.

MR. WOOTEN:  And, Your Honor, I -- I'm aware and my recall is that Mr. Richman said something to the fact of, "We

really haven't looked at the documents there, we believe they're related to the Mach E investigation, and we don't think they are relevant."

But there was no objection to the documents.  And that never came out of anyone's mouth.  And no one asked for any more information at that point.

Again, if I had it to do over again, given this -- I mean, I guess I would have jumped up and down and yelled and screamed, "Hey!  Wait a minute!  Let me explain even more what's happened."

At the end of the day, again, in my mind, the way that I interpreted what happened that day in the courtroom -- and, again, obviously it was wrong and I apologize -- but the way that that transpired to me, when I was asking may we proceed into these documents, I was thinking that I was inviting everyone to ask any questions about these documents we had just produced, the letter we had sent to Your Honor.  And Your Honor said, "Proceed," and that's -- and I did.

You know, in retrospect, I mean, clearly if Your Honor doesn't think it was enough, it wasn't enough.  That's my -- more than anything else, that bothers me the most.  Because I feel like I let Your Honor down in that regards.

THE COURT:  Well, let me just ask you straight out:  Do you think it was appropriate to tell me that "these documents are publicly available on the NHTSA website and can

be easily viewed on Adobe"?

MR. WOOTEN:  Your Honor, they are.

THE COURT:  I understand.  You can say that's a factually correct statement.  I think Ford would disagree with that, but you can say that is a factually correct statement.

Is it an appropriate representation to the Court when, in fact, there was an effort -- again, an amateurist effort, but an effort to redact the documents?

MR. WOOTEN:  But, Your Honor, if you will recall, in the -- what we showed you as 9 --

THE COURT:  Well, I will say the documents were redacted.  That's undisputed.  You just were able to remove the redactions.

MR. WOOTEN:  And, Your Honor, I want to be very clear, I think it's important we show you these videos.  I don't think -- and I am not -- I hate it when lawyers try to play word games.  I try to be very direct.  I don't believe that it is accurate to say the documents are redacted, because Ford clearly had -- they knew when they wanted to redact, they could.  Ford --

THE COURT:  You are familiar with the concept of material omissions?

MR. WOOTEN:  Your Honor, I -- I -- I promise you I am familiar with the concept of material omissions.  And I promise you that I would never in my life omit something that I thought

was material from Your Honor.  That's part of what is troubling to me, is that I'm in this position with this scenario and these facts, given everything that we've been through in this case about documents not being produced and all the discovery we fought just to try to understand the issues.

But, you know, what we were talking about was a very -- about half of these documents, there was absolutely no redaction.  Including statements by Ford in response to NHTSA questions that were materially different than what had been said in this courtroom.

So, if we're talking about the documents that had squares on them, there's 191 of those.  There's -- out of 442, I believe, were either no redactions at all, no attempts at redactions, or the few that had been properly redacted.

I mean, if you technically define the term "redaction," it says that it is a permanent change to the document that cannot be undone.  I mean, that was what -- we looked it up in *Black's*, and I did -- would not dare include that as an argument in this case, because this is about what Your Honor believes.  If you believe I misrepresented something to you, that's problematic to me.  And I am not going to make a hypertechnical argument.

And if I had it to do over again, I would -- I would have written the letter on July 31st myself and sent it to Your Honor.  But, I also read Mr. Cheeley's letter on July 31st.  To

me, as someone who deals with ESI, it was screaming that there was a redaction problem, if you understand what the term "redaction" means, and you use Adobe, which is what Ford's counsel in their certification to NHTSA said.

THE COURT:  Whoa, whoa, whoa, whoa.  Are you telling me now that this letter was intended to inform me that the documents had been redacted?

MR. WOOTEN:  No, sir.  I'm saying -- it was an attempt to inform my colleagues, if I was receiving that letter, and I was holding documents I thought were redacted --

THE COURT:  But you just keep making it worse, Mr. Wooten.  I'm sorry.

MR. WOOTEN:  Again, I didn't write that letter and I accept responsibility for it.  If I had it to do over again, Your Honor, we obviously wouldn't be here.  That's clear.

THE COURT:  The idea that this letter was carefully crafted --

MR. WOOTEN:  Your Honor, I didn't -- again, Mr. Cheeley wrote the letter, I didn't write the letter, and I am accepting responsibility for everything that happened.  But I am saying that if I received that letter, I would know -- if I believed I had redacted documents, as an attorney practicing, I would know that there was a problem from that letter.  I didn't say that Your Honor would know.  And I am not -- again --

THE COURT:  Well, again, you just keep making it worse.

Let me hear from Ford.

MR. BOORMAN:  Thank you, Your Honor.

THE COURT:  You can be seated.

MR. BOORMAN:  Thank you, Your Honor.  I don't know how much you need to hear from us.  We agree with the Court.  I will say this is disturbing, and the argument that we've heard this morning is very disturbing.

At every turn of this case, the plaintiffs have accused not only Ford but the lawyers sitting at this table and the lawyers representing Ford of wrongdoing, and they have been proven wrong every single time.

Now, in a situation that in our view is black and white what you should not do as a lawyer, they are taking zero responsibility.  Despite the fact that the Court has found that sanctions are appropriate, they take zero responsibility.

What we heard in the argument by plaintiffs counsel is a false apology.  He started with, "I'm sorry that we are here."  That's I'm sorry I got caught; not I'm sorry for redacting (sic) documents secretly and not telling anybody about it.

Then, Your Honor, we sat through ten minutes of shuffling spreadsheets, trying to reargue discoverability issues which is not the issue that we're here to talk about

this morning.

Then, we have an admission from plaintiffs counsel that in the past, when he has seen redaction issues -- meaning he's had this exact situation before -- he has reached out to defense counsel to talk to them about it. Again, proving that what he did here is even not in line with his own past practice.

What we ultimately end up with, Judge, is plaintiffs counsel trying, with very little credibility, to blame Ford for waiving an objection for something he didn't know he did. Or blame Ford for not reading some sort of bizarre tell in a letter from Mr. Cheeley that they did this.

Judge, this -- this is aggravating and disturbing. Our client is very upset that this was done. We're very appreciative of the Court for calling this out and dealing with it. We haven't asked for extreme sanctions; we have just asked for some very basic things. But it's up to Your Honor what sort of -- especially after hearing the argument this morning -- of what is appropriate here.

And there's still -- they still don't try -- they still don't take responsibility. They're paying a law professor to be here to try to make excuses for something that we don't need a law professor to tell us is wrong. So, we disagree with much of what's said in the argument. I don't think I need to go further than that. I am happy to answer any

questions of the Court.

THE COURT: Well, fill in the facts for me from Ford's perspective about what happened with the production of these documents and the hearing on -- was it August 7th? -- August 7th.

MR. PETERSEN: Do you mean the timing of the production from the plaintiffs?

THE COURT: Right.

MR. PETERSEN: Yes, sir.

THE COURT: You know, they've raised the issue that Ford should have known, and -- and presumably from their standpoint did know exactly what had happened with these documents.

MR. PETERSEN: Your Honor, first, at the hearing, at the August hearing, in our briefing and today, we have steadfastly maintained we had at the time these documents were being used no idea that they had been altered to remove redactions. We do not assume the worst of anyone we work with. If someone hands us an unredacted document, no one is going to assume that document was altered.

THE COURT: What was your state of review or knowledge of the documents at the time of the hearing? When were they produced to you?

