IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF GEORGIA

MACON DIVISION

| | |
|---|---|
| BEVERLY WOOTEN, as Surviving Spouse of Barry Wooten and BARRY WAYNE WOOTEN, as Administrator of the Estate of Barry Wyatt Wooten, deceased.<br><br>Plaintiffs,<br><br>vs.<br><br>FORD MOTOR COMPANY,<br><br>Defendants. | 5:23-CV-000346-MTT |

VIDEO-RECORDED DEPOSITION OF MICHELLE KUYKENDAL

Phoenix, Arizona
July 22, 2025
8:00 a.m.

**REPORTED BY;**
Herder & Associates, LLC
Kristen Brown, RPR
Certified Court Reporter
AZ-CR No. 50708

A P P E A R A N C E S

FOR THE PLAINTIFF:

CHEELEY LAW GROUP, LLC
Nick Wooten, Esq.
2500 Old Milton Parkway, Suite 200
Alpharetta, Georgia 30009
Nick@cheeleylawgroup.com, 770.814.7001

FOR DEFENDANTS FORD MOTOR COMPANY:

WATSON SPENCE, LLP
Michael R. Boorman, Esq.
Bank of America Plaza
600 Peachtree Street NE
Atlanta, Georgia 30308
Mboorman@watsonspence.com, 229.436.1545

ALSO PRESENT:

Brian Downey - Videographer
Gabby Gravel - via Zoom
Paula Senra - via Zoom
Philip Kegler - via Zoom
Scott Richman, Esq. - via Zoom
Tiffany Gutierrez, Esq. - via Zoom
Kamden Ahlberg - via Zoom

INDEX OF EXAMINATION


| WITNESS: | PAGE |
|---|---|
| MICHELLE KUYKENDAL | |
| By Mr. Wooten | 5 |


INDEX OF EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exh. 10 | Ford F150 Owner's Manual | 10 |
| Exh. 11 | Ford F150 Owner's Manual with BlueCruise | 11 |
| Exh. 12 | Architecture Elements | 55 |
| Exh. 13 | Ford Connected Vehicle Terms and Privacy | 41 |
| Exh. 14 | Privacy Notice | 49 |
| Exh. 15 | June 2025 Privacy Policy | 52 |
| Exh. 41 | Signal Detection Test for the IPMA | 129 |
| Exh. 42 | Mobileye KPI Detection Accuracy | 132 |
| Exh. 45 | Cuts from Manuals | 175 |
| Exh. 51 | Highway Assist - Active Drive Assist | 185 |
| Exh. 54 | A Method to Assess Robustness of SAE Level 2 Hands-Free Feature | 152 |
| Exh. 55 | Adaptive Cruise Control Stop&Go With Lane Centering Assist | 192 |


* * * * *

INDEX OF EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exh. 57 | Shawn Harrington Letter, 7/1/2025 | 151 |
| Exh. 91 | All New Ford F-150 Slides | 101 |
| Exh. 107 | Ken Washington Material | 103 |
| Exh. 121 | Stuart Taylor Material | 106 |
| Exh. 134 | Gateway readout from Test Vehicle | 80 |
| Exh. 142 | Function Description & Requirements Stop&Go ACC CGEA 1.3 | 39 |
| Exh. 143 | Ford Response to PE24-012 Request 5 | 190 |
| Exh. 148 | Email to Chet Hearn, 6/21/2020 | 177 |
| Exh. 150 | Email to Dave Kaminski, 6/27/2020 | 179 |
| Exh. 169 | Video Clip | 112 |
| Exh. 196 | IPMA Detection Specification | 137 |
| Exh. 216 | Diagram | 79 |
| Exh. 220 | Email from Patrick Gibson, 3/17/2017 | 184 |
| Exh. 223 | Weekly Status Chart Showing Active Drive Assist 0.1 as a P702 Attribute | 182 |
| Exh. 233 | Deposition Transcript Dated 2/13/2025 | 109 |
| Exh. 256 | Rolling Out BlueCruise 1.3 Article | 76 |

BE IT KNOWN that the deposition of MICHELLE KUYKENDAL was taken this date, July 22, 2025, from the hour of 8:00 a.m. until 3:36 p.m.; in the foregoing action, held at Hilton Garden Inn, 1940 West Pinnacle Peak Road, Phoenix, Arizona, before Kristen Brown, Registered Professional Reporter, and Arizona Certified Court Reporter, No. 50708, within and for the State of Arizona.

VIDEOGRAPHER: Good morning. We are now on the record. Today's date is July 22, 2025, and the time is 8:10 a.m. My name is Brian Downey, legal video specialist with Legal Technology Services. Our court reporter is Kristen Brown, representing Herder & Associates, located at 2 North Central Avenue, Suite 1800, Phoenix, Arizona.

We are at Hilton Garden Inn, Phoenix, North Happy Valley, 194 (sic) West Pinnacle Peak Road, Phoenix, Arizona to take the deposition of Michelle Kuykendal in the United States District Court, Middle District of Georgia, Macon Division, case of Wooten versus Ford Motor Company.

The attorneys will now introduce themselves and anyone else attending with them, noticing party first, please, and then the court reporter will swear in the witness.

MR. WOOTEN: This is Nick Wooten. I represent the plaintiffs, and I have a couple members of my firm online as well.

MR. BOORMAN: Mike Boorman for Ford, and we also have other lawyers attending.

MICHELLE KUYKENDAL, a witness herein, having been first duly sworn by the Certified Court Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. WOOTEN:

Q. All right. Good morning, ma'am. Would you state your full name for the record.

A. Michelle Lee Kuykendal.

Q. All right. And we didn't cover this beforehand, so since this is a deposition, tell me what you would prefer as far as titles. I tend to be informal, but if you'd like for me to address you as "Doctor," happy to do so, I just want to make sure we know now before we get deep into this what your preference is.

A. I'm flexible, but Dr. Kuykendal works.

Q. All right. So let's -- couple very quick things because I do know from our chitchat, while y'all

were waiting on me, you have testified before, obviously, and you do work for Exponent, and part of your work is litigation and testifying, so you're familiar with this process?

A. That's correct.

Q. Okay. And as part of this, again, I think I mentioned beforehand, at some point today I will ask a bad question and you will look at me like I have four heads, and you will not hurt my feelings. If you don't understand, please say "I don't understand," and I'll attempt to ask a better question. Okay?

A. Okay.

Q. All right. That's just a runoff from my brain and my mouth not always being in sync when I'm dealing with this type of technical stuff.

The other part is, again, not torture. If you need to take a break, happy to do so. We'll try to move quickly, but obviously there's a lot to go over, as you well know.

So with that, are you ready to get into this?

A. Yes.

Q. All right. So, Dr. Kuykendal, if you will give me, you know, basic educational background that's taken you from high school to the point of having a PhD.

A. Okay. I went to high school in St. Louis, Missouri at Clayton High School. From there, I went to the University of Missouri, Rolla. It's the Missouri University of Science and Technology now. There, I completed two bachelor of science degrees; one in computer engineering, and the second in electrical engineering.

From Missouri, I went to Georgia Tech where I studied in the Electrical and Computer Engineering department. I received a master of science in electrical engineering, specializing in electronics.

After that, I continued on with my education at Georgia Tech where I applied my electrical engineering computer science and computer engineering skills to create a close loop system -- excuse me -- to study neuroscience. And so I got my PhD then in 2014. From there, I joined Exponent, and have been there since.

Q. Did you have any meaningful professional work during your academic career up until the time you joined Exponent?

A. I did a number of internships and co-ops, but I didn't leave school to start my career; I stayed in school.

Q. Okay. When you originally went to school to

work in engineering, was it your long-term goal to work for Exponent or something like that, or did you have aspirations of some other type of career in engineering?

A. I didn't know that Exponent existed, actually, until graduate school. What I really enjoyed was problem-solving, and so that kind of was the primary inspiration for my pursuit of engineering and science.

I discovered Exponent in grad school and I saw an opportunity to work with people and clients, to not just be in the lab, but still have the opportunity to get my hands dirty, do analytical work, testing work, computational work. And so it was really appealing as an opportunity to do a huge variety of failure analysis, root cause investigations, design review, safety consulting. And then, ultimately, I have applied those skills to the litigation space as well.

Q. All right. Do you have any training in human factors?

A. No -- no, I do not.

Q. Okay. And you've never worked for an automobile manufacturer before?

A. No, I have not.

Q. And you've been working at Exponent since 2014?

A. That's correct.

Q. Let's talk about your career at Exponent. Let's just begin at the beginning. It won't take us much time to get through it. Just tell me, sort of, high level how your career has progressed at Exponent.

A. Okay. I began with Exponent in Atlanta, Georgia. There, I worked for about a year, but I found myself very interested in automotive electronics and found opportunities to travel out to our Phoenix office quite regularly to conduct investigations into electrical and electronic systems in vehicles.

And so after a year in Atlanta, I decided to move out to Phoenix because here we have 147 acres, got a two-mile oval test track, and opportunities to do very hands-on work to investigate either recall issues, failure analyses or litigation allegations relating to electrical systems in vehicles or electronic components.

And so I have spent the last ten years here in Phoenix doing a variety of investigations in both the automotive space specifically, also in the electric vehicle space, in consumer products that are electronics containing. And so my work has really been a diversity of analyses relating to where failures may or may not occur in products and how they might be

mitigated, and what kind of -- what kind of effects failures may have.

Q. So within Exponent, when you began working there 2014, would you be, like, a lead expert on a case, or were you -- did you go through some sort of apprenticeship or training in that process? Tell me about that.

A. Okay. I joined as an associate, so at that point, at the very beginning of my career, I would not have been a lead testifying expert. At that point, I was training and learning under other experts in both the Phoenix office, Chicago office, New York office. I worked for and with a variety of experts throughout the firm, especially in our electrical engineering and computer science practice, but across to other practices too as many components, like vehicles, devices, are -- are very interdisciplinary devices. And so from associate role, I would support many of the ongoing projects and training.

Q. And how long were you in an associate role before you began to accept the, call it, lead expert role?

A. Probably about five years. It was a -- excuse me -- it's a slow process in terms of you don't just one day become lead testifier. There are smaller

opportunities that might present themselves. But while I'm leading, perhaps, one investigation, I'm still supporting many others. So it's a very natural ramp-up process to become lead testifier in a team.

Q. So sounds like from the math, it would've been around 2019, 2020 where you started accepting the role of lead testifying expert in some cases?

A. I think that's correct.

Q. I think you provided a testimony history -- a case history as part of the normal Rule 26 disclosures in this case, correct?

A. Correct.

Q. And, obviously, Exponent has a lot of resources, so you guys track all that. It's up to date as of the time it was provided, correct?

A. That's correct.

Q. When you're the lead expert, I'm assuming that you're provided with whatever support you need from Exponent, from your team, to do whatever work you need to do on the case, right?

A. Yes, I've got a team.

Q. Does your team assist you in helping to prepare the report that you ultimately sign off on as the lead expert?

A. Yes, they do.

Q. Do you recall how many cases at this point you've been the lead testifying expert on?
A. No, I do not. Many of them have not gone to deposition. It might be 20 or 25.
Q. Okay. And I'll go ahead and tell you that's not a trick question, it's not a trap. I'm just trying to get some sense of how many. Roughly is fine. So that's your approximate guess just working out of memory?
A. Yes.
Q. Fair enough. And how many times have you given court testimony so far based on your recollection?
A. Perhaps nine or ten times.
Q. Now, obviously, you have a broad educational background, but do you hold yourself out at this juncture as working primarily in the field of ADAS systems?
A. Yes, it is my primary focus as automotive electronics are most interesting and compelling to me. I also work in non-ADAS electronics in -- in vehicles.
Q. Sure. And I'm certainly by no means trying to pigeonhole you. I'm just saying, if you were sitting here thinking about the percentage of work you do, seems like from what I've seen, most of your work right

now is -- I would call ADAS related; is that fair?
A. Not exactly. I would say most of my work is automotive electronics.
Q. Okay. Fair enough. In your education, did you have any experience building any automotive electronic systems?
A. No, I didn't build systems, although I studied system designs.
Q. Are you familiar with the engineering processes employed by manufacturers like Ford for the development of complex engineering systems?
A. I think generally speaking, yes.
Q. Are you familiar with the FMEA process automotive manufacturers like Ford employ to identify and categorize potential failure modes?
MR. BOORMAN: Object to the form. Vague as to time, but answer if you can.
THE WITNESS: Yes, I am.
MR. BOORMAN: Just letting you know I'm here, Nick.
MR. WOOTEN: You're right; the timing was just about right.
BY MR. WOOTEN:
Q. Beyond your work in automobile electronics in this case, are you retained as an expert for any

purpose other than the automobile electronics aspect?

A. Yes.

Q. Okay. Tell me about that.

A. I'm also a certified fire and explosion investigator and a certified vehicle fire investigator. And so I investigate fires, and sometimes those go to litigation as well. I also consult in consumer products that are not vehicles, and have been retained when some of those products are alleged to have caught on fire, for example.

Q. Okay. And that's -- that's your general career, correct? That's your overall type of work you do, sort of your entire scope of your expertise, right?

A. Broadly speaking, yes.

Q. Sure. For this case, are you hired to give any opinions that do not revolve around automobile electronics?

A. No.

Q. All right. Is it fair to say that your clientele and world of litigation would be considered defense clientele such as Ford or other automobile manufacturers?

A. Not always, but often.

Q. Have you ever been hired by a firm representing an injured person to provide opinions

against a corporate defendant?

A. No, I have not.

Q. So at least any plaintiffs' work that you would have done, would that be, essentially, corporate to corporate-type litigation?

A. Yes.

Q. Have you ever testified that an automobile manufacturer had a defect?

A. I don't believe so.

Q. Have you ever written an opinion finding that a corporate defendant -- scratch that.

Have you ever written an opinion saying an automobile manufacturer had a defect?

A. No, I have not. And, generally speaking, as a consultant for an automobile manufacturer, if I believe there is a defect, I provide my opinion to them and often issues relating to a defect don't go any further.

Q. Fair enough. In other words, sometimes obvious problems have a way of going away, correct?

MR. BOORMAN: I'm sorry. Object to the form. Misstates testimony, but answer if you can.

THE WITNESS: Yeah, it's not that they go away; it's that if my client understands, based on my opinion and expertise, that they have a defect, often the result is to pursue mitigation, or there have been

recalls or other ways to solve -- solve the issue.
BY MR. WOOTEN:
Q. And I didn't mean to infer anything negative by that. What I'm saying is that cases resolve at all points in litigation from pre-suit to after verdicts. I'm just saying that if you found there was a defect and you so informed your client, a lot of times what that means is that that particular case ends up getting resolved by the parties; is that fair?
A. I think that's fair.
Q. I mean, it's nothing -- from my world as a litigator, that's not news to anybody, I don't think, that cases get settled way more than they go to trial, correct?
A. I'm not sure if you said from your perspective.
Q. Well, from a litigator's perspective, we can't try all of the cases. I think the statistics are, like, .02 percent go to trial, or something like that. Mike might know better than me, but it's not a big number, trust me.
Have you testified on behalf of Ford before?
A. No, I don't believe I have.
Q. I know I have seen testimony from you before about a Ford collision warning case involving, I think,

Nissan. Have you testified in -- in AEB and FCW-type cases before?

A. Yes, I have.

Q. And I think you're probably aware, it seems to me there's cases out there that says manufacturers should have equipped with certain technology, and they're other cases that say manufacturer's technology didn't work correctly. Are you familiar with those types of cases?

A. Yes, I am.

Q. And my understanding is you've done some work in, kind of, both of those groupings of cases; is that fair?

A. That's correct.

Q. And in this case, when is the first time that you heard the term "steering probable path"?

A. I believe the first time it was brought up was when Steve Louden wrote a report recently bringing it to light.

Q. Before you saw Mr. Louden's report, had you personally ever heard of the term "steering probable path" or SPP?

A. Yes.

Q. Okay. Tell me about that.

A. So, generally speaking, in studying Advanced

Driver Assistance Systems, I have learned about both the hardware and the software, the conceptual algorithms that underlie the features that exist in ADAS systems.

Q. All right. And can you put some type of timestamp on when you would have first heard about steering probable path, or SPP, as a concept?

A. Probably about five years ago.

Q. Okay. And can you tell me in what context you would have heard about that. Just studies or specific litigation matter?

A. This would have been generally in research.

Q. Okay. So, essentially, gathering knowledge about how these various systems operate and function?

A. That's correct.

Q. Sort of adding to the expertise, so to speak?

A. That's correct. It is important at Exponent that we continue -- all of us as consultants continue our professional development regularly. And so it's critical that I stay up-to-date on all of the technologies, especially in the automotive space that are being developed, and these are all being rapidly developed.

Q. Fair point. And also, just to sort of close the loop on something we need to close at some point

today, ADAS systems of this nature, these Level 2 systems, are also not currently governed by any particular FMVSS, correct?

A. That is correct.

Q. And for those that don't know, an FMVSS is like a federal regulation setting minimum standards, correct?

A. That is correct.

Q. I don't want to call it Wild West, that's not fair to anybody, but there is freedom for manufacturers to make choices about how they're going to allow those systems to operate, correct?

A. I think that's a fair way to put it; that, in order to allow innovation to progress, I understand that NHTSA doesn't regulate before they feel that it's the right time.

Q. All right. So when you learned about steering probable path, or SPP -- which I think I'll probably just save the court reporter some fingers and we'll just go by "SPP" going forward -- were you studying any particular system, or were you just studying the concepts of how these systems were meant to operate?

A. I was primarily studying the concepts.

Q. And as we sit here today, how many manufacturers' systems have you studied in depth with

respect to the functioning of the Level 2 systems?
A. Specific manufacturer systems, maybe five, or maybe a deeper dive into five and perhaps more review investigation of another ten.
Q. Okay. So for the ones that you classified as a deeper dive, which ones are those?
A. So, for example, I have studied other peer technologies to the Ford F150. Those would -- those would be some of the systems, some of the automotive manufacturers.
Q. So you've studied BlueCruise, obviously?
A. I have studied BlueCruise.
Q. And you've studied Super Cruise?
A. I have studied some Super Cruise.
Q. Who else's systems have you studied?
A. I have studied Nissan, I have studied Daimler Truck North America. I know that's not a peer here, but that's another system that I have studied. Those are a couple other examples.
Q. Okay. Toyota or Mercedes?
A. Yes, I have studied both of those. I have not been retained in matters relating to ADAS for them, so I have not, for example, done deep dives into production materials.
Q. Okay. And what about Tesla?

A. Yes, I have studied Tesla systems in regards to what is publicly available.

Q. Have you have been retained by Tesla?

A. Not in Advanced Driver Assistance Systems.

Q. Okay. As part of your studies in electrical engineering, you have familiarity with vehicle telemetry systems?

A. Yes, I am.

Q. And what do you know about Ford's capability in the vehicle telemetry space?

MR. BOORMAN: Object to form. Vague as to time. Answer if you can.

THE WITNESS: Yeah, I have not studied specifically what their telemetry system components or subcomponents or capabilities are.

BY MR. WOOTEN:

Q. But you would understand things like an engineering hierarchy that laid out the modules that would be involved in Ford's cloud connectivity and that sort of thing? If we look at a diagram, you would be looking at a foreign material, right?

MR. BOORMAN: Object to the form. Foundation. Answer if you can.

THE WITNESS: That's likely correct.

BY MR. WOOTEN:

Q. A lot of studying in electrical engineering you did to get to the PhD field, right?
A. That's correct.
Q. And those types of things, sort of a network-type structure, be it an automobile, be it a home, be it an office, they do have sort of a familiar hierarchy, correct?
A. I'm not exactly sure what you're referring to by "hierarchy."
Q. So, in other words, you're going to have some sort of connection come into some sort of modem, and then that modem is going to have some sort of networking to the network components?
A. I think that's reasonable.
Q. And that would be -- that would be the same whether it's my Internet connection at home that connects to my TV and my kids' Xbox and my iPad or my office where everybody plugs into a land with a cable network, or whether I'm talking about a car that has an Internet connection through some type of 5G service, right?
A. Those are similar, but not exactly the same since you were just explaining that the car might have a data connection through cell towers, for example.
Q. Right. So it may be some slight differences,

but, generically, that structure involves a signal, a modem or router, and then the components of the network that are connected to the modem or router, correct?

A. I think that's rather broad because there are substantive differences; but, yes, there are communications and components that are enabling those.

Q. So as part of your analysis in this case, have you seen computer network data for the subject vehicle that was involved in the crash?

A. I don't believe I have studied that.

Q. Have you seen any data from the connected -- from the subject vehicle?

A. I don't believe so.

Q. Would it be useful to you in your analysis of the case to see any vehicle data that might exist?

MR. BOORMAN: Object to the form. Vague. Answer if you can.

THE WITNESS: I think, generally speaking, any data that's collected relating to this incident crash, it could potentially be relevant.

BY MR. WOOTEN:

Q. As between yourself and Natendra Nath that we deposed back in March, who do you think would have superior knowledge of Ford's BlueCruise system?

A. Mr. Nath would.

Q. When you looked at Super Cruise and BlueCruise, were there differences that you could easily identify between the basic architecture of those two systems?
A. Differences in the basic architecture? I have not done a side-by-side comparison.
Q. Do you know if Ford uses an HD map for the BlueCruise system?
A. I don't know if they use an HD map.
Q. Do you know what degree of precision Ford uses for its GNSS for the BlueCruise system?
A. No, I do not.
Q. Do you know if it's road level or lane level?
A. No, I do not.
Q. And have you studied the development of the Level 2 systems over the last, let's call it, 15 years?
A. Yes.
Q. Are you familiar with areas of known limitations of the Level 2 ADAS systems for their performance?
A. Generally speaking, I think a lot of them are outlined in the various owner's manuals that accompany those systems.
Q. Can you agree that entering and exiting a highway is a known edge scenario for Level 2 systems

generally?
A. I'm not sure that I would use the word "edge," but I do believe that there are indications and warnings in the owner's manuals that these Level 2 systems, for example, Ford LCA with ACC, need to be closely supervised through exits and entrances.
Q. Speaking generally, not just of the Ford system, but of what we know from the overall body of development, isn't it true that Level 2 systems have known limitations with negotiating exits from interstates and other sorts of changes in road segments?
MR. BOORMAN: Object to the form. Asked and answered.
THE WITNESS: I think that exits and entrances might be beyond the scope of many Level 2 systems' capabilities. So it's not necessarily true that entrances and exits are edge cases, but instead, they are not within the scope of where those systems should be used.
BY MR. WOOTEN:
Q. Fair enough. It seems, and this is not casting disparagement at anyone, but the research seems to indicate where we are with these Level 2 systems at this point is some of them are doing pretty well on,

you know, highway scenarios where you're mostly straight line driving and you don't have big changes in curvature and speed and the system's essentially maintaining the lane for you or maybe even changing lanes momentarily or even overtaking other vehicles in certain scenarios. It seems that the technology, at this point, is pretty good in those domains. Is that about what your appraisal is?

