**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **BEVERLY WOOTEN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:23-cv-346 (MTT)** |
| ) | |
| **FORD MOTOR COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**ORDER**

This filed, dismissed, and renewed product liability case has a tortuous history. In both iterations of the case, the Plaintiffs have struggled to find a defect to support their claim. In the first action, former counsel alleged "Barry Wooten was severely injured and subsequently died as a result of a sudden steering system failure in his 2021 Ford F-150." Case No. 5:22-cv-00209-MTT, ECF 1 at 2. That didn't pan out, and the Plaintiffs voluntarily dismissed. In their renewed action, the Plaintiffs, with new lead counsel, focused generally on the Ford pickup's Automated (or Advanced) Driver Assistance Systems ("ADAS"). ECF 1 ¶ 3. New lead counsel was, and is, Nicholas Wooten, the nephew of the decedent. The Plaintiffs struggled to find a defect in the ADAS, and, when they found what they thought was a defect, they faced new factual hurdles, one of which is relevant here—there is no direct evidence that the ADAS's lane centering assist feature ("LCA") was engaged at the time of the crash. If the Plaintiffs can't prove that the LCA was active, their claims almost certainly fail. All along the way in the renewed action, Plaintiffs' counsel have accused Ford of misconduct. But as far as the

Court can tell, Ford transgressed only once, and the Court afforded the Plaintiffs a remedy. The conduct of Plaintiffs' counsel has been a different story.

This Order addresses two issues: (1) Ford's motion to sanction the Plaintiffs for representations by Plaintiffs' counsel to the Court regarding redacted documents Ford filed with the National Highway Traffic Safety Administration ("NHTSA") (ECF 184)[1], and (2) Ford's motion to strike the latest in a series of late witness disclosures by Plaintiffs' counsel (ECF 205).

### 1. The Unredacted Redacted NHTSA Documents

On July 31, 2025, Plaintiffs' co-counsel, Mr. Cheeley, sent a letter to the Court stating that two days prior, Plaintiffs' counsel had learned of "relevant documents that Ford provided to NHTSA but not to Plaintiffs." ECF 184-1 at 2. The letter claimed that "the documents are responsive to several of Plaintiffs' document requests," and represented that "[t]he documents are publicly available on the NHTSA website and can be easily viewed on Adobe." *Id.* The letter leveled the then-latest allegation of Ford misconduct: "We are in the process of Bates labeling the hundreds of documents that Ford has wrongfully withheld [and] seek direction from the Court about how to present some of the most salient documents in advance of the upcoming hearing on August 7, 2025."[2] *Id.*

On August 5, 2025, the Plaintiffs produced to Ford 10,710 documents downloaded from the NHTSA website and served discovery on Ford seeking admission

---

[1] Ford also claimed that the Plaintiffs improperly removed redactions from the documents. ECF 184.

[2] The Court did not respond to this letter for several reasons, the primary reason being Plaintiffs' counsel's continued disregard of the Court's May 29, 2025, Order directing "[a]ll further communications with the Court shall be filed on the docket." ECF 136.

that Ford produced the documents to NHTSA but withheld them from the Plaintiffs. ECF 184 at 2; 187 at 2; 187-3.

On August 7, 2025, the Court held a hearing on motions unrelated to the NHTSA documents, including Ford's motion to strike late expert testing (ECF 147), Ford's motion to strike late expert and lay witness disclosures[3] and motion for protective order (ECF 177), and the Plaintiffs' second motion to compel (ECF 156). ECF 164; 179. Early in the hearing, Mr. Wooten made several passing references to the NHTSA documents in discussions about the Plaintiffs' second motion to compel. ECF 184-3 at 18:7-12, 20:9-11, 21:21-23, 27:10-13. After Ford's counsel provided its understanding of the hardware and software equipped on the Ford pickup, Plaintiffs' counsel requested permission to publish "a document that proves otherwise," which the Court allowed.[4] *Id.* at 34:5-36:12. Mr. Wooten then identified the documents as NHTSA documents, without mention of removed redactions. *Id.* at 36:18-37:25. When Mr. Wooten finished presenting the documents, the Court observed that there was nothing particularly surprising in the documents and told Mr. Wooten to move on. *Id.* at 40:2-12. Later in the

---

[3] These late disclosures are not the late disclosure addressed here.

