IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

BEVERLY WOOTEN as surviving spouse and co-administrator of the Estate of Barry Wyatt Wooten; BARRY WAYNE WOOTEN as co-administrator of Estate of Barry Wyatt Wooten,

Plaintiffs,

vs.

FORD MOTOR COMPANY,

Defendant.

Case No. 5:23-CV-346

Macon, Georgia

STATUS CONFERENCE

April 1, 2026

BEFORE THE HONORABLE MARC T. TREADWELL
UNITED STATES DISTRICT JUDGE

Proceedings reported stenographically

---

DARLENE D. FULLER, USCR
Registered Professional Reporter
Registered Merit Reporter
Certified Realtime Reporter
Georgia Certified Reporter No. 5641-3440-5157-6832

APPEARANCES:

FOR THE PLAINTIFF:

Robert D. Cheeley
Andrew Craft
Gabrielle D. Gravel
McKenzie Rivers Nadel
CHEELEY LAW GROUP LLC
2500 Old Milton Parkway, Suite 200
Alpharetta, Georgia 30009
(770) 814-7001
bob@cheeleylawgroup.com
andrew@cheeleylawgroup.com
gabby@cheeleylawgroup.com
mckenzie@cheeleylawgroup.com

Nick Wooten
Attorney at Law
3125 Carlton Road
Cumming, Georgia 30041
(512) 589-3397
nick@nickwooten.com

FOR DEFENDANT FORD:

Paul E. Petersen III
WATSON SPENCE LLP
999 Peachtree Street NE, Suite 1130
Atlanta, Georgia 30309
(229) 436-1545
ppetersen@watsonspence.com

Scott A. Richman
Tiffany M. Gutierrez
MCDONALD TOOLE RICHMAN & CORRENTI
111 North Magnolia Avenue, Ste 1200
Orlando, Florida 32801
(407) 246-1800
srichman@mtrclegal.com
tgutierrez@mtrclegal.com

ALSO PRESENT:

Kamden Ahlberg

Macon, Georgia
Wednesday, April 1, 2026
9:55 a.m.

P R O C E E D I N G S

COURT OFFICER: All rise. United States District Court for the Middle District of Georgia, Macon Division, is now in session. Please be seated and come to order.

THE COURT: Good morning.

COUNSEL COLLECTIVELY: Good morning, Judge.

THE COURT: All right. Mr. Cheeley, you want to give us appearances at your table?

MR. CHEELEY: Yes, Your Honor. Seated to my right is Andrew Craft; and seated to his right is Gabby Gravel, she just got married three weeks ago, Waldrop; and then McKenzie Nadel, N-a-d-e-l.

THE COURT: All right. Good morning to all of you.

And I look to Ford, we have Mr. Petersen, Mr. Richman, and Ms. Gutierrez.

I see Mr. Wooten, and who do you have with you?

MR. WOOTEN: This is Kamden Ahlberg, Your Honor, my paralegal.

THE COURT: Again, good morning, everybody. I am not entirely sure where we're going this morning, but I'm going to turn it to Ford first to get us started.

MR. RICHMAN: Yes, Your Honor.

THE COURT: You can be seated, if you would. In fact, please be seated. And make sure you've got a microphone there.

MR. RICHMAN: I do. So, Your Honor's kind of been brought up to speed by our -- by the timeline that we sent. But, um, just as a quick background, Your Honor entered the Court's order related to the sanctions that Ford had requested, and then several days later we received a phone call from Mr. Cheeley -- or it might have been from Mr. Craft from Mr. Cheeley's office, but explaining that they had discovered -- that Mr. Wooten had left the firm, and they had discovered in his emails that several violations of Your Honor's orders and the protective order in the case have occurred.

Over the week since, we have been getting more information about that. We received a number of emails from Mr. Cheeley's firm. We've provided those to you.

And from Ford's position, we are kind of -- we are in a -- we're in an unusual and difficult spot, because we -- we've spoken -- I personally have spoken to Mr. Wooten, but I've also spoken to Mr. Craft, and we're getting different stories from both of them -- from each of them as to what's going on and what was sent and what wasn't sent.

We know from the emails some things that are very clear. There were definitely protective order violations,

definitely violations of Your Honor's order related to the unredacted NHTSA documents. But beyond that, some really egregious, um, things were said in those emails and done in those emails, and so from Ford's position, though, we're still in a point of having a lack of knowledge.

What Ford really wants to know before we even get to a what-do-we-do-about-it, Ford wants to know everybody to whom documents were sent. We know some, but we don't know all, and I'll explain why in a second. We want to know what documents were sent to those people.

We know from speaking with Mr. Craft that the -- he or he and Mr. Cheeley, some number of people at their firm, did look through Mr. Wooten's and Mr. Ahlberg's emails and produced to us what they found.

But they admit they are lawyers, they are not IT experts or forensic computer experts, and they only looked at those two email folders. So, Ford would like to have a, um -- a computer forensic expert look through their email servers--and not -- not just limited to those two individuals--to find out everything that was sent and to whom.

If we need -- if need be, um, those emails could be produced to the Court. Or if it's too voluminous for the Court, we're fine with the Court appointing a special master to review those. We think that maybe something that could be done is that special master or the Court could kind of put these

emails into buckets of things that should be produced, things that are irrelevant, and things that are privileged, and then we can deal with those.

We'd obviously like to get an order from the Court about these violations.

And then even in the information that's been provided to us, there's a lot of unknowns. My understanding is Mr. Cheeley's office provided the emails, the emails show that there were links, links to DropBox accounts that had documents in them. We haven't been able to or have not accessed those DropBox links, but we have been provided documents from Mr. Cheeley's office, what they have represented to have been in those DropBox links to those various third parties.

The problem is we've been told that some of those links, the documents were deleted, so we don't know what is in them. And Mr. Wooten has raised a question as to the veracity of the statements and production of those documents and if they really represent what was said.

So Ford's in a really bad position of really not knowing. We know clearly, without question, from those emails, that the orders -- the violations of the order occurred, but the depth and breadth of them is still unknown. And for Ford Motor Company, as you can imagine, having all this highly sensitive information that Ford has fought very hard -- Your Honor knows because those fights have been in front of Your

Honor -- to keep confidential, and then to have them just thrown around to third parties, to investigative reporters, to plaintiffs counsel in other firms, it's been very frustrating, and Ford really wants to understand the scope of it so it at least knows which of its documents are out there, um, and then what attempts it can make, if any, to claw some of those back. So, that's kind of where Ford is. Today.

