**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| BEVERLY WOOTEN, as Surviving Spouse of Barry Wyatt Wooten, and BARRY WAYNE WOOTEN, as Administrators of the ESTATE OF BARRY WYATT WOOTEN, Deceased,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Civil Action No. 5:23-cv-00346-MTT |

**RESPONSE OF FORMER PLAINTIFFS' COUNSEL NICHOLAS H. WOOTEN IN OPPOSITION TO FORD MOTOR COMPANY'S MOTION TO COMPEL (DOC. 358), AS SUPPLEMENTED (DOC. 359)**

Nicholas H. Wooten, former counsel for Plaintiffs, responds in opposition to Defendant Ford Motor Company's Motion to Compel (Doc. 358), as supplemented on October 8, 2026 (Doc. 359), insofar as it seeks documents withheld on his privilege log. Mr. Wooten's obligations under the Digital Forensic Collection and Analysis Protocol run to the entries bearing NHW Bates numbers; entries withheld only on Cheeley Law Group's log are that firm's to address. Doc. 357-1 § 6.2.2.

## I. INTRODUCTION

Ford asks the Court to strip privilege and work-product protection from every communication a court-ordered keyword search swept up, on the theory that the search itself proves the communications are "closely related" to misconduct. Doc. 358 at 10. The search proves no such thing. The Protocol's 114 search terms include "Wooten and/or Barry" and "Ford AND (Wooten OR Barry)." Doc. 357-1, App. A, Nos. 4, 62. Those terms hit essentially every email Mr. Wooten sent or received in any way related to this case, because his surname is in the caption, in his email address, and in his signature block. He said exactly that, in writing, before the Protocol was adopted. Ex. B.

What remains withheld on Mr. Wooten's log is what one would expect a lawyer under a sanctions motion to have written: communications with lawyers he consulted about defending himself and his employer, with ethics professors he considered retaining for that defense, with the testifying ethics expert whose declaration the Court received (Doc. 210), with a consulting expert, and with his clients, together with a question he posted to a plaintiffs' bar listserv asking whether anyone had authority on who bears the burden of a failed redaction—with no Ford document attached. A lawyer asking other lawyers how to answer an accusation is the antithesis of the crime-fraud exception.

Ford's newest accusation—that Mr. Wooten shared "the confidential deposition of Ford's employee Natalie (Dostie) DeCook," Doc. 358 at 7—fails on the text of the Protective Order. Paragraph 10 gave Ford fourteen business days after receiving the transcript to designate any portion of it as confidential, and it provides that "[a]ll portions of transcripts not design[at]ed as Confidential within the time frame provided herein shall be deemed not confidential." Doc. 47 ¶ 10. The Dostie transcript was certified on June 3, 2024, so Ford's time to designate expired in late June 2024. Ford served its first written designation on October 15, 2024—134 days after certification and nearly four months after its deadline. Ex. E (NHW0004136–38). Because Ford designated nothing within the time Paragraph 10 allows, the entire transcript is "deemed not confidential." Ford's motion does not mention the deadline, the date of its designation, or the consequence Paragraph 10 attaches to missing it.

The motion should be denied. If the Court wishes to confirm the log's description of any particular entry, Mr. Wooten will submit that entry for the Court's own in camera review. He objects to wholesale production, and to review of his privileged communications by a vendor his adversary retained and pays.

## II. BACKGROUND

### A. The investigation and the Protocol.

Mr. Wooten resigned from Cheeley Law Group on February 11, 2026. Doc. 351 at 18:19-22. The next day, that firm notified the Court of what it described as "violations of court orders pertaining to protected documents." Doc. 338. Its lawyers have represented to the Court that they reviewed Mr. Wooten's firm email account "email-by-email" and sent Ford what they selected, Doc. 351 at 9:4-16, beginning, according to Ford, on February 18, 2026, Doc. 358 at 3. What they sent included at least one communication with a client that Mr. Wooten asked be clawed back but that the Cheeley Firm failed to retrieve. Doc. 351 at 11:15-23.

At the April 1, 2026 conference, the Court described Ford's position as wanting "to know what's out there," *id.* at 22:22-23, observed that the alleged violations "may be subject to mitigating explanations," *id.* at 40:12-13, and directed Ford to propose a forensic examination as "the first step," *id.* at 40:15-18. The resulting Protocol defines "Relevant Documents" as ESI that "contains, points to, or references the unredacted NHTSA Ford data and/or documents design[at]ed confidential pursuant to the Protective Order." Doc. 357-1 § 1.1. It directs counsel to "review the production, create a privilege log of withheld emails, and produce the remaining emails." *Id.* § 6.2.2. And it provides that ArcherHall's collection "is not a waiver of any attorney/client privilege or attorney work-product privilege." *Id.* § 9.

