**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| BEVERLY WOOTEN, as Surviving Spouse of Barry Wyatt Wooten, and BARRY WAYNE WOOTEN, as Administrators of the ESTATE OF BARRY WYATT WOOTEN, Deceased,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Civil Action No. 5:23-cv-00346-MTT |

# EXHIBIT B

Letter from N. Wooten to counsel re: Protocol and search terms (May 25, 2026)

to

**WOOTEN'S RESPONSE IN OPPOSITION TO FORD MOTOR COMPANY'S MOTION TO COMPEL (DOCS. 358, 359)**

# NICK WOOTEN, LLC
## ATTORNEY AT LAW

**Nicholas H. Wooten, JD, LLM, CAM, MFP, CWM, AFA, CPM** **Telephone:**
nick@nickwooten.com **(833) 937-6389**

**Licensed in:**
**Alabama, Colorado, Texas** **Facsimile:**
www.nickwooten.com **(833) 937-6389**

May 25, 2026

Delivery via email only to:

Paul Petersen
ppetersen@watsonspence.com

Michael Boorman
mboorman@watsonspence.com

Andrew Craft
andrew@cheeleylawgroup.com

Melina D'Argenio
mdargenio@mtrclegal.com

Bob Cheeley
bob@cheeleylawgroup.com

Michelle L. H. Miller
mmiller@watsonspence.com

Scott Richman
srichman@mtrclegal.com

Tiffany M Gutierrez
tgutierrez@mtrclegal.com

***In re: Wooten v. Ford Motor Company; Pending in the Middle District of Georgia, Case Number 5:23-cv-00346-MTT; Protocol For ESI Issues***

Dear All,

I previously wrote to everyone on Thursday May 14, 2026, requesting until May 25, 2026, to respond to your proposed protocol due to being out of state on depositions in an unrelated matter. This request was apparently ignored as the email thread includes a meeting and discussions about this protocol and revisions to the protocol without any input from me.

I would like to remind everyone involved that I have my own attorney client privilege and work product protections that must be respected independent of anyone else's or anyone at the Cheeley Law Group.

Apparently, everyone else involved in this situation saw fit to ignore any interests that I might have as the target of these spurious allegations when amending this protocol. So, please consider this my response to the proposed protocol. I will lodge my own separate objections to the continuance of this investigation if my attorney-client and work-product rights cannot be respected in this process.

In no particular order, here are my objections to the proposal that Ford and Cheeley have crafted:

1) **Removal from Access to Materials Produced.** Ford and Cheeley have agreed to deny me access to any of the information that is produced through this collection. According to the amended document provided, Mr. Craft suggested removing me and Kamden Ahlberg from the definition of Plaintiff Counsel on page 1 and Ford accepted this suggestion. Afterwards, no one made any provision for me or Mr. Ahlberg to have access to the materials retrieved during the collection. We are thereafter excluded from any rights to any of the materials collected by the later terms of this document. This is clearly improper and goes directly against the Court's instructions that I should be involved in this process.

   To correct this issue, another category would have to be created in the document to identify myself and Mr. Ahlberg which then sets out our rights to access at least the contents of our own email accounts. Otherwise, we will have to object to this protocol and seek the Court's involvement.

2) **Invasion of Privileges.** The actual protocols proposed do not provide any mechanism to avoid the invasion of both attorney-client privileged information and attorney work-product across all matters being worked on at the Firm. Therefore, I cannot agree to the blanket search of the entire email account. This is especially true in light of the representations of the Cheeley Firm at the April 1 hearing that they searched both my own and Kamden Ahlberg's email accounts message by message completely. In light of what seems to be the Cheeley's group's purpose of attacking me in this process, I think it is reasonable to believe that if there were other messages that allegedly violated the protective order in my account, that Ford and the Court would have already had those messages.

   At least as to my own CLG email account, I would anticipate that 95% of my emails are covered by either attorney-client privilege or attorney work-product privileges involving the Firm's current or former clients. I cannot find any case authorizing an opponent to have *carte blanche* access to opposing counsel's email account for any reason. Though I have found at least one case that supports the idea of TAR reviewed documents that "hit" upon agreed search terms being captured for further review. This seems to support Andrew Craft's stated position that capturing the entire email accounts would be a step too far and that the captures should be limited to those instances where there is a "hit" upon an agreed search term. There should be no reason for Ford to seek any materials that do not contain a "hit" to a referenced topic.

3) **Dropbox and Filevine Searches.** I am forced to agree with Mr. Craft that there is little to be gained by a wholesale search of either Dropbox or Filevine. However, such a search is rife with danger for the invasion of both attorney-client and work-product privileges. The Filevine situation should be easy enough to comprehend. Emails relevant to the Wooten file would have or should have been copied to the Filevine environment. However, there would be no entries in Filevine that are email related that would not be within someone's email account. Any search of Filevine would simply be redundant, unlimited as to email only, and creates the possibility of invading both work-product and attorney-client privileges. As to Dropbox, generally the same rationale would apply. If a Dropbox link was shared with anyone, that would require an email to the person receiving the shared file link. Therefore, outside of examining the links that have been discussed, there seems to be no reason to search the rest of the Firm's Dropbox environment. However, there remains a high degree of likelihood that the Firm's privileges could be violated to the detriment of its current and former clients for no good reason.

