**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| BEVERLY WOOTEN, as Surviving Spouse of Barry Wyatt Wooten, and BARRY WAYNE WOOTEN, as Administrators of the ESTATE OF BARRY WYATT WOOTEN, Deceased,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Civil Action No. 5:23-cv-00346-MTT |

**MOTION OF FORMER PLAINTIFFS' COUNSEL NICHOLAS H. WOOTEN TO TERMINATE FORD'S INVESTIGATION AS TO FORMER COUNSEL, FOR A PROTECTIVE ORDER, AND FOR RELATED RELIEF, AND INCORPORATED MEMORANDUM OF LAW**

Nicholas H. Wooten, former counsel for Plaintiffs, moves under Federal Rule of Civil Procedure 26(c), Paragraph 18 of the Amended Sharing and Non-Sharing Protective Order (Doc. 47), and the Court's inherent authority for an order (1) declaring Ford's forensic investigation complete as to former counsel; (2) protecting his privileged communications from further discovery; (3) requiring Ford to sequester client communications and work product it received outside the Protocol; (4) requiring that any further sanctions request against him be presented on a defined schedule and record; (5) directing Ford to correct the characterizations of the record discussed in Part III.F; and (6) confirming that the Court's restriction on use of the NHTSA documents in this case does not restrict their use or dissemination outside of this litigation.

## I. INTRODUCTION

Ford's investigation of Mr. Wooten did not begin with anything Ford discovered. It began on February 12, 2026, the day after Mr. Wooten resigned from Cheeley Law Group, when that firm told the Court it had learned of "violations of court orders," Doc. 338, and then reviewed Wooten's email account and gave Ford what it chose—including communications with

his clients and his work product—without notice to him. Docs. 348, 348-1 to 348-8; Doc. 351 at 9:4-16, 10:10-13, 11:15-23.

Ford's concerns, as it described them at the April 1, 2026 conference, were two: the NHTSA documents, and documents Ford produced under the Protective Order. *Id.* at 7:8-18. As to the first, the Court observed that because Ford's redactions were ineffective, "there's certainly a good argument that little prejudice could flow to Ford." *Id.* at 25:2-6. As to the second, when the Court asked where the prejudice lay, Ford answered: "we don't know." *Id.* at 25:16-19. The Court authorized a forensic examination as "the first step" to find out. *Id.* at 40:15-18.

That step is complete. ArcherHall collected seventeen custodians' mailboxes, ran 114 search terms, and delivered the results; counsel reviewed, logged, and produced. Ford now has every transmission it identified, and it has filed many of them. What it seeks next (Docs. 358, 359) is different in kind: Mr. Wooten's communications with the lawyers he consulted about defending himself, with the ethics professors he considered retaining, and with his clients. Those communications will not tell Ford what was transmitted to whom; the transmissions do that. Whatever questions remain about Mr. Wooten's conduct can be decided on the record that exists. The investigation should be closed, and any remaining request for sanctions should be presented, specified, and decided.

## II. BACKGROUND

### A. How the investigation began.

The Court entered its order on Ford's NHTSA-document sanctions motion on February 9, 2026. Doc. 337. Two days later, after Mr. Cheeley sought to force Mr. Wooten out of this case, Mr. Wooten resigned from Cheeley Law Group effective immediately. Doc. 340 at 1–2; Doc. 351 at 18:1-22. The next day, the firm filed a notice of his departure and a request for an in camera hearing to address "violations of court orders pertaining to protected documents." Doc. 338. Mr. Wooten was not notified of the resulting February 13 conference. Doc. 340 at 1. The day after he resigned, while he was asking that his firm email account be unblocked so that he

could take care of his cases, Mr. Cheeley emailed him that the firm had discovered "disturbing allegations" in that account and would report them to the Court. Doc. 351 at 11:7-11. The firm has kept him locked out of his email, his work product, and the clients' files ever since, on the ground that he violated the Protective Order. *Id.* at 24:5-10; Doc. 340 at 3–4. Cheeley Law Group's lawyers then reviewed his firm email "email-by-email" and sent Ford what they found. Doc. 351 at 9:4-16. That production included communications with his clients and his work product. *Id.* at 10:10-13, 11:15-23. Since February 11, Mr. Wooten has had no access to the firm's files. *Id.* at 24:5-10.