MR. PETERSEN: Monday afternoon before a Wednesday hearing. Is that right? It was two days, and I remember it

not being the morning of the second day.  I'll put it that way.  But just like today -- today's pretty similar actually -- that hearing was not about NHTSA documents.  We were preparing to come here to talk about -- I forgot what it was -- oh, striking some late-disclosed witnesses and compelling unrelated documents.

I'm preparing for a hearing on separate issues, and -- I don't know, 36 hours before, 10,000 pages gets dumped on me.  I can look at those the day after the hearing and everything's fine in my opinion.  I've got time to deal with that issue.

And then at the hearing, these documents were used.  Nobody at this table -- if Mr. Richman was here, he would agree with us.  Nobody at this table realized that these were documents that had been altered.  And when we got back and we said, "There's been an order from the Court to allow Plaintiffs to depose Chet Hearn based on that draft affidavit," Ford came back to us and said, "Well, how the hell did they get this document?  This was redacted on the NHTSA website."  That's the first time that we realized that there had been a problem.

MR. WOOTEN:  So, Your Honor, may I respond to one thing that Mr. Boorman said?

THE COURT:  You may.

MR. WOOTEN:  He said that I acted differently in this instance from what I acted in previous instances where opposing

counsel made production to me and there were issues. And that is correct. Because I did not get these documents from my opposing counsel.

Ford had given us the 15 documents that I showed you in Exhibit 7, I believe, with the yellow highlighting. That was the only NHTSA documents I got from Ford, and they were unredacted. And they came in April 25th of 2025 with no warning that there were 11,000 pages of other documents.

Again, I believed that I was short-circuiting six or seven months of discovery disputes about these documents for the benefit of everyone involved in this case. We've been interested in trying to advance the case. The reason that I did not call them about it is because I didn't get that from them. I got it from the NHTSA website, and it was a publicly available source.

And, again, we have videos that demonstrate exactly what we were seeing when we dealt with these documents, because we maintained the original file that we downloaded, just as it set when we got it the very first time.

And even today, Your Honor, we checked this morning, since this hearing, Ford is so disturbed about what we've done, they are still posting documents on the NHTSA website that have the same issue. We can go on there right now, we can pull up the website, pull off a document, and it's the same, exact thing. We looked at ten of their investigations on multiple

vehicles. Every one of them they have done this with respect to the documents that have been published on the NHTSA website.

So, we treated the documents as publicly obtained information, just like the other 30,000 pages of Ford documents we've had to go out and find to try to understand this technology, to try to represent our clients, because Ford's only produced about 12,000 pages to us.

That is why I didn't call my colleagues. These documents didn't have Ford Bates labels on them, they had our Bates labels on them.

And, again, I am sorry, Your Honor. I would not intentionally mislead you, and I would not intentionally do anything that was unethical. And, again, I am very disappointed that I have let you down in this instance.

THE COURT: I think part of the problem here -- and it's been evident to me during the course of the hearing and I've certainly noted it before -- Mr. Wooten, I think you're too emotionally involved in this case. I've lost count on how many times you've referred to "my uncle." What I hear more of this morning are decisions that are made that seem to be based in part on your belief, as you have argued again and again, that Ford is acting unfairly.

It sounds to me like you took that as license to handle this the way you did. I think your judgment was clouded, because, as I said, you have to wonder what -- what

would a reasonable lawyer be thinking.  I mean, he -- by your assessment, you had a treasure trove.  And by your assessment, you had Ford in a bad spot.

And then you made the decision to throw it away.  By writing that letter to me.  And then adding to it this morning by telling me that you calculated in the hearing to handle it and just say, well, if anybody raises it -- if the judge doesn't stop me, or if they don't object, I will just keep going.  Illustrating that you knew you had a problem.

MR. WOOTEN:  Your Honor, I'm sorry that you see it that way.  I don't agree.

THE COURT:  I understand you don't agree.

MR. WOOTEN:  I believed at the time that if we were going to stop and talk about the NHTSA documents, we were going -- that's why I specifically asked may I go into the documents before I started talking about any of the exhibits.

THE COURT:  I think you should stop.  Just -- it gets worse.  It gets worse when you come up with your reasons for why you did it.  In my view, it does.  It just illustrates more culpability.  You knew you were on treacherous ground.  And you say, "Well, if they don't object, I can get away with it."  "If the judge doesn't stop me, I can get away with it."

MR. WOOTEN:  Your Honor, I didn't believe that I was trying to get away with anything.  I -- I will --

THE COURT:  But that's what you told me.

MR. WOOTEN:  I will bring you as many affidavits as you like from counsel all over the country and other judges.  I do not -- *do not* -- misrepresent and omit material facts.  I would never do that intentionally.  The only thing I have in this business is my integrity.  I would never mislead Your Honor.  And, again, I am very upset that I have left you with the impression that I have done so.

THE COURT:  All right.  Let's take a break.  When we come back, we'll talk about Mr. Christian.  Take about ten minutes.

COURT OFFICER:  All rise.

(Court in recess from 10:52 a.m. to 11:15 a.m.)

COURT OFFICER:  All rise.  This Honorable Court is again in session.  Please be seated.

THE COURT:  Okay.  Let's talk about Mr. Christian.

MR. CHEELEY:  Judge Treadwell?  Bob Cheeley.

THE COURT:  Yes.

MR. CHEELEY:  I would like to make a statement for the record, Your Honor.  On behalf of the Cheeley Law Group, I sincerely apologize to Your Honor that in my letter to the Court on July the 31st I did not include the fact that Ford had redacted these documents to NHTSA.  I sincerely apologize.  That was miscommunication on my part, but I assure you, Your Honor, it was not my intention to mislead the Court.

Secondly, I agree with Your Honor that Nick Wooten

has gotten very emotionally involved in this case because it's a family member who died, and I've had to reel him back in a lot. And I -- but he -- he -- he's just very tenacious in terms of trying to get to the facts. I want to make that point.

And secondly -- or finally, I would just ask the Court to consider that there was really nothing -- I know Your Honor -- you hit the nail on the head a moment ago when you said we had Ford -- I think, "you had a treasure trove," and we had Ford in a bad spot.

And, Your Honor, I would just point out to you that we asked for the NHTSA documents from Ford in March of 2024. We filed a motion to compel in August of 2024 in which we asked for those NHTSA documents. That was on August the 20th before Your Honor. Nine days later Ford --

THE COURT: That wasn't a motion to compel. That was the problem.

MR. CHEELEY: Pardon?

THE COURT: It was not a motion to compel.

MR. CHEELEY: Well, I was under the impression that it was a -- you wanted us to bring discovery disputes to Your Honor.

THE COURT: Well, what -- the main issue that brought us to that hearing was a motion for sanctions. Am I correct?

MR. WOOTEN: Your Honor --

THE COURT: My point was, that Ford had raised its objections to the BlueCruise -- any discovery of BlueCruise. And there had been no effort by the plaintiffs to compel BlueCruise. Rather, they moved for a motion for sanctions. Is my recollection correct from Ford's standpoint?

MR. PETERSEN: Yes, Your Honor. There was a prior motion to compel; but the motion for sanctions, part of the reason for you denying it was that Plaintiffs never moved to overrule any objections and never filed a motion.

THE COURT: In any event --

MR. CHEELEY: I may stand corrected, but I recall the -- what we wrote to the Court on August -- I think we had a hearing on August the 20th -- was a motion to compel Ford to give us three categories of documents: Videos from testing; the FEMA -- or the Failure Modes and Effects Analysis documents; and the NHTSA documents. And it was nine days later, on the 29th of August, I believe, that Ford produced the NHTSA documents to NHTSA. And so there was never any --

THE COURT: Okay. Well, whatever happened happened. But in any event, what else, Mr. Cheeley?