A. I just wouldn't be able to summarize Level 2 systems across automotive manufacturers down to, sort of, as you refer to it, in technology. They all have different features, and so you can stack different features on top of one another. And while some Level 2 systems may be able to execute a lane change, others are not designed to do so. And so I think those are just different features across manufacturers.

Q. Now, I don't mean to pick on you in any way, I'm just trying to make sure I understand your full opinions. But after having looked through your first report and your supplemental report, are -- are you doing any science with respect to your opinions, or are you simply providing us information about these technologies?

MR. BOORMAN: Object to the form. Vague. Answer if you understand the question.

THE WITNESS: Yes. My analysis is scientifically an engineering based. It's based on both my expertise and my experience and my research and studies into Ford's system, their production documents that describe the design approaches, the analyses that they performed, some of the testing that has been conducted.

And so my analysis encompasses a synthesis of a lot of these materials to understand what the capabilities within an LCA and ACC system that Ford produced for the subject vehicle, how it would be expected to perform.

BY MR. WOOTEN:

Q. What testing did you perform in that regards?

A. I did not perform testing in this matter.

Q. My understanding is you drove an exemplar vehicle here. You mentioned the Exponent facility is right around the corner from where we're sitting, right?

A. That's correct.

Q. So you drove it around the track and drove it around town to check it out as part of your investigation of the vehicle and its equipment, right?

A. That's correct, to familiarize myself with Ford's system.

Q. Did you capture or analyze any computer network data for the vehicle while you were driving it?
A. No, I did not.
Q. Did you capture or analyze any of the testing data provided by either Mr. Pascarella or Mr. Harrington?
A. I didn't capture their data. I believe they were the ones instrumenting their vehicles and capturing the data. I did review it.
Q. Both Mr. Harrington's and Mr. Pascarella's?
A. Yes.
Q. All right. And I would assume with your expertise that you have the ability to understand CAN messages and the data carried by the CAN network?
A. Yes. Generally speaking, yes.
Q. And you had the ability to decode those signals and determine their meaning?
A. Not all of them. So I know that both Bob and Shawn Harrington have employed various methodologies for capturing and identifying some of the messages that are being relayed on the CAN. That's not a comprehensive data capture, but some of the relevant signals, I believe, were captured by them during their testing.
And yes, I can understand them. I don't

specifically have the decoder file myself, but I understand they used various tools to understand which messages related to which parameters, for example.

Q. And, certainly, you're representing Ford; if you needed decoder information, your client could have provided it to you, right?

A. Well, I don't represent Ford.

Q. I'm sorry. Testifying in this case for Ford; is that fair?

A. I believe so.

Q. But you didn't need anything from them to -- to conduct your analysis?

A. Not beyond the production materials that they supplied.

Q. Okay. Do you hold any patents related to ADAS design?

A. No, I do not.

Q. Do you have any specific degrees or certifications related to functional safety?

A. Yes. I have studied functional safety and passed an exam to name me as a functional safety practitioner.

Q. All right. And is that an ISO 26262 certification?

A. That's correct.

Q. And do you have any special certifications in embedded control systems?

A. Embedded control systems is absolutely part of my expertise. And I'm a professionally licensed electrical engineer in the state of Arizona, and so that professional engineering expertise would absolutely encompass embedded systems.

Q. All right. And are you offering any opinions on software, or just high-level-system behavior?

A. I believe inherent in my opinions are both high level system behavior and software. Software is implicit when we're talking about ADAS's algorithm functionality.

Q. Did you undertake an independent failure analysis in this case?

A. I don't know exactly what you mean by that question. I performed an independent analysis of the subject crash. I studied the conditions surrounding the crash and the systems that the subject vehicle was equipped with. So I'm absolutely conducting an independent analysis, and trying to understand what may have happened during the crash.

Q. Is it your general opinion that the ADAS system in this vehicle functioned exactly as designed?

A. Yes; I see no evidence to -- to say otherwise.

I also see no evidence to say that the ADAS system necessarily was engaged at the time of the crash.

Q. Did you obtain or inspect the version of the software active on Barry Wooten's truck at the time of the incident?

A. Are you referring to reviewing software lines of code?

Q. I'm talking about the software that would have been installed on his vehicle.

A. I did not review the software; although, again, the software also is implicit in the algorithms. So I have studied the algorithms, I just have not studied the source code.

Q. With respect to Mr. Pascarella's testing, did you have any input over the methodology that he employed or the data that he obtained?

A. No, I did not. That was his independent testing.

Q. Through either Mr. Pascarella's data or Mr. Harrington's data, have you had access to full CAN bus logs, sensor data streams or raw environmental inputs used by the ADAS system on the exemplar vehicles?

A. You listed a number of things there. I have seen the CAN files that the two of them have collected,

and I have been able to review some of those CAN messages using, for example, a VBox software and using the -- the header decoders that -- that they have supplied.

Q. Have you had access to Ford internal development data such as thresholds for intervention or disengagement of the system?

A. Yes, I believe so.

Q. Have you sought any information that you believe was relevant to your analysis that you have not been provided?

A. No, I have not.

Q. Have you reviewed Ford's failure modes and effects analysis document for the LCA system to determine every probable or possible cause of failure with a lane departure?

A. I've reviewed some of it.

Q. And have you considered each and every possible cause of lane departure Ford identified in its own internal documents?

A. I'm not sure I would say every possible cause because I have not reviewed every single line of the FMEA, but I have generally reviewed some of it regarding lane departure.

Q. Have you had access to source code or internal

firmware to confirm the systems functioning as to the data you've received from exemplar testing?

A. I'm not sure I understood your question.

Q. Have you been able to independently confirm that the data that Mr. Harrington and Mr. Pascarella have produced regarding the functioning of the LCA system performed according to Ford's intended logic?

A. I'm still a little bit confused about Ford's "intended logic," but I will say that the data streams that they collected, I was able to review, and I don't have any reason to believe that they were otherwise altered.

Q. Okay. And that is as to the data collected by both Mr. Harrington and Mr. Pascarella?

A. Well, actually, I can't verify any authenticity regarding the data collected by Mr. Harrington. I'm not sure about his methodology nor his -- his approach.

Q. As between Mr. Harrington and Mr. Pascarella, who was able to garner more data about the CAN bus signals on the exemplar vehicles?

A. I don't know if I've seen any quantification of the amount of data that either one of them has collected. In my review of Mr. Pascarella's testing, it looked to me that he was able to drive further into

the exit than Mr. Harrington and his team.

So if you're referring to data collected in an individual run, perhaps Bob Pascarella has more data available to him; but in terms of the number of CAN messages or data channels or instrumentation components that they've equipped their vehicles with, I'm not sure how much of each was collected.

MR. WOOTEN: We've been going right about an hour. I'm kind of about to change subjects. Do you want to take a quick break before we dive off into a bunch of documents?

THE WITNESS: Sure.

VIDEOGRAPHER: We are off the record at 8:57 a.m.

(Recess.)

VIDEOGRAPHER: We are back on the record at 9:06 a.m.

BY MR. WOOTEN:

Q. All right. Dr. Kuykendal, we're going to try to move into your report. And I'm going to kind of do this in reverse order. We'll start with your supplemental. So first of all, there's this issue of whether LCA with -- ACC with LCA was engaged or not, correct?

A. That's correct.

Q. And you understand that there's essentially three possible scenarios there: There is normal cruise was engaged, or ACC was engaged without LCA, or ACC was engaged with LCA, correct?

A. Yes, I think that's correct.

Q. All right. Do you know the default state of the cruise control in the P702?

A. I believe the default state is what the previous state was on the last key cycle.

Q. All right. And you understand that you have to navigate into the infotainment menu, at least a couple of levels, to turn on or turn off LCA, correct?

A. No; I believe you can do it directly from the steering wheel.

Q. To make the initial selection. In other words, when you're setting up the truck when you first buy it, if you want to use LCA, it tells you to go into the infotainment module and turn it on, correct?

A. I think that sounds right.

Q. And then, as you said, once you've made that selection of whether you want to utilize the feature or not, then you also have the button that's on the steering wheel that you can click it off, correct?

A. Yes, that's my understanding.

Q. And you -- you would agree that there's

testimony and even text messages from Barry Wooten that talk about where the family said he regularly used LC -- or ACC with LCA?

MR. BOORMAN: Object to the form. Misstates the evidence, but answer if you can.

THE WITNESS: Yeah, I don't think that it was word for word as you stated. I think there were messages of the effect that he was intrigued by the technology.

BY MR. WOOTEN:

Q. And do you recall reading the family's depositions?

A. Yes.

Q. Do you recall his wife testified that he used the system?

A. I believe that's correct.

Q. And his daughter testified that she knew he used the system?

A. I don't recall specifically her testimony.

Q. And his son, Lane, do you recall him testifying that he used the system?

A. I don't recall if he said he used it.

Q. All right. You understand that once you have LCA toggled on in the infotainment system, if you're using ACC, the LCA will automatically engage in the

proper -- if you have the proper circumstances, in other words, you have visible lane lines?

A. If the previous setting had LCA on, I believe that's correct, but if it did not, I don't think it will automatically engage.

Q. Do you know if the system -- the vehicle system itself actually defaults to ACC rather than normal cruise control on this truck?

A. Again, are you saying only defaults that one time when the truck is first purchased?

Q. I'm talking about once you've turned on the truck, the default setting for as between normal and ACC is actually ACC?

A. Perhaps when you first purchase it, but again, I understood that to be a setting that was retained across key cycles. So if you changed it to regular cruise control, that it would remain there.

Q. So you don't think the system itself continues to default to ACC and you have to select normal cruise specifically if you want to use that?

A. Perhaps in the beginning when you first purchase it, but I thought that it retained the last setting.

MR. WOOTEN: Cam, if you will show me Document 142.6.1. This is Exhibit 142 Page 6. It

should pop up on the screen for us.

(Exhibit 142 is marked for identification.)

BY MR. WOOTEN:

Q. Let me know when you've had a second to read that.

MR. BOORMAN: This is a 29-page document; is that right?

MR. WOOTEN: Yeah. The Bates label page number is in the lower right under the highlighted portion. We can pull it down if we need to. It's hard to read.

BY MR. WOOTEN:

Q. Are you able to read that?

A. Yes, I am.

Q. Take your time. We're not trying to break your eyes. If we need to try to blow it up some more, we can do that also.

A. That actually just helped.

Q. Okay. All right.

A. Yes, I see that.

Q. So does this seem to indicate that normal cruise control is an enhancement to ACC, but the system defaults to ACC?

A. Yes. Can you tell me what document I'm looking at, please.

Q. Yes. It comes from the -- it's called the CGEA 1.3 Stop-and-Go ACC, Functional Engineering Specification for Cruise Control.
A. Okay.
Q. Does that help?
A. Yes.
Q. All right.
MR. WOOTEN: You can take that down.
THE WITNESS: It might be helpful going forward if we could pull that a little closer because I have a feeling we're going to do this a couple of times.
MR. WOOTEN: Yeah, we're going to do it a couple of times, you're right. Do you want to pause to let us do that? Let's just go off the record just a second and we'll get this resituated. We have been having it on the big screen, but this far away it might not make any difference. Probably just as easy to move that up. And I do have an iPad; if you need me to, I can put it closer to you.
VIDEOGRAPHER: We are off the record at 9:13 a.m.
(Recess.)
VIDEOGRAPHER: We are back on the record at 9:16 a.m.

BY MR. WOOTEN:
Q. All right. Dr. Kuykendal, we took a quick break to try to help with the screen. We probably should have tested that before we started, so my apologies.
I mentioned earlier the idea of connected data and telematics. Are you familiar with Ford's connected data capabilities for its post 2020 vehicles?
A. Not specifically.
Q. Okay. All right. Let me show you what we marked as Exhibit 13, please.
(Exhibit 13 is marked for identification.)
BY MR. WOOTEN:
Q. This is a Connected Vehicle Terms and Privacy Policy from -- it's actually from Australia from 2021 because they had a data privacy law. Let me show you the first spot from that, please.
MR. WOOTEN: Show me point 1.
BY MR. WOOTEN:
Q. So are you familiar with FordPass and FordPass Connect in the Ford system?
A. Yes, I've heard of it.
Q. Okay. All right. Able to see that?
A. Yes, I am.
MR. WOOTEN: Show me 13.2, please.

BY MR. WOOTEN:
Q. So what Ford's telling consumers in Australia, in 2021, these are some of the things that they're doing with connected data through the FordPass system. Had you had a chance to see this before?
A. It doesn't look familiar.
Q. All right.
MR. WOOTEN: Show me point 3.2, please.
BY MR. WOOTEN:
Q. So under this heading, Ford's explaining what data the Pass Connect modem is sending from your vehicle in factory resetting. Give you a second to read that.
MR. WOOTEN: If you can blow that up a little bit, Kam. Just need to move it right there.
BY MR. WOOTEN:
Q. Are you able to see that okay?
A. Yes, I am.
Q. All right. Does this indicate the vehicle's coming from the factory with a modem, and it was called a Partially Activated State? And down about the middle of the page, it indicates that it communicates the electronic serial number of your FordPass Connect modem, the SIM serial number, and your vehicle identification number as part of its communications?

A. Yes, I see that.
Q. And prior to today, have you seen anything like that before?
A. Not specifically, but that's not unexpected.
Q. And this is not unique to Ford. I mean, other manufacturers do telematics and have built-in modems, correct?
A. Yes, they do.
Q. Obviously, Tesla is pretty famous for communicating data from vehicles to Tesla servers, correct?
A. Yes.
Q. And so this notion of a connected vehicle, these are types of things you would expect to be communicated so the information can be tracked, right?
A. Yes.
Q. Okay. All right.
MR. WOOTEN: Show me 13.4, please.
BY MR. WOOTEN:
Q. On this page, it says that to use all the full services, you have to fully activate your modem. You essentially have to create your FordPass account. And it tells you down at the bottom, once you fully activated your modem, the vehicle continues to send data. And it shows you what it will do even if you

attempt to stop it. It shows you what data it will still send down at the bottom. Do you see that?

A. Okay.

Q. All right.

MR. WOOTEN: Show me 5.1, please. Actually, go back to the previous one, 4.1.

BY MR. WOOTEN:

Q. The top section, that middle bullet point, calling your attention to that highlighted portion, it talks about driving data. Let you make sure you see that.

A. I see it.

MR. WOOTEN: Take me to 8.1, please.

BY MR. WOOTEN:

Q. This explains what types of connected vehicle data Ford uses? That was a terrible question. Just let me know when you've read that, and I'll take you to the table that shows you the definitions.

A. Okay. I'm ready.

MR. WOOTEN: Show me 9.3, please.

If you can pull out those middle sections where the highlights are.

THE WITNESS: Could I see the column headers first, please.

BY MR. WOOTEN:

Q. Sure. He might be even able to whizzbang that thing where he could put those up underneath that to help you. He's pretty good with that thing. Does that help?

A. Yes, it does.

Q. All right. So I highlighted those two particular categories because I thought they probably were most relevant, but I'll let you read those explanations.

A. Okay.

Q. Again, the types of information that you're seeing listed here, in your work in this field, you're not surprised by the types of data that I'm showing you in this policy, correct?

A. That's correct.

Q. And this is -- seems to be where manufacturers are headed generally, correct?

A. Yes; in having connected vehicles, yes, I agree.

Q. Right.

MR. WOOTEN: You can pop that down, Kam. Show me 10.1, please.

BY MR. WOOTEN:

Q. This section talks about data transfer, storage and sharing. I'll give you a minute to read

through that.

A. Should I read the second one too?

Q. Really, I think the second one you can just confirm the main point there looks like they're accepting all this data back to the United States to Ford's storage servers.

A. Okay.

MR. WOOTEN: Kam, show me 10.29, please. You can close that one down, we don't need that one. There is one last highlight on that page that I don't think we need. Take me to Exhibit 10, Page 29, please.

(Exhibit 10 is marked for identification.)

BY MR. WOOTEN:

Q. This is from the Version 1 owner's manual for the truck. This is the data privacy page from the owner's manual that would have been applicable to Barry Wooten's vehicle. Have you had a chance to review that?

A. I'm not sure that I've read every line of the data privacy portion.

Q. Okay. I might be able to save us a minute. I can represent to you that, essentially, it more or less says kind of what we just saw from the Australia policy. It says, We are collecting data and there's a connected modem, that sort of thing. That wouldn't

surprise you either, right?

MR. BOORMAN: Object to the form. The document speaks for being itself.

MR. WOOTEN: Sure.

MR. BOORMAN: And answer if you can.

THE WITNESS: It would not surprise me.

BY MR. WOOTEN:

Q. All right.

MR. WOOTEN: Show me 10.30, please.

BY MR. WOOTEN:

Q. It distinguishes between service data in this policy and event data. The service data, I've got that up right now. If you want to take a moment and read that if you need it.

A. This one is a little bit small.

Q. Yeah.

MR. WOOTEN: Can you blow that up at all, Kam? We might have to parcel it out into more pieces to make it big enough to see.

BY MR. WOOTEN:

Q. Let's read that piece first.

A. This one is referencing Canada.

Q. It says Ford Motor Company and for, Motor Company in Canada. It references both.

A. Okay.

Q. All right.

MR. WOOTEN: Give us the next slice of that, please.

THE WITNESS: Okay.

MR. WOOTEN: The rest of that, if that's on one slice.

THE WITNESS: Okay.

MR. WOOTEN: We did have that highlighted, but pick it back up.

THE WITNESS: Okay.

BY MR. WOOTEN:

Q. Now, the next portion there is event data. I'll represent to you that that deals with what you normally see in the event data recorder, so they separate those two buckets out. Happy to let you read it if you'd like. Just tell me if you want to read the whole thing or not.

A. I suppose it depends on your question.

Q. All right. That just shows the event data section. I don't think -- there's no ambush in that. I just wanted you to know there's a distinction Ford makes between the two buckets of data.

A. Okay.

MR. WOOTEN: Can you pull up the event data description for us, Kam, first paragraph. There you

go.

THE WITNESS: Okay.

MR. WOOTEN: Pop that down. Show me 10.30, please. You can go ahead and show me the cuddle map, please. It might help us read it. Was that the next page? If it is, then I called the wrong number. So 31, then. Sorry. It's Page 31, 10.31.

THE WITNESS: Okay.

MR. WOOTEN: Is there a second clip on that page, Kam?

BY MR. WOOTEN:

Q. This also discusses the driver-facing camera in the vehicle?

A. Okay.

MR. WOOTEN: Then the last page on that document for this purpose is Page 568. Do we have a clip on that? There we go. Pull up under "What is a Connected Vehicle?" please. Just pull up that section.

THE WITNESS: Okay.

MR. WOOTEN: Let's move to Exhibit 14, please.

(Exhibit 14 is marked for identification.)

MR. WOOTEN: This is a 2025 Ford privacy policy. Just pull up the clip you had, please.

BY MR. WOOTEN:

Q. This was published in August of 2024 for 2025

that describes the types of data that Ford's collecting now that's applicable to the U.S. And I've pulled up the chart that explained the types of data for you to review. Take a second and look at that for me.
A. Could you please zoom in.
MR. WOOTEN: Yeah. You may have to pull that down, Kam, and do one block at a time just to...
MR. BOORMAN: We can move this in the center, then. That's where it's going to go. I need to be able to see it. If you want to move it here, if you want to move it there, but...
MR. WOOTEN: Are you able to see it?
MR. BOORMAN: I need to be able to see it and the witness needs to be able to see it.
THE WITNESS: It was okay when he zoomed in.
MR. WOOTEN: We can help you with the zoom too. Don't let me torture you on that.
BY MR. WOOTEN:
Q. Anyway, the first section is vehicle data similar to what we saw with the Australian policy. It talks about communicating the modem ID, the vehicle identification number, and the SIM card number, right?
A. For 2025.
Q. Right.
MR. WOOTEN: Show me the next portion of that,

please.

BY MR. WOOTEN:

Q. And this defines the driving data and vehicle location similar to what we saw with the Australian policy, right?

A. Yes, it looks similar.

Q. Okay. In any of your work with Ford or in studying Ford, have you ever had access to connected vehicle data from any of their vehicles?

A. I'm not sure right now.

Q. Okay.

MR. WOOTEN: You can pop that one down, Kam.

BY MR. WOOTEN:

Q. Again, we're talking about one of the points disputed in this case is whether the ACC with LCA was actually engaged at the time of the crash, correct?

A. Yes, we have.

Q. If Ford has connected vehicle data that would show the status of that system, that would be important to all of us, wouldn't it?

A. It would be, but I'm not sure that I've seen anything that tells me that they have that.

Q. Okay. So you understand Barry Wooten had an activated FordPass account for the vehicle that crashed, right?

A. I'm not sure that I was aware.

Q. Okay.

A. I also didn't see anything in here that described the LCA and ACC features that we were talking about.

Q. Yeah. I've got a document for that, and we'll get into in it a second. Just -- I'm just trying to make sure you had some sense of what Ford was saying they were collecting before we went off down that path --

A. Okay.

Q. -- which is where we're headed.

MR. WOOTEN: Show me Exhibit -- let's go to Exhibit 15, please, just so I don't skip anything.

(Exhibit 15 is marked for identification.)