[4] The Court's permission was as follows:

> MR. WOOTEN: We're happy to display these documents to the Court, Your Honor. I think it would take you in the neighborhood of -- it would take us less than five minutes to go through these things. They're pretty well cut and dried and highlighted.
>
> THE COURT: All right.
>
> MR. WOOTEN: *Do we have permission to publish these and explain them?*
>
> THE COURT: Certainly.

*Id.* at 36:4-12 (emphasis added).

hearing, Plaintiffs' counsel asked to publish an affidavit from the NHTSA documents, again without mention of redactions. *Id.* at 56:16-23. According to Mr. Cheeley, the affidavit was "presented to [Chet Hearn] by marketing people outside of Ford," but Mr. Hearn "refused to sign it," and Plaintiffs' counsel wanted to know why. *Id.* at 56:5-6. The Court agreed to look at the document, noting that Ford was unaware of the affidavit to which the Plaintiffs were referring.[5] *Id.* at 69:23-70:6; *see id.* at 56:1-23.

The next day, August 8, 2025, the Plaintiffs filed the NHTSA document exhibits on the docket. ECF 180. On August 18, 2025, Ford, having reviewed the documents, moved the Court to seal the NHTSA documents and to impose sanctions against the Plaintiffs, asserting that the Plaintiffs had improperly removed redactions from the NHTSA documents and published and filed those now-unredacted documents with the Court. ECF 184. Specifically, Ford charged that the Plaintiffs had "removed sixty-four pages, including all five pages of the [Hearn] affidavit, worth of full-page redactions from [a NHTSA] document before presenting it to the Court as 'publicly available' information and filing it on the public case docket."[6] *Id.* at 3. That was the first notice to the Court that the NHTSA documents had redactions and, to that extent, were not "publicly

---

[5]

> MR. CHEELEY: We got that Hearn affidavit that we found in the NHTSA documents.
>
> THE COURT: Right. If you've got it, I would like to look at it.
>
> MR. CHEELEY: Yes, we found it.
>
> THE COURT: Ford sounds like they'd like to look at it too.
>
> MR. RICHMAN: Yes.

ECF 184-3 at 69:24-70:6.

[6] Recall that Plaintiffs' counsel served the 10,710 NHTSA documents less than two days before the hearing.

available." Accordingly, the Court granted Ford's motion to seal the documents and ordered the Plaintiffs to file a response confirming or denying Ford's allegations. ECF 185.

In their response, the Plaintiffs argued (1) Ford bore the burden of properly redacting all documents it submitted to NHTSA; (2) removal of ineffective redactions from publicly available NHTSA documents was not improper; (3) Plaintiffs' third request covered the NHTSA documents for production; and (4) Plaintiffs had every right to use the NHTSA documents at the August 7 Hearing. ECF 187. The response included a declaration from Mr. Wooten, stating that he was "the attorney who was responsible for the decision to remove Ford's ineffective redactions" and "the attorney who was responsible for the decision to use and publish these documents at the August 7 hearing." ECF 187-4 ¶¶ 39, 42. The Plaintiffs also filed their response to Ford's "motion for final case deadlines" (ECF 186) and reported: "Plaintiffs' experts do not intend to supplement their opinions based upon the NHTSA documents Plaintiffs obtained from NHTSA's website." ECF 188 ¶ 2. "Instead, the Plaintiffs' experts will rely upon the NHTSA documents where appropriate as additional support for their existing opinions." *Id.* ¶ 3. The Plaintiffs did not explain why their lawyers' July 31 letter did not disclose that redactions had been removed or why their lawyers represented that the redacted documents were "publicly available."