THE COURT: So, let me be sure I understand the scope. First--and I am relying on your chronology as well--even before the issue with the NHTSA documents arose, Ford said, based upon what you got from Mr. Cheeley's office and what I see here on your chronology, that there were violations of the protective order entered in the case.

MR. RICHMAN: Yes, Your Honor.

THE COURT: That's one category. And then the next category is violations of my September 2nd order, 2025, regarding the NHTSA documents.

MR. RICHMAN: Yes, Your Honor.

THE COURT: Okay. All right. Mr. Cheeley, I'll turn to you first, or whoever wants to say where you see we are now.

MR. CHEELEY: Go ahead.

Your Honor, Andrew Craft is going to respond.

THE COURT: All right.

MR. CRAFT: Good morning, Your Honor.

THE COURT: Good morning.

MR. CRAFT: I believe what most of Mr. Richman stated is true from our perspective. Since Mr. Wooten and Mr. Ahlberg's leaving the firm, we have obviously sent over to Ford everything that we have learned of we believe to be a violation of either the protective order or your September 2nd order regarding the NHTSA documents.

I know Ford just asked for breadth or more about to whom they were sent and what were sent. I think it -- I don't think Ford disagrees that since then, the Cheeley Law Group has sent over everything that we believe to be a violation and everything that we could find related to it.

They are in receipt of all the persons that we found violations to in emails as well as the documents we were able to locate. We've also sent Ford emails that I sent to the third parties requesting them to return any documents they'd received and then to destroy them.

Their receipt of those -- to date, we have received responses from all except one. One hasn't responded. And then *The Wall Street Journal* has responded saying they are not going to comply with our wishes to delete the documents they received.

The other individuals have confirmed they have not shared it with anybody and have destroyed them or -- and/or have sent them back to us. So, I am not sure exactly what you're wanting from us.

THE COURT: Well, let me ask you this. What about -- give me your description of the scope of your search. How you went about it, as well.

MR. CRAFT: When Mr. Wooten left the firm, we saw *The Wall Street Journal* article that mentioned unredacted documents. We collectively said we're not sure how they knew that. It had to be from somewhere within. So, that's when we started reviewing Mr. Wooten's emails, saw a link provided to Mr. Ryan Felton at *The Wall Street Journal*, and so we got -- continued to search to see what else was discovered.

So, over the next weeks, attorneys in our office -- Gabby and McKenzie and I -- went through both Nick Wooten's emails, inbox and outbox, individually-based. No, like, search terms; it was email-by-email. As well as Mr. Ahlberg's. Which resulted in more disclosures to Ford, and we revealed that to them every time we found an additional revelation.

So, that's how we've gone about it so far. He's right, we are not IT folks, but that's how we have done it so far. We have no reason to believe that any other person in the firm -- I started there, here at the firm, in October of last year. I certainly have not disclosed any documents. But we have no reason to believe and I don't think Ford really thinks there's any reason to believe any other person disclosed any other documents.

If Your Honor orders this whole investigation into

our emails, I think we need some scope because there would be a lot of issues with privilege and client communication. But I just don't think that's warranted right now, given that there isn't any allegation that any other person, other than Mr. Ahlberg or Mr. Wooten, provided any protected documents to any other third person. So we have not searched any current employees' emails.

THE COURT: Okay. Mr. Wooten, where do you see we are?

MR. WOOTEN: Well, Your Honor, there are a lot of issues of privilege and work product in the production that my former colleagues gave Ford. I raised that in my motion for a hearing.

Um, you know, the way that I see this is for you to have the full understanding of what happened and how these things came about, you're going to need to delve into the last two or three days of my employment at Cheeley and get into a lot of privileged information that we would need to share with you for you to fully understand what transpired.

But this started literally over Mr. Cheeley panicking over the Court's order on the 9th where he decided that I needed to be cast off the case because it might somehow change your opinion of the case. And, you know, he formed opinions about your beliefs about the case based on that order.

And he did not understand and does not understand the

evidence that's been presented at summary judgment. He doesn't know the facts of the case. And when we clashed about that, um, he called my aunt and made comments to her that were completely false. And I confronted him about making a false statement to a client and asked him to correct it. And he wouldn't. And I had to resign. I didn't have any choice.

And, you know, the next day, when I was asking how my email account -- be unblocked so that I could take care of my cases, I got an email from him saying that he had discovered disturbing allegations in my email account and they were going to report it to you. And I said, "Mr. Cheeley, if you think I've done something wrong, report it to the judge," and I'll do what I did every time you've called me down here, I will stand in front of you and answer for everything I've done.

But the issue that I have is for me to discuss this fully and frankly with you, I'm going to be all inside of our work processes, our internal operations, our discussions, our attorney-client privilege. Because one of the things they turned over to Ford was an email to Wendy Wooten (Wendy Wells) with a link to material that she needed to read, but they gave that to Mr. Richman and Mr. Petersen. And I asked them to claw it back under the terms of the protective order, and they refused. So, that's just one example.

It can't be a violation of the protective order to give our clients information. But they deny it. We have an

email that they gave you where I sent an email to a consulting expert that I've been using for three years, who was studying connected vehicle data and was preparing a written article on what Ford vehicles transmit in connected vehicle data.

And I sent him an email -- and I've known him for, like I said, three years, and used him. What they didn't give Your Honor that I'll give you today is his response the next day that says, "Nick, we haven't signed a consulting agreement yet, and I am not going to handle confidential information until we do, and I am not available in your window, so I don't know if I can help."

And my response, which I've given to Ford, says, "Man, I forgot about that, just destroy that email." Which he did. And he's confirmed to Ford that he did.

But Mr. Cheeley was busy smearing me to my clients, my family members, my co-counsels, my colleagues all over the country, even in jurisdictions he doesn't practice in, and wanted to make me look bad in front of you. So, that is this effort.

And I am happy to answer for these. I will tell you, Your Honor, there are two of them I can't explain. Well, I can. One of them I can; the other one I can't. I don't know how I missed the NHTSA document. I don't know how I missed that.