Before the Protocol was finalized, Mr. Wooten objected in writing that proposed terms such as "Wooten" and "Ford and (Wooten OR Barry)" would capture "every email that I ever sent or received" in the case and "[e]very communication between the parties," and that the search should exclude communications among the Plaintiffs' legal team, experts, and clients. Ex. B (May 25, 2026 letter). The broad terms were adopted. Doc. 357-1, App. A, Nos. 4, 62.

### B. Mr. Wooten's review, production, and log.

ArcherHall delivered its results on August 15, 2026. Doc. 358 at 6. The set routed to Mr. Wooten contained 425 entries bearing NHW Bates numbers. He reviewed each, and on

September 16, 2026 he produced 188 documents (1,458 pages) and served a 223-entry privilege log identifying each withheld item by Bates range, date, author, recipients, and the basis claimed. Ex. F (Sept. 16, 2026 letter); Ex. G. Where Cheeley Law Group claimed a privilege that he did not, he deferred to that firm's designation and said so. *Id.*; Doc. 358-2 at 3. His transmittal letter also explained how AIEG handles shared materials: it releases nothing from its repository to a member who cannot certify entitlement under the governing protective order, and AIEG's counsel represented to him that no member had accessed the Dostie transcript since it was shared. Ex. F. AIEG therefore treats the Dostie transcript as protected even though nothing was timely designated by Ford.

**C. Ford's September 18 letter, Mr. Wooten's response, and Ford's supplement.**

Ford's September 18, 2026 letter was addressed to Cheeley Law Group and copied to Mr. Wooten. Doc. 358-2. Three days later, Mr. Wooten answered the entries that pertained to him, row by row. Ex. C (Sept. 21, 2026 letter). Ford's motion says that "Wooten refused to produce any additional emails or attachments—invoking privilege as the basis for the refusal." Doc. 358 at 8. It neither attaches nor describes his letter, which explained, among other things, that the withheld communications with Frank Beltran and Andrew Lemmon sought legal advice about the sanctions proceedings and about possible representation in them; that the communications with Professor Longan concerned possibly retaining him as an expert for that defense; that every document sent to Professor Hall is a docket entry Ford can identify by ECF number; that the "Failed Redactions" listserv thread was a legal question with no documents attached; that the witness-location vendor Stratejic never received any Ford material; and that the Dostie transcript was not timely designated. Ex. C.

On October 8, 2026, Ford supplemented its motion to withdraw its requests for emails sent to court reporters and for thirteen emails and two attachments that Cheeley Law Group produced after Ford's September 18 letter. Doc. 359 at 1–2; Doc. 359-1. Several of those thirteen are communications Mr. Wooten had logged as privileged or as his work product, including his

communications with Mr. Lemmon about possibly representing Mr. Wooten, Mr. Cheeley, and Cheeley Law Group in the sanctions proceedings (NHW0003173, NHW0003260) and with Garrett Rogers (NHW0001948, NHW0001959, NHW0001972). *Compare* Doc. 358-3, *with* Doc. 359-1. Those documents are the subject of Mr. Wooten's separate motion under Paragraph 18.

## III. ARGUMENT

### A. The Dostie transcript is not confidential, because Ford never timely designated any part of it.

Two of Ford's six "new" violations are Mr. Wooten's December 3, 2024 transmissions of "the confidential deposition of Ford's employee Natalie (Dostie) DeCook" to other plaintiffs' lawyers and to the Attorneys Information Exchange Group (AIEG). Doc. 358 at 7 (Nos. 9–10). Ford also relies on that premise to argue that AIEG's involvement warrants still broader inquiry. *Id.* at 11 nn.9–10. The premise is wrong.

#### 1. Paragraph 10 gave Ford fourteen business days to designate, and undesignated testimony is "deemed not confidential."