4) **General Failure to Limit Searches.** It is undisputed that internal firm emails cannot violate the protective order. However, the protocol as drafted does not seek to exclude emails that are only internal to Cheeley Law Group accounts. Therefore, the search process begins far too broadly. Any properly limited protocol must require a recipient be outside of the Cheeley Law Group domain. Any properly limited protocol must target only emails that include at least one recipient outside of the Firm's domain. Otherwise, your efforts are being spent on searching the Firm's work product. Once that limitation is in place, your consultants should also exclude all emails to our known experts and their staff as work product. Also, our emails to known co-counsel such as our local counsel firm and Mr. Slavik's firm must be excluded from the search as well. I'm sure that your consultants can derive the proper limitations on their search protocol to eliminate emails that are only among the counsel team or counsel and experts for the Wootens in this case. We can also provide you with the email addresses for Beverly, Wayne, and Wendy Wooten as well. Any emails to the clients should also be excluded from the search. In addition, we should exclude all messages between counsel for the parties as no one indicates that emails between counsel are at issue. Putting these proper limitations on this production will greatly reduce the potential number of emails to address through any manual review.

5) **Section 6.2 – Search for Relevant Documents.** This section sets out the ingestion of the complete email accounts and then the search for "hits" under the search terms. There is no reason that ArcherHall cannot search the email accounts for relative "hits" and then simply export those messages for further review. This is a common method of searching email archives as you know. It is much less common to export the entire email account and then search the

account. Most ESI searches look for search terms and then pull only the hits. Given the relevant privilege concerns that I must independently raise, I cannot agree to do this in the manner you suggest. I must seek to limit any possible infringement on attorney-client or work-product privileges.

I would propose you search the accounts in their native setting and export only the "hits" under the search terms for further analysis. This is the least invasive and least likely to invade the Firm's current or former clients' privileges.

6) **Section 6.3 retrieval of Dropbox Data.** As previously stated, beyond analysis of links that are "in the scope" of this search, I cannot agree to any search of the remainder of the Dropbox account on both attorney-client and work-product privilege grounds which I am ethically obligated to raise even if no one from the Cheeley Group does so.

7) **Export of Relevant Data.** As to any data identified in mine or Mr. Ahlberg's accounts, that data must first be delivered to me for review for privilege assertions before delivery to anyone else, including the Court. I cannot commit to a ten-day turnaround on this review because I do not know how long it will take for your consultants to gather the data and provide that to me. I also cannot anticipate what will be going on with my own schedule when it is received as I have major deadlines coming up in other cases as well as trial settings and large briefing projects. What I will commit to is a conference with you when the materials are delivered so that we can discuss a reasonable time to review and respond in light of my circumstances and calendar when the materials are received.

8) **Search Terms.** I have a number of issues with search terms. I will simply list the term and my issue so that you can consider my position.

| **Search Term** | **Issue** |
|---|---|
| NHTSA | My understanding is that NHTSA is not subject to your agreement in the comments. I also think this term is too broad as much of the Firm's work dealt with automotive safety and reference to NHTSA's website was a common part of the Firm's practice. This is likely to generate numerous hits that have nothing to do with the issue being addressed. |
| Unredacted | Similar to above. The word unredacted would not be uncommon in a law firm's work and this term |

| | |
|---|---|
| | will likely generate numerous irrelevant and unhelpful hits. |
| Wooten | Any use of Wooten as a hit will lead to every email that I ever sent or received being flagged because of my signature line and my email address. This term is practically useless to identify relevant materials because of the presence of my name and email in literally every message regarding this case since 2023. |
| FMEA | It is my recollection that we obtained more than one FMEA as well as multiple Ford documents including the FMEA guide from publicly available materials. There would be no restrictions on dissemination of publicly available Ford materials. I would assume you would need to narrow this to any FMEA that Ford produced with restrictions under the protective order rather than materials we produced under Wooten Bates labels without any restrictions. |
| Connected Vehicle Data and Connected Data | It is my recollection that we produced hundreds or thousands of pages on this topic to Ford Motor Company during this litigation under Wooten Bates labels and without any restrictions under the protective order. It is my recollection that Ford only produced two (or three) spreadsheets that Ford stated contained information covered by the protective order. Again, there are no restrictions on our sharing of publicly available information or information that we produced to Ford under Wooten Bates labels with no protective order restrictions. This means there would need to be some level of restriction to materials that are produced by Ford and have Ford |

| | |
|---|---|
| | Bates labels with a restriction against sharing. |
| Over the Air Data | It is my recollection that we produced hundreds or thousands of pages on this topic to Ford Motor Company during this litigation under Wooten Bates labels and without any restrictions under the protective order. It is my recollection that Ford only produced two (or three) spreadsheets that Ford stated contained information covered by the protective order. Again, there are no restrictions on our sharing of publicly available information or information that we produced to Ford under Wooten Bates labels with no protective order restrictions. This means there would need to be some level of restriction to materials that are produced by Ford and have Ford Bates labels with a restriction against sharing. |
| Ford and (Wooten OR Barry) | This term seems far too broad and will surely result in a large number of irrelevant hits. Every communication between the parties would trigger this term along with almost every email and thousands of internal Cheeley emails. This one seems to be far more problematic than helpful in identifying anything relevant to the issues we are addressing. |

In short, this protocol, while lengthy, largely misses the mark on focusing any search on arguably relevant messages. This protocol will generate untold thousands of irrelevant hits and messages that are internal or between only members of Plaintiffs' litigation team. Without instituting proper limits, this protocol is just a glorified fishing expedition guaranteed to take up too much time and cost too much money.

Please consider the issues that I have raised and set a time to talk with me regarding these concerns. I am traveling this week for a wedding. However, I will have about eight hours of windshield time tomorrow for a phone call. I can also carve

some time out either Wednesday or Thursday of this week during the day with sufficient notice. Each of you has my cell phone number if you need to reach me.

Sincerely,

Nick Wooten

Nick Wooten