**B. The April 1 conference and the Protocol.**

At the April 1 conference, the Court described Ford's position as wanting "to know what's out there," *id.* at 22:22-23, noted that alleged violations "may be subject to mitigating explanations," *id.* at 40:12-13, and directed Ford to develop a proposal for a forensic examination as "the first step," *id.* at 40:15-18. The resulting Protocol limited the examination to "Relevant Documents"—ESI that "contains, points to, or references the unredacted NHTSA Ford data and/or documents design[at]ed confidential pursuant to the Protective Order"—and provided that ArcherHall's collection "is not a waiver of any attorney/client privilege or attorney work-product privilege." Doc. 357-1 §§ 1.1, 9. Over Mr. Wooten's written objection, its search terms included "Wooten and/or Barry" and "Ford AND (Wooten OR Barry)." *Id.*, App. A, Nos. 4, 62; *see* Doc. 360-2.

**C. The Protocol has been carried out.**

ArcherHall delivered approximately 635 items on August 15, 2026. Doc. 358 at 6. Mr. Wooten and Cheeley Law Group reviewed them and, on September 16, 2026, produced approximately 300 items and served privilege logs. *Id.* Ford's subpoena to Dropbox has been addressed. Doc. 356. Cheeley Law Group then produced thirteen more emails, including communications Mr. Wooten had logged as privileged. Doc. 359 at 1. Ford's motion to compel,

as supplemented, seeks the remaining withheld items, including Mr. Wooten's communications with his own counsel and prospective experts. Doc. 358 at 17–18; Doc. 359-1.

## III. ARGUMENT

### A. The Court has authority to bring the inquiry to a close.

Discovery must be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). For good cause, the Court may issue an order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including "forbidding the disclosure or discovery" and "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." Fed. R. Civ. P. 26(c)(1)(A), (D). Rule 26(c) protects any "person from whom discovery is sought," which includes former counsel. The Court also has inherent authority "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)).

Good cause exists. The examination the Court authorized has been completed. What remains for Ford to obtain is, by its nature, privileged: a lawyer's communications with his own counsel, his prospective experts, and his clients. Ford has not identified any fact about what was transmitted, or to whom, that those communications would supply.

### B. The NHTSA documents do not warrant further investigation of former counsel.

#### 1. The NHTSA documents are public records, not documents Ford produced in this case.

The Protective Order governs "[d]ocuments or information to be produced or provided by Ford or any party in this litigation" that the producing party designates as confidential. Doc. 47 ¶¶ 1, 3. The NHTSA documents were not produced by Ford in this litigation; Plaintiffs' counsel downloaded them from NHTSA's public website, where Ford had filed them with redactions the Court has called "amateurish." Doc. 202; Doc. 337 at 6. Plaintiffs' counsel produced them to

Ford without any confidentiality designation. Ford has never challenged that designation as the Protective Order requires, nor made any showing that the materials are actually deserving of confidential treatment. Ignoring that Plaintiffs' counsel acquired this information through their own lawful investigative efforts, Ford has blindly argued that the NHTSA documents are entitled to confidential treatment without making any required showing. The Court sanctioned Plaintiffs' counsel for not properly disclosing the removal of the redactions from the NHTSA documents by barring their use in this litigation. The Court has never disagreed that these documents are public because of Ford's own incompetence and Mr. Wooten's efforts to obtain them publicly.

As Professor Hall explained in his declaration, "the Supreme Court in *Seattle Times v. Rhinehart*, 467 U.S. 20, 34 (1984), held that 'a protective order prevents a party from disseminating only that information obtained through use of the discovery process. Thus, the party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes.'" Doc. 210 ¶ 23. Professor Hall also noted the extraordinary nature of Ford's argument about the NHTSA documents: "In over 25 years' experience as a litigator, judicial law clerk, rules committee attorney, and professor and scholar of civil procedure, this is the first case I have seen in which a party made the extraordinary argument that the confidentiality provisions of a protective order apply to documents and information that (1) were not produced in discovery, (2) were not designated as confidential under the protective order, and (3) were independently obtained outside of the discovery process after the owner of the information published it to the world by allowing it to be posted on the internet." *Id.* ¶ 28.