MR. CHEELEY: And then in conclusion, Your Honor, if the Court will so permit us, I'd like the Court to hear from Professor Matt Hall on this issue of what a lawyer's duty is under this set of facts where the -- the documents are publicly available documents and not part of the documents produced in

discovery.

THE COURT: Well, first, let me ask you a question. Since Mr. Wooten brought it up. In your letter of July 31st, when you said that these documents -- when you wrote that these "documents...can be easily viewed on Adobe," were you intending to send a signal to Ford's lawyers that should have alerted them to this issue?

MR. CHEELEY: Yes, sir. I should have inserted the word "redactions" or "their attempted redaction." But this was a letter that we got out in a hurry because I felt like we needed to make the Court aware that NHTSA documents had been improperly withheld from us by Ford, and we were able to view them using Adobe. And we -- I concluded that letter by saying, "We seek direction from the Court about how to present some of the most salient documents in advance of the upcoming hearing on August the 7th."

So, you know, it was miscommunication on my part, but it was not an intention whatsoever to misrepresent or mislead the Court.

THE COURT: All right. We'll decide later whether there's any need to hear from Professor Hall.

MR. WOOTEN: He said he'd hear from Professor Hall. Do you want to call him?

MR. CHEELEY: Professor Hall?

THE COURT: No, I said I'd decide later.

MR. WOOTEN:  I'm sorry, I thought you said you'd hear from him.  My apologies, I misheard.

We have a couple of the documents we mentioned earlier, the videos we made about what we were seeing when we saw these documents and things.  If Your Honor doesn't want to view them -- they are very short -- but I would like to offer them and get them in the record just for the sake of completeness since we've been discussing them.  Um, and I think the other documents that we had mentioned, Your Honor's already gone over from attachments.

THE COURT:  You may put them in the record.  I am not going to look at them now.

MR. PETERSEN:  Your Honor, if we may, just to bring up one point.  Since our client learned of these -- of this problem with redactions -- we admit there's a problem with these redactions obviously -- we requested NHTSA take these documents down.  NHTSA did that and never put them back up.

If we heard today correctly that there are other documents on NHTSA's website that have these same problems, we're also going to let NHTSA know about that.  I personally -- and I believe I speak for my client -- would not like those videos in the public record showing other people how to do this.

We are currently still in talks with NHTSA to make sure that we correct Ford's mistake.  So, I would object to any

further evidence going into the record.  That was a big problem with our motion to seal for sanctions originally as well.  So I would object to those being attached to this record.

THE COURT:  Well, they will be put in the record Restricted.

MR. PETERSEN:  Thank you, Your Honor.

How are they identified?

MR. WOOTEN:  We have them marked as Exhibits 3, 4 and 5 and 6.  I apologize.

(Plaintiffs' Exhibits 3, 4, 5, and 6 admitted into evidence at 11:24 a.m.)

THE COURT:  All right.  You need to -- have you provided Ford with copies?

MR. WOOTEN:  We have USBs here to give the Court and Ford copies at the end of the hearing.  We couldn't give it to them before the hearing because we didn't know what all the complete set of exhibits would be because we didn't know all the ground that Your Honor would cover.

THE COURT:  Get them that.  If you don't know, as of this week you will not have access to restricted documents on the docket.  That's a nation-wide change.  So, the lawyers are going to have to figure out on their end how to deal with that.

I tell you how I'm going to deal with it.  I am going to be restricting far fewer -- granting far fewer requests to file Restricted.  But that's just a general observation.

MR. PETERSEN:  Do you mind if I ask a question about your general observation?  Is that due to the government shut-down?

THE COURT:  No, no, no, it's a security issue that the AO, Administrative Office, has been struggling with.  And their solution -- it's what I've called a "meat cleaver approach" -- but it is to bar access to sealed or restricted documents except by a small set of court personnel.

MR. PETERSEN:  Thank you for clarifying, Your Honor.

THE COURT:  It has to do with foreign agents.  Not that -- well, okay.

So, those will be filed Restricted, and give them to Ford.  And henceforth, anything that is filed Restricted, that means you will have to serve it the old fashioned way.

All right.  Let's turn to Mr. Christian.  I have some questions first.  Has Ford ever talked with Mr. Christian?

MR. PETERSEN:  No, Your Honor.  Not one time.

THE COURT:  All right.  When did anybody on the plaintiffs' team first talk with Mr. Christian?

MR. WOOTEN:  Your Honor, on the issues that we disclosed, we talked with Mr. Christian -- I put in the motion, I believe it was between July 17th and 19th.  Maybe it was the -- maybe it was the 14th or 15th because we had two weeks of expert depositions.

And the reason that we reached out to him was because

my aunt, Ms. Beverly Wooten, said that he might know where Barry got the seat belt extender.  And so, I reached out to him -- myself and Mr. Cheeley -- and we had a talk with him at that time.  And that was the subject matter of our update, was what I included in supplement.

THE COURT:  When did anybody from the plaintiffs' team first talk with Mr. Christian?

MR. WOOTEN:  When did we first talk with him ever?

THE COURT:  When you first talked to him.

MR. WOOTEN:  Okay.  Well, we had talked to him previously about his relationship with Barry, just generally.  But we had not talked about any of the issues related to the seat belt extender or even the LCA issue, because we were thinking of his use, primarily, way back when -- I mean, if we used him at all, it would be in the nature of what I call a friends-and-family witness to talk about kind of who Barry was, the person, and that sort of thing.  But we hadn't made any effort to disclose him because we weren't sure who we were going to use in that situation, or if we would use anybody other than family.

THE COURT:  All right.  Nobody will have any further communication, directly or indirectly, with Mr. Christian.  Is that understood, Mr. Wooten?

MR. WOOTEN:  Yes, Your Honor.

THE COURT:  You don't call up your cousin or whoever

and say, "Tell or ask Mr. Christian this."  Is that clear?

MR. WOOTEN:  Yes, sir.  We will have no contact with Mr. Christian.

THE COURT:  And you're telling me that in your communications with him you never had any discussion about LCA or whether Mr. Wooten used or didn't use LCA or related features?

MR. WOOTEN:  So, to be very clear, Your Honor, I spoke with Mr. Christian -- when I told you that I spoke with Mr. Christian with Mr. Cheeley, that's the only conversation I had with him.  If Your Honor will recall, I was not part of the first case.  I didn't get involved until the refiling.

And so, when I say that my understanding was that maybe somebody from the prior case spoke with him back at the beginning, that's my general understanding from reviewing our file.  I did not speak to him personally, myself, until what we talked about right before the expert depositions, when we were trying to find out where the seat belt extender might have come from.

MR. CHEELEY:  Your Honor, I did speak to Mr. Christian probably -- I don't know, many months ago.  Probably close to the time of Beverly Wooten's deposition.  Just called him to ask him how long he worked with Barry, was Barry -- did he ever ride in the vehicle with Barry.  He said no.  He said that he had ridden -- Barry had ridden in the

vehicle with him.  And I asked him if Barry wore a seat belt, and he said yes.  So, that was the extent of my conversation with him.  Didn't ask him anything about LCA or anything else.

MR. PETERSEN:  Sir, may I touch on that?

THE COURT:  Yes.

MR. PETERSEN:  If this is a witness they would like to proffer, they should have investigated this witness, should have asked him what he knew about especially the subjects he's now been disclosed to testify about.  That disclosure happened three months after fact discovery closed.