BY MR. WOOTEN:

Q. This is -- all right. This is Ford's privacy policy. It says it's effective in June of 2025. This is 15.7, Page 7 of Exhibit 15.

MR. WOOTEN: Blow that up for us, please.

BY MR. WOOTEN:

Q. Again, are these categories of data in line with what you would expect manufacturers to be collecting with telematics and connected vehicle type systems? Correct?

MR. BOORMAN: Objection. Vague as to time, vehicle, location.

THE WITNESS: Yes, these are reasonable.

MR. WOOTEN: Show me 15 -- Page 15, please.

BY MR. WOOTEN:

Q. This talks about the use of personal information in -- in how Ford uses personal information, correct?

A. Yes.

Q. All right.

MR. WOOTEN: Show me 15.16, please.

THE WITNESS: Okay.

MR. WOOTEN: And show me 16.2, please. Probably have to blow that up.

BY MR. WOOTEN:

Q. So, in that section, does it say that one of the reasons this could be used is to defend a pending or anticipated investigation or legal claim?

A. "Defend a pending or anticipated investigation or legal claim." I see that.

Q. All right.

MR. WOOTEN: Show me the second part of that, please, Kam.

THE WITNESS: Okay.

BY MR. WOOTEN:

Q. And that particular paragraph also allows use of that information in litigation, right?

A. Yes.

MR. WOOTEN: Show me 17 -- 15.17, please.

THE WITNESS: This is still the same document? This is the 2025 U.S. privacy notice?

MR. WOOTEN: This is the January -- June 26, 2025 privacy policy.

THE WITNESS: Okay.

BY MR. WOOTEN:

Q. This section talks about using processing data that Ford collects using artificial intelligence, machine learning and other automated decision-making technology to support the processing, right?

A. Yes.

Q. Again, that, also, you would expect the manufacturer to do based on your knowledge of telematics and how manufacturers are using data from connected vehicles?

MR. BOORMAN: Objection. Vague as to time, vehicle, location, but answer if you can.

THE WITNESS: Yes. I think that might be a much newer concept that's being employed, so I have not specifically studied the use of AI to analyze this data. It sounds like there's a lot here they're

referring to. For example, chatbots to interact with the consumer.

So I don't totally understand what all they're indicating that they're analyzing. But yes, I see the use of AI to do it.

BY MR. WOOTEN:

Q. You are aware of automobile manufacturers such as Tesla using AI and large language models to train camera systems to address particularly challenging road situations that Tesla has encountered; is that fair?

A. Yes, I think so.

Q. All right.

MR. WOOTEN: Show me 23.1, please. Page 23.

BY MR. WOOTEN:

Q. This is the retention policy, correct?

A. That's correct.

Q. All right. You said you had not seen anything about the architecture of the Ford Vehicle 2 system for cloud connections to vehicles?

A. No, I don't believe I have.

Q. All right.

MR. WOOTEN: Show us Exhibit 12, please, Kam.

(Exhibit 12 is marked for identification.)

BY MR. WOOTEN:

Q. This is a document that we were able to

locate --

MR. WOOTEN: Can you blow up the title, please. It's kind of hard to read.

BY MR. WOOTEN:

Q. My guess is you've probably never seen this PowerPoint since we just talked about you haven't seen an architectural document, correct?

A. That's correct.

MR. WOOTEN: Can you take me to Page 14, please.

BY MR. WOOTEN:

Q. Are you able to read that text from this distance? Do we need to try to blow it up more?

A. I can read the text.

Q. I'll let you take a second to look at that.

A. Okay.

Q. The information that's contained there on Page 14 of Exhibit 12, is that in line with the types of architecture and information you expect to see with respect to the architecture for connected vehicles and cloud communications?

A. I would have to study it. It's a rather sophisticated complex drawing that I guess is demonstrating components and their conductivity within the architecture. I'm not sure what the FNV 2 is

referring to. Is there some documentation that this is...

Q. Yeah. We'll see it in a minute, but it's called Ford New Vehicle 2, or 2.0. It's essentially the second set of vehicle architecture. There'll be some reference to explain that in a minute or two.

MR. WOOTEN: But go to Page 26, please.

BY MR. WOOTEN:

Q. This page has a drawing for camera architecture. I'm guessing that text is probably too small; would you agree?

A. On the left side it is.

MR. WOOTEN: Can you blow up the text from the left side first, please.

THE WITNESS: Okay.

BY MR. WOOTEN:

Q. So, essentially -- you know what, there's two versions of the camera architecture. This one talks about the dash cam feature. And since I know we are not talking about a dash cam scenario, let's just go to 27, please.

This is an explanation of the camera service. It's not specific to any reference to the dash cam.

MR. WOOTEN: If you can, can you blow up the right side first, please.

BY MR. WOOTEN:
Q. I mean, obviously there's a million variations to components of electronics, correct?
A. Yes.
Q. This appears to be a drawing of a camera manager functionality that's represented in this document. Are you able to tell anything about this other than with just what the pictures say?
A. No, I don't think so. I think I'd have to have definitions. It appears that there's a number of functions, and they probably have relevant definitions somewhere else.
MR. WOOTEN: All right. Pop that down.
MR. BOORMAN: What document and page was that?
MR. WOOTEN: This is on Exhibit 12, and that particular page is 27.
Over on the left side where it says "Camera Service," can you pull the top portion of that, please, and blow it up for us, Kam.
BY MR. WOOTEN:
Q. So you are familiar with the terminology "DAT," correct?
A. Yes.
Q. And that's a reference to Ford's Driver Assist Technologies?

A. Yes.

Q. And this is talking about camera service for -- in the box -- inside the box, it says "DAT," correct?

A. Yes.

Q. And so that's showing four camera services; the lowest one says "360 camera," correct?

A. Yes.

Q. And, of course, we know that the DAT-equipped vehicles had 360 cameras, correct?

MR. BOORMAN: Wait. Object to the form. Vague as to which vehicles. And -- and have you represented this represents a certain vehicle, that this applies to a certain vehicle?

MR. WOOTEN: It's the architecture for any of the vehicles that are equipped with 360.

MR. BOORMAN: As of what date? What vehicle lines? What country? I just didn't hear any foundation for it.

MR. WOOTEN: Okay. All right. Well, my understanding it's the Ford N Vehicle 2 architecture. And where it says "360 camera," it's for the 360 camera suite for any vehicle that's equipped with a 360 camera suite. That's my understanding.

MR. BOORMAN: All right. Are you asking her

to accept that for the purpose of a hypothetical, or is there something you're going to show her that suggests that?

MR. WOOTEN: We'll run through what the parts I'm going to show her. I'm asking her if she has any familiarity with how many camera services are on -- in the DAT system. She may not know.

BY MR. WOOTEN:

Q. Do you know how many cameras are involved in the Driver Assist Technology system?

A. For the 360 view?

Q. Yes.

A. I'm -- no, I'm not sure.

Q. Again, this is new, right? You haven't seen this document before today, correct?

A. That's correct, I have not.

MR. WOOTEN: Show me the lower portion of that slide, please.

BY MR. WOOTEN:

Q. Have you seen any drawings from Ford that are similarly describing the camera service for the DAT system for any Ford vehicles similar to what I'm showing you now?

A. No, I have not.

MR. WOOTEN: Show me Page 28, please. Can you

blow up the diagram, please.
BY MR. WOOTEN:
Q. Does this diagram look like a relatively standard form diagram for the camera service manager?
A. I'm not sure that there is a diagram that I would expect to be standard. Every automotive manufacturer has their own internal design, so I'm not sure I would call this "standard."
Q. Okay.
A. It may be for Ford, if that's -- if that's correct, but I'm not sure.
Q. Do you know if the Ford vehicle is equipped with a telematics control unit?
A. Yes.
Q. And we do know there is an ADAS module for the subject vehicle at least, correct?
A. That's correct.
Q. Are you familiar with the Gateway modem for Ford connected vehicles?
A. Not in terms of any kind of specifications to define its capabilities. It was also my understanding that the 360-degree camera view is actually housed in a separate module from some of the other Advanced Driver Assistance System computations. So I'm not quite sure if this is providing sufficient detail to know which

modules we're looking at.

Q. All right. Well, I obviously didn't do the diagram, so I can't help you with that either, so -- all right.

MR. WOOTEN: Let's look at Page 34, please.

BY MR. WOOTEN:

Q. So had you ever seen cloud-based vehicle analytics from any of Ford's vehicle prior to 2021?

A. No, I'm not familiar with that.

MR. WOOTEN: I skipped a page. Show me Page 33, please. Cut out that diagram for me and blow it up, please.

BY MR. WOOTEN:

Q. Again, this is the first time you're looking at this system. Do you recognize any of those component as various ECUs or modules that are present in the P702 vehicle?

A. No. I mean, "ECU" is a rather generic term. I see a TCU. As you -- as you cited to earlier, I think maybe it's the Telematics Control Unit. Here it's also talking about any ECU, so it's maybe taking a generic perspective at how communications are sent over the Ethernet, but I'm not familiar with this diagram.

Q. Okay.

MR. WOOTEN: Pull that down, Kam. Show me 34,

please. If you can clip out the text in the upper left, please, blow it up for us.

BY MR. WOOTEN:

Q. So this is titled "Parsed and FNV Analytics." Are you familiar with Ford using the term "FNV" for Ford New Vehicle?

A. Not -- not exactly familiar with what all it refers to. I also see that this is referring to other training. So I guess I'm not sure if we're looking at something that was intended for an internal training session for Ford employees.

Q. Well, it was intended to explain the cloud to vehicle architecture for Ford vehicles and for -- internally for Ford employees, but...

MR. WOOTEN: Drop that back down, please. If you pull the illustration off the lower right, please.

BY MR. WOOTEN:

Q. So this document appears to be illustrating three modules: the TCU, the EVG and the Sync module with data, sort of, transmitting from all three of those modules to the Ford New Vehicle analytics cloud. Does that appear to be what's shown there?

MR. BOORMAN: Object to the form and foundation.

THE WITNESS: I don't know. There's arrows up

to a cloud picture.
BY MR. WOOTEN:
Q. Is that type of architecture what you would expect to see for a connected vehicle system?
A. I -- I don't know that this is explaining the architecture to me. I'm not -- I'm not sure I can answer.
Q. Okay.
MR. WOOTEN: Show me the next page, please. I was clicking my pen, I will stop.
BY MR. WOOTEN:
Q. So this page is titled "What do we have now?" And it says, "FNV Program Devices Analysis." Do you see that heading?
A. I see the heading.
Q. And it breaks down the count of devices and breaks down the categories. Do you see that?
A. Yes, I do.
Q. For instance, I think it says it has 87 sensors. Am I seeing that right?
A. Yes.
Q. Across the bottom it also breaks down several other categories, correct?
A. Yes.
MR. WOOTEN: Kam, can you pull up two of those

at a time so we can see them more clearly.

BY MR. WOOTEN:

Q. Do you recognize DIDs as internal Ford names?

A. I don't recall right now. I -- I know I've seen DID before. I don't remember what that acronym stands for. But also, I don't know that I saw -- when is now?

Q. The date of the report, the date of this presentation.

MR. BOORMAN: Which is when?

MR. WOOTEN: It's on the front page. I'm pretty sure we've got a metadata date on that. Hold on a second. Just a second, he's going to pull it up on the native to tell you the date.

MR. BOORMAN: For the record, this was not produced in this case, right?

MR. WOOTEN: We produced it.

MR. BOORMAN: Well --

MR. WOOTEN: Ford didn't send it to us.

MR. BOORMAN: Something you got off the Internet?

MR. WOOTEN: Yeah. There's the date. What does that say? Can't really see it. Just cut it and send it to me in Teams. I can't tell.

MR. BOORMAN: I can read the date. It says

5/6/2020, but that doesn't mean that that's when this document was created. It could be -- well, that's for another time.

MR. WOOTEN: Yeah. At some other point, right. You can take that down. Go back to the page we were on, please. Go ahead and take me to the next page, please. Take me to the next page. And I think the last page, please.

BY MR. WOOTEN:

Q. So this is from Page 51. It's the last page we have highlighted. This was an explanation of the device type subcategories and attributes. Are you able to read that?

A. I am, but I believe I still haven't been refreshed on what the acronym DID that we're talking about here stands for.

Q. My understanding it had to do with diagnostic IDs from Ford. It's an internal Ford term.

A. Okay. Was that shown here?

Q. No. We can find it for you. I just seen it about a million places. I think we're going to see it in just a minute in one of the exhibits a little further down the line.

A. The reason it doesn't totally make sense is because this says "Attributes in bold have few or zero

DIDs for most of the devices."

But if it was a diagnostic ID, I would think that that would be something that is existing for a system, and it would get set or encoded or something, but...

Q. Right. So let's talk about that issue in particular for a moment. For instance, under "Sensors," it's got a laundry list of -- of attributes. First one being "Type." It wouldn't take but a single DID to tell you what type that is, correct?

A. Well, again, I'm not familiar with the DID structure, but if that's a diagnostic -- if it's the equivalent of a diagnostic trouble code --

Q. It's not. Those are two different things.

A. Okay. I'm just not familiar.

Q. A DTC is like, as you mentioned, it's a trouble code, it's like an error or a fault. A DID is typically telling you what something is. So, for instance, when you talk about a type of sensor, it's going to give you a code for that type, and that'll -- it gives you a lookup and tells you which type of sensor it is. So it would only have one attribute to tell you what type of sensor you were working on. Does that make sense?

A. I -- I suppose if this -- if the diagnostic ID

is a structure that has all of these different attributes and each of these attributes has a value, but it says that there are zero DIDs for most of the devices.

Q. Few or zero.

A. Few or zero. But if there was some attribute relating to a LIDAR, I would think that it would have an ID. So I guess I just don't understand.

Q. Okay. All right. Well, the DID definition is not in this document. I'll find it for you in a minute if we need to come back and look at this later today. We've got some time, we can do that also. All right.

Really, what I was looking for is on this particular page we're talking about the categories. You don't see anything that looks out of place, obviously, in those descriptions about the various types of categories, right?

A. Right. I guess I just don't know what they're categories of. These are just categories of types of sensors?

Q. Right. It's giving you just examples. It's telling you -- it says "Device Type Subcategories and Attributes," and it's giving you -- the first, the top line is categories, and attributes are across the bottom.

A. Okay.
Q. Okay.
MR. WOOTEN: You can pull that down, Kam. Show me 250, please. Page 2. Show me the first page, please. Go back to the title page.
(Exhibit 250 is marked for identification.)
BY MR. WOOTEN:
Q. Have you ever seen any information from Ford about using MATLAB to monitor ADAS feature usage analysis and scenario generation?
A. I mean, no, I have not. MATLAB is a very common tool that many developers and analysts use, but I'm not sure what Apache Spark is. I have not seen this.
Q. Okay.
MR. WOOTEN: Take me to the next page, please.
BY MR. WOOTEN:
Q. This is a clip from the second page, sort of introducing what's going on with this presentation. Let me know when you've read that.
A. Okay.
Q. So this appears to be describing how Ford uses big data to serve for edge cases, I think they call it, using these MATLAB?
A. Yeah, I don't know it's that they use big data

or they use MATLAB tools to more efficiently analyze data. But, again, I don't know what Apache Spark Resources are or the Hadoop file system. I'm not sure what we're referring to here.

Q. Do you know if that's an internal Ford file system?

A. No, I'm not familiar.

MR. WOOTEN: Y'all want to take a quick pause?

MR. BOORMAN: Sure.

VIDEOGRAPHER: We are off the record at 10:06 a.m.

(Recess.)

VIDEOGRAPHER: We are back on the record at 10:18 a.m.

BY MR. WOOTEN:

Q. Going back to Exhibit 250 that we were on. I'll represent to you that this is a 2020 document that came from a Ford presentation at an engineering conference. You said you weren't familiar with the analysis or the Apache Spark. That was a name you were unfamiliar with?

A. That's correct.

Q. You've had a chance to see the abstract that's -- let me see what the page number -- I got it. Never mind.

MR. BOORMAN: 2, but it's also Bates-labeled 16148.

MR. WOOTEN: Yeah.

BY MR. WOOTEN:

Q. Have you had a chance to read the abstract?

A. Yes, I did.

Q. Let's look at Page 3. You don't know any of these people from Ford or MathWorks, right?

A. No, I do not.

Q. MathWorks, is that the company that owns MATLAB?

A. That's correct.

Q. Okay. So let's look at Page 4 together. A lot of this, we'll move through really quick. Let me know when you've had a chance to read that, or if you need anything blown up, tell me that too.

A. It's large enough I can read it.

Q. All right.

A. Okay. I read it.

Q. And, for instance, the first bullet point says, "The ADAS Customer Experience and Data Analytic Team was formed by engineers from various disciplines such as NVH (Noise Vibration Harshness) and PowerTrain Engineering."

Did I read that correctly?

A. Yes.
Q. I mean, does that sound like normal things all manufacturers do for data analytics?
A. It sounds like an interdisciplinary team.
Q. All right. Next page, Page 5. I will tell you that the video, for whatever reason, says "Private," you can't access it, but we found that to be the case with a number of Ford videos, so maybe Ford.
Let you read that.
MR. WOOTEN: Pull up the bottom section for us, please.
THE WITNESS: Okay.
BY MR. WOOTEN:
Q. This indicates at least full CAN traffic data is collected and sent to the Ford Cloud, right?
A. Yes.
Q. Let's look at the next page.
A. Okay.
Q. Are you familiar with Ford's proclivity for three letter acronyms?
A. I'm not sure.
Q. Ms. Dossy told me they had a term for it at Ford called TLA. It's all three letter acronyms.
So look at Page 7. Says "Developing the workflow." It shows a big bucket of tools on the left;

it became a streamlined bucket of tools on the right.

A. Okay.

Q. Page 8, there's a slide titled "Final Workflow." Are you able to see the blown-up cutout of that?

A. Yes, I think so.

Q. So this mentions the Hadoop file system on the slide itself, again, underneath this drawing.

MR. WOOTEN: Kam, drop that down and show that text underneath the drawing.

THE WITNESS: Okay.

BY MR. WOOTEN:

Q. Again, it doesn't necessarily explain exactly what the Hadoop file system is, but I noticed in the drawing it has capital "HDFS," which I assume means the Hadoop file system again.

Does this seem like a logical workflow for this type of big data analysis based on what you know about the processes?

A. At the high level, "Define," "Query and Group," "Detect," "Subset," those all sound reasonable. I don't think I read all of the subcategories.

Q. Sure. I really don't think there would be any reason for you to do that today.

A. Okay.

Q. So the next couple of examples it talks about, on Page 9, Step 1 Define. A little bit of explanation there. Page 10, Step 2 Query & Group. Sort of explains that structure.

The next slide on Page 11, "Workflow Step 3 Detect." This talks about using MATLAB Vehicle Network Toolbox to decode the CAN data, correct?

A. Yes, I think so.

Q. This mentions Apache Spark down at the bottom text box as well. It says that their algorithm is running Apache Spark, but doesn't define what Apache Spark is, right?

A. Correct.

Q. Page 12, it talks about Workflow Step 3 Detect. It says it concludes with the creation of an Event Dictionary like the one shown below. It says this is a high-level look at the events of interest.

Did I read that correctly?

A. Yes.

Q. Page 13 talks about Step 4 Subset. It explains that step, correct?

A. Yes.

Q. Page 14 states that the workflow was used to analyze several ADAS features, and says the next few pages show early examples, correct?

A. Yes.

Q. So Page 15, it talks about an Example Use Case of Active Park Assist Plus. Explains that, correct?

A. Somewhat.

Q. Page 16 provides some additional explanation regarding the Active Park Assist Plus, correct?

A. Okay.

Q. Page 17, presentation indicates that Ford then used a Toolchain to analyze other ADAS features such as Adaptive Cruise Control and Lane Centering, correct?

A. Yes.

Q. Then on Page 18, they have an example of results of a lane centering wander analysis, correct?

A. That's what the caption says. I can't really see the -- the graphical interface. This is tiny.

MR. WOOTEN: Can you blow up the center graphical interface with the CAN signal, please. Think you can cut that out where you can see it a little bit better.

THE WITNESS: Okay.

BY MR. WOOTEN:

Q. Does that help you see that a little bit better?

A. Yes.

Q. Do you recognize that signal?

A. Yes, I do.
Q. Is that what Mr. Harrington was referring to as the steering path signal?
A. I'm not recollecting what he says, but it's my understanding that it's the offset or the position in the lane.
Q. Which is, essentially, where the steering algorithm is projecting the vehicle to go?
A. Not exactly. This would be what the offset is or the position of the vehicle with respect to either the intended path or perhaps, in this case, I see underscore L. That might actually be the offset with respect to the left detected lane line.
Q. Okay. And then the last page.
A. Okay.
Q. So at least from the example on Page 18, it seems to indicate Ford's been studying vehicle level details on even lane centering from CAN bus data that it collected, correct?
A. It appears so.
Q. I'm guessing you probably haven't seen any of that data before either, right?
A. No, I have not.
MR. WOOTEN: Show me 256.
(Exhibit 256 is marked for identification.)

BY MR. WOOTEN:
Q. I don't know if you recognize this document or not, but it was one of the documents you cited in your report from a Ford employee LinkedIn article that they published. Do you recognize it?
MR. BOORMAN: Sorry, Nick. What exhibit is this?
MR. WOOTEN: 256.
MR. BOORMAN: Thank you. And what page?
MR. WOOTEN: This is the title page, Page 1.
MR. BOORMAN: Thank you.
BY MR. WOOTEN:
Q. This has a graphic across the top of it -- show us that blowup, please -- that seems to indicate Ford using the data that it's gathering from connected vehicles to improve BlueCruise, correct?
A. Yes.
Q. Which is sort of the purpose of gathering telematics data, correct? At least one of the purposes is trying to improve a product if you see an issue?
A. Yes, I think that's definitely one purpose.
MR. WOOTEN: Show me the second clip from that page, please.
BY MR. WOOTEN:
Q. Let me know when you've read that.