On September 2, 2025, the Court ordered:

> The Court agrees with the Defendant that sanctions . . . are appropriate. The breadth of those sanctions will be determined. For now, the parties shall assume that the Plaintiffs' experts cannot base their opinions on the NHTSA documents. That, however, is likely not a sufficient sanction because the Plaintiffs effectively concede that their experts will not base their opinions on the

NHTSA documents. [ECF 188 ¶ 2]. The Court ORDERS the Plaintiffs to submit affidavits from their experts by 9/15/2025 stating specifically the NHTSA documents that provide "additional support" for their existing opinions and why. [*Id.* ¶ 3]. The Plaintiffs SHALL immediately embargo the NHTSA documents and by 9/10/2025 file a disclosure identifying who they have disseminated the NHTSA documents to, and which documents were disseminated.

ECF 195. The Plaintiffs reported that Plaintiffs' counsel provided the NHTSA documents to three experts, of whom only one had reviewed the NHTSA documents before the Court's order. ECF 196-1 ¶¶ 2-7. The Plaintiffs moved for an evidentiary hearing (ECF 197), which the Court granted in part, instructing: "The narrow issue to be addressed by the plaintiffs is Mr. Wooten's failure to disclose that the NHTSA documents at issue were redacted and confidential. Ford's amateurish efforts at redaction have been established." ECF 202. The Court imposed that limitation because the Court accepted, but did not decide, that Plaintiffs' counsel did not act improperly when they removed Ford's "amateurish" redactions.

The Court held the evidentiary hearing on October 2, 2025. ECF 213. Mr. Wooten reiterated that he was taking responsibility for all decisions about the handling and presentation of the NHTSA documents, including the July 31 letter from Mr. Cheeley. ECF 213 at 44:18-20. But Mr. Wooten argued that Plaintiffs' counsel had twice alerted Ford *and* the Court to the redaction issue, first in the July 31 letter and next at the August 7 hearing. Both arguments were met with incredulity.

> MR. WOOTEN: And if I had it to do over again, I would -- I would have written the letter on July 31st myself and sent it to Your Honor. But, I also read Mr. Cheeley's letter on July 31st. To me, as someone who deals with ESI, it was screaming that there was a redaction problem, if you understand what the term "redaction" means, and you use Adobe, which is what Ford's counsel in their certification to NHTSA said.

-6-

*Id*. at 43:23-44:4. It took a moment for the Court[7] to grasp the argument; Mr. Wooten meant that "easily viewed on Adobe" screams to all that redactions had been removed.[8]

> THE COURT: Whoa, whoa, whoa, whoa. Are you telling me now that this letter was intended to inform me that the documents had been redacted?
>
> MR. WOOTEN: No, sir. I'm saying -- it was an attempt to inform my colleagues, if I was receiving that letter, and I was holding documents I thought were redacted --
>
> THE COURT: But you just keep making it worse, Mr. Wooten. I'm sorry.
>
> MR. WOOTEN: Again, I didn't write that letter and I accept responsibility for it. If I had it to do over again, Your Honor, we obviously wouldn't be here. That's clear.
>
> THE COURT: The idea that this letter was carefully crafted --
>
> MR. WOOTEN: Your Honor, I didn't -- again, Mr. Cheeley wrote the letter, I didn't write the letter, and I am accepting responsibility for everything that happened. But I am saying that if I received that letter, I would know – if I believed I had redacted documents, as an attorney practicing, I would know that there was a problem from that letter. I didn't say that Your Honor would know.

*Id.* at 43:23-44:24. That was the "alert" in the July 31 letter.

As for the alert at the August 7 hearing and the Court's permission to use unredacted redacted documents, Mr. Wooten had this to say:

> MR. WOOTEN: [W]hen we came here on the 7th, in my mind what was going to happen is we were going to talk about those documents before we ever got into the substance of them. And you can go back to the transcript -- you know, we talked about – I mentioned we had recently acquired NHTSA documents. I

---

[7] The Court, like any federal district judge, has considerable experience with redacted documents. The letter did not scream to the Court, or to Ford, that Plaintiffs' counsel had removed redactions.