But that is something that's covered specifically

under -- my communication with Mr. Teitelman was covered specifically under the protective order. It says we can go to NHTSA if we believe that there is a life safety issue. And I had a discussion with Mr. Teitelman in front of Bob -- he was present for half that conversation -- and then I sent him the information to support it, and it was related to the human factors issue regarding the steering probable path (SPP) and how there's not enough time at certain intersections for people to react if there is a lane departure. That was a life safety issue.

I gave that to Mr. Teitelman. That's permitted under the protective order. I did miss that. I absolutely did. And I should have had that in there. I don't know why. Other than the fact that we had been worked to death, because Mr. Ahlberg and I worked about 20 hours a day for about three months. Because we did every expert deposition. Traveled all over the country. I think these people from Ford, my colleagues, can confirm that.

And the day of the communication with Mr. Felton, if you go back and look at that email chain carefully, Mr. Felton responded around noon. And I responded to him. Mr. Ahlberg's email went out at 3:25. Well, by 3:25 on that day, I was asleep, because that was the day after we finished Ram Krishwasnami's deposition. I didn't make it to 5:00 o'clock that day. That's the first chance I had to rest in six or

eight weeks.

So, that got lost in the 17- or 1800 emails I was behind, so I didn't see that link. But when I did talk to Mr. Felton, he told us that he had already downloaded the documents. He didn't need documents from us; he didn't want documents from us. And he said he'd been investigating BlueCruise for years.

And I think if you look him up, he's got articles going back several years. And I think if you honestly assess what was said in that article, it says he reviewed some NHTSA documents that were publicly available, but he doesn't say that he got them from us or that he used ours.

But what you didn't get from Mr. Cheeley is that Mr. Cheeley ordered those documents to be sent to him. He told Kam to send those documents. Mr. Cheeley wanted to blast this all over the world. I put a stop to that.

Gardiner Harris is Mr. Cheeley's friend. He introduced us to Gardiner Harris and brought him to the office. We never gave that link to Gardiner Harris. It has been told to the Court that we did, but if you look at the email chain, the link didn't go to Gardiner Harris, the link went to Mr. Felton. And that was at Mr. Cheeley's direction.

And if you look at Mr. Harris' email chain, you actually see Mr. Ahlberg say that Bob was going to be in touch with him later. And then if you follow that chain out, you see

that Bob's included on those emails.

Now, I spoke to Mr. Harris, but that was after I convinced Bob not to blast it all over the media. I said it was unnecessary; if we just disclose it properly, we could use the documents. And, of course, Mr. Cheeley's letter that I took responsibility for started all this.

So, um, yeah, there's a lot to discuss. And I'm happy to discuss it. And if Your Honor decides I need to go to jail and take my Bar license, well, I guess that will be my sanction. But that's certainly what's been told to everybody that I represent all over the country. So.

But that's where we are. And I think to get through those issues, there's a lot of things that are privileged and protected and we would need to disclose to you, but I don't think we should have to say those things in front of Ford because of their nature. There's certainly things that we can talk about with Ford, but I think we have to segregate those things.

THE COURT: I understand, of course, that you no longer have access to the files, computers, databases that we're talking about at the Cheeley Law Firm. But what's your position on whether a forensic examination is appropriate?

MR. WOOTEN: Well, Your Honor, I've got emails I've marked as exhibits for today's hearing where I asked that Mr. Cheeley provide me with anything that he claims is proof

that I did something wrong.

I will tell you that they are -- I have no hard feelings towards them, but there ain't nobody at that table that knows this case. Mr. Craft said himself he has only been at the firm a couple months. Ms. Gravel, Ms. Nadel I think will tell you honestly that they didn't spend a lot of time on the case because they had other obligations.

Mr. Cheeley was working about six hours a week in the office when we were working this case up. It was Mr. Ahlberg and I that were doing the facts of this case, and I think these gentlemen would tell you that. And Ms. Gutierrez.

So, a lot of what they sent you -- for instance, the things that we sent in the last Ryan Felton email, that email starts with, "Here's everything we can share not covered by the protective order." We know -- Mr. Ahlberg and I -- that material's things we found and produced to Ford. It is not covered by the protective order. We had marked it non-confidential.

The things that we sent to our colleague, Mr. Tracy, I personally redacted the transcripts where -- what they had claimed was confidential from Ms. Dostie, I redacted those pages myself. They didn't give you that.

I gave them to Mr. Ahlberg. He sent that to them. With redactions.

Beyond that, the other files were information we

provided to Ford. You'll recall I've been saying for months, we've given them 30,000 more pages of their own documents than they produced. So it's material we originated. But nobody at that table, Mr. Cheeley's table, knew enough about the case or the facts to know that. But they had no problem slandering me to Your Honor and my colleagues and co-counsel and clients.

So, it's a little frustrating for me, Your Honor. You said I have been emotional in the past. This makes me emotional. This is an attack on my integrity. We would never intentionally violate a protective order.

Most of what they told you is completely false. And I think you have seen me enough in this courtroom now to know if I've done something wrong, I am going to take credit for it. And I've already told you, I missed that NHTSA document. I did. I missed that email to Mr. Teitelman, should have been in my affidavit. Missed it.

I missed the one that Kam sent to Mr. Felton. But I talked to Mr. Felton, and Mr. Felton said that he didn't need the documents from us. He had them. Said he'd been monitoring Ford. Said he didn't write about Ford. Beyond that, Mr. Cheeley was the person that ordered that done, but he didn't tell Your Honor that. I put a cap on it, so it didn't get out of hand. But nobody said that, either.

I have been trying to litigate this case professionally and technically and precisely, and I have had a

boat anchor. And part of what he complained about when he got upset and wanted me to withdraw from the case was that -- your criticisms of me in the order and the things that you said were amateurish. If you will recall, those were the things that Mr. Cheeley did that I took responsibility for. And I told him that.

And I said, Bob, if you -- if you force me off this case, even if I could comply -- because I had one client who said, "You don't need to get off the case," and I had one client who was saying, "Well, if you're hurting the case, you ought to get off," because Mr. Cheeley said, "The judge will see the case more favorably if you force Nick off the case."