Paragraph 10 governs deposition transcripts, and its text was the same in the order in effect when Ms. Dostie testified as it is in the amended order. *Compare* Doc. 34 ¶ 10, *with* Doc. 47 ¶ 10. Designation "of the portion of the transcript (including exhibits) which contains references to Protected Documents or information shall be made (i) by a statement to such effect on the record during the proceeding in which the testimony is received, or (ii) by written notice served on counsel of record in this Litigation within fourteen (14) business days after the receipt of the draft or final transcript (whichever is received earlier)." Doc. 47 ¶ 10. The transcript is treated as protected only "before such fourteen (14) day period expires," and "[a]ll portions of transcripts not design[at]ed as Confidential within the time frame provided herein shall be deemed not confidential." *Id.*

Ms. Dostie testified on May 30, 2024, and the court reporter certified the transcript on June 3, 2024. Ex. D (Dostie Dep. 222:1-17). Counted from certification, fourteen business days

ran no later than June 24, 2024, even excluding the June 19 federal holiday. Ford served its written designation on October 15, 2024. Ex. E (NHW0004136–38). That was 134 days after the transcript was certified and nearly four months after the deadline. No portion of the transcript was designated "within the time frame provided herein," so every portion of it "shall be deemed not confidential." Doc. 47 ¶ 10.

Paragraph 10 contains no mechanism for reviving confidentiality after the deadline passes. Nor did Ford invoke Paragraph 20's procedure for documents produced without a designation, which in any event addresses documents a party "produces," requires written notice "within fourteen (14) days of the discovery of the disclosure," and was not followed here. Doc. 47 ¶ 20(a).

**2. Ford's opening statement at the deposition was not a designation of any portion of the transcript.**

Ford may point to its counsel's statement at the outset of the deposition that it was "going to be taken designated confidential pursuant to the protective order" and that Ford would "comply with the rights of that protective order . . . in designating the confidential portions." Ex. D (Dostie Dep. 9:21–10:3). That statement does not help Ford. Paragraph 10 provides for designation of "the portion of the transcript . . . which contains references to Protected Documents or information," not every word a witness speaks. The statement described the interim protection Paragraph 10 already provides "before such fourteen (14) day period expires," and it expressly anticipated that Ford would later designate "the confidential portions." Ford then attempted to do exactly that—under Paragraph 10, by written notice identifying specific lines—but it did so months too late. Ex. E (designation made "[p]ursuant to Paragraph 10"). The language of the Protective Order is self-effectuating. Ford's failure to make timely designations renders the transcript non-confidential. Ford's late designation does not revive confidentiality.

**3. Even Ford's untimely designation covered two and one-half pages, every line of them "Sharing."**

Even if Ford's October 15, 2024 designation could be given effect, it would not make the transcript a "confidential deposition." Ford designated six excerpts totaling roughly two and one-half pages of a 221-page transcript—78:19–79:13, 80:2-7, 82:1-4 and 8-10, 83:3-25, and 84:16–85:9—and marked every one of them "subject to the sharing provisions of the Protective Order." Ex. E. Paragraph 6(f) permits disclosure of documents Ford designated as "Sharing" or "Subject to Protective Order" to "attorneys representing Plaintiff(s) . . . in other cases pending against Ford" involving claims that a 2015–2023 F-150's ADAS system is defective. Doc. 47 ¶ 6(f).

**4. The transmissions carried Ford's designation and the Protective Order with them.**

On December 3, 2024, Mr. Wooten sent the transcript to a paralegal at a firm whose lawyers are AIEG members together with Ford's October 15, 2024 designation, and asked that it be kept confidential other than for use by lawyers suing Ford. Ex. A ¶ 8. The same day, when AIEG's database manager was asked whether AIEG had received the deposition and Ford's designation, she asked for the Protective Order, and it was sent to her. *Id.* Those emails are listed on Mr. Wooten's privilege log (NHW0004126–28; NHW0004364–65), and he will submit them for the Court's in camera review on request. Ex. A ¶ 12. AIEG releases nothing from its repository to a member who cannot certify entitlement under the governing protective order, and AIEG's counsel has represented that no member has accessed the transcript since it was shared. Ex. F. That is not the conduct of a lawyer trying to evade a protective order.

**5. The January 14, 2026 transmission to Garrett Rogers.**

Mr. Wooten has stated that, before the Dostie transcripts were sent to Mr. Rogers, he personally redacted the pages Ford had designated and gave the redacted transcripts to Mr. Ahlberg to send. Doc. 351 at 16:19-24, 41:25–42:3; Ex. A ¶ 9. Cheeley Law Group has represented that the copy it located in the link was unredacted. Doc. 351 at 42:22–43:5. Mr.