The Court has also found that the NHTSA documents "contain no revelations or surprises." Doc. 337 at 12. To end Ford's exploitation of the NHTSA documents to further delay this case, Mr. Wooten requests that the Court rule specifically that the Court's restriction on use of the NHTSA documents in this case in no way restricts the use or dissemination of the NHTSA documents outside of this litigation.

**2. The transmissions Ford complains of are already in the record.**

The Court has ruled that Plaintiffs' counsel may not use the redacted NHTSA documents in this case and may not share them with experts. Doc. 337 at 12. The transmissions Ford identifies are all in the record, and none requires further investigation of Mr. Wooten's privileged communications to understand:

- The August 2, 2025 link to Ryan Felton was sent by Kamden Ahlberg. Doc. 358 at 4. Mr. Wooten has stated that it was sent at Mr. Cheeley's direction and that the link did not go to Gardiner Harris. Doc. 351 at 13:19–14:22.
- The August 13, 2025 email to Joseph Teitelman went to the agency on whose website the documents were posted. Mr. Wooten has already acknowledged on April 1 that this email should have been included in his September 8, 2025 disclosure. Doc. 351 at 13:11-13, 17:14-16.
- The January 14, 2026 email to Garrett Rogers is Doc. 348-8. Ford has it, has filed it, and has argued it. Doc. 351 at 30:4-14.

**3. The September 2, 2025 order did not clearly bar sharing publicly posted documents with counsel in another action.**

The January 14, 2026 email directed that the NHTSA documents from which Plaintiffs' counsel had removed Ford's redactions be sent to Mr. Rogers. Doc. 348-8. Mr. Wooten does not dispute that. The question is whether the September 2, 2025 order clearly prohibited it.

The September 2 order directed Plaintiffs to "immediately embargo the NHTSA documents and by 9/10/2025 file a disclosure identifying who they have disseminated the NHTSA documents to, and which documents were disseminated." Doc. 337 at 6 (quoting Doc. 195). It did not define "embargo." At the October 2, 2025 hearing, the Court explained its order: "Then let's clarify where we are on the NHTSA documents. Pending a final ruling on the motion for sanctions, the redacted documents cannot be used. My text order on this should have clarified we're talking about the redacted documents." Doc. 213 at 73:17-21; *see id.* at 80:19-20 ("I am talking about the redacted documents."). In its February 9, 2026 order, the Court described the restrictions it was affirming: Plaintiffs' counsel "could not make use of the redacted NHTSA documents," and "were not to share the redacted NHTSA documents with their experts,

including experts retained but not identified as trial experts." Doc. 337 at 12. On the Court's own descriptions, the restriction is on use in this case and on sharing with experts. Neither description addresses sharing documents posted on a public government website with counsel in a different action. Given that the Court had made clear that its ruling was directed at use of the NHTSA documents in this case and given the admittedly public nature of the NHTSA documents due to Ford's amateurish attempts at redaction, Professor Hall's testimony, and the holding in *Seattle Times*, 467 U.S. at 34, undersigned believed that there was no restriction on use of the NHTSA documents outside of this case.

The Court's February 9, 2026 order does not change that analysis. It was entered almost four weeks after the January 14 email, so it could not have given notice of any broader restriction. Doc. 337 at 14. And it describes the restriction in the same terms. It "affirms" the October 2 ruling that Plaintiffs' counsel "could not make use of the redacted NHTSA documents" and "were not to share the redacted NHTSA documents with their experts," subject to use for impeachment if the Court permits, together with "the Court's September 2, 2025, ruling." *Id.* at 12. It then observes that "[a]rguably, the Court's rulings are not sanctions at all." *Id.* Nothing in Doc. 337 addresses sharing the NHTSA documents with lawyers in other cases.