They should have been diligent in finding this witness early on in the case if they wanted to use his testimony.  The fact that they didn't talk to him about seat belt use until July 18th or 19th, if you will remember, that was one week before Dr. Wood's deposition that we spoke about at the last hearing.

Dr. Wood testified on the seat belt reminder defeat device.  Plaintiffs supplemented their disclosures a week -- approximately a week after, on July 24th, that they spoke to Mr. Christian to identify other witnesses.  They did not disclose this witness on the seat belt defeat device when they supplemented their disclosures while Dr. Wood was -- our seat belt expert was being deposed.  That's just one part of it.

So, the other part is LCA.  They have disclosed him

for the LCA use.  We've all known since before the second lawsuit was filed that LCA use was a -- was THE key issue in the case.  If they would like to use this witness' testimony about this issue, they should have disclosed it -- disclosed him within the fact discovery so that Ford could have deposed him.

The plaintiffs made initial disclosures back in December of 2023.  He wasn't included.  Ford asked an Interrogatory Number 4--that was responded to in April of 2024--that said, "Who has information about the crash or the sequence of the crash?"  And they did not disclose Mr. Christian.  They supplemented disclosures a few times, even after fact discovery and before -- or during Dr. Wood's testimony, and they didn't disclose Mr. Christian.  They waited until September, two months after they were already late in speaking to him and after Dr. Wood was deposed, all of our experts had given their opinions, to interject new liability defenses about LCA use and about seat belt and the seat belt defeat device use.  I can explain all of this further.  I've got a few exhibits if you would like to hear it.  If that's not necessary, I understand.

MR. WOOTEN:  May I respond to that, Your Honor?

THE COURT:  No.  No, no, we talked about this generally earlier, and here we are again.  It reminds me of what -- the issue we had to deal with with the physicians.

It's the same thing.  Perhaps worse in some respects.

But let me make a couple of observations just so this is in the record.  I did go back and look at Dr. Wood's report that was provided to the plaintiffs in January, I believe, and there was extensive discussion about a seat belt extender in that report.  And, of course, his analysis goes into that in some depth.

He also mentions a seat belt warning defeat device.  Is that separate from the extender?

MR. PETERSEN:  So, these are part of the exhibits I would like to show Your Honor.  There is only one device.  There was no seat belt extender in the vehicle.  If you -- if Your Honor is familiar with extenders, they plug into the seat belt, they have some webbing to add some length, and then they have another robust buckle, right.

What was in Mr. Wooten's vehicle -- we're going to publish an exhibit which is a picture of the device, the seat belt SHEIN defeat device that was in Mr. Wooten's vehicle.

(Defense Exhibit 6 admitted into evidence at 11:34 a.m.)

MR. PETERSEN:  This device is made up almost entirely of plastic.  It has no webbing to extend anything.  It's plugged in.  It will only -- as you saw in Dr. Wood's report, it will only sustain pressure of about -- or force of about 388 pounds, I believe it is.  And Mr. Wooten had a delta-v

of -- in the fifties and, at his weight, would have imparted thousands of pounds of force on this device.  It would have exploded if it was used in this accident.

Yet, on the scene of the accident, the sheriffs took pictures -- this is going to be another exhibit -- with the defeat device plugged into the vehicle.  That's it at the bottom left of the picture.

(Defense Exhibit 7 admitted into evidence at 11:35 a.m.)

MR. PETERSEN:  And then there's a third picture, zoomed in.  And admittedly this was -- I don't believe this picture was taken on the scene.  This was at an inspection later.  But this is the device Dr. Wood is speaking of.  There is no extender.

(Defense Exhibit 8 admitted into evidence at 11:35 a.m.)

THE COURT:  Has anybody on the plaintiffs' team showed Mr. Christian any pictures?

MR. CHEELEY:  No, sir.

MR. WOOTEN:  I have not, Your Honor.  I had a phone call with him.

THE COURT:  Did you talk with him about a seat belt warning defeat device?

MR. WOOTEN:  We've never used that terminology, Your Honor.

THE COURT:  Did you talk with him about such a device?

MR. WOOTEN:  We talked to him about what you see in that picture right there.  He was aware that Barry Wooten had one of those because of his weight and because it made it a little bit easier for him to reach over and get the belt attached.

And he said that he got it from -- he said Five Star orders those devices from Ford Parts, and they come in a box, and they give them out to their customers who need them.  He said there's several different styles of them.  And that's what he told us, and that's what he told us right before we went over to depose Dr. Wood.

THE COURT:  How did he know what you were talking about?  You had to --

MR. WOOTEN:  He knew that Barry had the device plugged into his seat belt.  He'd seen it.

THE COURT:  But you said he had this device.  I mean, how did you -- you're talking.  You say you didn't show him any pictures.

MR. WOOTEN:  Right.

THE COURT:  So how --

MR. WOOTEN:  Well, he knows what they are, Your Honor.  He was being trained to replace Barry so Barry could retire.  He runs the -- he's taken over Barry's role now.  He's

running all the parts and service dealerships for Five Star, and he knew what they were.

THE COURT:  He said he had a seat belt extender?

MR. WOOTEN:  He said he had the device that plugged into the seat belt.  I think Mr. Cheeley described --

THE COURT:  How did he know it plugged into the seat belt?  I mean, you didn't show him any pictures.  How did he know what was plugged in -- what you were talking about when presumably you asked him what Mr. Wooten had plugged into his seat belt.

MR. WOOTEN:  Right.  We asked him was he aware that he had a seat belt extender -- that was the term that we used -- and he said yes.

THE COURT:  So the extent of what he's told you is that he had a seat belt extender and that -- that it sounds like you're saying it's a Ford product or is it an after-market or do you know?

MR. WOOTEN:  I have tried to make this clear, and it was what we mentioned in our motion.  What Mr. Christian said to us was that they order these from -- or they -- maybe used to order them, but they order these parts from the Ford warehouse.  He didn't say they were a Ford part.  They are clearly not a Ford part.  We have not contended such.

What he said is that Five Star provides them as a courtesy to their clients who ask for them and they have them

in boxes in their parts rooms, and they will give you one for the asking.  And Barry walked in and out of the parts rooms all the time.  And he could walk in and get one.  And he said, "There is no reason for me to think he would have gone somewhere and bought something that he could get out of the dealership that we give away for free."

And so, you know, what we got into -- Your Honor, I just want the record to be very clear -- Beverly Wooten testified that Tommy Christian told her the truck failed.

THE COURT:  I saw that.  I saw that.

MR. WOOTEN:  And so --

THE COURT:  I tell you, that is not a disclosure.  As required by Rule 26 or by Rule 33 or 34.  I get your point, but it is not a substitute for an appropriate disclosure or interrogatory response.

But, in any event, what I want the record to be clear is, what he -- in terms of the specific device, what he's told you is he had a seat belt extender.

MR. WOOTEN:  That's correct.

THE COURT:  He doesn't know -- and that he got it out of a box, he thinks.

MR. WOOTEN:  That's --

THE COURT:  But specifically what it was --

MR. WOOTEN:  He does not --

THE COURT:  -- he hasn't told you.

MR. WOOTEN:  We have not shown him a picture for him to look at.  He just said that he had a seat belt extender in his truck and he knew that.

THE COURT:  All right.  Now, I think you've told me this, Mr. Cheeley, but in your earlier conversation with Mr. Christian, there was no discussion of LCA.

MR. CHEELEY:  That's correct.

THE COURT:  Well, let me then pose this question.  Obviously, it's the question that is -- that Ford is scratching its head about, and your brief is a little schizophrenic on this point.  You chastise Ford for not investigating based upon Ms. Wooten's testimony, and then in the next paragraph you say, "We first raised these issues in July."