A. Okay.
Q. The article itself seems to indicate that through the use of data collected from connected vehicles, Ford's been able to improve BlueCruise substantially as far as the amount of time it can remain engaged, correct?
A. Yes, in a hands-free mode.
Q. Correct. I guess I'll try to be more careful to make that distinction specifically today since that's part of what we clearly have to talk about.
MR. WOOTEN: Show me 1.3, please. The last clip on that first page. All right. Show me Page 2, please.
BY MR. WOOTEN:
Q. So on this -- this particular clip, which I think comes off the second page, it speaks of a continuous learning loop, right?
A. Yes.
Q. And discusses -- again, this is generically using the data from connected vehicles to improve the process, correct?
A. Yes.
Q. It mentions, at this point, Ford already knows that the customers have driven 95 million-plus cumulative hands-free miles in BlueCruise hands free,

right?

A. Yes.

Q. And down in that last highlighted area, it mentions an example the author gives when a driver takes back control of the vehicle in hands-free mode, we can review BlueCruise data and how the system responded during the event to identify areas for improvement. Do you see that sentence?

A. Yes, I do.

Q. So this tends to indicate a relatively granular level of detail that Ford is able to extract from connected data, correct?

MR. BOORMAN: Object to the form. Foundation. The document speaks for itself, but answer if you can.

THE WITNESS: Yes, I think so.

BY MR. WOOTEN:

Q. And, again, that's sort of the overarching purpose of connected data and telematics is to gather this type of data to try to figure out ways to find areas to improve, correct?

A. Yes, I think that is one primary use.

MR. WOOTEN: Show me Exhibit 216, please.

(Exhibit 216 is marked for identification.)

BY MR. WOOTEN:

Q. Mr. Pascarella had this diagram in his

documents. Have you seen this before?
A. I'm not specifically sure.
Q. So you don't know if this is P702 specific or anything like that, right?
A. I didn't see the top of this. I see. This is a diagram that he got from all data?
Q. Yes.
A. Okay.
Q. All right. You yourself have actually not looked at the diagram before, correct?
A. I don't believe I've looked at this diagram before.
MR. WOOTEN: Okay. Show me 134, Page 33, please. Actually, show me the first page first so we don't just jump to something.
(Exhibit 134 is marked for identification.)
MR. WOOTEN: Can you see the Bates number on that, Mike?
MR. BOORMAN: Yes, I can. But are these within the exhibits that you sent us? because I'm not finding them.
MR. WOOTEN: They're the -- this one is in the first group that had, like, 211 in it. And then the ones that were beyond 211 is what we sent out today, I think.

MR. BOORMAN: I'm on that one that goes up to 211, and it has 181, but you said this was --
MR. WOOTEN: Well, there's videos that were the difference.
MR. BOORMAN: Okay. But I'm just not finding the exhibit number. You said this one was 134.
MR. WOOTEN: Yeah, this one is 134.
MR. BOORMAN: For some reason -- I won't hold us up, but I'm not seeing it.
MR. WOOTEN: When we take the next break, let me know.
MR. BOORMAN: Wait a minute. Wait a minute. My apologies. I just found it.
MR. WOOTEN: If you see something like that, let me know I'll make sure we get it. So 134 is Ford-Wooten 006 for lack of a better -- I don't want to read all the zeros.
Show us the title of that document, please, Kam.
The only thing about having everything marked is then -- you know, my OCD kicks in, so...
MR. BOORMAN: Idle hands.
BY MR. WOOTEN:
Q. Are you familiar with this document at all? That is a Gateway readout from a test vehicle.

A. I don't believe so.

Q. Okay. So I'll represent to you, at least that's what was explained to us, was that this came from a Gateway connection to a P702 prior to testing. Shows all the various modules that the system connects to and everything else for initial diagnostics.

The first heading there talks about the scanning connection for the ECUs.

MR. WOOTEN: And, actually, what I want to look at is -- show me, Kam 2.1 first, please.

MR. BOORMAN: What page, Nick?

MR. WOOTEN: So it will be point -- the second page of the document.

MR. BOORMAN: All right. I'm not trying to slow us down because I know you're working through this, but my 134 -- Ford Expert Exhibit 134 doesn't look the same as this. Is this the right exhibit number?

MR. WOOTEN: Pull that highlight down, Kam. It have be -- if it's on Page 2 --

MR. BOORMAN: So this is my Page 2 (indicating.) And I hope I'm not -- I don't know what I'm doing wrong.

MR. WOOTEN: Does it not have Wooten 007 in the lower right?

MR. BOORMAN: No, this one doesn't. Sorry for the confusion, but I do want to follow along so I can --

MR. WOOTEN: I'm with you.

MR. BOORMAN: This is the folder, Nick, and it's -- I don't know if I'm looking in the right place, but I thought that was 134.

MR. WOOTEN: Yeah, that is 134, but that's -- so yours is in text format and this is in PDF.

Kam, can you just Teams me 134 in PDF, please. That's why the page is breaking differently. We sent you the text file and it's the PDF file.

MR. BOORMAN: Well, this is PDF. I mean, it is a .PDF, but it looks different. We can figure this out later. I'm going to make a note, and you make sure I have that later.

MR. WOOTEN: So do you have any -- do you have any Bates labeling on that document?

MR. BOORMAN: No.

MR. WOOTEN: Okay. All right. Well, let me try to figure that out.

MR. BOORMAN: When we take a break, that's fine.

MR. WOOTEN: So -- all right. Kam, go back up to the 2.1, please.

BY MR. WOOTEN:

Q. So this indicates that the system's communicating with the Gateway module, which we've seen that pop up a couple times from the truck. Do you remember seeing that in the diagrams we saw earlier?

A. I do, but I'm not sure what system is communicating with the Gateway module here.

Q. I'm not sure I do either. I just know it was the diagnostics that Ford gave us earlier on. So some of this production has been split up by time to some degree.

MR. WOOTEN: Show me Page 33, please. Show me the cutout from that. Can you blow that up a little bigger for us, please.

BY MR. WOOTEN:

Q. So this runs through a list of modules and shows them as enabled or disabled, including LCA, TJA, LKA, just some for example, correct?

A. Yes.

Q. All right.

MR. WOOTEN: Show me Page 44, please. Can you blow that up because I can't even see that one.

BY MR. WOOTEN:

Q. Has the architecture version at the top of this page that says FNV 2?

A. Yes.
Q. Which is what we were looking at earlier in the Exhibit 12 that had the vehicle architecture?
A. Yes.
Q. It also, in the lower part, says "OTA automatic updates HMI." It says "HMI enabled," correct?
A. Yes.
MR. WOOTEN: And then show me 45, please. I just want to pull that up in two separate pieces so you can make them a little bigger. There you go.
BY MR. WOOTEN:
Q. So this says "TCU: Present." "Hotspot capable Modem: Present." And "Customer Connectivity Setting: Enabled," correct?
A. Yes. I don't recall what -- what vehicle this is from.
Q. This was from one of Ford's test vehicles produced early on. Obviously, I mean -- I don't know which -- when certain documents were produced and certain weren't, but this was just one that talked about the Gateway connection that showed the different modules that were queried, apparently, before testing was done for some of the vehicles that were driven and the testing results that we got.

MR. BOORMAN: For the record, Nick, so -- because I don't have -- this wasn't sent to me. Can you tell me whose test run this was, what test run it was.

MR. WOOTEN: Honestly, I can't because we got, like, two sets of these from, like, two different vehicles, and there were about six or seven vehicles we sought testing from. It's just one of those gap things. But it came early on with some of the earliest Bates-labeled documents.

MR. BOORMAN: All right.

MR. WOOTEN: I mean, sometimes we were still running around trying to figure out what hole we were digging in when some of that stuff came out. So this didn't make a whole lot of sense to us until much later. So, you know, we could piece it together after we saw that architecture document. I'll get you the Bates label --

MR. BOORMAN: I got you.

MR. WOOTEN: -- and a copy of that document to make sure we get it back to y'all.

MR. BOORMAN: Great. Thank you.

BY MR. WOOTEN:

Q. Then the other piece of that --

MR. WOOTEN: Go ahead and give me the second

part of that, Kam.

BY MR. WOOTEN:

Q. It -- it talks about electronic horizon. It says "Electronic Horizon: Off." "Electronic Horizon Type: MPP plus Stubs." And then "Local Hazard Information," "Cloud-Based Routing," "Cloud-Based Routing Fuel," "Cloud-Based Routing Weather." Did I read all that correctly?

A. Yes.

Q. Do you know what the electric horizon is?

A. No, I don't believe I do.

Q. What about an electronic horizon?

A. No, I do not.

Q. Do you know what MP plus Stubs means?

A. No, I do not.

Q. All right. Let's talk a little bit more about some of the specifics --

MR. WOOTEN: You can pull that down, Kam. Kam, when you get a second, send me a complete PDF of that exhibit on Teams so I can send it to Mike, please. Take him just a second to send that to me and I'll send it to you.

MR. BOORMAN: Okay.

MR. WOOTEN: I don't know what happened there.

BY MR. WOOTEN:

Q. So if there's Cloud data, connected data from the vehicle, it would help all of us to know exactly what the status of the vehicle is at the time of the crash, correct?

MR. BOORMAN: Object to the form. Calls for speculation, but answer if you can.

THE WITNESS: I'm not sure in 2021 exactly what the Cloud data you're referring to would be inclusive of. I know we looked at documents across various time frames. And so, generally speaking, data that are collected during the crash would be relevant, but I'm not sure what Cloud data would include in this regard.

BY MR. WOOTEN:

Q. Right; but anything that would give us insight into whether or not the system was active and in use at the time would be relevant to the question at hand, correct?

A. Certainly.

Q. Now, with respect to SPP in this scenario, you understand that the use of the Level 2 ADAS system, it is plotting a steering path when that system's engaged, correct?

MR. BOORMAN: Hold on. Object to the form. Vague as to "in this scenario," but answer if you can.

BY MR. WOOTEN:
Q. Let me rephrase. Fair objection. If you are driving a P702 and it is equipped with ACC with LCA, and it is engaged, then that system is plotting a steering path, correct?
A. Yes.
Q. All right. Now, do you know what particular components are involved in plotting the steering path?
A. So -- so, first, I would say that there is an intended driving path, and then there is steering commands to get the vehicle to that intended driving path. And those paths are calculated utilizing many different parameters and measurements including what the camera is seeing ahead of it, what the speed is, what the steering inputs are, and other -- other sensed parameters describing the vehicle dynamics.
Q. With respect to SPP, is there anything involved in the plotting of the steering probable path other than the camera?
A. Oh, I'm sorry.
Q. Sorry.
A. Okay. The camera is utilized to look ahead and determine a path. You're asking is the camera the sole entity or device that is responsible for plotting that path; is that correct?

Q. So we -- we know that a Level 2 ADAS computer vision system is a fusion, right? It combines signals from multiple sensors.

A. That's correct.

Q. We know that radar is one of those sensors, and we know that the camera is the other, correct?

A. Yes, but there are also sensors in the vehicle that are used to inform the outputs as well.

Q. And do you know if any other sensors impact the algorithms' calculation of steering probable path other than the vision sensors?

A. So a part of the steering -- the SPP, the steering probable path, includes how the vehicle is presently positioned in space, and that informs how it can get to the intended driving path. And so it needs to know its position in the lane in addition to heading or yaw and the upcoming curvature of the road. And so while the camera is looking forward, what the vehicle will do or what the commands for the vehicle will say is going to be dependent on how the vehicle is positioned and traveling in the lane.

Q. Okay. So when the vehicle's going straight down an interstate road and the vehicle, essentially, has to keep a straight lane, what's impacting SPP other than the vision?

A. Well, I guess I would say that understanding the vehicle dynamics, whether it's going straight or it's shifting in the lane or it's moving on a different heading or the road is curved, is factored into how the vehicle will traverse the planned path.

Q. And, specifically with respect to what factors affecting the path planning in this vehicle, again, if Mr. Nath's testimony differs from yours, you would defer to Mr. Nath's testimony, right?

A. Yes. I would defer to Mr. Nath's testimony regarding Ford's algorithms.

Q. Do you know where the algorithm is embedded in the LCA feature?

A. Generally, I understand the compute to be happening on the IPMA module.

Q. Do you know what the three components of the LCA system are according to Mr. Nath?

A. Are you referring to the camera radar in IPMA?

Q. No.

A. I'm not sure which three components you're referring to.

Q. One of them is the SPP, the other is the sensor feature model -- or module, and then the last is Lateral Motion Controller. You've seen those in Mr. Nath's documents, right?

A. Yes, we have.
Q. Is it your understanding that the SPP is actually calculated in the sensor feature module?
A. I would have to refresh myself to make sure I understand exactly where it is being computed.
Q. Okay. You understand that the sensor feature module inputs commands to the Lateral Motion Controller to follow the path that's been plotted?
A. I believe that's correct.
Q. So do you know exactly what the vision range is of the camera that's providing the vision for the sensor?
A. That's depending on the roadway conditions, but I have seen different references to its capability to detect different things at distances varying between 30 meters and a hundred.
Q. Where have you seen a reference to the camera detecting something at a hundred meters?
A. I believe it was in reference to identification of construction zones which might have other features that are more easily recognizable.
Q. Okay. What about the detection of split points and exits?
A. I've seen descriptions of the requirements for detecting those type of features in the IPMA spec.

Q. Do you recall the distances that were required for those features?

A. I would have to look at them. I believe some may have said 50 meters, some may have said 30. I can't recall right now.

Q. When you talk about automotive tolerances for errors, in the automotive industry in the United States, is the error rate typically considered single digits or microscopic versus the total population of products?

MR. BOORMAN: Object to the form. Vague.

THE WITNESS: I don't know what error rate you're talking about and what tolerances on what products. Could you be more specific?

BY MR. WOOTEN:

Q. Well, I don't -- are you familiar with any automotive engineering standard that authorizes as much as 10 percent error rate for the safety-related feature?

MR. BOORMAN: Object to the form. Vague. Answer if you can.

THE WITNESS: I'm not sure that that's specific enough for me to answer. There's various different levels of safety integrity across features, devices, components. There are different requirements

depending on feature expectations, so I'm not sure that that's specific enough for me to answer.

BY MR. WOOTEN:

Q. Would you agree that being able to see through the vision sensor is an important aspect of being able to plot a safe steerable path?

A. Do you mean that the vision sensor being able to sense forward as in not being obstructed is important?

Q. Yes, both; not being obstructed and being able to see what's ahead.

A. Okay. I would -- I would say yes, but I would say "sense" as it's not completely analogous to human vision.

Q. Sure. I think the camera on the P702 is, like, less than two megapixels; is that right?

A. I don't recall the resolution.

Q. And humans, we see in roughly 500 megapixel resolution; is that right?

A. I'm not sure that I've seen that approximation.

Q. On your own cell phone, do you know what the resolution of your camera is for your cell phone?

A. Maybe 10 to 20 megapixels. I'm not sure exactly.

Q. Do you know what would go into accurately detecting an exit lane for the vision system in the P702?

A. I understand that there are many different things that go into that, including lane line quality, including the presence of one or both lane lines, including the continuation of lane lines as a new exit lane exists. I think there are many, many aspects that factor into the ability to detect an exit lane.

Q. Do you know what the system's programming was with respect to lane lines disappearing or widening where only one lane line disappeared or widened?

A. When you say "the system," do you mean the LCA system on Mr. Wooten's vehicle?

Q. Yes.

A. And so you're asking what are the capabilities in detecting when only one lane line is present?

Q. What I'm asking is: Do you know what the system's programming instructed it to do to determine a path when a lane diverged or one lane line disappeared?

A. We could look at the requirements to better explain the way that the lane line detection system is expected to behave under various conditions, including when a new lane develops or one merges into another, or when there are potentially conflicting lane lines that

need to be traced. So, specifically, I think there are a number of requirements that govern the way that detection is performed under various lane line conditions.

Q. But you would defer to the specifications?

A. Yes, I would.

Q. Or to Mr. Nath's testimony about that?

A. Yes. I'm happy to speak to it, though, if we look at the specification.

Q. Sure. You took issue with Mr. Louden assuming that the ACC with LCA was engaged based on the family's testimony about Mr. Wooten's prior usage, right?

A. I did not believe that he established a foundation or evidence to suggest that he knew it was engaged.

Q. So, in other words, his opinion that it was engaged based on his view of the evidence was what you objected to, correct?

A. I did not believe that he presented evidence that would indicate that LCA was engaged at the time of the crash.

Q. Based on what I showed you earlier about the memorization state and the default state of the ACC, does that change your opinion about whether it's more likely than not that ACC was engaged with LCA at the

time of the crash?
A. No. I don't believe I've seen evidence to suggest one way or another if it was cruise control or adaptive cruise control that was engaged. I believe that both accident reconstructionists agree that some form of cruise control was engaged, but I don't think there's been evidence to suggest that it was normal cruise or adaptive.
Q. Do you know what the maximum amount of steering wheel angle input can be generated by use of the LCA system?
A. The maximum amount of steering wheel input?
Q. Steering wheel angle.
A. Angle. No, I don't know that there's a requirement on maximum steering wheel angle. I only understand that there is a requirement to limit the amount of torque and also the lateral acceleration that is occurring.
Q. Okay. So have you reviewed all the testing videos for Mr. Harrington and Mr. Pascarella where they were driving the vehicle definitely in ACC with LCA? Have you reviewed the steering wheel angle inputs while the system was engaged in providing steering?
A. I have reviewed Mr. Pascarella's; however, all of the testing Mr. Harrington conducted with LCA and

ACC and not BlueCruise, I believe, was conducted in the most recent production, and I have not had a chance to review a hundred percent of his new materials.

Q. And have you ever seen any videos from any of the testing that showed that the system imparted a double digit steering wheel angle when it was providing steering inputs for the vehicles under test?

A. To my recollection, I don't recall seeing steering wheel angles exceeding 10 degrees.

Q. Okay. Do you know if that's a feature of the system or not?

A. I think, in this regard, I'm not sure what you refer to as "a feature." I think that is what happened when, for example, Mr. Pascarella drove the vehicle equipped with having engaged LCA with ACC through this exit.

Q. You mentioned one source of verifiable data about what system was in use might come from the EDR, correct?

A. Yes.

Q. But we know the EDR does not record what version of cruise control was in use, correct?

A. Correct.

Q. But we know it for -- it could record what version of cruise control was in use if we wanted to,

correct?

A. I don't specifically know.

Q. Do you have any technical reason a manufacturer can't determine what version of cruise control was operable?

A. No, I don't.

Q. And we showed some exhibits a minute ago that showed Ford collecting connected vehicle data that was very granular about use of the LCA, right?

MR. BOORMAN: Object to the form. Documents speak for themselves. Answer if you can.

THE WITNESS: You're referring to some of their focus driving studies in which they have added additional instrumentation to vehicles in order to collect extensive or full CAN logs?

BY MR. WOOTEN:

Q. No; collected CAN data from actual connected vehicles is what that PowerPoint we went through was showing you. It wasn't instrumented vehicles.

A. Okay. We looked at a couple of them, and in one of them I thought I read that there was a device plugged into an OV2 port that was actually pulling a very full CAN log, and that was part of one of those studies. So I might be mixing a couple of the studies that you showed me.

Q. Okay. So if Ford's connected vehicle data policies we looked at says it's collecting that type of information, and the report we looked at or presentation showed Ford connecting and processing that type of data, it would seem that they could collect that type of data?

A. In all of the documents that we looked at regarding the privacy policies, and whether it was Australia or U.S. or Canada, there were policies that indicated Ford is collecting many different types of data if the customer authorizes it, but I didn't see in any of those documents a reference to data inclusive of the state of an Advanced Driver Assistance System support feature like LCA. I saw a lot of data that looked like vehicle dynamics or it looks more reminiscent of EDR-type content.

Q. So if Ford wasn't collecting that level of data, how could its engineers pick up on scenarios where people disengage hands-free BlueCruise and go back and review the data to find out why?

MR. BOORMAN: Object to the form. Calls for speculation. Answer if you can.

THE WITNESS: So it's a little bit confusing because we looked at a few different studies. So we were looking at some privacy warnings and notifications

that were different from what the PowerPoint was describing in a study where they were using the Apache Spark and doing big data processing. And so in that PowerPoint study, I also understand that they were utilizing BlueCruise-equipped vehicles to study what -- what was going on through driving. I -- I think there are a number of different things here that I don't know we can definitely combine.

MR. WOOTEN: Kam, show me Exhibit 91, please.

(Exhibit 91 is marked for identification.)

MR. WOOTEN: This was the slide deck for the P702, 2021 vehicle. Can you show me the page with the connected data, please.

MR. BOORMAN: For the record, there's no Bates label that I'm seeing. Does your copy have a Bates label?

MR. WOOTEN: Probably, yes, I would guess. We show a table with the Bates label showing the Bates range when this was originally produced.

MR. BOORMAN: That's the first page. I just want to know if it's produced in this case for it.

MR. WOOTEN: Yeah, we produced this. This was part of the expert --

MR. BOORMAN: I'm sorry. I stated that wrong. I want to know if Ford produced it in this case.

MR. WOOTEN: No, this came from Ford's website.

MR. BOORMAN: I gotcha. Thank you.

MR. WOOTEN: Show me the page with the connected data, please. Show me the next page. If you don't know which one, I could tell you where it's at. Right there. Maybe not. There we go.

BY MR. WOOTEN:

Q. Are you familiar with Ford's corporate statements about every vehicle sold after 2020 being connected?

A. I'm not sure exactly. I also recall we were looking at something that says they're sold in an inactive state, so I'm not sure that it necessarily means that all customers end up being connected.

Q. Well, it's sold partially activated.

A. Partially activated.

Q. There's a default amount of data that's shared no matter what, but then to use FordPass, you have to become fully activated, which means Ford can collect whatever it seeks to collect.

Have you seen the slide deck for the F150 -- the new F150 P702 for the 2021 model year before?

A. This slide deck? I don't think I've seen this slide deck.

Q. Okay.

MR. WOOTEN: Let's go up to 107, please.

(Exhibit 107 is marked for identification.)

BY MR. WOOTEN:

Q. Do you know Ken Washington, the chief technology officer at Ford?

A. I know of him.

Q. So this is a Morgan Stanley Conference in September 2020.

MR. WOOTEN: We have one page marked there, Kam. Go for it. If you don't know which one it is -- you're sending me Zoom stuff, I can't see it. Go ahead. Right there.