[8] Mr. Cheeley acknowledged that they "should have inserted the word 'redactions' or '[Ford's] attempted redaction.'" *Id.* at 55:8-9. *Those words* would have screamed.

mentioned that there were some we wanted to show you. And when it got to the point in time where it was time to do that, I said, "May I proceed into the documents?" and Your Honor said, "Yes."

Now, I need you to be clear about where my head was at in that moment. I thought that I was going to prompt something from someone. Either Your Honor was going to say, "Mr. Wooten sent us a letter, what is this about? Can you explain what the letter meant?" Or, Ford was going to make at least a prophylactic objection of some sort to discussing those documents.

When they didn't, I thought that that was a strategic choice. Because Your Honor had already talked about the fact that they had promised to produce some discovery, and they had told the Court they were unable to comply, it was too difficult. And I thought that they were making the choice not to say anything in the hopes of not upsetting Your Honor about this issue of holding back 11,000 documents.

So, I understood that to be the Court's permission to proceed into the substance. Now, the –

THE COURT: Hold on. How could you interpret silence, which is what you're describing, by permission from me to begin using documents that had been redacted? And that you had unredacted?

MR. WOOTEN: Well, Your Honor –

THE COURT: Because -- *because* -- nobody told me they had been redacted. And Ford will probably tell us this, but I remember very well they -- they acknowledged they had gotten this document dump, but they were not familiar with the documents at that point. And they will probably talk about that in a moment. But so, how was my -- how did I give you permission?

MR. WOOTEN: Your Honor, I am not blaming Your Honor. I -- I told you when I signed the declaration, if there's a consequence, then I will have to bear it. I did not believe -- when I went into those documents, I believed that we had alerted the Court that there was an issue to discuss about the documents.

*Id.* at 32:8-33:25.

On October 14, 2025, the Court ordered: "[T]he parties may file by October 24, 2025, supplemental briefs on revelations at the October 2, 2025 hearing regarding

plaintiffs' counsel's July 31, 2025 letter." ECF 221. The Plaintiffs requested "further guidance or clarification as to the specific issues the Court would like addressed in any further briefing." ECF 227 at 1. The Court did not respond. Ford filed its supplemental brief on October 24, 2025, and the Plaintiffs did not file supplemental briefing. ECF 230.

### 2. The Late Disclosure

As noted, the Plaintiffs lack clear evidence that the decedent was using LCA. In substantial part, they rely on family members' recollections that the decedent generally liked to use technology. On September 12, 2025, long after a number of deadlines had passed, Plaintiffs' counsel informed Ford that Tommy Christian "has personal knowledge regarding the seat belt extender and Mr. Wooten's use of LCA in the subject vehicle." ECF 205 at 3. In Plaintiffs' counsel's brief in response to Ford's motion to strike Christian's disclosure, they made clear what Christian would do at trial: "Tommy Christian is expected to *testify* that Barry Wooten habitually chose to use the highest-level technology available in his vehicle, i.e., *habitually chose intelligent advanced cruise control with LCA over base cruise control.*" ECF 209 at 11-12 (emphasis added). Then they blamed Ford's lawyers, arguing that family member deposition testimony "adequately explained that Tommy Christian was Barry Wooten's right-hand man, [which was] more than enough notice for Ford to have pursued testimony from Tommy Christian." *Id.* at 2. Yet, in seeking to justify their late disclosure, Plaintiffs' counsel claimed they had not timely talked with Christian.[9] *Id.* at 9.

---

[9] Plaintiffs' counsel's brief concluded that they had saved Ford's lawyers from their ineptitude: "Once Plaintiffs' counsel became aware that Ford had not spoken with Tommy Christian, they moved as quickly as circumstances would permit to provide a supplementation that filled in the relevant gaps in Ford's knowledge, including volunteering that Tommy Christian had knowledge relevant to Barry Wooten's use of LCA." *Id.* at 6.