So I am in a little bit of a pickle because I've got an ethical obligation to clients. One says, "You need to stay on the case"; one says, "You need to get off." But she says you need to get off because Mr. Cheeley is telling her that Your Honor's opinion about the case is going to change if I'm not involved. Which is patently improper. Wildly improper.

And all my colleagues at that table, including Mr. Cheeley, were in the conference room when I got up and walked out, when he wouldn't stop. He said I have no choice, I have to resign. And that was 9:30 on February the 11th.

Now, I'm told Mr. Richman said -- when y'all had that call on that Friday, the 13th -- that Mr. Cheeley told Your Honor that he found out about these violations and fired me.

That's absolutely not true.

As a matter of fact, what happened was Mr. Ahlberg had been terminated on Friday with what started as an allegation of improper AI use. And after I had demonstrated that the person that Mr. Cheeley had brought in was not competent on AI and that Mr. Ahlberg had actually not done anything improper, then I got called out of the room, and Mr. Ahlberg was accused of something personally improper involving a co-employee. And I knew at that point Mr. Cheeley was determined to fire him.

So, I went and collected his computers -- Mr. Ahlberg was sick that day, working from home -- went and collected his computers, brought them back to the office. And since that time, his computers and his personal email accounts have been hacked, and he's lost $20,000 worth of electronics. Literally he's holding my laptop, can't even use a cell phone because he can't log into it because it gets automatically hacked. And all the things that he was using as work product -- gone. Not his bank account, not his credit cards, but his work product.

We asked that that be restored and that behavior stop. Hasn't stopped. He's living in the stone age.

THE COURT: When you say "hacked," it sounds like you mean that he no longer has access to files that he was working on while at Cheeley.

MR. WOOTEN: His personal emails. When I took his

computers on that Friday, when Bob said he was going to terminate him, I didn't give him a chance to open his computers or log out or do anything. So, he was logged into his personal computer -- his personal email on a Cheeley device. And that afternoon, when I got back, and they were looking at his account, the IT person said, "I can see everything on the account except for his personal email," which he's -- "I can't get into that, that's his. And everything else I can see, there's -- you know, it's fine."

I said, "Look, if he's got something in his personal email account I'll get it." Kam is not uncooperative. That was on Friday. I said, "Tell me what you think is there, we'll get it, I'll talk to him."

We come in on Monday, the 9th. Bob comes in about 3:00 o'clock in the afternoon that day. And I sat down with him, I said, "Bob, if what happened with Kam affects my ability to lead this firm for you...," as a managing attorney, I offered to resign.

He said, "I don't want you to resign, Nick, I want you to continue on. You're not responsible for what Kam was accused of doing."

"I just want you to have that. I don't -- if I'm impairing what you want to do here, I am happy to resign."

"No, no, no, I don't want that."

Twenty minutes later, your order comes through. We

all look at it. Think everything's okay.

The next day I had to work from home. And at 4:30 that afternoon, I get a voicemail from Mr. Cheeley saying that everyone's decided that I should withdraw from the case. So we had a preliminary talk, and I said can't do it, you know, clients don't want me to do it, and what -- think about these other things.

Thought we were all good. Showed up the next morning. Same thing started. Then he involved the client, then he made misrepresentations, then he wouldn't correct them, and then I had to resign. That's how that went.

But, when I dropped the computers off, left them there, after I resigned is when his (indicating Mr. Ahlberg) problems started. He was actually trying to copy files to give back to them when he got completely locked out and everything just went -- poof. And he has not been able to use his personal email account, banking accounts, credit card accounts, or anything since then.

Yesterday, the account I created for him in my firm's name, I went into the admin logs and found a mobile device management account had been linked to the email I created for him, and it had done something called a take-out, where it requests everything in the Google folder -- Google Wallet, Google Drive, pictures, emails.

I don't have mobile device management. And it's

linked to a data center account that my IT people say is what you'd use if you were hacking somebody's account and monitoring their device and controlling it remotely. So, I have that forensic investigation going.

But he still is in the stone age. He had to go get a new debit card and change bank accounts yesterday because he couldn't pay his bills. So, it's been a very pleasant experience for us to both be accused of wrongdoing and then him be crippled from being able to work.

But, the reason that we think that that occurred and where it came from is because the only things that were sought were things that were related to -- potentially related to either this case or things that Mr. Ahlberg had kept about his employment. Those were the things that he -- he could see were gone before he was completely locked out of access.

So that's where we are, Your Honor.

THE COURT: Well, I certainly can understand that there are significant issues between you and Mr. Ahlberg and Mr. Cheeley and the Cheeley Law Firm. And while they may tangentially shed some light on the issues that Ford wants to look at, I don't know that your issues have any -- have a significant impact on where Ford is right now, and that is they want to know what's out there.

MR. WOOTEN: Your Honor, I'm happy to walk through these documents and these attachments and explain them to Your

Honor, and some of these things I can explain to Ford, some things I have attempted to explain to Ford.

But, you know, everyone at Ford's table I think will tell you that we've all had a good working relationship, it's been very professional, and even though we've been at each other at times, we have been able to maintain professionalism. But they represent Ford. Ford has questions. That's legitimate.

But we have had some conversations about some of these things and, you know, I'm happy to -- everything that I don't think is privileged, I am happy to explain to Your Honor and to Ford. And I think that's -- you know, if -- if you want me to, if you can find me a table or place to plug in where I can see the timeline and see the documents, I can try to talk through them one by one if Your Honor wants me to.

THE COURT: Well, let me ask you this question. It's the ultimate question. Other than what we have as summarized in Ford's March 20th, 2026, filing, have you or has anyone acting at your direction shared any information that was subject to the confidentiality order in place here or my September 2nd, 2025, order concerning the NHTSA documents?

MR. WOOTEN: Your Honor, I don't believe so. That was why I asked Your Honor to enter an order restoring my access so I could do my own search. Similar to the email I found from Mr. Choffnes, explaining that he never even accessed

the documents that I sent as a consultant, I feel like anything that's in there, if I had access to my resources, my work product, I could explain it to Your Honor and to Ford's satisfaction.

But I have been locked out in violation of multiple rules regarding an attorney's right to access their own work product and their files, and that hasn't been restored. What I've been told is that I can't have access unless Your Honor orders it. They refuse to give it to me because they say I violated the protective order.