Wooten has had no access to his former firm's computers, email, Teams, or document systems since February 11, 2026, and so cannot retrieve the redacted version or any communications about redacting the transcript. Ex. A ¶¶ 2, 9; Doc. 351 at 24:5-10. The dispute does not matter to Ford's motion: because Ford designated nothing within the time Paragraph 10 allows, the transcript was not confidential whether or not those pages were redacted.

**6. Ford's remaining "new" items do not concern the documents Mr. Wooten withheld.**

Of Ford's other four new items, two are communications with Wendy Wells, an heir of the decedent who is a client and who has been treated and communicated with as a client throughout this case. Doc. 351 at 46:4-12. Mr. Wooten acknowledged at the April 1 conference that she is not a named party. *Id.* at 46:13-14. Whether a client who is not a named party is a "Qualified Person" under Paragraph 6 is a legal question Ford has already briefed with those emails in hand; it does not make the communications themselves any less privileged, and Plaintiffs' current counsel now asserts the same privilege over them, Doc. 358-3 ("CLG Priv Log" entries for NHW0000374, NHW0000868, NHW0001884), after previously turning them over to Ford. The two emails are NHW0004075–77 (March 4, 2025) and NHW0000374–76, with its attachments, NHW0000377–719 (May 23, 2025). Mr. Wooten does not have access to the file materials to determine whether Ford ever designated any part of the Hearn transcript. His recollection is that Ford did not timely designate the testimony of any Ford witness. The other two (Nos. 13–14) are emails Kamden Ahlberg sent to a reporter. Doc. 358 at 7. No email dated July 22–24, 2025 to or from that reporter is among the 425 entries routed to Mr. Wooten. The August 4, 2025 email is NHW0002914–20; Mr. Wooten was copied on it, and he produced it on September 16, 2026. It should be pointed out that in NHW0002914 Mr. Ahlberg tells the reporter he must talk to Mr. Cheeley about how Mr. Cheeley wants to proceed with the data, and that Mr. Cheeley was initially "fine with getting the information out there."

### B. The crime-fraud exception does not reach these communications.

#### 1. Ford has not made a prima facie showing of a crime or fraud.

The exception requires "a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice," and "a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it." *Drummond Co. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1335 (11th Cir. 2018) (quoting *In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987)). Where an attorney's own conduct is the basis, the question is whether the attorney "engage[d] in illegal conduct or a fraud upon the court." *Id.* at 1338. Ford's showing is of alleged Protective Order violations, and Ford acknowledges that whether any of them was criminal "remains to be determined." Doc. 358 at 10. Ford does not identify a fraud or any crime. Ford's authority for extending the exception to undefined "other misconduct" is a district court decision, *Gutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1298 (S.D. Fla. 2000), not *Drummond*. The Eleventh Circuit has never cited *Gutter*. *Gutter* itself applied this Circuit's two-part test and described the exception as reaching work "made or performed in furtherance of a crime or fraud." *Id.* at 1305, 1311.

#### 2. Ford makes no document-specific showing of "furtherance."

For the exception to apply, "a court must find that the specific document or testimony . . . reflects work of the attorney that was performed in furtherance of the criminal or fraudulent activity or that was closely related to it." *Drummond*, 885 F.3d at 1338. Ford's only showing of relatedness is that the communications were "captured by a protocol designed to identify Court Order Violations." Doc. 358 at 10. But the search terms were not designed to isolate violations; they pair the Plaintiffs' surname with the Defendant's name. Doc. 357-1, App. A, Nos. 4, 62. Ford's own spreadsheet confirms the point: for entry after entry, its stated basis is that it

"[n]eed[s] assurance" or "[n]eed[s] to ensure" that nothing confidential was shared. Doc. 358-3; Doc. 359-1. A request for assurance that nothing was shared is not a prima facie showing, and the Supreme Court has rejected letting "opponents of the privilege . . . engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents." *United States v. Zolin*, 491 U.S. 554, 571 (1989).