Mr. Wooten recognizes that the Court may read its orders more broadly, as a bar on any further circulation of the NHTSA redacted documents. If the Court reads its order that way, the January 14, 2026 transmission falls within it, and Mr. Wooten will answer for it. But a sanction for violating a court order requires an order that is "clear and unambiguous," *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002) (citing *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000)), and a sanction under the Court's inherent power requires subjective bad faith, *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1224–25 (11th Cir. 2017). A good-faith reading of an undefined term, consistent with the Court's own descriptions of its ruling, is neither. And the Court has already observed that because Ford's redactions were ineffective, "there's certainly a good argument that little prejudice could flow to Ford from the improper disclosure of those documents." Doc. 351 at 25:2-6. That question can

be decided now, on the existing record. Mr. Wooten's later communications with his own counsel will not change what was sent, when, or to whom.

**C. The Dostie transcript is not confidential, because Ford never timely designated any part of it.**

Ford's other principal theme, the Dostie transcript, rests on the premise that it is a "confidential deposition." Doc. 358 at 5, 7. Paragraph 10 gave Ford fourteen business days after receiving the transcript to designate any portion of it, and it provides that "[a]ll portions of transcripts not design[at]ed as Confidential within the time frame provided herein shall be deemed not confidential." Doc. 47 ¶ 10; *accord* Doc. 34 ¶ 10. The transcript was certified on June 3, 2024, so Ford's time ran no later than June 24, 2024. Ford served its first written designation on October 15, 2024—134 days after certification and nearly four months after the deadline. NHW0004136–37. Because nothing was designated within the time Paragraph 10 allows, the entire transcript is, in the Protective Order's words, "deemed not confidential." Ford's counsel's opening statement at the deposition did not designate any portion; it anticipated that Ford would later designate "the confidential portions," which Ford then attempted to do, late. *See* Doc. 360, Part III.A. Even Ford's untimely designation covered roughly two and one-half pages of a 221-page transcript, every line of them "subject to the sharing provisions of the Protective Order." NHW0004136–37. No investigation of counsel's privileged communications is needed to apply that text.

**D. A lawyer cannot be sanctioned for sharing information the Protective Order does not protect, or for communicating with his clients about their case.**

Sanctions for violating a court order require a clear order and a clear violation. Civil contempt, for example, requires clear and convincing evidence that "the allegedly violated order was valid and lawful," that "the order was clear and unambiguous," and that "the alleged violator had the ability to comply with the order." *Riccard*, 307 F.3d at 1296 (citing *McGregor*, 206 F.3d at 1383). Sanctions under the Court's inherent power require a finding of subjective bad faith.

*Purchasing Power*, 851 F.3d at 1224–25 ("Recklessness alone does not satisfy the inherent powers standard; there must be more.").

Two consequences follow. First, sharing a transcript that the Protective Order itself deems "not confidential" violates no order, and sharing documents that counsel obtained from a public government website, independent of discovery, and produced to Ford without any restriction on dissemination is not a violation of the Protective Order. Second, a lawyer's communications with his clients about their case are privileged, and the Protective Order does not suspend counsel's duty to "keep the client reasonably informed about the status of the matter." Ga. R. Prof. Conduct 1.4(a)(3); *see* M.D. Ga. L.R. 83.2.1(A). Without conceding that it was improper to share materials with a client who knew of the Protective Order and understood that what her counsel shared with her was not to be disseminated, Doc. 360-1 ¶ 5(e), Mr. Wooten acknowledges, as he did on April 1, that Mrs. Wells is not a named party. Doc. 351 at 46:13-14. Whether particular documents sent to her were designated, and what follows if they were, can be decided from the documents Ford already has. What Ford may not do is use that question to obtain the contents of attorney-client communications.

**E. Ford should be required to sequester the client communications and work product it received outside the Protocol.**

The Protective Order anticipates that privileged material may reach an adversary. A receiving party that "has reason to believe" a document is privileged must "promptly notify the producing party." Doc. 47 ¶ 18(e). Once notice is given, the material may not be used "during any aspect of this matter or any other matter" unless a court rules it unprotected. *Id.* ¶ 18(c). The Protocol likewise provides that the collection "is not a waiver of any attorney/client privilege or attorney work-product privilege." Doc. 357-1 § 9.