So, let me turn to the LCA.  I mean, as Ford understands, you're talking about a critical lynchpin issue in this case, whether or not what technology Mr. Wooten used.

MR. WOOTEN:  Yes.

THE COURT:  And given your knowledge about what your clients were telling you--Ford only got the deposition version--about Mr. Wooten, you're saying you never thought to ask Mr. Christian about the technology in this truck that Mr. Wooten used?

MR. WOOTEN:  Your Honor, we saw and I see Mr. Christian, what he said, and that to me --

THE COURT:  No, no, no, that's not my question.

MR. WOOTEN:  I did not.

THE COURT:  Did not.  You did not.

MR. WOOTEN:  We had family that said that he always used the technology, and we were relying on the habit evidence and what we knew about the way the system worked.  I didn't see that it was necessarily anything extra to bring in one more person to repeat it.

THE COURT:  Yet it's so important to you that that was a -- that that family testimony was a critical factor in your expert's opinion--which is an interesting opinion--that the technology was being used.  And yet it didn't occur to you, knowing what you knew, that you should go talk to Mr. Christian, somebody independent of the family, who worked with him day to day and understood the vehicle, to ask him about Mr. Wooten's use of LCA?

MR. CHEELEY:  He said he never rode with Mr. Wooten, so he didn't know -- he never had a discussion with Mr. Wooten is what I recall him saying about the use of ADAS systems.

THE COURT:  So, he's not going to talk about that.

MR. CHEELEY:  No, sir.

THE COURT:  That disclosure -- was that an inadvertent disclosure, then?  He's not going to talk about LCA?  Is that what you're telling me now?

MR. CHEELEY:  No, sir.  We're not going to -- we're not going to ask him anything about that because he doesn't

remember ever even discussing it.

MR. PETERSEN:  Your Honor, do you mind?

MR. WOOTEN:  Your Honor, I need to make sure this is correct.  That the disclosure that I provided about what he said, he preferred the higher level technology, that is -- that is what we said.  But, again --

THE COURT:  You all aren't even on the same page.

MR. WOOTEN:  You're right, Your Honor.  And that's -- I do not disagree with you.

THE COURT:  Here's what you said:  Mr. Christian has "personal knowledge regarding the seat belt extender and Mr. Wooten's use of LCA in the subject vehicle."  That's directly contrary to what Mr. Cheeley just told me.

MR. WOOTEN:  I -- Your Honor, I -- cannot explain the contradiction, but I agree with you.  Because I prepared the supplement, and I -- I stand by what's in the supplement.

And, again, we did not have him listed as a witness.  Let me go back and explain.  Mr. Petersen wrote us a letter on August 7th and said did we have a good faith basis for what we said.  And I said yes, we do.  And that was based off a conversation with Mr. Christian and my recollection and my notes right before we went to talk to the experts.  That --

THE COURT:  Mr. Cheeley is going to be a witness, you understand.  If Mr. Christian gets on the stand and testifies about LCA, Ford's going to have to call Mr. Cheeley to

demonstrate that he doesn't have personal knowledge --

MR. WOOTEN:  Your Honor --

THE COURT:  -- based upon Mr. Christian's admissions to Mr. Cheeley.

MR. WOOTEN:  So, once again, Mr. Petersen said that they didn't have knowledge.  At that point, I understood there had not been a disclosure about those issues.  I was trying to provide that information to Mr. Petersen so that he would know where -- what our information came from that we said to the Court on August the 7th.

I didn't say I was calling Mr. Christian.  I just told Mr. Petersen what I understood the information they did not have.  That was what I was trying to provide.

And if you want to -- we will be happy to say that Mr. Christian is not coming to testify, Your Honor.  I was just trying to fill in the gap that my colleague had about where our information came from.  I mean, it -- I do not see Mr. Christian as a case-dispositive witness one way or the other.  I was trying to fill in a gap and make a disclosure where I saw there was a problem.

THE COURT:  Well, thank you for that concession. Ford's motion to strike is granted by consent.

Where are you with regard to deposing Ford's experts and specifically experts who might have something to say about SPP?

MR. WOOTEN:  Your Honor, they were supposed to provide us their updated reports in a couple of days.  I don't remember the exact date that Your Honor set.  I think it was --

(Addressing Mr. Petersen)  The 21st?

MR. PETERSEN:  It is -- I think it was 20 days from yesterday, so October 21st sounds about right.

MR. WOOTEN:  And I don't anticipate that we will redepose their experts, Your Honor, unless something revelatory comes out that hasn't been said before.

MR. PETERSEN:  Well, and, Your Honor, to respond to that, we asked if they would like to depose the experts afterwards.  They said they do not believe they will be, so we did not include a deadline in our motion for final case deadlines, so we weren't believing there would be any more depositions of Ford experts.  By consent of the plaintiffs basically.

MR. WOOTEN:  Your Honor, again, I don't anticipate the need to go back to their experts based on what I understand Mr. Harrington's testimony was and the testing that he had done.  They have said they will respond to that.  I think we have plowed the ground with their experts.

I mean, I would -- if there's something that just is so far out of left field I might bring it to the Court's attention.  But I don't anticipate that being an issue.  That's why I didn't request time to do it.

The only issue I'm aware of, Your Honor, is that we have set the deposition of a nurse, and I have alerted my colleagues that we had indications from her she would cooperate and appear, and now we have indications she will not.  That's October 9th.

And we have set the depositions of one of the EMS people who responded to the scene of the crash and assisted with the extraction, and that's for October 15th.  Beyond that, I don't know that there's any other depositions to be done.

THE COURT:  When are the supplemental reports due?

MR. PETERSEN:  I am going to confirm October 24th first.  Give me one minute.

MR. WOOTEN:  I do believe that is the date, Your Honor.

MR. PETERSEN:  It is going to be ECF 200, and Defendant shall supplement their reports by October 21st.

THE COURT:  All right.  Then let's clarify where we are on the NHTSA documents.  Pending a final ruling on the motion for sanctions, the redacted documents cannot be used. My text order on this should have clarified we're talking about the redacted documents.

Right now, the only possible use I can see -- can conceive of that would be appropriate for the plaintiffs would be if Ford adduces evidence, including opinions, that is contradicted by information in the redacted documents.

And even then I would have to further address the issue.  That's the reason I was pushing -- not "pushing," but asking about just what is Ford's position on the SPP issue.  And send me the supplemental reports as well.

And the obvious reason is just a matter of basic fairness.  I am not going to let a Ford witness say something that is contradicted by a Ford document.

MR. PETERSEN:  Your Honor, can I ask a clarifying question.  There have been -- one, I don't believe any opinions to date are contradicted by the NHTSA documents.  Two, there has been strident and well tread opinions and evidence so far that LCA and BlueCruise are different systems.

What Plaintiffs have said their main aim in unredacting and producing the NHTSA documents was is to somehow show that they are the same system.  I don't know if you remember at the August 7th hearing, you asked a very specific question, and plaintiffs counsel went through a multitude of BlueCruise documents.  And then you said, "What's the point of that?"  And Plaintiff said it was to show that BlueCruise and LCA are the same.

So, our opinion -- I mean, our experts, just like Ford, holds the opinion that these are two separate systems.  I don't want to run afoul and open up Pandora's box just because we hold the same or similar opinions that have already been given.