BY MR. WOOTEN:

Q. So have you seen any presentations from 2020 about Ford's connectivity?

A. Are you referring to marketing presentations?

Q. Well, this one was made by Mr. Washington, chief technology officer?

A. Right. I guess I'm not familiar.

Q. Okay.

MR. WOOTEN: All right. Go to the next page, please. Next page. Go to the next page. There's one that's much simpler.

BY MR. WOOTEN:

Q. So this is Page 8 of that document.

MR. BOORMAN: I think that's 6, Nick.

MR. WOOTEN: 6? Sorry. I can't see it.

MR. BOORMAN: I think so.

MR. WOOTEN: The title is "Importance Of Connectivity." Take a second to look at that.

THE WITNESS: Okay.

BY MR. WOOTEN:

Q. You said you've never seen this presentation before, correct?

A. I don't believe so.

Q. All right. Go to the next page, please. The next page is Page 7, and it says -- the title is "Intersection of Connected Vehicles and New Technologies," correct?

A. Yes.

Q. And it says "The technological building blocks of Level 2 features are growing towards the Level 4 use cases."

Did I read that correctly?

A. Yes.

Q. It has a picture of a Ford Co-Pilot 360 Technology in the upper right?

A. Correct.

MR. WOOTEN: Can you pull up that center

picture, please. Take that down. Show me the next page.

BY MR. WOOTEN:

Q. The next slide on Page 8 is titled "Driver Assist Technologies," correct?

A. Yes.

Q. What does the text across the bottom of that page say?

A. "Our fused, 360-degree, multi-spectral sensor set allows us to create a holistic suite of driver assistance features that build trust and reduce driving-related stress."

MR. WOOTEN: Go to the next slide, please. Next. Next. I'm on the wrong document. That's my fault. Give me just a second.

MR. BOORMAN: Nick, we've been going an hour, so is now a good time?

MR. WOOTEN: That's fine. If you want to stop, we can take a quick break.

MR. BOORMAN: It's 11:20.

MR. WOOTEN: That's fine. Take five minutes.

VIDEOGRAPHER: This ends Media Unit 1. We are off the record at 11:20 a.m.

(Recess.)

VIDEOGRAPHER: This begins Media Unit 2. We

are on the record at 11:31 a.m.

BY MR. WOOTEN:

Q. My apologies for my disorganization.

MR. WOOTEN: Kam, will you show us Exhibit 121, please.

(Exhibit 121 is marked for identification.)

BY MR. WOOTEN:

Q. Page 1, presentation by Mr. Stuart Taylor. It says he's the executive director of Enterprise Connectivity for Ford. Presentation is November 10th of 2020. Have you seen this before?

A. I don't believe so.

Q. Be very quick.

MR. WOOTEN: Show me Page 4, please.

BY MR. WOOTEN:

Q. This slide says that "100 percent of Ford's new vehicles in the U.S. are now connected. 90 percent of our new vehicles globally will be connected by the end of 2020."

Did I read that correctly?

A. Yes.

Q. Okay.

MR. WOOTEN: You can take that down, please.

BY MR. WOOTEN:

Q. You would agree that one part of the

scientific method is ruling in likely causes, ruling out unlikely causes, correct?
A. Not exactly. I would say that, generally, the scientific method hinges on listing all possible hypotheses regarding a root cause, and then only eliminating hypotheses as there is evidence to eliminate them.
Q. That's -- I'm sure it was probably my question, but that's exactly what I was saying. Kind of like doctors and differential diagnoses, you start at the top of the tornado with every possible potential cause and you distill it down to the most likely causes, correct?
A. Yes, by eliminating those that have evidence to suggest they could not have occurred.
Q. Correct. And that is a normal scientific process of elimination using the evidence available to eliminate possible causes that you know could not have applied, correct?
A. Correct.
Q. For instance, in this case, we know that there was no mechanical defect in steering, correct?
A. Correct.
Q. So that's an example of how we can eliminate a possible cause out of the total list of possible

causes, correct?

A. That's correct. I'm not sure that was how we eliminate the cause, but that is one cause that was eliminated.

Q. That's just an example of the process that I think we can agree on, correct?

A. Yes.

Q. Okay. So you mentioned in your response to Mr. Louden that he has two alternative theories, and you think that they're mutually exclusive, correct?

A. Yes.

Q. You understand that the theory of too little torque for the exit was actually offered by Ford counsel in a hearing, correct?

A. Too little torque for the LCA system hadn't been engaged to take the exit by itself at 77 miles per hour, that is correct.

Q. Okay. All right. And you understand that that was a contention that came out of the hearing on the Motion to Compel where we were seeking access to Ford's DBC files?

MR. BOORMAN: Object to the form. If you've got a document to show her, show her, but I don't think that accurately reflects it.

MR. WOOTEN: Yeah, we can. Kam, show me

Exhibit 233 Page 52, please.
(Exhibit 233 is marked for identification.)
BY MR. WOOTEN:
Q. You have read the transcript of the hearing, right, because you reference it in your report, correct?
A. Yes.
Q. Here's one of those. Do you recall this portion of the transcript, the questioning of Mr. Peterson and Mr. Louden at Page 52?
A. Generally, yes.
Q. You don't disagree with that sentiment that the position was taken that the vehicle could not steer through this exit -- did not have sufficient torque to steer through this exit at 77 miles an hour?
MR. BOORMAN: That's not what the question says. I object to the form, but now you're asking her a separate question. Please answer if you can.
THE WITNESS: It's my understanding that the vehicle with the driver engaged in the driving activity, if LCA was engaged, can steer through this intersection, but it requires driver input, which is also necessitated by the LCA system engagement.
BY MR. WOOTEN:
Q. In other words, the LCA system alone cannot

provide enough steering torque based on the limitations built into the system to steer through the exit without driver input?

A. Yes, but the LCA should never be used all by itself anyhow.

Q. So are you familiar with Ford's marketing materials regarding the capabilities of the system?

A. Generally.

Q. And you're familiar with the taxonomy of ADAS, correct?

A. Yes.

Q. And you'd agree that J3016 clearly says that the seller or the manufacturer of an ADAS system should be clear about its designation so it doesn't lead to customer confusion about the capabilities?

A. I would have to look specifically at that language. J3016 is clear about defining the levels of autonomy for various advanced driver assistance features, but I would have to look at the language where it's advising OEMs to provide information as you are suggesting.

Q. We'll go to J3016 in a couple minutes. Do you know what Ford's manual says about the -- what the system can and can't do?

A. Generally --

MR. BOORMAN: I'm sorry.
THE WITNESS: Excuse me.
MR. BOORMAN: Objection. Vague as to "manual," but...
BY MR. WOOTEN:
Q. Okay. Let me rephrase to address that. You're familiar that there are multiple versions of the Ford F150 manual for Model Year 2021 depending on when the vehicle was manufactured?
MR. BOORMAN: Owner's manual?
MR. WOOTEN: Owner's manual.
MR. BOORMAN: Sorry, Nick. There's a lot of manuals. Thank you.
MR. WOOTEN: To be clear, owner's manual.
THE WITNESS: Yes, I believe that's correct.
BY MR. WOOTEN:
Q. There's a version that was initially published in, like, September of 2020, and then there was a version that was published in roughly mid-2021 for vehicles that were manufactured in, like, July 2021 or later. Are you aware of that sort of distinction between the versions?
A. Generally, but I don't remember the exact dates.
Q. All right. So do you know how the manual --

we'll call it Version 1 that was published in September 2020 -- do you know how it described LCA, ACC or ADA?

A. That probably is inclusive of multiple paragraphs.

Q. Right. Have you reviewed the testing videos -- you said you had not reviewed the testing videos from Mr. Harrington from the latest round of testing, correct?

A. I have reviewed some of them.

Q. All right.

MR. WOOTEN: Kam, show me Exhibit 169, please.

(Exhibit 169 is marked for identification.)

BY MR. WOOTEN:

Q. This is about two minutes, so we'll just let it play through so you can see it.

MR. BOORMAN: Whose is this, Nick?

MR. WOOTEN: This is Mr. Pascarella's test, Number 4.

MR. BOORMAN: 169.

(Video played.)

BY MR. WOOTEN:

Q. So that should be the end of that.

MR. WOOTEN: If you'll take it back to about five seconds from before the back of the truck, please.

BY MR. WOOTEN:

Q. Essentially, we've been using that as where the solid line kicks in, essentially. I know there's a lot to look at there. Have you looked at the steering wheel angles as the vehicle approaches the exit?

A. Yes. I will have to review again because he's got a number of videos; but yes, I've stepped through.

Q. You've seen that the steering wheel angle initially -- it's mostly straight, but jogs a little left, and then at the last instance it turns a little right, essentially, at or near the line. Have you seen that in these videos?

A. Yes, generally. I think we have to step through it to -- to kind of qualify exactly what the last instant is and so on.

Q. Sure. So right here we're at minus two, which is a slight right-hand steer. Negatives are right, correct?

A. Yes.

MR. WOOTEN: So let's go forward a tenth, please, Kam. Click it forward until I tell you to stop. Just use tenth increments.

(Video played. )

MR. WOOTEN: Stop right there.

BY MR. WOOTEN:

Q. So, at this point, we've gone from minus two, essentially, to triple zero, which is straight ahead, correct?
A. Yes.
Q. So that's a slight move back to the left just two degrees of steering input over a couple tenths of a second, correct?
A. Well, I'm not sure that he actually moved back to the left, but he straightened out.
Q. Right. In other words, the steering wheel angle -- I'm talking about the steering wheel angle only, because I don't think you see any change, really, in the vehicle. It's not observably anyway. And if you see, the steering wheel angle comes back from a little to the right, now we're all the way to zero, correct?
A. Yes, but only two degrees.
Q. Right. That is absolutely correct. So this is still essentially straight, correct?
A. Correct.
Q. In other words, those changes, two degrees of steering wheel angle, that's not something a normal human driver is going to feel or perceive, correct?
MR. BOORMAN: Objection. Calls for speculation. Answer if you can.

THE WITNESS: I don't know what a human is capable of perceiving.

BY MR. WOOTEN:

Q. Do you know if Ford ever measured that?

A. I'm not sure I'm aware of a value.

MR. WOOTEN: All right. Take us forward a little bit more, please.

(Video played.)

MR. WOOTEN: So now -- pause right there.

BY MR. WOOTEN:

Q. Now we're going to the plus one. So, again, very minor differences in steering wheel angle, but this is now technically a left steering angle, correct?

A. Yes; left by one degree.

Q. Right. Okay.

MR. WOOTEN: Continue forward, please.

(Video played.)

MR. WOOTEN: Stop right there.

BY MR. WOOTEN:

Q. So now it swung back from the left -- I think he got it to 2 degrees, maybe 3 degrees. Now it swung back to the right to minus 4 degrees at this point, correct?

MR. BOORMAN: Object to the form of the question, specifically how it characterizes the

steering angle, but answer if you can.

THE WITNESS: Yes. What I observed was a positive couple of degree angle at the point when his truck appeared, to me in the video, to be slightly offset to the right of the lane perhaps as he had come out of the previous curve, and now the steering wheel angle has gone back to negative 4, or rightward.

BY MR. WOOTEN:

Q. Okay. And this is, essentially, approaching the left fog lane, correct?

A. Yes.

Q. And this is all LCA steering at this point, correct? Mr. Pascarella has not yet put his hands on the wheel, correct?

A. That appears to be correct.

Q. Let's go forward to the lane line.

(Video played.)

MR. WOOTEN: Pause.

BY MR. WOOTEN:

Q. Roughly at the lane line, at this point, steering wheel angle is now -- indicates 7 degrees to the right, correct?

A. That's correct.

Q. Mr. Pascarella's hands have gotten to the wheel, correct?

A. Correct.
Q. All right.
MR. WOOTEN: Two more tenths, please.
(Video played.)
MR. WOOTEN: Pause.
BY MR. WOOTEN:
Q. So in two more tenths, he's induced a left steering wheel angle of 35 degrees, correct?
A. Yes.
MR. WOOTEN: And two more tenths, please.
(Video played.)
BY MR. WOOTEN:
Q. And at this point, we've gone four tenths, and he's induced 47 degrees of steering wheel angle, correct?
A. Yes, that's correct.
Q. All right. At this point, are you able to see any appreciable path change in the vehicle as -- I know we're moving through in tenth increments, but do you see the dynamics change, the vehicle role or shift yet?
A. I don't see any quantification of anything like roll or yaw or anything that would tell me what the vehicle dynamics are.
Q. Right.
MR. WOOTEN: And two more tenths, please.

(Video played.)

MR. WOOTEN: Now back that up to the same point and play it through at speed, please.

(Video played.)

MR. WOOTEN: Take it back to the gantry for me, please. All right. Go ahead.

(Video played.)

MR. WOOTEN: Pause that.

BY MR. WOOTEN:

Q. Do you know how far in front of the truck by time the camera's able to see the path or as part of the sensing for the SPP when you're approaching that exit?

A. How far ahead in time is the camera able to see? It's my understanding that it would be approximately somewhere between 1 and 2 seconds, or maybe around 1 at that speed, because it's dependent on --

Q. Speed?

A. -- speed. Well, it's distance. So in time, it would be dependent on speed.

Q. So at interstate speeds, 77 miles an hour is roughly 34 meters per second. Does that sound about right to you?

A. Yes, it does.

Q. And if the final specifications for the truck were that the camera could reliably see 30 meters in front, that's within 1-second distance, correct?

A. Correct; slightly less than a second.

Q. So if there is a path error at this junction, the driver's got to perceive that and correct it in less than a second, correct?

MR. BOORMAN: Object to the form. Outside the scope, and misstates the evidence, but answer if you can.

THE WITNESS: It's not my understanding that paths are static; instead, an SPP is a dynamic, rapidly updating concept based on a polynomial that is tracing the road ahead. And so the path ahead would be updated -- at least the variables that define the path ahead at a millisecond rate, you know, 50 milliseconds or so for some of the parameters.

And so the steering probable path, while it's being updated, if there was ever a time in which the paths were different from what the driver is taking, it doesn't mean that it is a static concept.

So I'm not really able to answer what a driver would have to do especially when the torque limits in what the LCA system can supply are designed to be overcome by a fifth percentile female. And so I think

that in an LCA hands-on system like the one that Bob is testing right there, I don't really see how anything to do with the path would realize itself as something that the driver must take action against.

BY MR. WOOTEN:

Q. Do you remember, like, an exhibit or two ago where Ford CTO was saying that Ford wants to build user trust in its systems?

A. Yes.

Q. Are you familiar with something called the irony of automation, right?

A. I'm not sure I'm specifically familiar.

Q. What about overtrusting automation?

A. I understand generally what you're saying.

Q. And are you familiar with NHTSA studies from as early as 2018 indicating that even 30 minutes of exposure to a Level 2 ADAS system can degrade human perception reaction time?

A. I don't recall that specifically.

Q. Mr. Pascarella testified last Friday that you're talking about somewhere between .1 and .3 seconds from the gantry to a point where you can still steer to the right and make that exit without going into the gore. I'm assuming you would defer to him about how long that window is to get yourself up

that exit without dying, right?
A. Yes, I would defer to him.
Q. Okay. So -- and I'm assuming you've probably been following the testimony, but it's been a long week and long weekend, I won't make too many assumptions, but you're aware that none of us -- partially because we don't have any connected data from this vehicle -- have any idea if Mr. Wooten, my uncle, had actually been through this exit with his system engaged even one time before the day of this crash?
A. That's my understanding that there's no documentation.
Q. Right. So none of us can exclude the possibility that this was the first time that he went through this system -- through this exit and had the system engaged?
A. That's correct. I don't think there's evidence to say one way or the other.
Q. Right. Which, again, if we had connected data, that would help all of us understand if there was any more information about whether that had occurred or not, right?
A. If the connected data were inclusive of things like this.
Q. And so you didn't notice in Mr. Pascarella's

video that just shortly before this exit, the vehicle had gone around a curve and stayed in the lane using the LCA with ACC system, correct?

A. Yes; I saw Mr. Pascarella take his hands off the wheel at some point in the curve preceding this exit.

Q. So -- and Ford -- we could spend a lot of time beating through documents, but I think we can agree Ford did not say, Do not use this system at an exit; it said, Pay attention. Right?

A. I believe the wording was something like, Pay close attention when exiting or entering the highway.

Q. And so if a person didn't know that the system could plot the wrong path and essentially steer a little too far for a couple tenths of a second, you understand, as a scientist, and it's well understood by automotive companies, that there is a window of human perception reaction time if there's any failure, right?

MR. BOORMAN: Object to the form. Misstates some of the evidence, multiple questions in there, but answer if you can.

THE WITNESS: Well, one thing that you said was if a system steers too far. And I'm not sure what you're referring to here.

BY MR. WOOTEN:

Q. So, in this instance, you agree that the vehicle basically just went straight into the left fog lane?

A. Well, I saw a rightward steering that was gradually increasing as he was approaching it, and then he grabbed the wheel and bailed left.

Q. Do you think that the 7 degrees of steering -- do you know if that's anywhere near enough to actually take that exit?

A. No, it is not enough to take the exit.

Q. Right. And that steering was at or near the fog line, right?

A. The rightward steering that the LCA system was performing? I saw it as Kam was stepping forward occurring over however many timeframe steps preceding the fog line and up to, it looked like, the fog line.

Q. Okay. So my point being: It's somewhere between if -- if you were using the system and you believed it would go right, then there's a point where you would have steered right if you were manually driving and a point where you would have to realize the system isn't going right, correct?

A. Well, that was a little bit layered because you and the system are driving together when you're using Lane Centering. And so certainly there's a point

when you're taking the exit, that you will recognize that you need to input steering to go right through the curve.

I don't have an opinion regarding where that place is or what the PRT associated with something like that is, but you and the system together, as I understand it based on watching some videos, including even one of the Shawn Harrington ones I believe you were referring to earlier, can take the exit when used properly.

Q. Right. So it's definitely no problem to take the exit with manual steering. And that's a part of the other issue in this specific case is part of what my uncle was faced with was his own previous experiences and his previous F150s, and the way he had driven through the curve and speeds he had used in the past. That was part of his sort of foundational knowledge prior to the day of this crash, correct?

MR. BOORMAN: Object to the form. Outside the scope and speculation, but answer if you can.

THE WITNESS: Yeah, I wouldn't speak to what he knew or didn't know or experienced in any of his previous trucks.

BY MR. WOOTEN:

Q. And we don't even know if he had actually

driven this truck through this exit manually before today -- before the day of the crash, correct?

MR. BOORMAN: Object to the form to the extent that it misstates the evidence.

THE WITNESS: I'm not sure how many times he's driven through this exit. It was my understanding that he drove through this exit regularly, and that he had had this truck for a little while. And so I don't know how many times he's -- he had driven through this exit in this truck.

BY MR. WOOTEN:

Q. And you know he had the truck about 96 days when the crash occurred, right?

A. If that's -- if that's correct, yes. That's my understanding, roughly.

Q. Have you had much experience with Level 2 systems as an operator?

A. Yes. I travel a fair bit and I always rent cars to try out different systems. And I enjoy learning about other systems when I'm on the road, so I try to.

Q. Do you have any idea about how many miles you've driven utilizing Level 2 driver assist systems?

A. No, I don't know. Hundreds.

Q. What car do you drive on a daily basis?

A. I generally drive a 2018 Chrysler Pacific minivan.
Q. That does not have any Level 2 ADAS equipment, right?
A. No, it does not.
Q. Do you know if you ever drove a 2021 F150 with ACC with LCA to utilize that system?
A. I'm sorry. Did I drive a 2021 F150?
Q. With ACC with LCA.
A. I did, although the vehicle that I drove also had BlueCruise.
Q. Do you know if there's any objective difference between the performance of the steering assist as between a vehicle that only has ACC with LCA and a vehicle that has BlueCruise?
A. It's my understanding that they're completely different algorithms.
Q. Which algorithms do you think are different?
A. It's my understanding that the path planning is housed in the IPMA owned by Aptive in the LCA with ACC vehicle not equipped with BlueCruise. However, when BlueCruise was released by Ford, that Ford owned the algorithm at that point in time.
Q. Do you know about how long it takes a vehicle to cross a lane line at the left fog line at Exit 15 in

Bolingbroke at 77 miles an hour?

A. My recollection is that Steve Fenton described that the drift rate was approximately 10 feet per second in this incident, and so I'm not sure exactly what that would turn out to be, but that's a very rapid crossing speed.

Q. And even a moment ago when we were clicking the video through in tenths of a second, it looked like it was something to be accomplished in a tenth of a second or maybe slightly more?

A. I'm not sure exactly, but that could be approximately close.

Q. Do you know if the camera on the subject P702 would have even seen the lane line crossing in front of it?

A. Do you mean when the lane line was beneath the wheel?

Q. I mean in the runup to the lane line.

A. I would expect that the camera would see that lane line, yes.

Q. And why is it that you would expect it to see that?

A. I would expect that because having the LCA, as Bob did, engaged leading up to it, the camera would have been imaging and perceiving that lane line for --

I think we were saying approximately 1 second leading up to it.

It's also my understanding from reading some of the IPMA requirements from the spec document, that it would have been tracking the lane line on the right-hand side as well, which was exiting with the lane.

Q. All right. So, in other words, your opinion on the SPP issue, in part, would be informed by your expectation that the vehicle was performing in accordance with the specifications from the IPMA document?

A. Yes, that's correct.

Q. And would you agree that performing in accordance with those specifications would be necessary to accurately plot a steering probable path?

A. Performing consistent with the specification and requirements would be necessary for plotting a steering probable path, yes, I think that's correct.

Q. Would you also agree that if the system was not performing in accordance with the steering probable path, that it would not be possible to plot an accurate steering probable path at Exit 15 in Bolingbroke?

MR. BOORMAN: Object to the form. Incomplete hypothetical, but answer if you can.

THE WITNESS: So it's my understanding that the IPMA requirements, as outlined in the specification document, are there in order to describe the way in which lane line detection, for example, should occur. And so those requirements are included alongside performance and verification requirements and methodologies to confirm performance.