Given this almost last-minute disclosure of purported habit evidence critical to the Plaintiffs' case, the Court wanted to know when Plaintiffs' counsel first talked with Christian, when they learned that Christian had this vital information, and why they did not file a timely Rule 26 disclosure or identify Mr. Christian in their interrogatory responses. This is how that went at the October 2, 2025, hearing:

> THE COURT: All right. When did anybody on the plaintiffs' team first talk with Mr. Christian?
>
> MR. WOOTEN: Your Honor, on the issues that we disclosed, we talked with Mr. Christian -- I put in the motion, I believe it was between July 17th and 19th.

ECF 213 at 58:18-22. That was not responsive, so the Court asked the question again.

> MR. WOOTEN: When did we first talk with him ever?
>
> THE COURT: When you first talked to him.
>
> MR. WOOTEN: Okay. Well, we had talked to him previously about his relationship with Barry, just generally. But we had not talked about any of the issues related to the seat belt extender or even the LCA issue, because we were thinking of his use, primarily, way back when -- I mean, if we used him at all, it would be in the nature of what I call a friends-and-family witness to talk about kind of who Barry was, the person, and that sort of thing. But we hadn't made any effort to disclose him because we weren't sure who we were going to use in that situation, or if we would use anybody other than family.

*Id.* at 59:8-20.

> THE COURT: And you're telling me that in your communications with him you never had any discussion about LCA or whether Mr. Wooten used or didn't use LCA or related features?
>
> MR. WOOTEN: So, to be very clear, Your Honor, I spoke with Mr. Christian -- when I told you that I spoke with Mr. Christian with Mr. Cheeley, that's the only conversation I had with him. If Your Honor will recall, I was not part of the first case. I didn't get involved until the refiling.

And so, when I say that my understanding was that maybe somebody from the prior case spoke with him back at the beginning, that's my general understanding from reviewing our file. I did not speak to him personally, myself, until what we talked about right before the expert depositions, when we were trying to find out where the seat belt extender might have come from.

*Id.* at 60:4-19.

THE COURT: . . . [Y]ou're saying you never thought to ask Mr. Christian about the technology in this truck that Mr. Wooten used?

MR. WOOTEN: Your Honor, we saw and I see Mr. Christian, what he said, and that to me --

THE COURT: No, no, no, that's not my question.

MR. WOOTEN: I did not.

THE COURT: Did not. You did not.

MR. WOOTEN: We had family that said that he always used the technology, and we were relying on the habit evidence and what we knew about the way the system worked. I didn't see that it was necessarily anything extra to bring in one more person to repeat it.

THE COURT: Yet it's so important to you that that was a -- that that family testimony was a critical factor in your expert's opinion . . . that the technology was being used. And yet it didn't occur to you, knowing what you knew, that you should go talk to Mr. Christian, somebody independent of the family, who worked with him day to day and understood the vehicle, to ask him about Mr. Wooten's use of LCA?

*Id.* at 68:20-69:15. At that point, Mr. Cheeley spoke up.

MR. CHEELEY: He said he never rode with Mr. Wooten, so he didn't know -- he never had a discussion with Mr. Wooten is what I recall him saying about the use of ADAS systems.

THE COURT: So, he's not going to talk about that.

MR. CHEELEY: No, sir.

*Id.* at 69:16-24.

That was strange. Lead counsel maintained that Christian would testify that the decedent habitually used LCA, yet Christian told co-counsel that he, Christian, knew nothing about the subject. That led the Court to suggest how that might go at trial.

> THE COURT: Mr. Cheeley is going to be a witness, you understand. If Mr. Christian gets on the stand and testifies about LCA, Ford's going to have to call Mr. Cheeley to demonstrate that he doesn't have personal knowledge.

ECF 213 at 70:23-71:1. Mr. Wooten then claimed he never said Christian would testify and would be "happy to say that Mr. Christian is not coming to testify." *Id.* at 71:11-15. The Court granted the motion to strike by consent. *Id.* at 71:21-22, 84:12-25.