I can tell you from memory what I can see, I don't believe there's anything else. And I think when we get through this I don't think Your Honor's going to think that this is the widespread problem that they have tried to make it out to be.

But, again, when you're dealing with people who don't know their own file, it's kind of hard to work with that. I mean, that's just factually -- there was nobody left at the firm that knew the facts of the file or even the evidence.

THE COURT: All right. Thank you, Mr. Cheeley (sic) -- pardon me, Mr. Wooten.

Mr. Richman, let me turn to you for a moment. You mentioned the harm that Ford is concerned about. Let me ask you to elaborate on that.

And I will say this. To the extent the NHTSA documents were circulated in violation of the order I entered,

that's certainly a serious matter. As any conduct in violation of a court order is. But, you know, those documents, as we all know now, weren't effectively redacted anyway, so I am not -- I think there's certainly a good argument that little prejudice could flow to Ford from the improper disclosure of those documents.

I am not saying that now. I am just -- in a final way. I am just noting what I think -- well, I know is the situation there in terms of the attempted redacting of those documents.

But -- and you can address that. But what about the violations of the protective order? Based upon what you know or what you suspect, where's the prejudice there? Again, very serious matter if my order was violated. That could call for sanctions. But what is Ford's concern there?

MR. RICHMAN: Well, I think this is part of the problem, Your Honor, is we don't know. We don't know who -- who got them, what they got, and what they did with them. So, until we find out answers to that, it's hard for Ford to know.

I do want to -- maybe it would help if I -- I won't say correct, but maybe put into context a couple of things that Mr. Wooten said. Not about what is going on between Mr. Wooten and Mr. Cheeley, but just about the violations of the order.

Mr. Wooten says sending protected documents to Wendy Wells, who is a family member and a client -- purportedly

client; Ford doesn't know that, but that is the representation -- is not a violation of the protective order. That's wrong. The protective order is very clear who are qualified people to receive protected documents, and family members of the Wootens is not a qualified class of people.

I don't know how many siblings -- the only -- the only parties to the case are Mr. Wooten's aunt, Beverly Wooten; and his nephew, Barry Wayne Wooten Junior. Those two people are parties. They would be contemplated by the protective order. All their siblings, cousins, aunts, uncles, those people are not qualified. They cannot get documents.

But, they were sent -- by admission, right in front of you now, Wendy Wells was sent protected documents, and Mr. Wooten doesn't understand that that is a violation of the protective order. What she did with those documents, we don't know.

David Choffnes is the professor that Mr. Wooten said he's had a relationship with for three years. He sent Mr. Choffnes protective order documents -- documents covered by the protective order. Professor Choffnes wrote back to him and said, "Hey, we don't have a consulting expert arrangement, I don't feel comfortable looking at these documents," and Mr. Wooten said, "Okay, just destroy them."

Mr. Wooten is again confused. Whether the professor read those documents or not is not the violation of the

protective order. The violation of the protective order is Mr. Wooten freely sending them to him without apparently understanding that that's a violation of the protective order.

He also sent documents to the -- as part of serving a subpoena on a company called HERE, H-E-R-E, all capitals, he sent them PO-protected documents without -- you know, they are definitely not a qualified person under the protective order, but he sent it to them.

We know that Ryan Felton at *The Wall Street Journal* -- that's obviously a big concern to Ford -- he was sent -- from what we could tell in the emails, which is all we have to go on right now, he was sent documents subject to the protective order. There's comments made in the emails between Mr. Wooten, Mr. Ahlberg, and Mr. Felton that show he was sent Ford's FMEA--that's a failure modes and effect analysis--which is a non-sharing/protected document. That was sent to Mr. Felton apparently without a care.

And then, as Your Honor knows and has come to light now, Mr. Felton was sent the unredacted NHTSA documents prior to them actually being sent to Ford, prior to it coming to the Court's knowledge, and then that was misrepresented both in an affidavit from Mr. Wooten and in statements at a hearing to Your Honor when he was asked who those were sent to, and he said only my three -- three disclosed experts.

And he didn't talk about all these other people. He

didn't talk about Ryan Felton at *The Wall Street Journal* that they had been sent to; Gardiner Harris, a freelance investigative reporter associated with *The New York Times*. They had both received these documents.

Now, Mr. Wooten has said today that he spoke with Ryan Felton and that Ryan Felton told him he didn't need those documents because he had them already. Well, we don't know anything about the truth of that statement other than Mr. Wooten said it here. But, um that's not contained in any writing anywhere.

And it's really beside the point because it was the sending of those documents to these reporters before they were given to Ford or the Court, and then not disclosing it. After he was specifically asked by the Court to disclose it, he failed to disclose it. And specifically said he didn't send it to anyone other than those people. And, again, we don't have the links, so we don't know.

He also talked about sending them to somebody at NHTSA. He's again mistaken about that. He did. He sent PO-protected documents, sharing and non-sharing, and the unredacted NHTSA documents to Mr. Teitelman at NHTSA. The NHTSA documents obviously he would already have access to, but the PO-protected documents -- he is not allowed under the protective order to send them to NHTSA.

What the protective order requires is that if

plaintiffs counsel believes that there is some issue related to safety that requires the production of these documents to a governmental organization, they need to tell Ford about it, and then Ford will produce them to NHTSA pursuant to the federal regulations for how such things are done. It is absolutely a violation of the protective order for Mr. Wooten on his own to decide to send PO-protected documents to somebody at NHTSA and not tell Ford about it and do it in the manner he did. That is no question a violation of the protective order.

And then the last one, Mr. Garrett Rogers. That's the plaintiffs lawyer in Texas. He was sent, to our knowledge, unredacted copies of the deposition of Ford's corporate representative, Natalie DeCook. He says he redacted them.

The copy of the deposition that was provided to us by Mr. Cheeley's office and represented to be what he sent to, um, that attorney is an unredacted copy of her deposition, along with a copy of Ford's confidential designations. So they sent him an unredacted copy and then a list of all the things that Ford said were confidential.

That lawyer, who is not part of the PO, not subject to the PO, and wouldn't qualify to receive these documents because -- his lawsuit against Ford involves different features and a different vehicle, so he wouldn't be allowed to share these documents. He received the deposition, the list of everything that Ford said was confidential, and then took our

witness' deposition in another case using that information. We can't unring that bell. And we had no idea it happened at the time.