**3. The withheld communications are the opposite of "furtherance."**

The bulk of the withheld NHW entries that Ford still seeks fall into categories that, by their nature, could not have furthered the conduct Ford complains about:

- communications with Frank Beltran, a lawyer Mr. Wooten consulted for advice and possible representation in the sanctions proceedings (NHW0000882; NHW0000889; NHW0000932; NHW0000936 and attachments);
- communications with Professor Patrick Longan about retaining him as an ethics expert for that defense (NHW0000916; NHW0000920; NHW0003192);
- the September 12, 2025 transmittal to Professor Matt Hall, the testifying ethics expert whose declaration the Court received, attaching docket entries (NHW0001208 and attachments); and
- the September 2–3, 2025 "Question about Failed Redactions" listserv thread, in which Mr. Wooten asked whether colleagues had authority on who bears the burden of making proper redactions, attaching no Ford document (NHW0000924; NHW0002967; NHW0003076–3149; NHW0003197–3241).

Each of those communications post-dates Ford's August 18, 2025 sanctions motion (Doc. 184) and was a step in responding to it. Seeking legal advice about an accusation, and asking what the law requires, is what the privilege exists to protect.

**4. Ford has not met even the threshold for in camera review of these categories.**

Before reviewing documents in camera to determine whether the exception applies, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person" that the review may reveal evidence establishing it. *Zolin*, 491 U.S. at 572 (citation omitted). Ford's speculation that a lawyer's request for ethics advice might reveal a

violation does not meet that standard. Mr. Wooten nevertheless offers below to submit any entry the Court identifies for in camera review.

**C. Mr. Wooten did not place his privileged communications "at issue."**

Ford's at-issue argument rests on *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386 (11th Cir. 1994). Doc. 358 at 12–13. Waiver of that kind occurs when a party "injects into the case an issue that in fairness requires an examination of otherwise protected communications." *Id.* at 12 (quoting *Cox*, 17 F.3d at 1419). In *Cox*, the party went "beyond mere denial, affirmatively to assert good faith," and so put its knowledge of the law at issue. 17 F.3d at 1419. Even then, the waiver reached only attorney-client communications: *Cox* held that implied waiver does not extend to opinion work product. *Id.* at 1422–23. Mr. Wooten has asserted no advice-of-counsel defense and relies on no privileged communication. The September 8, 2025 declaration Ford cites was filed because the Court ordered a disclosure. Doc. 195; Doc. 196-1. Complying with a court order is not a voluntary injection of an issue.

Nor does fairness require Ford to read Mr. Wooten's privileged communications to test that declaration. Ford's complaint is that the declaration omitted transmissions to third parties. Ford has those transmissions; Mr. Wooten acknowledged on the record that the Teitelman and Felton emails should have been included in his disclosure to the Court, Doc. 351 at 13:11-13, 17:14-17; and whether the declaration was complete can be decided from the transmissions themselves. What Mr. Wooten later said to his own lawyers adds nothing to that question.

**D. Ford's third-party-disclosure argument does not reach the withheld entries.**

Ford argues that counsel forfeited protection over emails "sent outside the attorney-client relationship." Doc. 358 at 14. The waiver question is entry-specific, and the standard Ford itself quotes for work product supports Mr. Wooten: protection is waived only when materials are disclosed "in a manner which is either inconsistent with maintaining secrecy against opponents or which 'substantially increases the opportunity for potential adversaries to obtain the information.'" *Id.* at 14–15 (quoting *In re Chiquita Brands Int'l, Inc.*, 270 F. Supp. 3d 1332,

1338 (S.D. Fla. 2017)). The withheld communications went to: counsel Mr. Wooten consulted about representing him and his employer in the sanctions proceedings, whose communications with him are privileged; prospective and consulting experts, Fed. R. Civ. P. 26(b)(3), (b)(4)(D); a testifying expert, whose communications with counsel are protected except as to compensation, facts or data provided, and assumptions, Fed. R. Civ. P. 26(b)(4)(C)—and the facts and data provided to Professor Hall are docket entries Ford's own spreadsheet identifies by number, Doc. 358-3; other plaintiffs' lawyers, by way of a listserv question that attached no Ford document; and clients. Docs. 107-1 and 131-1 were filed under seal, and access under the seal was limited to the parties. Professor Hall, as Plaintiffs' retained expert, was entitled to see them. None of those recipients is Ford's agent, and none of those disclosures made it more likely that Ford would obtain the communications.

The privilege for communications with Plaintiffs belongs to Plaintiffs. Their current counsel has asserted it as to the same entries. Doc. 358-3. Former counsel cannot waive it, and his log preserves it.

### E. Rule 26(b)(5)(B) and Paragraph 18 bar Ford from keeping, or relying on, the work product it has been asked to return.