Ford received, from Cheeley Law Group and outside the Protocol, communications between Mr. Wooten and his clients and documents reflecting his work product. Doc. 351 at 10:10-13, 11:15-23. There can be no doubt that Ford was aware this was a disclosure of Mr. Wooten's work product and client communications. Mr. Wooten asked that at least one such

client communication be clawed back. *Id.* at 11:21-23. Ford has continued to rely on those materials. *E.g.*, Doc. 358 at 4–5 (Nos. 2, 6). The privilege in client communications belongs to Plaintiffs and has not been waived by Plaintiffs; Plaintiffs' current counsel now asserts it as to the same communications. Doc. 358-3. The Court should direct Ford, within fourteen days, to identify every communication between Plaintiffs' counsel and any Plaintiff or Mrs. Wells, and every document on Mr. Wooten's privilege log, that it received from any source, and to sequester those materials and refrain from using them pending further order.

**F. Ford's characterizations of the record should be corrected.**

Mr. Wooten does not ask the Court to sanction Ford. He asks only that the record be accurate, because two of Ford's characterizations are not.

First, Ford told the Court that Mr. Wooten sent "the confidential deposition of Ford's employee Natalie (Dostie) DeCook" to other lawyers and to AIEG. Doc. 358 at 7. Paragraph 10 gave Ford fourteen business days after receiving that transcript to designate any part of it, and provides that anything not designated in that time "shall be deemed not confidential." Doc. 47 ¶ 10. Ford did not designate anything until October 15, 2024, 134 days after the transcript was certified. NHW0004136–37. Ford's motion does not mention the deadline, the date of its designation, or that the designation, when it came, covered about two and one-half pages and made every designated line shareable. The designation and the motion were signed by the same counsel. *Compare* NHW0004137, *with* Doc. 358 at 18.

Second, Ford told the Court that "Wooten refused to produce any additional emails or attachments." Doc. 358 at 8. It did not attach or describe Mr. Wooten's September 21, 2026 letter answering Ford's requests entry by entry. Doc. 360-3.

Mr. Wooten requests that the Court direct Ford, in any further filing, to describe the Dostie transcript consistently with Paragraph 10 and with the date and content of its October 15, 2024 designation.

**G. Any further sanctions request against Mr. Wooten should be presented on a defined schedule and record.**

Mr. Wooten has said from the beginning that he will answer for anything he did. Doc. 340 at 2. What he asks is that the inquiry end in a decision rather than continue indefinitely. A court invoking its inherent power "must comply with the mandates of due process." *Chambers*, 501 U.S. at 50. The Court should therefore order that, if Ford seeks further sanctions against Mr. Wooten, it file a motion within twenty-one days identifying each act on which it relies, the specific provision of the specific order it contends was violated, and the evidence supporting each; that Mr. Wooten may respond within twenty-one days; and that no further discovery directed to Mr. Wooten's communications be taken absent leave of Court on a specific showing.

## IV. CONCLUSION

Mr. Wooten respectfully requests that the Court: (1) declare the forensic investigation complete as to former counsel; (2) enter a protective order barring further discovery of Mr. Wooten's communications with his counsel, prospective and retained experts, and clients, absent leave of Court on a specific showing; (3) direct Ford to identify, sequester, and refrain from using the materials described in Part III.E pending further order; (4) set the schedule described in Part III.G for any further sanctions request; (5) direct Ford to correct the characterizations described in Part III.F; (6) confirm that its restriction on use of the NHTSA documents in this case does not restrict their use or dissemination outside of this litigation, as described in Part III.B.1; and (7) grant such further relief as the Court deems just.

## CERTIFICATIONS

Under Federal Rule of Civil Procedure 26(c)(1), Mr. Wooten certifies that he conferred in good faith with counsel for Ford in an effort to resolve this dispute without court action, at the conclusion of the parties' conference preceding Ford's motion to compel, and that Ford opposes the relief requested.

Respectfully submitted this 20th day of October, 2026.

*/s/ Nick Wooten*
Nicholas H. Wooten
NICK WOOTEN, LLC
3125 Carlton Road
Cumming, Georgia 30041
Telephone: (833) 937-6389
nick@nickwooten.com
Former Counsel for Plaintiffs, appearing on his own behalf

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Motion to Terminate Ford's Investigation as to Former Counsel, for a Protective Order, and for Related Relief with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

This 20th day of October, 2026.

*/s/ Nick Wooten*
Nicholas H. Wooten