THE COURT:  They are two separate systems.  And that's one reason why, though, I put up the testimony of Mr. Harrington from February and Mr. Loudon's statement on -- in August.  I understand that Ford says the differences go beyond that, but my point in showing that was the plaintiffs have fully understood that the hardware was there, and if they were going to make an issue out of the hardware, including that forward-facing camera, for the life of me I can't understand why they didn't.  And I will be interested in reading Mr. Harrington's reconvened deposition transcript.

No, what I'm talking about is more specific than what you're talking about, Mr. Petersen.  Not that whether BlueCruise is a different system, but whether -- I mean, you know Mr. Petersen's -- pardon me, Mr. Harrington's opinion.  I mean, he is going to say that the -- that forward-facing camera calculated a straight path.

And if a Ford witness -- and I am speaking inartfully I'm sure -- if a Ford expert is going to say that couldn't have happened, and there's a document that says it could have happened, I am not going to -- out of fairness, I would not allow the witness to testify without having to explain that document.  That's a simplistic and probably an inaccurate -- technically inaccurate way to put it, but it is the concept I think it illustrates.

MR. PETERSEN:  Yes, sir.  And that makes sense.  So,

if Mr. Harrington's opinion is that SPP plotted a straight path, and that SPP drove -- actively drove the vehicle straight; and one of our experts gives a new opinion that that could not happen, and there is a NHTSA document that says so, that would be opening the door to using that NHTSA document.

THE COURT:  That's an example, yes.  But --

MR. PETERSEN:  It's just that these NHTSA documents are *so* nebulous.  There's 10,000 pages.  They talk about marking for BlueCruise, they talk about -- they talk about everything under the sun, most of which -- almost all of which is not relevant or within the scope of our discovery.  So I don't want to just trod -- you know, an expert to say something that is out there that nobody even knew was out there, and then it would be --

THE COURT:  Quite frankly, I have understood all the commotion about -- the plaintiffs have made about BlueCruise versus Mr. Wooten's truck is -- boils down to an argument about expanded discovery.  And I've never fully understood why there was all that commotion instead of some action to deal with it.

But the general what-BlueCruise-is versus Mr. Wooten's vehicle has been known to everybody for a long time.  How Ford might have described the progression from BlueCruise -- I mean, from the base system to BlueCruise 1 and more, to show that Ford thinks it's all the same thing, I've never understood the point.

Except to say, Ford's objection based upon BlueCruise -- as to BlueCruise is not a valid objection.  I get that argument.  And it should have been maybe discussed a long time ago.  Back when Mr. Harrington said, "Hey, this truck," as I understand he did, "it's calculating a path, we need to talk about that.  And it happens whether it's BlueCruise or not because it's the hardware that's in there."  But that's not what I ever heard.

So, no, we're not going to be talking further about is BlueCruise the same as this truck.  We're talking about the opinions that the plaintiff is relying on at this point; and I think it's very specific, it is that path that they claim that forward camera calculated.

MR. PETERSEN:  And I understand that part of Your Honor's ruling crystal clear.  What complicates this issue is maybe something everyone is not aware of is that Mr. Harrington's testing work and to an extent his supplemental report did go into more than just that.

So, if our experts feel like they need to rebut more than what was represented to you as the very specific -- that is going to be -- that's going to be a part of motion practice, that you were told Mr. Harrington only did this testing to do this one thing.  He did four other things.

So, what I don't want to run afoul of is because everyone -- because the universe of Mr. Harrington's new

testing is so much larger than what's been represented, if our experts rebut that, then all of a sudden we've opened the door to something we -- we were almost --

THE COURT: Well, remember --

MR. PETERSEN: -- never intending to offer anyway.

THE COURT: Remember that the sole reason that I allowed for that testing was to rebut an alleged statement by Mr. Nath that this would not happen with the BlueCruise vehicle. That's what I was told.

Now, you know, I understand his opinion, and I'm sure he was cross-examined about this, that he did his testing with a BlueCruise vehicle. That's all he had. But, if the hardware in question has the problem identified by Plaintiffs' experts, if it in their opinion can manifest itself -- and that is their opinion, it manifests itself because it's the hardware -- and I know there's a software, but if -- if it manifests itself in the BlueCruise vehicle for the same reasons that it manifested itself in Mr. Wooten's vehicle, I think that's fair game.

MR. PETERSEN: The difference in the hardware is an internal-facing camera. I think that might be beside the point. I'm just trying to make sure we don't violate Your Honor's orders. So I'm trying to -- as long as it's within that scope of testing that Mr. Harrington was allowed to do, if our experts contradict that, and there's a NHTSA document that contradicts that, that's what the NHTSA document -- that

specific or those specific NHTSA documents can be used for.

THE COURT:  Here's how it will unfold if it arises. The plaintiffs will say, "Hey, we think that opinion conflicts with a NHTSA-redacted document," and then we resolve the issue.

MR. PETERSEN:  We'd have to make that factual determination.  Because there's been a lot of talk about these NHTSA documents that once you look at them it appears to be a little different.

MR. BOORMAN:  And, Your Honor, that will be done outside the presence of the jury or...?

THE COURT:  Oh, yes.  It will be dealt with long before trial.  If there is a trial, yes, it could come up at trial.  Trial testimony might stray from what anybody anticipated.  But certainly if we're in a trial, something like that wouldn't come up with -- in the presence of the jury in the first instance.

So, that's where we are for now on the sanctions motion.

MR. WOOTEN:  Your Honor, can I -- I just want to make sure I'm perfectly clear.  We have presented the Court with Exhibit 9, which was the summary.  And if I understand what Your Honor is saying is that the documents that we identified as 186 documents with no mark-ups, if they are relevant for a purpose, we can still use those.

But the 191 and the -- the others we haven't -- they

were properly redacted. But the 191, if we believe there's a reason to use them essentially as rebuttal for something Ford says, we will alert Your Honor to the issue, the specific issue and the specific document, as soon as we are aware of that issue. Is that what I understand Your Honor to be ordering?

THE COURT: With regard to the redacted documents.

MR. WOOTEN: Yes, sir.

THE COURT: Yes. As soon as you are aware means, for example, when you get the supplemental reports.

MR. WOOTEN: Yes, Your Honor, we will immediately examine the supplemental reports for any issues. The only complication to that issue, Your Honor, is there are the 12 out of 15 documents that are in Exhibit 7 that were produced in April, the ones that are in the yellow highlights. They were produced without redactions April 25th of 2025, so I would assume that those documents in Exhibit 7 would not be included in Your Honor's restriction? Since they were given to us back in April of 2025.

THE COURT: Yeah. I am talking about the redacted documents.

MR. WOOTEN: Well, the -- the only reason I brought that up, Your Honor, is because they were redacted in the NHTSA documents that started this motion, but they were given to us unredacted back in April.

THE COURT: So you got them from another source?

MR. WOOTEN:  From them.

THE COURT:  Obviously, that would --

MR. PETERSEN:  Well, yes, Your Honor.  What happened was in April we produced a subset.  We produced THE NHTSA documents that were relevant and responsive to discovery in this case.  Everything else is -- I mean, we -- our counsel looked at it and produced both relevant and responsive.  That was never challenged.

Now, they are saying there's 186 documents -- I want to be clear, I want to make sure, because this is the first time we're ever seeing this.  I don't know if any of this is -- I am not saying it's inaccurate.  I am just saying I don't know.  He's saying there were 186 documents that were on the NHTSA website that had no redactions whatsoever, and they want to use those; is that right?

MR. WOOTEN:  That is correct, Mr. Petersen.  And I will be happy to meet with you and go over them and discuss it because it's what's in Exhibit 8, the big spreadsheet.  And we can tell you how to tell which ones were attempted to be redacted and which ones had no efforts at redaction.