And so it is my expectation that based on the existence of the requirements, the performance definitions and the verification procedures, that it's reasonable to expect the path plotting to align and be consistent with those requirements.

BY MR. WOOTEN:

Q. Sure. Let me show you Expert Exhibit Number 41, please.

(Exhibit 41 is marked for identification.)

MR. WOOTEN: This is Ford-Wooten 001143.

BY MR. WOOTEN:

Q. Have you had the opportunity to see this document before?

A. Can you please remind me what we're looking at.

Q. This is the signal detection test for the IPMA.

MR. BOORMAN: I'm sorry, Nick. I didn't hear

the exhibit number.

MR. WOOTEN: It's 41.

MR. BOORMAN: 41. Thank you.

BY MR. WOOTEN:

Q. This is a final engineer signoff for the IPMA for the Job 1, P702. Are you able to see that? I know it's sort of small.

A. Not really.

MR. WOOTEN: Kam, take that in pieces, please. You sort of have the top cut off there. Give us just a second, we'll try to make that a little bit better.

THE WITNESS: If you wouldn't mind, if I could read the headers as well, I would appreciate that.

BY MR. WOOTEN:

Q. Sure.

MR. WOOTEN: Can you cut the headers off and put them up as a separate clip, please, so we can see those. The headers -- the leftmost column is the "ID," the next column is the "Title," the third column -- looks like the middle column that we're showing is the "Results Approval," and then the next column -- the fourth column would be the "Results Review Date," and the last column would be the "Results Comments."

So you can pull that one down, go to the next one, Kam. There are several of them we could look at,

just pull these up one by one or so.

BY MR. WOOTEN:

Q. The first one on this page that I'm interested in is the "Lane Marking Type Performance." And the "Results Review" date was in August of 2020. And it said "Test failed. Signal not used in DAT201."

Did I read that correctly?

A. Yes, I think so.

Q. All right.

MR. WOOTEN: And show me the next one, please. That's so small I can't even read it. There we go.

THE WITNESS: I can actually see it when he blows it up. He doesn't have to do the headers again if that's a little simpler.

BY MR. WOOTEN:

Q. That's all right. So the next one is the -- looks like lane marking detection performance for adjacent lanes also from August 6th of 2020. It says "Test failed. Signal not used in DAT201," correct?

A. Yes.

Q. All right. Let's go to the second page of that, please. You have the lane marking detention performance adjacent lanes. We saw that already. "Motorway Exit and Entrance Ramp, 8/3/2020. Failed. No impact. Signal not used in DAT201."

Did I read that correctly?
A. Yes.
Q. "Motorway Exit and Entrance Ramp Performance. Motorway exit signal not used during DAT 2.0 Project."
Did I read that correctly?
A. Yes.
Q. Same way with the motorway exit and entrance ramp test. It says "Motorway exit signal not used during DAT 2.0 Project"?
A. Yes.
MR. WOOTEN: And then -- where is the lane marking detention one, please?
BY MR. WOOTEN:
Q. "Lane Marking Type Performance," says "Test failed. Signal not used in DAT201"; is that correct?
A. Yes.
Q. "Merge and Split Point Detection," it says "The test case results were approved despite the failed test steps because current accuracy has no negative effect on the customer experience. No feature uses the merge and split point exact coordinates for DAT202."
Did I read that correctly?
A. Yes.
MR. WOOTEN: You can take that down, please. Show me Exhibit 42, please.

(Exhibit 42 is marked for identification.)

MR. WOOTEN: This is the Mobileye KPI detection accuracy as tested. Can you show me the exit ramp detection, please.

MR. BOORMAN: Nick, did Ford produce that in this case?

MR. WOOTEN: Yes.

MR. BOORMAN: I don't see a Bates.

MR. WOOTEN: 41 is Ford-Wooten 1143. And the KPI data is from Mobileye Wooten-Ford 884.

MR. BOORMAN: Is there a reason why it's not Bates-labeled?

MR. WOOTEN: It was a spreadsheet, and they gave us one number for the whole spreadsheet.

MR. BOORMAN: I gotcha. Thank you.

MR. WOOTEN: That was part of -- you weren't involved in some of those early conversations where we were having difficulties with Bates labels.

MR. BOORMAN: Okay.

MR. WOOTEN: But, no, that was the issue.

Can you find the ramp detection accuracy for me.

BY MR. WOOTEN:

Q. So what KPI -- or what Mobileye refers to as next lane accuracy determination for ramps, it has

severe error rate of 28.94 percent. I think that rate holds pretty steady whether you break it up by day or night. There's a slight difference with an accurate determination 67 percent of the time. Did I read that correctly?

A. I think I might need some clarification here. This is -- it's my understanding that this is referring to the Mobileye accuracy regarding detection that the adjacent lane is exiting.

Q. Right.

A. But we're not talking about something that would be analogous to what is existing at the Bolingbroke exit.

Q. Well, yeah. I think you could certainly make that argument that it might not be exactly the same, but for what I've gathered from all the testimony is that they consider the branch to the exit as an adjacent lane. I could be wrong, I'm subject to being corrected, but my understanding is they're counting the branch off the lane away from the interstate as the next lane.

A. But this lane at Bolingbroke never branched; it was its own lane that then exited the highway. And so I think it might be reasonable to expect that performance by this chip in understanding what the

adjacent lanes are doing might be lower than the accuracy that it has in understanding what its lane is doing.

MR. WOOTEN: Is there a same lane number?

MR. BOORMAN: We cut off the top. Is this the host lane?

MR. WOOTEN: I think that's probably going to say "Host Lane."

MR. BOORMAN: Okay. I got it now.

THE WITNESS: Yes.

MR. BOORMAN: Okay.

BY MR. WOOTEN:

Q. So you're saying host lane, you think, is a more accurate description? So it says it's getting host lanes right 96 percent of the time, correct?

A. That's correct.

Q. All right. And the distinction being it's being designated as next lane or host lane, correct?

A. Yes.

Q. But we know that, according to 1143, the exit ramp signal was cut off, right?

A. I'm sorry. Remind me, what is 1143?

Q. The previous document that we showed you where it says "Test failed. Lane signal not used."

A. Perhaps we need to look a little closer at

what that one is referring to because we might be talking about the scenario in which there is an exit lane in an adjacent lane versus, again, the host lane.

MR. WOOTEN: Let's go back to 1143 to the exit lane scenario.

BY MR. WOOTEN:

Q. What I see is "Motorway exit and entrance ramp failed. No impact signal. Not used in DAT201."

A. Unfortunately, I don't think this has enough description to understand exactly what motorway exit and entrance ramp means. I think we've uncovered that there are many different ways in which an exit or an entrance ramp can merge or diverge or split, or in our Bolingbroke location, be its own singular lane that never has a merge, never has a divergent, never has a split point nor is an adjacent lane.

So I'm not sure that this one line here is sufficient to help me understand what the -- what the text is specifically describing.

MR. WOOTEN: Okay. So where we are at this moment -- I think it's 12:20 local time; is that right?

MR. BOORMAN: We've got about another eight minutes until an hour, but if you want -- whatever you want to do is fine.

MR. WOOTEN: I do know where the explanations

of that document are at if y'all -- I don't normally take lunch anyway, if you want to take -- yeah, let's go off the record.

VIDEOGRAPHER: We're off the record at 12:22 p.m.

(Recess.)

VIDEOGRAPHER: We are back on the record at 1:14 p.m.

BY MR. WOOTEN:

Q. All right, Dr. Kuykendal, we took a short lunch break and we're jumping back into where we were. We were looking at what we had labeled as Ford Expert Deposition Exhibit 41, but we're going to jump over to a different document now, Ford Expert Exhibit 196.

(Exhibit 196 is marked for identification.)

BY MR. WOOTEN:

Q. It is the IPMA detection document you were -- we just mentioned that right before we took a break, correct?

A. Yes.

Q. Okay. So Page 1, I think, has the title document on it. It's not cut, but can you see that, or do we need to pull up the title to it?

A. No, I can see it. Thank you.

Q. All right. Let me take you to Page 4, please,

where it talks about the -- I think it says the purpose of the document at the top paragraph.

A. Do you mind just blowing it up a little bit more as you -- as you were able to.

Q. Sure. We certainly should be able to blow that up without too much trouble.

A. Great. Thank you.

Q. Are you able to read that now?

A. Yes, I am. Thank you.

Q. Is that definition in line with your understanding of the IPMA specification?

A. Yes.

Q. Okay. All right. Let's go over to Page 8 just so we have a point of reference. This is the last entry about modifications and changes, which just indicate that the final changes in the document were marked in green. Do you understand that from this entry?

A. Yes.

Q. All right. Just to help us get grounded in case we're going to bump into some green some way along the way, I'm sure, so let go over to 196, Page 69, please.

Are you able to see this document, or is it too small?

A. We probably need to zoom in a little more.
Q. All right. Let me see if we can blow that up a little bit.
A. I can see that.
Q. Okay. Let me catch up just a second on my screen. So the title of this one is "View Range," correct?
A. Yes.
Q. And I think there's an indicator down at the bottom of what that range is supposed to be. Let me get that to the right spot. So this is the "Prediction Information," right, under the "Requirement Text"?
A. Yes.
Q. Okay. This says "If one of the lane data information reported as polynomial is predicted/estimated, this should be reported by a dedicated signal. The signal shall be bit coded and report the following prediction types."
Did I read that correctly?
A. Yes.
Q. Then it explains what the prediction types are, correct?
A. That's correct.
Q. All right. What does it say about a diverging lane marking prediction?

A. It says "Prediction active if lanes are diverging, for example, because of an exit ramp and there is no lane marking separating host lane and exit lane. Base on other side prediction."

Q. All right. Do you think our situation at Bolingbroke fits that description?

A. No, I do not.

Q. Tell me -- go ahead.

A. It is my understanding that here, they are differentiating between when there is a host lane that the subject vehicle would be in and there is an adjacent exit lane; however, there are no lane markings between those two lanes and, therefore, it is stating that the requirement is to use the opposite side lane line to predict the path of the host lane.

Q. Okay. And -- but to the extent that Mr. Nath's explanation of this scenario is different, you would defer to him?

A. I guess I would prefer to look at his explanation in this case.

Q. Okay. Well, I don't really want to take a break to go find any explanation on that because it's going to take me a minute. That isn't something I have marked. I'm just saying if there's a difference as between the two of you, you would defer to his

explanation?

A. I'm not exactly sure. I would really need to understand what he said, because I believe, based on my review of this document, that what I stated is correct. I would certainly want to deconflict that with what you're saying Mr. Nath testified, but I do not recall him testifying anything in conflict with what I just said.

Q. Just to be absolutely clear, all I said was if there was a difference between your testimony and his. I didn't say there was; I'm just trying to make sure that we're still at the same point where you agree if there were a conflict on this point about system performance, you would defer to him.

MR. BOORMAN: Objection. Asked and answered. But answer the question again if you can.

THE WITNESS: If you're saying that if Mr. Nath explains that the diverging lane marking prediction is different than what I understood it to be, then perhaps I would defer to him. But again, I would really like to review what he said in case there's some possibility that there's a misunderstanding, but our descriptions are truly in alignment with one another.

BY MR. WOOTEN:

Q. All right. I appreciate that and that qualification.

MR. WOOTEN: Show me 169, Page 70, please.

MR. BOORMAN: Sorry. You said -- this was -- was this Exhibit 196?

MR. WOOTEN: I said it wrong. It's 196.

MR. BOORMAN: Just making sure.

MR. WOOTEN: I literally just did a flip in my head.

MR. BOORMAN: Yeah, yeah. No problem.

MR. WOOTEN: No problem. So it is 196. All of these are 196. That was my mistake.

BY MR. WOOTEN:

Q. So this explains the lane marking type specification, correct?

A. Yes.

Q. And, I'm sorry. I'm just making some notes trying to flip through more efficiently.

MR. WOOTEN: Show me Page 79, please.

BY MR. WOOTEN:

Q. This is one heading that has a title "Motorway Exit and Entrance Ramp," correct?

A. Yes.

Q. Again, you would say this is not our scenario, right?

A. That's correct.

MR. WOOTEN: Show me 169, Page 80, please.

MR. BOORMAN: You said "169." Not to be a pain, I'm just --

MR. WOOTEN: You're right. 196, Page 80, please.

MR. BOORMAN: Yep.

MR. WOOTEN: Actually, I need to go to Page 81. My fault.

BY MR. WOOTEN:

Q. That's the road edge detection; is that correct?

A. Yes.

Q. All right. And that sets out what that specification requirement is, correct?

A. Yes, it does.

Q. Does that have any implications on our scenario?

A. Yes, it likely does.

Q. Tell me about that.

A. The requirement is stating that the road edge marks the transition from paved road surface to an impassable surface. And the road edge shall be detected up to a lateral distance of 7 meters. And so through the exit at Bolingbroke, I believe there is a

road edge within 7 meters of the host lane.

Q. Okay.

MR. WOOTEN: Show me Page 88, please.

BY MR. WOOTEN:

Q. This is some merge and split point detection?

A. I believe so, but I think we're going to zoom in in a moment.

Q. I think so too. Kam is probably one step ahead of me. Does that help you? Do you need to see the title of it, or are you okay with that?

A. I'm okay.

Q. This sets out the requirement for merge and split point detection, correct?

A. That's correct.

Q. All right.

MR. WOOTEN: Show me the next clip, please.

BY MR. WOOTEN:

Q. It gave a couple of examples of scenarios, correct?

A. That's correct.

Q. And one of these scenarios is similar to our exit at Bolingbroke, correct?

A. No, that is not my understanding.

Q. All right. Tell me about -- about that. You don't think the lower left is one that's similar to

Bolingbroke?

A. No, because it is my understanding in the lower left that the interest here is in identifying the lane that becomes the second from the outside. That is a new lane that is forming as that first right-hand red star is indicating the split point where our standard inner or left-hand driving lane is about to split into both a straight going lane and a new exit lane that did not exist before.

Q. All right. Are there what traditional roadway engineering-type people would say is a -- is a split point at Exit 15 where there is an asphalt gore by a grass gore?

A. Based on my understanding of the IPMA spec, there is no split point.

Q. Okay. All right.

MR. WOOTEN: Show me the next clip, please.

BY MR. WOOTEN:

Q. So this is from that same page along with a picture from the scene that was taken by Mr. Buckner. You're saying that you don't see-according to the IPMA spec, the box that we marked on the right, you don't see that as a split point?

A. No, those are not consistent with the diagram on the bottom left. The IPMA specifically states if a

lane marking splits and a new lane is forming, that is the scenario that the spec is referring to. And in our Exit 15, there is no lane forming, there is no lane that is splitting.

MR. WOOTEN: Show me Page 108, please.

BY MR. WOOTEN:

Q. That's the specification for motorway exit and entrance ramp performance again?

A. Yes, I see that.

Q. All right.

MR. WOOTEN: Show me --

THE WITNESS: But it is my understanding that this again is referring to diverging predictions or merging predictions. And that would not, again, be consistent with our exit.

BY MR. WOOTEN:

Q. But before I go any further, would you agree with me that the operational design domain for the ACC with LCA system is between lanes of travel between white lines?

A. Yeah, within a lane of travel, but not between lanes of travel.

Q. That was poorly asked. I told you I would do that. But what you said is correct.

A. Okay.

Q. Within a lane of travel is where the vehicle -- where the system's meant to operate?
A. Correct.
Q. Okay. All right.
MR. WOOTEN: Show me 109, please, in that document.
BY MR. WOOTEN:
Q. This is another merge and split point detection performance document. Are you able to read that?
A. Yes.
Q. All right. Take a moment and let me know if you think this has any application to our scenario.
A. No, I don't believe it does.
Q. All right. Tell me why.
A. Because this is referring to an incorrect classification of a merge as being a diverging lane, or the counter to that, a diverging lane being misclassified as a merge. And again, we have neither one of those.
Q. All right.
MR. WOOTEN: Show me Page 93, please.
BY MR. WOOTEN:
Q. This is a lane marking detection performance -- or lane marking detention performance for the host

lane?

A. Yes.

Q. And that sets out standards and the definitions for the KPI documents, correct?

A. Do you mind, please, zooming in a little bit more.

Q. Sure. The top part or the bottom?

A. The top part.

Q. All right.

A. Yes, I see that.

MR. WOOTEN: And show me Page 95, please.

BY MR. WOOTEN:

Q. That's the adjacent lane lane marking detection performance, correct?

A. That's correct.

Q. And that iteration regarding accuracy is also pulled from the KPI report, correct?

A. I'm not sure if it's pulled from the KPI report or if it's dictating that the KPI report shall differentiate between these classifications.

Q. Okay. All right.

MR. WOOTEN: You can take that down, Kam. Let's move on a little bit further.

BY MR. WOOTEN:

Q. If signals related to exit lanes are turned

off, how would it be possible for the system to detect an exit lane?

A. I don't understand the presumption there if signals for exit lanes are turned off.

Q. Yeah. Do you remember the earlier document where you said that the exit lane signals were not used in DAT201?

A. Okay. Yes, I do, and I thought we were going to find more detail into the definition there, because based on everything we just reviewed in the IPMA spec, it could easily be that what you were showing me before was referring to diverging and merging exit and entrance lanes. And so I'm not sure if, again, that's directly applicable here.

Q. And with respect to that, you think that there's a difference between the signals that we showed you earlier that talked about detection of exit and entrance ramps and whether the signal seeing that or not, you think that hinges on the definitions we looked at here, right?

A. I think that that would be reasonable if they were aligned with one another.

Q. Okay. Do you know how many tests have been run through that exit between Ford and Mr. Harrington in exemplar vehicles?

A. No, I don't.
Q. If I said it was somewhere in the neighborhood of 30 total, does that sound about right?
A. Yes, it does.
Q. None of those tests showed any steering efforts to the right on the part of any exemplar vehicles beyond just the minimal few degrees that we saw a while ago in the video that we watched about 7 degrees. You've seen Mr. Harrington's report about the path directions that's being plotted by the system at the intersection, right?
A. Yes.
Q. You disagree with his analysis of the signal data about the path that's being plotted at the exit?
A. If we could look at that, it could be helpful. He produced long reports.
Q. Yeah, I think it's -- I'll find the number, but I think it's in 57.
MR. WOOTEN: Take us down to the data analysis, Kam, where he's discussing the path plotting. That's a good question. Let us find that page for you. Right there.
MR. BOORMAN: Can you see what page this is, Nick?
MR. WOOTEN: I'm going to have him --

MR. BOORMAN: Is that 50?

MR. WOOTEN: -- tell me.

MR. BOORMAN: Okay. It's actually 50 of the data analysis. This is 97, so it's Exhibit 57, Page 97.

(Exhibit 57 is marked for identification.)

BY MR. WOOTEN:

Q. So this is one example. We'll blow the bottom up where he's got the signal.

MR. WOOTEN: If you'll cut the signal data and the text underneath it, please.

THE WITNESS: Is this from his first report?

BY MR. WOOTEN:

Q. This is the supplemental report where he did -- he actually had data analysis of signal.

A. This is the one he just produced?

MR. BOORMAN: July 1st.

MR. WOOTEN: Right.

BY MR. WOOTEN:

Q. He did not have the signal data at the first testing. That's something he only recently figured out.

A. Right. This supplemental report along with all of the many, many gigs of data underlying it are still being dove through, you know, by myself and my

team. So I'm not sure that I'm prepared today to opine on what his material says here.

Q. Okay. Well, let's just see what the text says down in the bottom.

MR. WOOTEN: Kam, if you can get that into focus, please.

BY MR. WOOTEN:

Q. Okay. So -- you know what? I'm going to have to find the right page of that because that's, like, three pages into the analysis, and what I need you to see is the path that's actually being plotted, and that's showing a different data point. So let's just back away from that for a minute and I'll come back to it.

MR. WOOTEN: Show me Exhibit 54, please.

(Exhibit 54 is marked for identification.)

BY MR. WOOTEN:

Q. Are you familiar with this document from Mr. Nath's deposition?

A. Yes.

Q. Let's talk about this for just a minute, please.

MR. WOOTEN: Show me the first highlight there. You may want to blow that up for me.

BY MR. WOOTEN:

Q. I realize there's some issue being taken with the language of critical failure that's been used in some of Mr. Louden's reports, the description of this document. But the language of critical failure and the definition of critical failure was put together by Mr. Nath and his team, right?
A. I believe that's correct.
Q. I mean, in other words, I didn't have anything to do with this document; this was something I saw as part of a deposition, right?
A. Yes.
Q. Okay. Now -- so do you know when this document was actually generated?
A. I don't recall.
Q. I think this one was for the 2021 Global Controls conference, I think they call it, that they do every couple years. Does that sound right to you?
A. Maybe so.
Q. Well, if -- if you're wrong and I'm wrong, we're not going to blame you for that. I believe this is 2021. But Page 1 of this document they're identifying and describing the problem that they're trying to identify and work on, correct?
A. Yes; they're identifying a problem that they are working to improve upon. That's -- I believe

that's how this reads.

Q. And again, they're using data to identify what they consider -- I think in a third bullet point he describes it as undesirable events?

A. Are you saying in this paragraph?

MR. WOOTEN: Go to the second page, please, Kam. I'm sorry. Next page.

BY MR. WOOTEN:

Q. I apologize. I didn't tell Kam to advance the ball. So in the third bullet point there, the description that was used on the document is "undesirable events," correct?

A. Yes.

Q. And, again, nothing being talked about here is new to people dealing with Level 2 systems and the engineers who are trying to address these systems and improve them, correct? I mean, there are all these anomalies that they're trying to work through and fix, correct?

A. Well, I don't know if this is new to them or otherwise, but I understand that because BlueCruise had not yet been released and because this was a pre-production vehicle, it's reasonable to expect that these are new issues that they are identifying and making an effort to improve upon.