### 3. The Court's Rulings

At the October 2, 2025 hearing, the Court tentatively ruled that Plaintiffs' counsel could not make use of the redacted NHTSA documents. *Id.* at 73:17-21. Further, Plaintiffs' counsel were not to share the redacted NHTSA documents with their experts, including experts retained but not identified as trial experts. Should Ford adduce evidence that was directly contradicted by a redacted NHTSA document, Plaintiffs' counsel could, if the Court permitted, use that document for impeachment. *Id.* at 73:22-74:7. The Court affirms that ruling and the Court's September 2, 2025, ruling. As noted, Plaintiffs' counsel consented to the Court's Order striking their disclosure that Mr. Christian would testify at trial.

Arguably, the Court's rulings are not sanctions at all. From what the Court has seen, the NHTSA documents contain no revelations or surprises, and the Plaintiffs have a remedy should Ford witness testimony be contradicted by the NHTSA documents. And after the debacle at the hearing, there was no chance the Plaintiffs would put Mr. Christian on the stand. The question is what to do about Mr. Wooten's conduct. As he

-12-

said, based on his extensive experience, he understood the ethical issues raised by the removal of Ford's redactions, "amateurish" though they were. And because of that experience, he knew, or certainly should have known, that had he been candid with the Court, the Court likely would have allowed the Plaintiffs to use the NHTSA documents, given Ford's failure to properly redact any sensitive information in the documents. Mr. Wooten rejected the candid approach. Knowing that Ford had not had an opportunity to review the documents, girded by the July 31 letter's screams to the Court and Ford that redactions had been removed, and seeking a sure path to using the documents, Mr. Wooten chose to maneuver Ford into waiving its objection and the Court into "permitting" the use of the documents.

The Christian disclosure was bafflingly improper. Ever since the Plaintiffs settled on their ADAS defect theory, Plaintiffs' counsel have literally scoured the countryside to find evidence, including coworker testimony, that the decedent was using LCA when he crashed.[10] The Court thought it unlikely that they failed to interview the decedent's "right-hand man," hence the Court's questioning at the hearing.

How to explain all this? The Court knows Plaintiffs' counsel to be highly competent and professional. But the conduct at issue raises serious ethical issues and, using the Court's description of Ford's redaction efforts, was clumsy and amateurish. The Court addressed this question at the hearing.

> THE COURT: I think part of the problem here – and it's been evident to me during the course of the hearing and I've certainly noted it before -- Mr. Wooten, I think you're too emotionally

---

[10] Not incidentally, the other topic of the Christian disclosure—the alleged seat belt extender—was necessitated by Plaintiffs' counsel's failure to timely counter Ford's seat belt defense, a misstep that led the Court to strike treating physician expert testimony. ECF 184-3 at 66:17-69:4.

> involved in this case.[11] I've lost count on how many times you've referred to "my uncle." What I hear more of this morning are decisions that are made that seem to be based in part on your belief, as you have argued again and again, that Ford is acting unfairly.
>
> It sounds to me like you took that as license to handle this the way you did. I think your judgment was clouded, because, as I said, you have to wonder what – what would a reasonable lawyer be thinking. I mean, he -- by your assessment, you had a treasure trove. And by your assessment, you had Ford in a bad spot.
>
> And then you made the decision to throw it away. By writing that letter to me. And then adding to it this morning by telling me that you calculated in the hearing to handle it and just say, well, if anybody raises it -- if the judge doesn't stop me, or if they don't object, I will just keep going. Illustrating that you knew you had a problem.

ECF 213 at 50:15-51:9.

After reflection, the Court still believes that is the explanation. Mr. Wooten represents his family in a tragic, high-stakes, and high-expense case. His judgment is clouded, and he has done things he would never have done had he been a zealous but detached advocate.

If Ford believes further sanctions are necessary, Ford shall move for those sanctions by February 23, 2026.

**SO ORDERED**, this 9th day of February, 2026.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[11] Mr. Cheeley agreed. ECF 213 at 52:25-53:3.

-14-