In addition -- and there's no debate about this because it's clearly spelled out in the emails -- he also sent Mr. Rogers, at the Todd Tracy Firm in Texas, a copy of the unredacted NHTSA documents after Your Honor had entered his order saying that they should be embargoed.

And in that email to Mr. Rogers at the Todd Tracy Firm he said, "Here are the unredacted documents. Please remove my firm's Bates labels from them," the Wooten Bates labels from them. And then Mr. Tracy wrote back -- I'm sorry, Mr. Rogers from the Tracy Firm wrote back and said, "Yes, we'll make sure they are clean before we use them."

It's hard to imagine a more egregious violation of your Court's order than that. So, I think we do have a lot of concerns and, unfortunately, we're not able to -- we are not able to believe the things that counsel are telling us because when they say them, we see that they're wrong -- demonstratively, objectively wrong -- based on the terms of the protective order. And in addition, they are disputed among counsel.

So, that is why we want to kind of do -- we want to kind of take counsel out of the picture. Since they both tell us that neither one of them can be trusted, we would like to

take them out of the picture and have a forensic expert go through their emails.

We also -- and not just limit it to Mr. Wooten and Mr. Ahlberg. You heard Mr. Craft say that they have not looked at any emails from any current employees. But we know from the emails that were provided to us that at least those emails state that Mr. Cheeley was in the loop. There's one email -- Mr. Cheeley is copied on one or more of those emails, and one of the emails references that Mr. Cheeley will call that person in a little bit. It was either Mr. Felton or Mr. -- *The New York Times* guy, Gardiner Harris, that Mr. Cheeley will call him to follow up on this. So, the emails seem to implicate Mr. Cheeley.

I haven't heard from Mr. Cheeley yet, but we understand from Mr. Craft that Mr. Cheeley will deny this or didn't pay attention to it or something to that effect. We will have to hear from him.

But that's why we'd like to have this forensic look done at all Cheeley employee emails, so that we can get to the bottom of this and actually determine the scope of what happened and the harm, as Your Honor said, if any, but we need to understand the scope before we can understand the harm. Unfortunately.

And one other thing. Your Honor asked -- Your Honor asked Mr. Wooten if any other disclosures -- improper

disclosures had occurred. And I wasn't sure if Your Honor was saying after the things mentioned in Ford's timeline or after Ford's timeline was served. But we did learn yesterday of additional improper disclosures that took place, and Mr. Petersen can tell you about that.

MR. PETERSEN: Yes, sir. And we don't expect Mr. Wooten to have a photographic memory, but things do continue to trickle out, which is why we are pushing for a comprehensive review.

Just yesterday we learned of at least two more violations that we didn't know about when we filed the timeline so they will not be included on your timeline in front of you.

On March 19th -- we learned this yesterday. On March 19th, 2025, Wendy Wells, who again is not a party, was sent the confidential deposition of Nitendra Nath. You will remember that name, he is a very technical engineer, has a lot of high-level confidential information.

Mr. Nath's deposition was taken on March 13th, so six days after -- and that deposition was designated as confidential per the protective order -- six days later, it was sent to a non-party. And that was before the confidential designations had been made per the protective order, so at that time the entire deposition was considered confidential.

Then a few days later -- or a few months later, May 23rd, Wendy Wells was sent Plaintiffs' reply to one of

their motions to compel, which was filed under seal and restricted to the parties. Again, Ms. Wells is not a party, so that's not strictly a protective order or a September 2nd order violation, but it is sharing of sealed documents on the docket with non-parties. Those are the few -- a few things we've -- a few violations we've learned.

Yesterday, we also learned some more information about what was shared with *The Wall Street Journal* and what they have decided to do with it. *The Wall Street Journal*'s legal counsel has declined to answer or work with Plaintiffs on clawing back any of those unredacted documents that were shared with them that they then used to publish the -- or the PO-protected documents that they then used to publish that article that we attached to one of our prior motions. That was all about BlueCruise, about this case, made reference to those documents.

MR. RICHMAN: And I want to say one other thing that I forgot, Your Honor. So, we have asked for that forensic expert to get involved.

One other thing. So, many of these emails that we've talked about have links, and those links would have had documents in them that were sent to these various people. For some of these links, people at the Cheeley Law Firm have provided us documents that they say were included in those links. For other links in emails, they have told us those

links have been deleted or the documents from those links have been deleted.

We don't have any way to get to the bottom of this, and maybe the forensic expert can help. But if these were all DropBox, um, documents, we would like to have an opportunity to subpoena the DropBox, the company, and maybe they can go back and provide to us all the documents that were in those links from those months and almost a year ago.

So, they could also -- so, a subpoena to DropBox could show us what was in those links or show us what activity happened on those links. In other words, when were things removed from those links, when were things deleted from those links, and who -- if it shows who was logged in to do that. And that would help us create this trail -- the electronic trail of what happened.

THE COURT: Well, what I gather from that is -- in response to my question about the potential prejudice that might arise or might have already surfaced -- it's just unknown to Ford, because Ford doesn't know the extent of these disclosures and won't without this forensic examination.

So, let me go back to Mr. Craft. How do you see this unfolding?

MR. CRAFT: I want to -- I am going to try to answer your question. I will try to make it a little clearer. There were seven people we discovered. The documents, whether in PDF

or by links, in all the emails except for the one to Ryan Felton, which was then later forwarded to Gardiner Harris--set that one aside--every other email we were able to access the link and/or the documents. And I uploaded that to a DropBox link to Ford. So, yes, they haven't seen the exact link, but I hope they can take our word that we literally copied what was in that link and put it into a larger DropBox link to send to Ford in one easy manner.

So, their receipt of everything, all five of them -- again, take out Ryan Felton and Gardiner Harris -- they received everything they received.

Ryan Felton, Gardiner Harris, that link is no longer active. We were not able to access -- our IT individual, personnel, were not able to open the link. It was -- it showed as inactive. We don't know when it was deleted or if it was deleted or just is inactive now. We cannot access it.