Part of what Ford offers as proof of "violations" is Mr. Wooten's own work product, which Cheeley Law Group produced over his objection. Ford's No. 7 is Mr. Wooten's December 14, 2025 email to Professor Choffnes. Doc. 358 at 5. Its No. 8 is the January 14, 2026 Rogers thread, NHW0001948, which is likewise Mr. Wooten's work product and is the subject of his supplemental Paragraph 18(a) notice. Doc. 358 at 5–6; Clawback Mot. Ex. D. As to that thread, Mr. Wooten does not object to the Court's considering what was sent, to whom, or when, all of which is already in the record. Doc. 348-8; Doc. 351 at 30:4-14. Before the materials were sent, he told Mr. Cheeley personally that he intended to share them with Mr. Rogers and asked how to share them correctly under AIEG's protocols, and Mr. Cheeley did not object. Ex. A ¶ 10. Mr. Wooten gave Ford written notice under Paragraph 18(a) that the Choffnes email is protected

work product, and asked for its return or destruction, on August 31, 2026, four weeks before Ford filed its motion. *See* Mot. to Enforce Clawback Provisions, Ex. B.

The parties agreed, and the Court ordered, that "[i]f a party inadvertently produces information that is subject to a claim of privilege, the parties agree to follow the procedures set forth in Federal Rule of Civil Procedure 26(b)(5)(B)." Doc. 19 § IV.D. Once notified of a claim of privilege or of protection as trial-preparation material, a receiving party "must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim." Fed. R. Civ. P. 26(b)(5)(B). Paragraph 18 of the Protective Order imposes the same duties and adds that a challenge to the protection "may not be based on the fact or circumstances of the production." Doc. 47 ¶ 18(b)–(c), (f). Ford has done none of what the rule requires. It has not returned, sequestered, or destroyed the Choffnes email, and it has not presented it under seal for a determination. It had already filed the email on the public docket, Doc. 348-7, and after notice it relied on it again as a ground for compelling more. Doc. 358 at 5.

Ford may answer that Rule 26(b)(5)(B) speaks of "the party making the claim," and that Mr. Wooten is former counsel rather than a party. That would not help Ford. The work product at issue was prepared for Plaintiffs, who are parties, and Rule 26(b)(3)(A) protects materials prepared "by or for another party or its representative (including the other party's attorney . . . )." The Court's Protocol assigns former counsel the review and logging of the emails that involve him, Doc. 357-1 § 6.2.2, and provides that the collection "is not a waiver of any attorney/client privilege or attorney work-product privilege," *id.* § 9. Paragraph 18(e) requires any receiving party that "has reason to believe" a document is privileged to notify the producing party, whoever holds the privilege. Doc. 47 ¶ 18(e). Paragraph 18(g) was entered "pursuant to Rule 502(d)," which permits the Court to order that protection "is not waived by disclosure connected with the litigation pending before the court," and does not limit who made the disclosure. Doc.

47 ¶ 18(g); Fed. R. Evid. 502(d). And as a "person from whom discovery is sought," Mr. Wooten may seek the same protection under Rule 26(c)(1).

A party asked to return protected material may not use that material to argue that more should be produced. Whether the materials are protected is the question presented by Mr. Wooten's motion to enforce the clawback provisions, filed simultaneously with this response. Under an order like this one, the receiving party's challenges to that protection, including a crime-fraud argument, belong in a motion addressed to the returned documents, not in a motion that treats them as the receiving party's to keep. *United Physician Grp., LLC v. LeChe*, 742 F. Supp. 3d 1251, 1259–60 (N.D. Ga. 2024). Until the clawback motion is decided, the Court should give no weight to Ford's No. 7.

**F. The log and the accompanying declaration satisfy Rule 26(b)(5)(A).**

Ford argues that no affidavit supports the log. Doc. 358 at 16. Mr. Wooten submits his declaration, Ex. A, which describes each category of withheld communication and the basis for protection. Together with the log, Ex. G, it supplies what Ford's own authority describes: "a detailed privilege log stating the basis of the claimed privilege for each document in question, together with an accompanying explanatory affidavit from counsel." *Id.* (quoting *Carnes v. Crete Carrier Corp.*, 244 F.R.D. 694, 698 (N.D. Ga. 2007)). The descriptions of two entries are redacted in the filed copy of the log; Mr. Wooten will lodge the unredacted log for the Court's in camera review on request.