THE COURT:  Well --

MR. PETERSEN:  So, my request would be -- I'm sorry, Your Honor.

THE COURT:  No, go ahead.

MR. PETERSEN:  Our request would be if Plaintiffs

would send us a link to those documents specifically.  No other documents.  We know the universe of documents we're talking about.  And we're still going to object to the responsiveness and relevancy of those documents because, again, just because they are out there doesn't mean they are at issue in this case --

THE COURT:  I think that's reasonable.

MR. PETERSEN:  -- but we would like to know what universe is being discussed.

MR. WOOTEN:  We will be happy to separate those out, Your Honor.  They are -- they can be gleaned from what's in Exhibit 8.  I will not put anybody to the task of that.  We will make it explicit which ones have never been redacted and no attempt to redact.

THE COURT:  All right.  Mr. Wooten, anything else we need to discuss today?

MR. WOOTEN:  Your Honor, you asked us at the August 7th hearing if there was anything else that we needed, and I indicated that we needed to look at those documents and essentially get back to Your Honor.

Um, as you saw from the declaration of Mr. Thompson, we did have to employ him to address the connected data issue that was part of the declaration.  Again, to be clear about Mr. Thompson, he was not even available to be retained as an expert until August 1st.  He just came out of private

employment and became an expert.

We learned of his identity about -- Mr. Cheeley met him August 26th. We retained him in a separate matter shortly thereafter. We reached out to him about this connected data issue after the document that I brought to the Court's attention. We do believe it would be fair to be able to add him to address -- because part of Ford still continues to deny that there was -- ADAS was engaged, and we do believe it would be fair, given his expertise, to have him added as an expert to be able to essentially offer opinions to explain why there should be evidence that the ADAS system was engaged.

THE COURT: No. I didn't think much -- well, it was interesting to read his affidavit. And you're right, it raised the possibility that there might have been uploaded data. But how we're going to deal with that is I'm going to get that affidavit --

MR. WOOTEN: Yes, sir.

THE COURT: -- and somebody's going to tell me under penalty of perjury just what the deal is. And if Ford's got somebody that's willing to lie about that, then it will surface and we'll deal with it. But -- and it's an easy call because if in fact such data exists, Ford would be in the same position you are in with the documents with Mr. Christian, except worse. It should have been disclosed. It is critical data. No question about it. If it exists, it should have been disclosed

to the extent it bore any relationship with regard to the accident.

MR. WOOTEN:  Yes, Your Honor, we agree.  We think a lot of the problems we've had in this case could have been avoided had the actual data been provided at the outset.

MR. PETERSEN:  Your Honor, can I clarify from your order there?  And are we all clear the plaintiff is not allowed to name new experts at this late hour?

THE COURT:  Yes.

MR. PETERSEN:  Thank you.

THE COURT:  Now, anything further from Ford?

MR. PETERSEN:  One very brief question about granting the motion to strike by consent.  There's two prongs of relief requested; one striking Mr. Christian, and a second order barring Plaintiffs from identifying any further witnesses. We've just been down this road a couple of times.  We would like to put a pin in it.  I was wondering if that's granted as well under your order.

THE COURT:  Well, I mean, that goes without saying, particularly given the plaintiffs' track record.  But, no, I won't expressly grant that requested relief.  Only for this reason.  It is conceivable, as -- for both sides, that one could learn that there's a witness out there.  And it's truly a newly discovered situation.  But that's the only thing. Particularly given the track record here.

MR. PETERSEN:  So the universe of facts as we know them today, no new witnesses on any of that.

THE COURT:  No.  Right.

MR. PETERSEN:  Thank you, Your Honor.

MR. WOOTEN:  Your Honor, the -- my colleague just pointed out to me that we originally mentioned there were several documents that we had improperly by method brought up to Your Honor by not putting in the record.  The documents we discovered when we got the SPP specification form from Ford that had -- we asked for three specific documents:  The IPMA Detection Specification; the CGEA 1.3 CADS3p5 LROS Specification; and the DAT2 Object Sensing Functional Engineering Specification.

THE COURT:  Is that D as in D?  I've got it as D-A-T.

MR. WOOTEN:  C as in cat --

THE COURT:  No, no, the third item.

MR. WOOTEN:  E.  E as in echo.  I'm sorry.  DAT2.0, Object Sensing Functional Engineering Specification.

THE COURT:  All right.  I've got it with a D, too.

MR. WOOTEN:  I apologize, Your Honor.  It was probably me.  Those three documents, there are multiple versions, but the current versions that are listed are Revision 2, Revision 17, and Revision 3.

THE COURT:  All right.

MR. WOOTEN:  If we can have those.

THE COURT: We discussed that briefly, and Ford generally said, you know, that was -- it was not within the scope of my order, so elaborate on that a little. You were dealing with that personally, Mr. Wooten (sic)?

MR. WOOTEN: So, Your Honor, that was --

THE COURT: No, no, Mr. Petersen. What were you telling me earlier about this?

MR. PETERSEN: Yes, sir. Your Honor on August 7th ordered us to produce two documents. We did exactly that. Now they're asking for more documents. It's -- it's -- never-ending. We would object to further -- and they haven't proved in this letter why these were relevant, why they are responsive to discovery. We haven't had a chance to review those documents to respond. It's just we are at the end of discovery. We are moving into dispositive motions. We at this point, especially under these facts, object to any further production.

THE COURT: Well, here again, we're talking about an issue where Ford created a problem for itself by its late production of these documents. Who knows how this case would have unfolded if those documents had been timely produced back in September, I think it was. A lot differently, I suspect.

Other than the fact that it's beyond the scope of what I ordered in August, what's Ford's position?

MR. PETERSEN: I'm sorry, Your Honor? What was that?

THE COURT:  Other than the fact that it's beyond the scope of what I ordered in August, what is Ford's position on those three specific documents?

MR. PETERSEN:  Again, we didn't believe this was properly before the Court.  We came here with a narrow scope and an additional motion.  May we please have a week to give you our position on that?

THE COURT:  Certainly.  And I know I had my piece to say about the letters, and so you were right to think that we wouldn't talk about that.  But if I've learned anything in this case, I want to make sure we whack as many moles as we can when we have the opportunity to whack.

All right.  Back to the final question.  With regard to Professor Hall, let me ask a question.  Mr. Cheeley, this may be for you.  Or Mr. Wooten.  But given what you've told me earlier, Mr. Cheeley, was Professor Hall informed that the phrase in the July 31st, 2025, letter -- specifically, quote, "can be easily viewed on Adobe," close quote -- was calculated to be sufficient notice to Ford so that if they didn't object, then the documents could be used?  Was Professor Hall informed of the significance of that phrase, in your mind?

MR. CHEELEY:  Nick?

MR. WOOTEN:  Your Honor, I'm sorry, I misunderstood. I thought you were asking Mr. Cheeley that question.

We explained what we did --

THE COURT: No, no, no, it's a very specific question about this phrase. I heard it from you and I heard it from Mr. Cheeley, there was a very specific purpose behind that phrase. And all I'm asking is, did you discuss that purpose with Professor Hall?

MR. WOOTEN: Your Honor, I want to be clear. I explained how I would have accepted that letter if I had received it. I did not say that I was trying to communicate anything specific with that letter. I just explained how I would have taken it.

All I know is I gave Professor Hall the documents to look at and consider. I don't remember a conversation about -- along the lines of your question.

THE COURT: Mr. Cheeley?

MR. CHEELEY: Your Honor --

THE COURT: Or did you deal with Professor Hall?