Q. So they have two examples of problems on the right side; one is where a shadow is misidentified as lane line markings, correct?
A. Yes.
Q. That's a known camera limitation, right?
A. I think that I would be careful not to generalize across all cameras, so I'm not sure it's one that is identified here.
Q. Okay. All right. So in this instance, what's being shown in the picture in Exhibit 1 -- which you can blow that up for us, Kam -- is a path deviation along the line of the shadow, correct?
A. Yes, that's correct.
Q. And, again, this is a frame from a camera that's being monitored, correct?
A. I believe that's correct.
Q. So if you follow those green lines all the way out to the end, they look like they would go all the way to the concrete barrier in this instance, correct?
A. Perhaps.
Q. But, obviously, it wouldn't have to go very far to leave the rightmost lane and go into the next lane, correct?
A. Maybe the distance between two lane markings.
Q. So a few feet, two or three?

A. No, I would think that's -- are you asking when would this vehicle theoretically exit the lane or depart the lane?
Q. In other words, you see there's three lanes of travel there?
A. Yes.
Q. The rightmost lane is where the car is, correct?
A. Yes.
Q. And what I'm saying is: To get to the middle lane, it would only have to go a couple of feet to the left, correct?
A. To begin entering the middle lane, yes.
Q. And then on the next picture, Exhibit 2, that is an indication of where the camera picked up a paint splatter as a lane line, correct?
A. Yes.
Q. Again, something that falls within known issues with camera perception vision in a Level 2 system, correct?
A. I don't know. This sounds like it's anomalous to them and they weren't expecting it. And so in their research in developing their BlueCruise hands-off system, they were studying where anomalies might lead to misidentification of lane line markings. So I don't

know how common this is or is not.

I do understand, though, that this is early in their development, so there's an expectation that they are going to learn and iterate from this testing environment and this analysis.

Q. But is it early, though? I mean, if it's in 2021 --

(Zoom interruption.)

MR. WOOTEN: That's someone joining, probably. That's one of the defense team.

THE WITNESS: No -- that was loud. No, this -- this is still early; this is pre-production. Anything that's before production. It's fair to call early because they're doing this testing so that they can refine their algorithm and improve upon it.

So this is not an indication that this is late or this is a system that's been deployed on the road.

BY MR. WOOTEN:

Q. Do you know if Ford intended to have BlueCruise fully able including hands-free mode when the P702 was originally launched?

A. I don't know their intent.

Q. You don't have information about their internal timeline and their plans to complete that?

A. Not that I recall right now.

MR. WOOTEN: If we go to the next page, please.

BY MR. WOOTEN:

Q. Again, Mr. Nath and his team, they titled this page "Characterizing Critical Failures," correct?

A. Yes.

Q. So they said "These are path errors of sufficient duration and magnitude in a hands-free zone to potentially cause a lane departure if there's no driver intervention."

Did I read that correctly?

A. I think so.

Q. And then they explain how they rate severity, correct?

A. Yes.

Q. And then for their ordering, they explained the information from the VIRTTEX simulator study from 2017, correct?

A. For ordering their critical failures, yes.

Q. And, again, this is Ford's document, but it says "Drivers perceive a system fault when lateral acceleration is above .2 meters per second squared."

A. Yes, that's what it says.

Q. And then the second point they had was "The study further concluded that it takes surprised drivers

about 1.5 seconds to respond to the event and grab the wheel," correct?

A. Yes, that's what it says.

Q. So in that scenario where you're talking about a driver who's surprised grabbing the wheel, it takes one and a half seconds. Are you saying that a driver with their hands on the wheel cannot be surprised?

A. I'm not here to opine on the ability of a person to be surprised. That sounds like I would probably defer to Mr. -- Dr. Case on that.

Q. Okay. And you're familiar that he's testifying in human factors as to human perception reaction and whether people can be surprised and all that, right?

A. Yes.

Q. So these were the parameters that Ford chose in this paper, correct?

A. That's my understanding.

Q. All right. So the next page explained how they identified potential critical failures algorithmically, correct?

A. Yes.

Q. So, in other words, the parameters of their search were based on their definitions of how they should search and what they should look for, correct?

A. Yes. Their parameters are based on their decision regarding how to filter their data, and as I understand it, in a conservative sense, so that they can more rapidly ensure that they capture all of the errors even if it's at the expense of capturing some that were not true errors.

Q. I think if you look at the right side of that page, it says that they actually did look at MOART1, and they found four that crossed the lane while they found 1,745 that do not.

A. Yes.

Q. And it also indicated that they found four that were accurately identified, three that were incorrectly flagged, correct?

A. That's correct, yes. So their -- their seven points were obtained, and only four of those seven were actually what they were looking for.

Q. So let's go to the next page. So the first thing they wanted to identify was environmental variation, correct?

A. Yes.

Q. And the first place they identified was entrance and exit ramps, correct?

A. Well, the first bullet that they have reported.

Q. Right. Did you see Mr. Nath's testimony about the variability of interstate exits?

A. I have not reviewed it recently. I don't remember the quantification.

Q. All right. So rather than run through each of the bullet points, let's go over to the next page. This is titled "Quantifying Environmental Variation," correct?

A. Yes.

Q. So this says that Ford used the ADA Version 5.3.0 map to identify the distribution of events in population, correct?

A. Yes.

Q. So it has the factors influencing exit types and it has multiple lines there, correct?

MR. WOOTEN: Top right, Kam. If you'll blow up that box.

BY MR. WOOTEN:

Q. So they categorize for "Lane type," "Traffic in adjacent lane," "Traffic type in adjacent lane," "Visibility," "Lane marking types," "Road curvature," and the number -- and that gave them a number of exit types, correct?

A. Yes. I don't quite know how they all combine into 324, but that's what I see there.

Q. Okay. So right down below that where they have "Exit Ramp Scenarios," they end up with, essentially, total number of exits, 56,758. Did I read that correctly?

A. Yes.

Q. And down below that, they identified 38,982 scenarios to test?

A. Yes.

Q. And that's a lot?

A. It sounds like a lot of scenarios.

Q. So, essentially, do you recall testimony from Mr. Nath saying that with hands free, they had concerns about allowing hands free at an exit because of this variability of scenarios or so many different ways the system -- so many different scenarios at an exit the system can encounter, and they wanted to bring the driver back in the loop, right?

A. I think that's fair.

Q. So -- and this also allies with what we talked about pretty early in the deposition about the idea that exit ramps are, sort of, known limitations areas for Level 2 ADAS systems generally, right?

A. I'm not sure I would call it a "known limitation." I think I would call it "out of scope." I think that it's beyond what at least Ford's LCA with

ACC is intended to be used for.

Q. Okay. All right. Let's go to the next page. So, essentially, Page 6 explains how they develop their test mileage for this test; is that right?

A. Yes.

Q. All right. Go to the next page, please. So this was Page 7, results from the ADA MOART testing, correct?

A. Yes.

Q. And so what they wrote here was "The method outlined provided an objective way to identify critical lane departures and formed the basis for assessing BlueCruise 0.5 and 1.0 maturity for launch on lead programs P702 and CX727."

Did I read that correctly?

A. Yes.

Q. We know P702 is the subject vehicle in this case, right, from that platform?

A. That's correct.

Q. Now, they have a Pareto of critical failures in the top right, correct?

A. Yes.

Q. So they break that down into the type of failure and then the time of the failure, correct?

A. Not the time of the failure. You mean the

reaction time associated with that failure, yes.
Q. That's correct. I spoke wrong, and you're right on that point. Solo reaction time is considered less than one and a half seconds, correct?
A. Yes.
Q. And then high reaction time is greater than one and a half seconds?
A. Yes.
Q. And then they had a category called "WNBF," will not be fixed, known system limitations?
A. Yes, I see that.
Q. So these were the critical failures that Mr. Nath and his team identified, correct?
A. That's my understanding.
Q. Do you understand that that comes out to 46 critical failures that -- that his team identified from the data?
A. The number sounds right from the charts. We're not seeing it right here, though.
Q. All right. We can take that down. And, again, you see a strip across the bottom below the Pareto where they lay out known critical failure, correct?
A. Yes; an example strip, yes.
Q. And, again, this is a measurement, looks like,

from signal data counting down to the milliseconds of the length of what they identified as a lane departure, correct?

A. Yes.

Q. So that Page 7 explains how they got to their calculations and how -- what the failure showed over the various MOARTs that they ran the calculations on, correct?

A. What I understand it shows is that they're using information like lateral acceleration, I believe, and they would characterize the point at which a person would be able to perceive that acceleration -- I think you -- you pointed it out as .2 meters per second squared. And because perception would occur there, that's their -- beginning of their calculation of a perception/response time, and they're comparing it to the point at which the vehicle departs the lane.

So I understand that they're giving an example here to show how they're calculating the needed reaction time based on this particular example failure.

Q. And that was across all the failures that they identified, correct?

A. That they would have performed this calculation? That's my understanding, because the Pareto chart does show a classification of low reaction

time or high reaction time. I don't know specifically if they evaluated how a person would be expected in each one of these to respond. I see the way that they've bucketed them.

Q. Okay. And, certainly, no one is arguing that you can't have a lane departure with a hands-on wheel, right?

A. I don't know that anyone says you can't have a lane departure with hands on a wheel.

Q. So, in other words, just because they were testing in a hands-free situation, it doesn't mean that you still can't have a lane departure if you have hands on a wheel? Isn't that -- I mean, we know people crash all the time, leave their lane with no type of Level 2 ADAS system, correct?

A. Yes, I think that's true.

MR. WOOTEN: What's the next page on that, please?

BY MR. WOOTEN:

Q. All right. Again, on the last page we're talking about conclusion and next steps. It says they're going to use that data to refine the algorithm and reduce false flags, correct?

A. Yes.

Q. And that's also pretty typical of data

analysis, you refine what you're doing and improve your system, correct?

A. That's right. Here, I think they're clarifying that they're concerned that it's difficult to distinguish between desired lane changes as they differentiate from lane departures.

Q. Okay. All right. Now, I think you had an issue with Mr. Louden's opinions when he talked about the number of absolute failures vis-a-vis the number of injuries per hundred million miles, correct?

A. That's correct.

Q. Okay. And you understand that all Mr. Louden did was take the 46 failures and extrapolate it out to -- by the number it would take to be a hundred million miles?

A. Right, based on the miles driven in the MOART.

Q. Right. You understood that's how he arrived at the number he had for a comparator?

A. That's what he explained he was doing, although I understood that he was miscalculating, because he was saying that something was -- I'd have to review exactly his calculation. It didn't totally make sense. It was 20,000 times as high as something, but then I believe on the record he said that maybe he didn't mean 20,000 times. And so he didn't quite do

that math correctly as he recorded it.

Q. I think maybe he explained it on the record at the deposition as what he was intending to say, which was those two numbers -- do you recall Mr. Nath saying they were trying to demonstrate that the system was as reliable as a human driver?

A. Generally, yes.

Q. And you know that NHTSA measures driver failures, for lack of a better term -- crashes with injuries, crashes with fatalities -- they measure that in terms of a hundred million miles driven, correct?

A. Right.

Q. So without extrapolating that number to get to a total number of issues over a hundred million miles, you wouldn't really have a fair comparator, would you?

A. No, that's fair. It's not always accurate, because if a dataset is relatively small, then you might exacerbate any kind of smaller features that show up that might not otherwise show up in a very large dataset like a hundred million miles.

So it is one methodology that you can employ, you could just multiply it out, but it doesn't necessarily mean that it's going to accurately capture what the expected statistics would be within the hundred million mile driving experience.

Q. I understand your point that there could be variations. I think Mr. Louden was essentially dealing with numbers that we had, which is all that we had at the time. And, obviously, I think Ford would hope that that would number improve no matter what the failure rates were that it had identified, correct?

A. I can't say what Ford would hope, but I think it's their intent that they're using this dataset to iterate and improve upon their systems.

Q. All right. So -- but when you talk about once you make the extrapolations, I mean, out to the hundred million miles and you've got 20,800-and-something, we know that the rate of crashes with injuries is about 80 per hundred million miles, correct?

A. Are you comparing lane departures to lane departures with injuries?

Q. No. What I'm saying is that there's an absolute number we know NHTSA calculates, which is crashes with injuries, correct?

A. Or reports on, yes.

Q. Right. And when you extrapolate this out to see the number of events per hundred million miles, what you're dealing with is two absolute numbers. In other words, there's 80 over here for crashes with injuries, and there's the extrapolated number here

about lane departures from the system, right?

A. But those are apples to oranges, because when you extrapolate lane departures, that does not infer that those are all injuries. So you're creating very different datasets.

Q. You're correct. I'm comparing a known number that you can identify, which is the number of injuries per hundred million miles, with a number that you can quantify through extrapolations, which would be lane departures in the system. Doesn't mean any of those end up in an injury or a death. We're just trying to express a frequency or a rate that's comparable to numbers that we know from NHTSA statistics. Do you see the difference?

A. I don't, because what we would need to compare to is the number of lane departures that NHTSA had in those hundred million miles, and all we have are the lane departures that resulted in injury. And so my concern is that if you have a reported -- I forget what the number is, but let's say 8,000 lane departures that result in injuries, you would expect to have a dramatically larger number of lane departures in total that are inclusive of those that did not result in injury, and those could now be compared to our lane departure dataset provided in this PowerPoint here.

Q. So do you have any information on the rate of lane departure crashes per hundred million miles with or without injuries?

A. Well, I don't mean lane departure crashes, I mean lane departures. So that would be inclusive of every single time everybody is driving down the road and has a even momentary lane departure, and comes back into their lane. That would be equivalent to what Mr. Nath and his team are reporting here.

And so it's not necessarily that it's full lane departures or crashes or injuries. These are inclusive -- Mr. Nath's dataset, I understand, are inclusive of any level of lane departure. So when I'm driving down the road and I'm veering a slight bit over a lane line, that would be included in the dataset of lane departures in total. That would not necessarily need to lead to crash or injury.

Q. So, in other words, you're saying that the numbers aren't fair because there's no way to measure the total number of lane departures because we don't have data on that?

A. I don't know offhand if NHTSA estimated that number. So right now, I don't -- I don't know what that number would be or if there is an estimate of that number. But I don't feel that it is comparable to talk

about NHTSA's report of lane departures that result in crashes to Mr. Nath's report of lane departures.

Q. All right. So that's the problem with Mr. Louden's position from your perspective on that comparison?

A. Yes. And also he did some weird math with some multiplication, and I think he tried to correct it to say it was in addition, but his report was not accurate math either.

MR. BOORMAN: Nick, we've been going about an hour, so when you get to a convenient stopping point.

MR. WOOTEN: That's fine. We can stop now.

VIDEOGRAPHER: We are off the record at 2:12 p.m.

(Recess.)

VIDEOGRAPHER: We are back on the record at 2:24 p.m.

BY MR. WOOTEN:

Q. All right. Dr. Kuykendal, we took a little break and tried to move through a couple other topic areas pretty quickly. I know that one of your opinions has been that the subject vehicle was not equipped with BlueCruise, and that BlueCruise is a feature that allows for hands-free driving. You understand there's more than one mode to BlueCruise, right?

A. I do understand that.
Q. And do you know how Ford referred to BlueCruise, its previous names?
A. I don't remember all of them. You mean, like, Limited or Extended? I'm not sure.
Q. So before they developed the name "BlueCruise" for -- the marketing department did, they used to call the feature Active Drive Assist. You're familiar with that?
A. Yes.
Q. And before that, they called it Highway Assist, or HA?
A. Okay.
Q. And then before that it was called TJA or TJA Plus with Stop and Go. Do you remember all those names in the documents?
A. I do remember those.
Q. Okay. And so you do know that Ford was marketing Active Drive Assist Aas part of original Job 1 vehicle?
A. I -- I don't know specifically the marketing materials you're referring to. I would have happily looked at them.
Q. All right. And would you agree that ACC with LCA is a part of BlueCruise?

A. Not exactly in the context of this matter today. I would say that when we're generally referring to LCA with ACC, that's referring to what Mr. Wooten had on his vehicle in which the BlueCruise system was not yet available. I understand he had a tech prep package that would enable him, if he wanted later, to change to BlueCruise or upgrade to BlueCruise; but because BlueCruise was not released at the time, it's not equivalent. So we can't refer to hands-on BlueCruise as the same as LCA with ACC in this context here.

Q. Do you know if Ford was marketing the product as a hands-on drive assist feature with the capability to become hands free through a purchased software update later?

A. That sounds reasonable, but I haven't seen those specific materials.

MR. WOOTEN: Going back to Exhibit 10. Show me Page 291 through -- start with 291, please.

BY MR. WOOTEN:

Q. So Exhibit 10, the manual for the first generation or Version 1 manual for the Job 1 P702 that was published in September of 2020. This is a section on Active Drive Assist.

MR. WOOTEN: Can you show me the first cut,

please, if there is one. Maybe there's not.
BY MR. WOOTEN:
Q. Do you -- you recall reading this as part of looking at the manuals when you were doing your comparison for your report?
A. I do.
MR. WOOTEN: I think there's four pages to this. Show me the next page, please. And show me 293 and 294.
BY MR. WOOTEN:
Q. You do agree that that feature is listed in the Job 1 manual, correct?
A. Yes, here.
Q. Okay. Let me show you Exhibit 45, which is the cuts from these manuals, so we can put them side by side.
(Exhibit 45 is marked for identification.)
BY MR. WOOTEN:
Q. Show you Page 45.5 please. This is a side-by-side of the lane centering section of the ACC feature on the left, and the ACC feature on the right from the Job 1 manual for the 2021 F150.
A. Okay.
Q. Have you put those side by side and compared them?

A. Have I put them side by side? No, I guess not.

Q. Do you know if the ADA section is in the manual before the ACC section for this manual?

A. No, I don't recall.

MR. WOOTEN: Show me point 5.1, please.

BY MR. WOOTEN:

Q. So the top box that talks about enabling and disabling lane centering on the left and the Active Drive Assist settings on the right, are those essentially the same settings?

A. Yes, I've only read the top portions, but yes.

Q. Okay. I think the bottom portions that talk about the -- I think that's the limitations -- yes, "Lane Centering will not correctly operate in any of the following conditions" on the left, and on the right, it says "Any of the following conditions could result in Active Drive Assist not operating correctly."

Did I read that correctly?

A. Yes.

Q. All right. I think all of those in yellow are identical, but I'll let you confirm that.

A. They're almost identical.

Q. Correct. The ones that aren't highlighted are different, correct?

A. Well, the construction line is slightly different as well.

Q. Okay. All right. Let me show you Exhibit 148, please.

(Exhibit 148 is marked for identification.)

MR. WOOTEN: This is the internal Ford email. Show me point 1, please.

BY MR. WOOTEN:

Q. This is an email from Justin Teems at Ford in June of 2020 to Craig Schmatz. Do you know either one of those individuals?

A. I've seen Justin Teems' name before, but I do not know them.

Q. And he's explaining the main customer benefits for ADA 0.1 in this email, correct?

A. I can't read it.

MR. WOOTEN: Okay. Blow that up for us, Kam.

BY MR. WOOTEN:

Q. Is that better?

A. Yes.

Q. So this references a "Driver-facing camera while lane centering, which improves driver awareness and attentiveness to the road." That's number one, correct?

A. Yes.

Q. "Ability for customer to upgrade to hands-free capability later." That's number two, correct?
A. Yes.
Q. Then "Early adoption of the Active Drive Assist feature which carries a certain trendsetter connotation." Correct?
A. Yes.
Q. Do you know what ADA 0.1 is?
A. I don't recall specifically what 0.1 refers to.
Q. Are you aware that this feature was on Job 1 P702?
A. I don't know what it specifically refers to.
MR. WOOTEN: All right. Let me show you -- show me point 2, please. Blow that up for us.
BY MR. WOOTEN:
Q. This is -- again, this is an email from June 21st of 2020 where the discussion's about -- it says "How do we use the driver-facing camera during the lane centering?" And it follows with a series of questions, correct?
A. Yes.
Q. Do you have any information about the driver-facing camera being active on the Job 1 P702?
A. No, I did not believe that it was active.

Q. And you see the reference in the email there about the -- integrating the telltale warning?

A. Not specifically that language. Do you mean the hands-on off detection or the ADA warning?

Q. Yes. It says "Or are we adding ADA warning algorithm"?

A. Yes.

MR. WOOTEN: Show me Exhibit 150.1, please.

(Exhibit 150 is marked for identification.)

BY MR. WOOTEN:

Q. Do you see there's a chart in that email?

A. I do.

MR. WOOTEN: Can you show me the email first, please. Highlight the relevant portion for us, please. Just a second to blow that up so we can see it.

BY MR. WOOTEN:

Q. So this is Justin Teems to a number of people at Ford, looks like, on June 26th of 2020; is that correct?

A. Yes.

Q. And it's saying that's the pre-green for ADA and LCA, correct?

A. Yes.

MR. WOOTEN: Can you show me 150.1.3, please.

BY MR. WOOTEN:

Q. This is a table that was below the email that I just showed you. Do you see there's a column for the P702?
A. Yes.
Q. First of all, there's a column from -- across from the IPC module. Do you see that? It's like the third module down? Some highlighted area under the P702, what does that say?
A. "No ADA telltale or Hands-On Steering Wheel metaphor during an eyes off warning - DI-6292. PD aligned, this is a saleable condition for P702."
Q. All right.
A. And then "Fix planned for an RO8 IPC release. Included in KCAP PP build."
Q. All right. Acronyms, right? And you -- you understand, in that context, ADA is referring to Active Drive Assist?
A. That's my understanding.
Q. Do you see the column across from DSCM (sic) for the P702 that states it's 100 percent functional?
A. I'm sorry. Do you mind zooming in. We have a little more screen.
MR. WOOTEN: Yeah. Pull that a little bigger if you can.
THE WITNESS: Would you please repeat which

one to look at.

BY MR. WOOTEN:

Q. So the second one down from the top where it says -- I think that might be DSMC instead of DSCM.

A. Yes.

Q. But it says that is 100 percent functional for the P702?

MR. BOORMAN: Are you referring to the "Sync" column? I'm trying to find what you're doing.

MR. WOOTEN: DSMC --

MR. BOORMAN: Oh, I'm sorry. Up here. Gotcha. Okay. Thank you.