We don't mind if there's -- if Ford wants to see if that link can be revived. That's fine. I mean, we're not trying to hide anything in that link. What we do know is that the email sent to Ryan Felton says, "Here is the unredacted documents." Other than that, we don't know what else is in that link. Every other person and every other email we do know what was in it.

THE COURT: I think the point is -- Ford's point -- at this point they are not questioning whether you have

conducted a search as thoroughly as you, as you say, non-IT people have done. So, they accept that. But -- I mean, that's the point. They think it's going to require more expertise to determine just what may be there.

So, I keep -- it seems to me what we keep coming back to is whether there should be a forensic examination of the Cheeley Law Firm's files. And I am just speaking very generally. Scope is one thing that certainly the details are going to have to be addressed.

But the concept, Mr. Craft, do you have a -- an issue with that?

MR. CRAFT: As far as, again, a -- a search, an independent search of the links that we were not able to access, we don't have a problem with that. I am not sure if Ford is wanting -- for example, Garrett Rogers, the law firm in Texas, we were able to access the link that was provided to him. We were -- emailed Mr. Rogers, he said, "I've deleted it and I have not shared it with anybody else." But we were able to access that and we sent that to Ford.

I don't think there is a reason to do an examination of that link if we were able to access it and send every single document to Ford.

We are fine with the link that was sent to Ryan Felton as an investigation and see if that can be revived. We have no issue with that.

To the extent that Ford wants additional, you know, independent forensic analysis of all of our emails, um, I -- I don't think there's been any allegation that anybody else has done it. We can all testify to you that we have not.

And to the extent that we don't know the case, yes, I haven't been on the case as long as Mr. Wooten, but I do know what "confidential" means, and I do know how to determine if something is confidential or not.

So, while I may not know every single fact he knows, I can see the docket and see if something is confidential or not. And that's what we determined to do, to evaluate whether a document in any of those emails was protected or not. So, that's where we are in kind of Ford's request.

We're also fine if Your Honor wants to send an order to all the non-parties asking for a call back. We have no issue with that. We did that independently. Except for Joe Teitelman at NHTSA, I had a conversation with Mr. Petersen, we agreed on a phone call that, yes, don't send an email yet, we will kind of approach it with the Court whether how to address Mr. Teitelman at NHTSA.

MR. PETERSEN: And, Your Honor, just for a little bit of clarification, there are layers of links to DropBoxes at this point. And the email to Attorney Rogers of the Tracy Firm, the plaintiffs firm that was deposing Ms. Dostie, is a great example. So, I'm glad that was brought up.

Yes, we have a link from the Cheeley Law Firm that has what they tell us was included in that link to Mr. Rogers. But when you -- we also have the email to Mr. Rogers that has a DropBox link. And in that link, the original link in the email, when you click on it, I just did, it says, "This link has been deleted."

So, while we're not at this point lobbing that type of accusation, the plaintiffs in this case have never taken Ford's word on production in this case, so far. So, to say that we're going to start doing that now would be antithetical to the history of this case. It's easy to do, that's one small thing that could be added on to the forensic examination, is the examination of all these links. So, yes, we do think that's necessary.

And then, again, we do believe that a search of actual email servers is necessary because there is evidence that at least other attorneys in the firm were copied on emails. That's just from what has been sent to us at Ford. Again, that needs to be searched and verified.

So, we do believe more is necessary than just looking at the emails that have already been produced from an independent expert. And that's why we're suggesting an independent expert, so that we're not combing through the plaintiffs' emails, but somebody with that expertise and independence is.

THE COURT: Well, has Ford looked into the specifics -- the specifics of how this would be done? Have you talked with somebody, whether or not he would be the investigator, but -- or she would be the investigator, but have you fleshed this out at all with regard, for example, how would this unfold, what gets looked at, broadly speaking?

MR. RICHMAN: We -- we have discussed it amongst ourselves and with our client. We have not identified a person. There is another attorney working with us, an outside counsel with Ford, who has been through this process before. He wasn't able to make the hearing today, but he knows a little bit more about the mechanics of how this can be done.

But if Your Honor allows it, we can go to that next step. If you want Ford to suggest somebody, we are happy to suggest somebody to do it. We do think it should be at Plaintiffs' expense because this is not a Ford-created problem, but we are happy to present the Court with names of forensic people who can do this.

MR. PETERSEN: And as Your Honor I'm sure is aware, there are people who do this all day, every day, searching emails, terms, for e-discovery basically. This would be almost no different.

THE COURT: All right. Well, I haven't heard a specific reason why we shouldn't do this, assuming it can be set up in a way that would protect, for example, issues of

confidentiality.

So, Ford -- Ford wants to go down this road. You need to put together a proposal, how this is going to work. At this point, I am not going to say that anybody other than Ford would be responsible for paying for that investigation. That will be addressed later. But as things stand right now, Ford would be paying for it.

What might ultimately happen with regard to that question, like the question of sanctions generally, is premature at this point. There's enough here certainly to tell us that there's strong indications that there have been violations of these orders. Again, they may be subject to mitigating explanations, but there's no evidence yet. We just don't have much evidence how widespread this has been.

So in the first step, the first step would be for Ford to flesh this out. Find out from somebody how it would be done. Propose who you think would do it. And then we can go from there.

Let me ask Ford -- well, let me ask you this question, Mr. Wooten, first. Similar to my question that I asked earlier: To your knowledge, has any -- have any documents or information from this case been shared with other law firms or other entities or individuals involved in ADAS litigation? Involving a Ford vehicle.

MR. WOOTEN: Your Honor, the only thing that we

shared, again, was the redacted deposition transcripts of Ms. Dostie, that once we had their confidentiality designations and the agreement was the rest of the deposition was able to be shared with lawyers, and we did share Ms. Dostie's deposition with Mr. Tracy.

As Your Honor saw, there's, like, 20 emails about our conversations about our opinions and thoughts about her as a witness. And, you know, I don't think any of those things were necessary, but they were again to target me. But that's the only thing that I'm aware of, is we did share those depositions of her, of her expert and her 30(b)(6), because he was about to take her 30(b)(6) deposition on -- that was a Ford crash warning case, camera, radar -- or that's a camera-only system he was looking at, and she had been listed as the 30(b)(6).

THE COURT: All right. So, the answer is that as far as you know that's the only information shared with law firms or other entities involved in ADAS litigation; right?