The parties also agreed, and the Court ordered, that no party need log "those documents created after the filing of the original complaint in this matter, including those documents created by counsel relating to the subject lawsuit or as it relates to any litigation file created or maintained by counsel." Doc. 19 § IV.D. Every entry Ford still seeks from Mr. Wooten's log post-dates the complaint. Mr. Wooten logged those documents anyway. Ford cannot fault the detail of a log the scheduling order did not require.

**G. Any review should be the Court's own, and targeted.**

Ford's alternative request is in camera review of the withheld emails or appointment of ArcherHall as special master "at Plaintiffs' expense." Doc. 358 at 17. ArcherHall was retained by Ford's counsel, Doc. 357-1 § 1, and Ford has paid it more than $44,000, Doc. 358 at 8 n.7. A vendor retained and paid by one side is not a neutral reviewer of the other side's privileged communications. And Mr. Wooten's communications with his own counsel are not Plaintiffs' to pay for. If the Court wishes to confirm the log's description of any entry, Mr. Wooten will lodge that entry for the Court's in camera review at the Court's request.

**H. Paragraph 8 assurances and disclosure list.**

Ford asks the Court to compel "the Written Assurances and disclosure list required by Section 8." Doc. 358 at 18; Doc. 359 at 2. Paragraph 8 requires those materials to be "submitted to counsel for Ford at the termination of this litigation or upon Order of the Court requiring production," permits redaction of the identity of non-testifying consultants, and provides for in camera submission of the unredacted versions. Doc. 47 ¶ 8. Mr. Wooten has had no access to Cheeley Law Group's files since February 11, 2026, Doc. 351 at 24:5-10, and he has already turned over everything in his possession that he gathered in this process. Ex. A ¶ 11. Cheeley Law Group has agreed to prepare and produce the list. Doc. 358 at 18 n.12; Doc. 359 at 2 n.1. Mr. Wooten does not oppose an order directing the firm that holds those records to comply with Paragraph 8 on the terms Paragraph 8 provides.

**I. Ford's request for expenses should be denied.**

An award of expenses is not permitted where "the opposing party's nondisclosure, response, or objection was substantially justified." Fed. R. Civ. P. 37(a)(5)(A)(ii). Mr. Wooten's objections rest on the Protective Order's text, the Protocol's own non-waiver clause, and settled privilege law. Mr. Wooten has also shown that the two sets of materials that triggered this investigation are not confidential materials under the Protective Order: the Dostie transcript, Part

III.A above, and the NHTSA documents, Mot. to Terminate, Part III.B. Ford's request for expenses should be denied.

## IV. RELATED MOTIONS

Mr. Wooten is filing two related motions with this response: a motion to enforce Paragraph 18's clawback provisions as to his work product and his own privileged communications, and a motion to terminate the investigation as to former counsel and for related relief. He incorporates both by reference.

## V. CONCLUSION

The Court should deny Ford's Motion to Compel, as supplemented, as to the entries on Mr. Wooten's privilege log and deny Ford's request for expenses. In the alternative, the Court should limit any further review to its own in camera inspection of specific entries it identifies.

Respectfully submitted this 20th day of October, 2026.

*/s/ Nick Wooten*
Nicholas H. Wooten
NICK WOOTEN, LLC
3125 Carlton Road
Cumming, Georgia 30041
Telephone: (833) 937-6389
nick@nickwooten.com
Former Counsel for Plaintiffs, appearing on his own behalf

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Response in Opposition to Ford Motor Company's Motion to Compel with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

This 20th day of October, 2026.

*/s/ Nick Wooten*
Nicholas H. Wooten

**INDEX OF EXHIBITS**

| Ex. | Description |
|---|---|
| A | Declaration of Nicholas H. Wooten (Oct. 20, 2026) |
| B | Letter from N. Wooten to counsel re: Protocol and search terms (May 25, 2026) |
| C | Letter from N. Wooten to counsel re: Ford's request for additional production (Sept. 21, 2026) |
| D | Excerpts, Deposition of Natalie Dostie (May 30, 2024): cover, 9–10, 222 (reporter's certificate) |
| E | Ford's Designation of Confidential Portions of Deposition Transcript of Natalie Dostie (Oct. 15, 2024) (NHW0004136–38) |
| F | Letter from N. Wooten to counsel re: production of search materials (Sept. 16, 2026) |
| G | Privilege Log (NHW Production), served Sept. 16, 2026 (two entries and one reference redacted; unredacted copy available for in camera review) |