MR. CHEELEY: No. Nick dealt with him on 98 percent of this. But the point of my use of the word "Using Adobe" is the very fact that I used the word "Adobe" to view the documents. I thought necessarily everybody reading the letter would know that the documents had to be -- you had to use Adobe in order to see what was in the -- in the documents on the NHTSA file.

There was no intent to mislead anybody. There was no sinister purpose behind the way the document was written. And

we fully disclosed to Professor Hall in our discussions leading up to his signing the declaration that he signed that we were simply trying to bring this to the Court's attention; that Ford had withheld these documents from us, and that we used Adobe to be able to view the documents.

And we wanted direction from the Court as to what's the next step. Because to put this in context, Your Honor had just basically come down hard on us for filing a motion for sanctions back in May, and so we were very timid about what to do and how to approach it with Your Honor. So, we were -- we felt like we were walking on eggshells, to be quite candid with Your Honor.

And so that's why we -- out of an abundance of caution, we wrote the letter rather than just, you know, filing another motion for sanctions. Which we thought -- we did consider, because Ford obviously did not produce these documents to us. And so --

THE COURT: What motion for sanctions are you talking about now?

MR. CHEELEY: A motion -- we contemplated filing a motion for sanctions for Ford's not producing all these NHTSA documents to us.

THE COURT: But what did I come down hard on you for?

MR. CHEELEY: Back in -- back in May we filed a motion for sanctions, and Your Honor denied it. Said that we

should have filed a motion to compel first, basically, as I recall.

THE COURT: Is that not what we did in August?

MR. CHEELEY: No, that was back in May.

MR. WOOTEN: We had the motion to compel in August.

THE COURT: Okay. That's right. That's when we heard the testimony.

MR. CHEELEY: So, Your Honor, it's -- it's just -- the point is, is that we were frustrated with Ford--not with Your Honor--that they had not given us these documents. And we found them on the NHTSA website. We were able to use Adobe to open them and read them. And believe me, if I had it to do over again, I would write a 3- or 4-page letter.

THE COURT: All right. Well, I've got Professor Hall's declaration, and I think that's sufficient.

All right. Thank you. I guess what I'll hear from Ford is its position on these three documents and the affidavit. Is that what we're waiting to hear about?

MR. BOORMAN: Yes, Your Honor.

MR. PETERSEN: I'm not -- I may have missed it. Do we have a timeline for the affidavit?

THE COURT: I said two weeks, but if you need more time. Again, I want to -- I know somebody is going to have to put some serious thought into this, so if you need more time, I'll certainly let you have it.

COURTROOM DEPUTY:  Can we confirm exhibits that they were trying to enter today.

THE COURT:  So, what are you going to give us by way of exhibits?

COURTROOM DEPUTY:  I can say what I have.

THE COURT:  Let Kim tell us where she is so we'll be sure the record is complete.

COURTROOM DEPUTY:  Obviously, the Court's -- we have Court's Exhibit 1, Exhibit 2, then Defendant pulled up -- I read the name on the top, all I saw was ASSVD declaration.  I didn't see a number.

MS. GUTIERREZ:  It's the Nath declaration.

MR. PETERSEN:  And it is going to be at Docket 125 as well.

COURTROOM DEPUTY:  But if you enter it today, can you give us a number?

MR. PETERSEN:  Yes, please.  Exhibit 1.

(Defense Exhibit 1 admitted into evidence at 12:20 p.m.)

COURTROOM DEPUTY:  So you will put that on a thumb drive for me?

MR. PETERSEN:  Yes, please.

COURTROOM DEPUTY:  And then I have Court's Exhibit 3. The handouts, which were 7, 8 and 9 for Plaintiffs.  Plaintiff Exhibit 11.

MR. WOOTEN:  Yes, ma'am.  That was the transcript, and we were going to submit the three videos -- four videos that we had marked.

COURTROOM DEPUTY:  And then 3, 4, 5, 6 videos.

MR. WOOTEN:  Yes, ma'am.

COURTROOM DEPUTY:  And then Defendant had 6, 7, and 8 that you pulled up rather quickly.

MR. PETERSEN:  That's right.  So we will have Ford Exhibit 1 and then Ford 6, 7 and 8?  Is that --

COURTROOM DEPUTY:  That's what I show.  I believe that's everything unless you feel something was missed.

MR. PETERSEN:  Would you prefer us to number them sequentially or leave it?

COURTROOM DEPUTY:  I think they were talked about that way, so just leave them that way.

MR. WOOTEN:  We will put the header of "Plaintiffs' Exhibits" for our numbers, just so there's clarity, because the Court had exhibits and the defendant had exhibits, if that's acceptable to everyone.

THE COURT:  And some of the plaintiffs' exhibits will be restricted.

MR. PETERSEN:  Were these charts entered as exhibits?

COURTROOM DEPUTY:  Yes.

MR. WOOTEN:  It was like 7, 8 and 9.

MR. PETERSEN:  So we will get copies of those

electronically?

MR. WOOTEN:  Yes, we will get you the spreadsheets.

THE COURT:  Those aren't being filed Restricted, then?

MR. PETERSEN:  I believe they should be because they do have document titles.

THE COURT:  As I was saying earlier, you will not get copies if they are filed Restricted.  They will have to send them to you.  Just remember, anything that I say can be filed Restricted will have to be served on opposing counsel.  Did they even get any notification?

MR. WOOTEN:  We did, Your Honor.  I've gotten a standing order that I've gotten from 35 courts about that issue.

THE COURT:  Since the update?

MR. WOOTEN:  They have all said the same thing.  They have all said the issue about --

THE COURT:  That's right.  You can see it on the docket.  You just pull up the cover sheet.

MR. WOOTEN:  Right.

THE COURT:  You can't get beyond that.

COURTROOM DEPUTY:  Can I get clarification?  So 7, 8 and 9, the handouts, those will be restricted; correct?

THE COURT:  Yes.

COURTROOM DEPUTY:  What about 11?

MR. WOOTEN:  11 is just that transcript.  And I can either give you the entire transcript or just the relevant three or four pages, whichever the Court would prefer.

THE COURT:  Which transcript?

MR. WOOTEN:  It was the deposition that I cited where we had a Rule 502 issue --

THE COURT:  Oh, oh.

MR. WOOTEN:  -- and we handled that.  I mean, I could just drop the whole document in.  It's not very large.

THE COURT:  Okay.  Does that need to be restricted?

MR. WOOTEN:  No, sir, Your Honor, it was just a transcript from deposition.

THE COURT:  Well, we will restrict it.  Frankly it's going to be --

MR. WOOTEN:  May be simpler just to restrict them all.

THE COURT:  -- easier.  And just the pages that you relied on.

COURTROOM DEPUTY:  Are there any issues with defendant exhibits?  Any restrictions?

MR. PETERSEN:  (Shaking head in the negative.)  No, ma'am, thank you.

THE COURT:  Does that get you what you need, Kim?

COURTROOM DEPUTY:  Yes, sir.

THE COURT:  Okay.  Thank you.

COURT OFFICER:  All rise.

(Proceedings concluded at 12:24 p.m.)

END OF RECORD

CERTIFICATE OF OFFICIAL REPORTER


        I, Darlene D. Fuller, Federal Official Realtime Court Reporter, in and for the United States District Court for the Middle District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


                        Dated this 6th day of October, 2025


                        *Darlene D. Fuller*
                        _____
                        Darlene D. Fuller, RPR, CRR, RMR
                        NCRA No. 5803
                        Federal Official Court Reporter
                        Georgia CCR 5641-3440-5157-6832
                        Michigan Certification CSR-0929