BY MR. WOOTEN:

Q. Right above where we were just at.

A. I don't recall what that is referring to.

Q. That's the driver state monitoring camera?

A. Okay.

Q. And right above that it's got the ADAS module?

A. Yes.

Q. And what does that say? Steerable path polynomial. Carry forward. Core feature model?

A. Yes.

Q. And under ADA 1.1, it says it's an LCA carryover?

A. Yes.

Q. And it's 100 percent functional?
A. I see "100 percent functional." This says "ADA 0.1 core feature DEV fleet."
Q. Uh-huh. Then it says it's "LCA carryover, 100 percent functional"?
A. Yes.
Q. And then next column for the P702, it says the same thing?
A. Yes, for the steerable path polynomial and core feature model. Okay.
Q. All right.
MR. WOOTEN: Show you Exhibit 223.
(Exhibit 223 is marked for identification.)
BY MR. WOOTEN:
Q. This is a weekly status chart showing Active Drive Assist 0.1 as a P702 attribute. Are you able to read that from this distance?
A. No, I am not.
MR. WOOTEN: You may want to pull up one half of it.
THE WITNESS: Okay. I can read this.
BY MR. WOOTEN:
Q. All right. And so the first column we showed you shows it's a P702 attribute, correct?
A. I don't know. It only flashed up for a

moment.

MR. WOOTEN: Put that back up for us.

BY MR. WOOTEN:

Q. It's showing the P702 ADAS features?

A. Yes.

Q. It shows Active Drive Assist 0.1, correct?

A. Yes.

Q. And then the other column --

MR. WOOTEN: Kam, if you'll put that up, please.

BY MR. WOOTEN:

Q. -- it says projected date to green is 26th of June?

A. Yes, but there was a different column header above that in the blue.

Q. You're talking about the row across?

A. Yeah. There's just another header above that. "Projection assumes team is back at work on May 18th, but still continues with social distancing practices." Okay.

Q. Does that help you with clarification of what that was?

A. Yeah. I don't actually know what this document is. I understand that it looks like there are -- I think you said this is a status update, so these

are projections for development timeframes?

Q. That's correct.

A. Okay. Key issues, comments. Okay.

Q. No dispute that ADA 0.1 and Active Drive Assist 0.1 are referring to the same thing?

A. Active Drive Assist and ADA are referring to the same thing? That's my understanding.

Q. All right. Let me show you Exhibit 220, please.

(Exhibit 220 is marked for identification.)

THE WITNESS: And what year did you say this is?

BY MR. WOOTEN:

Q. This document came from 2020. It was the weekly status chart in the runup to P702 going to production.

A. Okay.

MR. WOOTEN: Show Exhibit 220, please. Show me the first clip of that, please. I need the header too.

BY MR. WOOTEN:

Q. Do you remember we deposed Mr. Hearn in this case? He worked on this project?

A. Yes.

Q. This is an email from 2017 with Mr. Hearn,

correct?

A. Yes.

Q. Says "Highway Assist is an enhancement to ACC Stop and Go with lane centering Assist. So it would also require a front camera plus radar fusion system in addition to whatever else it needs (side radars, e-horizon, et cetera)."

Did I read that correctly?

A. Yes.

Q. Let me show you Exhibit 51.

(Exhibit 51 is marked for identification.)

BY MR. WOOTEN:

Q. This is one of Mr. Nath's documents. This one is about HA, or Highway Assist, becoming Active Drive Assist.

MR. WOOTEN: Show me the first clip, please.

BY MR. WOOTEN:

Q. This is under Box 1 on that poster. Have you had a chance to look at this before?

A. I'm not sure I have.

Q. Okay. This is one of the documents that was marked as an exhibit to Mr. Nath's deposition back in March.

A. Okay.

Q. It's one of the documents that he produced in

response to our deposition notice. So this indicates that "The competitive ADAS landscape requires SAE Level 2 features. Ford has lane centering Assist in North America on the model year 2019 Ford Edge and Lincoln Nautilus," correct?

A. Yes.

Q. And the highlighted portion, it says "Highway Assist, now Active Drive Assist, will be Ford's hands-free Level 2 feature on all" -- "on the all-new P 2021 F150." I think I threw a "P" in there somewhere. I'm sorry. You get the gist, correct? Supposed to be the hands-free feature for the P702, correct?

A. Yes.

Q. And then it says limited mode is hands-on and extend mode is hands-free, correct?

A. Yes.

Q. And it goes on to say limited mode is anywhere LCA will function currently?

A. Yes.

Q. All right.

MR. WOOTEN: Show me Exhibit 11, Page 365, please.

(Exhibit 11 is marked for identification.)

BY MR WOOTEN:

Q. This is a portion of the later version of the manual that has the BlueCruise section. That's the -- I've been referring to it as "Version 2," but I think this came out in, like, July of 2021. We've been talking about that a little bit today. Do you remember that conversation?

A. Yes.

Q. So Page 365 through 367 covers BlueCruise. Let you take a quick glance at them.

A. Okay.

MR. WOOTEN: Will you show me Exhibit 45.8.1.

BY MR. WOOTEN:

Q. This is -- this document is a side-by-side of the Active Drive Assist and the BlueCruise manual. Are you able to read those or is it too small?

A. Pretty close.

Q. All right.

A. I think I can get it.

MR. WOOTEN: Pick up the text portions of those at the bottom, please.

THE WITNESS: Great. Thank you.

BY MR. WOOTEN:

Q. So this is relatively similar language, at least the first sentence, correct?

MR. BOORMAN: Objection. Document speaks for

itself, but answer if you can.

THE WITNESS: Well, I mean, the right-hand one is discussing a hands-free mode, so that is fundamentally different from the left-hand one.

BY MR. WOOTEN:

Q. Right. It adds the BlueCruise has the hands-free language, correct?

A. Right.

Q. Okay. Let's go to the next page, 45.9. So this is a side-by-side of the portion of the manual. One says "What is Active Drive Assist"; the other is "What is BlueCruise." We highlighted or underlined where all the words were the same. There's two primary differences between those two documents. Were you able to see that? Again, I know it's -- this is difficult.

MR. WOOTEN: Can you enlarge that upper section where we can see that. That's still maybe tough.

THE WITNESS: I'm almost there. Okay. Do you want me to read everything?

BY MR. WOOTEN:

Q. I'm just asking if you can confirm that the underlined portions appear to have the same language.

MR. BOORMAN: Object, because they don't, but...

THE WITNESS: Yeah, I mean, I would have to use an ellipsis on the right-hand one to tie those two together to make the sentence on the left so -- just in the first section.

BY MR. WOOTEN:

Q. Okay.

MR. WOOTEN: Show me 45.10, please.

BY MR. WOOTEN:

Q. This is a comparison of the two, Between Active Drive Assist and BlueCruise. The BlueCruise feature adds the hands-free driving support feature telltale, correct?

A. Yes.

MR. WOOTEN: Show 45.4.3, please.

BY MR. WOOTEN:

Q. So I think the primary difference that I'm interested in is the BlueCruise precautions include the additional language about failure to control. "Failure to follow this instruction could result in the loss of control of your vehicle, personal injury or death." On the BlueCruise side on the lower warning, that's highlighted.

MR. BOORMAN: Sorry, Nick. Was that a question?

MR. WOOTEN: I may be wrong.

BY MR. WOOTEN:

Q. Are those four warnings on both sides the same, the ones that are highlighted?

A. On a cursory view, they look substantially similar, the four highlighted on the left and the four highlighted on the right.

Q. Okay. All right. And I think I was thinking about a different spot in my documents on the other issue.

MR. WOOTEN: Show me Exhibit 143, please.

(Exhibit 143 is marked for identification.)

MR. WOOTEN: I'm like a puppy over here tearing stuff up making noise. The videographer is going to kill me.

BY MR. WOOTEN:

Q. These documents were produced in discovery. They were materials submitted to NHTSA related to the mock hearing review. Are you familiar with that?

A. Only a little bit. I'm not sure that I've read this document.

Q. All right.

MR. WOOTEN: Show me Page 2.1, please.

BY MR. WOOTEN:

Q. This was Ford's response to NHTSA regarding the systems. Let me know when you've gotten through

that.

A. Yes, I have completed reading it.

Q. So Ford's description of all these variance is essentially that they all have continuous lateral support through lane centering and longitudinal feature through Adaptive Cruise Control, correct?

A. Yes.

Q. And down at the bottom it says "The lateral control is governed by steerable path, which utilizes a forward-facing camera," correct?

A. Yes.

MR. WOOTEN: Can you show me the next clip, please.

BY MR. WOOTEN:

Q. This portion says "BlueCruise can be described as a compilation of longitudinal control governed by ACC, which utilizes radar and a forward-facing camera, and lateral control from LCA's steerable path, which utilizes a forward-facing camera and then vehicle location as determined by vehicle GPS."

Did I read that correctly?

A. Yes.

Q. And then it says "The hands-on mode of BlueCruise may be referred to as limited hands-on or LCA mode in documentation," correct?

A. Yes.
Q. Can we agree that these documents at least indicate that every form of BlueCruise has both ACC and LCA?
A. I -- I think that in the context of the discussion we're having here, I would alter that slightly to say that BlueCruise has a lane centering feature, but that does not mean that the lane centering feature that BlueCruise has for lateral control is the same feature that the Job 1 P702s had in which there was a lane centering feature as well.
I understand that those algorithms originate from different entities, one being Aptiv and then BlueCruise being Ford. And so while they're both referring to a lane centering function for achieving lateral control, I don't see anything here that is pointing to the underlying origin of those algorithms. It's not clarifying here, but it's my understanding that just because they both have the lane centering feature does not mean that they are the same.
MR. WOOTEN: Can you show me 55, please.
(Exhibit 55 is marked for identification.)
MR. WOOTEN: Show me Box 1.
BY MR. WOOTEN:
Q. First of all, I did it a little quickly. Were

you able to see what the date of this document was?
A. No. I saw it referred to a conference, but I don't think I captured the date.
MR. WOOTEN: Pull up the first part.
THE WITNESS: Okay. All right. Pull the title part with the authors, please.
BY MR. WOOTEN:
Q. All right. You see this is another one of Mr. Nath's documents from 2017?
A. Yes, I do.
Q. So let's look at Box 1 again. So it says this paper presents an overview of the three key design components of ACC, Adaptive Cruise Control Stop and Go with lane centering Assist. And it lists them as the steerable predicted path, or SPP, the sensor feature model, and the Lateral Motion Controller, correct?
A. Yes.
Q. All right.
MR. WOOTEN: Pull that down for me, please. Show me Box 2.
BY MR. WOOTEN:
Q. Let me know when you've read the text on the left.
A. Okay.
Q. Does that indicate that the camera's providing

the lane detection?
A. Yes.
Q. Okay.
MR. WOOTEN: Pull that down. Show me the next box, please, Number 3.
BY MR. WOOTEN:
Q. Paragraph 3 discusses nuisance cancellations, is sort of one definition of what they are, correct?
A. Yes.
MR. WOOTEN: Pull that down, please. Show me Number 4.
BY MR. WOOTEN:
Q. Number 4 talks about a system availability extension strategy. Let you read that.
A. Okay.
MR. WOOTEN: Go to Box 5, please.
BY MR. WOOTEN:
Q. Box 5 talks about "SPP Coefficient Jumps." That's the title of it, correct?
A. Yes.
Q. I'll let you read the text. Let me know when you're done.
A. Okay.
Q. So in this paragraph, Mr. Nath's explaining what an SP coefficient jump is and where they've

observed it in their testing, correct?

A. That's correct. And as you've brought up earlier, this is a 2017 analysis. And so it's my understanding that this would be necessarily utilizing a different Mobileye chip in the IPMA than what we would have in the Job 1 for the P702.

So here, they're addressing some of the issues that this particular hardware configuration and software configuration may have with certain lane model changes, but I don't know that this is applicable to the subject vehicle.

MR. WOOTEN: Go to Page 6, please.

BY MR. WOOTEN:

Q. Paragraph 6 is discussing how they mitigated the SPP coefficient jumps through the sensor feature model?

A. Yes. And I understood that the SPP coefficient jumps were due to inconsistencies in lane markings, changes, gaps in markings, things or situations in which the lane markings were not consistently continuing forward along the length of the host lane. And so now I understand they're saying that they're looking to mitigate some of those jumps that would occur when there were inconsistent lane markings.

Q. Okay.

MR. WOOTEN: Show me Paragraph 7, please.
BY MR. WOOTEN:
Q. Paragraph 7 explains how the Lateral Motion Controller uses the SPP data.
A. Yes, to send a command to the EPAS.
Q. All right. And so in this paragraph, you get reference to SPP coefficients in the first sentence being processed and conditioned by the Sensor Feature Model, and then they are passed on to the chassis to follow the path which is referred to SPP again, right?
A. Yes.
Q. So you realize that there are two definitions that it used for SPP, right; one is the steering probable -- or steering path polynomial and the other is the steering probable path, right?
A. Yes. I don't know if they interchange the SPP; but yes, I understand that there are two concepts there.
Q. All right.
MR. WOOTEN: Next box, please.
BY MR. WOOTEN:
Q. So the first bullet point there, can you read that for me.
A. "An overview of the ACC, S&G with LCA feature is provided. The sensor, in conjunction with in-house

feature model, provides a steerable path to the Lateral Motion Controller. LMC follows the path provided to it."

Q. All right. You understand the sensor in that sentence is referring to the camera?

A. Yes, I think so.

Q. And that indicates the in-house feature model provides the steerable path, right?

A. It says "The sensor in conjunction with in-house feature model provides the steerable path."

And I believe they're referring to those coefficients that they were concerned with having jumps in them. For example, if the offset to a particular lane line jumped because the lane line was no longer detected, that's one of the coefficients that they're passing here to define the path or the polynomial.

Q. All right. One of the issues you raised about comparisons in this case was the issue with the Tesla Model 3. You claim it's not a peer vehicle, correct?

A. Correct.

Q. But it is a peer technology with respect to having the ability to steer a vehicle with a Level 2 functionality, correct?

A. I disagree because of the way in which Tesla has grouped their features. And so, for example, in

Mr. Harrington's testing in which he's utilizing a Tesla Model 3, he's utilizing a number of different features that would be add-ons or on top of an LCA plus ACC functionality. And so for that reason, I would say that the technologies or the features are not peers.

Q. Do you know how long Tesla's been able to drive a vehicle through an interstate exit without the driver having to input steering or braking?

A. No, I don't; however, I think that question is a little hard to answer because I believe Tesla even advises that it may not be able to drive through exits. And so because they do a substantial amount of learning as people drive those exits, their ability to take an exit would likely improve or evolve over time, but it doesn't mean that they can take all exits.

Q. Do you know what technology Tesla utilizes that Ford doesn't to allow their vehicles to take an interstate exit with no input from a driver?

A. Well, first, Tesla incorporates a very different sensor suite from the P702 that we've been discussing here. They have a very different set of cameras, radars and so on. So they're using different sensors, they're using a different number of sensors. I don't have knowledge of their internal algorithms or computation, but I would say that they're simply

different systems in both hardware and software.

Q. Do you know if Tesla uses connected vehicle data that it gathers from other Teslas to determine speeds at which Tesla vehicles have safely navigated interstate exits?

A. I have understood from some of the materials I've read that Tesla is using connected data to better understand the way some of their drivers drive through various locations like exits.

Q. And do you know whether Tesla utilizes HD maps?

A. I don't specifically know what kind of map they use.

Q. And do you know if Tesla uses an electronic horizon to assist with navigating interstate exits?

A. I'm not specifically familiar with the electronic horizon.

Q. And do you know if Ford ever used an electronic horizon for the P702 in the 2021 model year?

A. I'm not sure that I've seen that.

Q. Are you aware of any studies that show that sensor camera fusion based systems repeatedly struggle to successfully navigate interstate exits when the system was based only on a camera fusion?

A. Camera fusion with radar?

Q. Yes.
A. You're -- I have not seen a general study that characterizes and quantifies the difficulty that any particular system might have in regards to what you just asked.
Q. All right. Are you aware that Ford had the ability to slow or control speed on interstate exits through its map data?
A. No, I'm not aware of this.
Q. Can you explain the engineering hierarchy to me in sort of a 30,000 foot level?
A. Are you referring to the concept of designing out hazards, for example?
Q. Designing, guarding, warning. I've always called it the "engineering hierarchy."
A. Okay.
Q. Can you tell me what that is in the engineering world?
A. Okay. Generally, at a high level, it means that if you can design out a hazard or a risk of exposure to a hazard, then that would be first priority to do. If you cannot design out that risk, then you attempt to put in guardrails to prevent that risk from becoming realized. And if you cannot put up guardrails, then you warn to avoid scenarios that might

cause exposure to a particular risk of a hazard.

Q. We talked a little bit earlier about the idea that the operational design domain for the LCA with ACC system is to operate between two lane lines, correct?

A. Correct.

Q. Would you agree that the P702 would be considered defective if the LCA cannot maintain its lane line at 45 miles an hour?

MR. BOORMAN: Objection. Incomplete hypothetical, but answer if you can.

THE WITNESS: I'm not sure what you mean by "maintain its lane line." I know we also looked at earlier the other option to identify curves to use as guidance, for example. So I'm -- I'm not sure. Could you ask again.

BY MR. WOOTEN:

Q. Let me ask it this way: If -- if the P702 with ACC with LCA activated cannot maintain its lane lines at Exit 15 at Bolingbroke at 45 miles an hour, would you consider that to be defective?

A. No, but I'm still not sure that I know what you mean by "maintain it's lane lines."

Q. In other words, follow the lane lines that are at the exit and go up the exit as if it's departing the interstate.

A. Okay. So in regards to LCA with ACC, you're talking about a system that is meant to support the driver who has his or her hands on the steering wheel at all times. And so I don't see any reason that an LCA with ACC Ford system would be considered defective when it's intended to be used with the driver who can drive through that particular exit at 45 miles per hour.

Q. Do you know if there is any speed at which the ACC with LCA-equipped exemplar vehicles driven by Mr. Pascarella and Mr. Harrington would be able to follow the lane lines based on the steering input from the ACC with LCA system without human intervention?

A. No, I don't know.

Q. Would you agree that if Ford did turn off signals, it would have allowed the system to identify an interstate exit, that that's the type of thing consumers should be warned about?

MR. BOORMAN: Objection to the extent it's outside the scope on human factors question, but answer if you can.

THE WITNESS: Your question had an underlying assumption that Ford turned off signals to detect exits which would be inclusive of the Exit 15, and I'm not sure that I've seen anything to substantiate that.

BY MR. WOOTEN:

Q. Okay. Assuming that Ford had cut off the signals for detection of an interstate exit, is that the type of thing that you would expect a manufacturer to warn end users about?

MR. BOORMAN: Same objection, and misstates the evidence, but answer if you can.

THE WITNESS: It's hard to answer because I believe, based on my understanding, that you're talking about indications of diverging or merging exits or entrances. And so again, it's hard to apply the question relating to a diverging exit to this subject incident because it's not an analogous road configuration.

MR. WOOTEN: Let's take a short break.

VIDEOGRAPHER: This ends Media Unit 2. We are off the record at 3:20 p.m.

(Recess.)

VIDEOGRAPHER: This begins Media Unit 3. We are on the record at 3:32 p.m.

BY MR. WOOTEN:

Q. All right. Dr. Kuykendal, last question. Would you agree that any risk of serious injury or death is unreasonable and unacceptable if the hazard or risk can be eliminated by state of the art safety

engineering alternatives?

MR. BOORMAN: Object to the form. Incomplete hypothetical. Answer if you can.

THE WITNESS: So I would first need to break that down into a few different components. First, you said "any risk." I think that is probably a sufficiently broad term that it's impractical to discuss eliminating any risk. For example, if a person can speed beyond the speed limit, I'm not sure that there's anybody out there that designs cars that eliminate the risk that a person can speed. So I don't know that any risk should always necessarily be eliminated. We also don't know if the sun is going to explode tomorrow, so I don't know that any risk can always be taken down to zero in any way.

But you asked if not only any risk, but if it could be eliminated by reasonable safety design. I think that reasonable safety design is also something that I would need to define. I mean, I think that engineering and science, with enough money and enough time, could design out many different solutions to many different issues, but it doesn't mean that there is sufficient time or money or opportunity in the practical world.

And so I'm trying to understand your question.

It sounds like a very broad one, so I don't think it's reasonable to say that any risk should necessarily be eliminated by reasonable design. I don't know that that's practical or realizable.

MR. WOOTEN: And with that, thank you for your time.

MR. BOORMAN: All right. No questions. She will read and sign.

VIDEOGRAPHER: This concludes today's deposition of Michelle Kuykendal. We are off the record at 3:35 p.m.

(The deposition concluded at 3:36 p.m.)

THE REPORTER: Copy, Mike?

MR. BOORMAN: Yes.

THE REPORTER: Thank you.

______________________
MICHELLE KUYKENDAL

STATE OF ARIZONA )
)ss.
COUNTY OF MARICOPA)

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to, nor employed by any of the parties hereto, and have no interest in the outcome thereof.

[X] Review and signature was requested.
[ ] Review and signature was waived.
[ ] Review and signature not requested.

I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2), dated at Phoenix, Arizona, July 27, 2025.

____Kristen Brown____________
Kristen Brown, RPR, CCR
Arizona Certified Reporter #50708

* * * * * *

I CERTIFY that Herder & Associates has complied with the ethical obligations set forth in ACJA 7-206(J)(1)(g)(1) through (6).

______________________________
Herder & Associates
Registered Reporting Firm
Arizona RRF No. R1220

**Deposition of:** Michelle L. Kuykendal, PhD **Date of deposition:** 07 / 22 / 2025

**Case:** Beverly Wooten vs. Ford Motor Company

| Page/Line No. | Change/Correction | Reason |
|---|---|---|
| 28/2 | an --> and | misheard |
| | | |
| 108/15 | hadn't --> had it | misheard |
| | | |
| 126/1 | Pacific --> Pacifica | misheard |
| | | |
| 159/10 | Dr. Case --> Dr. Cades | misheard |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Witness Signature:** [signature] **Date:** 08/20/2025

**Herder & Associates, Inc.**
(480)481-0649 www.CourtReportersAZ.com