MR. WOOTEN: Again, Your Honor, with the caveat that I have not been able to go back. Had I had access to my own work product, I would have had multiple conversations with Mr. Richman and Mr. Petersen to try to get as many of these things addressed before we got here as possible.

But because I've been locked out, I'm working completely out of memory. But that is my recall. That I was the only person who deposed her. Mr. Tracy is a member of

AIEG. They knew that that deposition had taken place. They asked me for a copy of what I could share. I redacted the transcripts personally and sent those to him.

THE COURT: All right. I hear your answer. Thank you.

Now, let me turn and ask the same question of the Cheeley Firm. Any -- do you have any information suggesting that information from this case was shared with other lawyers or entities involved in ADAS litigation with Ford?

MR. CRAFT: No, Your Honor. I think it's also worth noting -- I know this has been brought up, but -- but I think the Court needs to be aware, there's been suggestions that we have produced documents that were not to Ford that were not confidential or properly, you know, redacted; particularly, this Mr. Rogers at the Tracy Firm.

I personally opened the link -- and I am happy to send this -- what happened with the link was, we copied it to a DropBox link. We deleted -- or we deactivated the link so that Mr. Tracy's firm could no longer access it. That's why we stopped it, so they couldn't even, you know, tap into it anymore. But we can reopen that, likely, and provide that.

But we looked at the transcript of Ms. Dostie and personally saw that there were no redactions. Certainly we -- we would have loved for them to be redacted and sent properly, but they were not. So it forced us to reveal that to Ford.

So, this painting of that I think needs to be cleared as false. Completely false. And Mr. Petersen and Mr. Richman mentioned that as well, that what they received, which was directly from the link that was in the email to Mr. Rogers, was unredacted copies of the deposition transcripts.

To answer your question, no, we have not sent it to any other ADAS lawyer.

THE COURT: So, where we are is that the Cheeley Firm and Mr. Wooten, the Cheeley Firm a little more emphatically, but -- and Mr. Wooten, subject to his recollection, there's been no other sharing than what the Cheeley Firm has located.

I am not asking you to accept that. We just have those representations on the table. And that can be a factor perhaps as Ford decides how aggressive it wants to be on this front.

Put together a concept, a proposal, whatever you want to do for this forensic examination again to be done for now at Ford's expense.

All right. From Ford's standpoint, is there anything else to address today?

MR. RICHMAN: I don't think so, Your Honor, no.

THE COURT: How about from the Cheeley Firm?

MR. CRAFT: No, other than we're able to collaborate with Ford about the proposed investigation to make sure that it -- you know, our privileged communications are protected and

so forth.

THE COURT: Yeah, but --

MR. CRAFT: So, we can't flesh that out right now, but just make sure that --

THE COURT: -- it will necessarily have to be an interactive process, but it gets started by Ford doing its legwork and figuring out how they think it should be done.

MR. PETERSEN: Your Honor, as far as the mechanism, how would you like us to make that proposal?

THE COURT: I think after all interested parties have had a chance to flesh it out, to the extent you can, that's the time that I need to get involved.

MR. PETERSEN: Would you like us to file that on the docket?

THE COURT: That, too, has been an issue in the case. But, yes, you should.

MR. PETERSEN: Okay. So maybe a motion --

THE COURT: What I'm envisioning is--optimistically perhaps--that Ford's going to come up with what it thinks is the best way to do this. Other interested parties can respond to Ford and tweak it, whatever. And as the result of that process--again, perhaps being optimistic--you would come back and say, "We've talked about it, and this is the way -- if it has to be done, this is the way we think it should be done."

And that protects the confidentiality issues that the

Cheeley Law Firm certainly has; but, you've worked out how to do it and here's the plan, and then we can decide if we're going to go forward with it.

MR. CRAFT: Your Honor, do we need to include Mr. Wooten on these collaborations?

THE COURT: I think so. I think so.

So, from the Cheeley Firm, anything further to discuss today?

MR. CHEELEY: Your Honor, I would like to respond to the baseless allegations that were leveled my way by Nick Wooten.

THE COURT: Well, let me take that as your response. I don't see me getting involved in that issue.

MR. CHEELEY: Okay.

THE COURT: Something might arise out of that that would require me to get into it. But the dispute that you and Mr. Wooten may have -- while it may at some point be a factor that comes back into play as we resolve this issue of wrongful -- potential wrongful disclosure; for right now, I -- I just don't see that I need to be involved.

But I understand obviously you disagree with him. Strongly.

MR. CHEELEY: Yeah, I didn't want my silence to be acquiescence or interpreted as such.

THE COURT: Well, it is not. It is not.

MR. CHEELEY: All right.

THE COURT: Since we've talked about her, I'll ask, who is -- is it Wendy -- what's her last name?

MR. WOOTEN: Your Honor, Wendy Wells is Wayne Wooten's sister. They are the three people -- Beverly, Wendy, and Wayne -- the three people who are the heirs of the estate. Wendy and Wayne have -- Wayne was the child who was chosen to be the co-administrator with Beverly.

But they have been clients. It's in the deposition. I have the transcript. Everyone's acknowledged that. That she was a client. She's been treated as a client. She has been communicated with as a client.

And Mr. Richman pointed out and, Your Honor, he is technically absolutely right. I realized it when he said that.

THE COURT: Okay. That's fine.

MR. WOOTEN: But that's who they are.

THE COURT: Does she have any particular expertise in these issues?

MR. WOOTEN: She's a school teacher, Your Honor.

THE COURT: All right, thank you.

All right. Today I think that's as much as can be done. And I will wait to hear from you further after you have addressed this potential forensic examination. Thank you.

MR. CHEELEY: Thank you, Your Honor.

MR. PETERSEN: Thank you, Your Honor.

COURT OFFICER: All rise.

(Proceedings concluded at 11:07 a.m.)

END OF RECORD

CERTIFICATE OF OFFICIAL REPORTER

I, Darlene D. Fuller, Federal Official Realtime Court Reporter, in and for the United States District Court for the Middle District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 6th day of April, 2026

Darlene D. Fuller

Darlene D. Fuller, RPR, CRR, RMR
NCRA No. 5803
Federal Official Court Reporter
Georgia CCR 5641-3440-5157-6832
Michigan Certification CSR-0929